**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

PENOBSCOT NATION )
)
Plaintiff, ) Civil Action No. 1:12-cv-00254-GZS
)
v. )
)
WILLIAM J. SCHNEIDER, )
Attorney General for the State of Maine; )
)
CHANDLER WOODCOCK, )
Commissioner for the Maine Department )
of Inland Fisheries and Wildlife; )
)
and )
)
JOEL T. WILKINSON, )
Colonel for the Maine Warden Service, )
)
Defendants. )

**FIRST AMENDED COMPLAINT**
**(INJUNCTIVE RELIEF REQUESTED)**

NOW COMES the Penobscot Nation and hereby claims as follows:

1. This case involves a controversy over the fishing and hunting rights and related regulatory and enforcement authorities of the Penobscot Nation (the “Nation”) within the Penobscot River (the “River”) in waters surrounding Indian Island and other islands in the so-called “main stem” of the River northward thereof up to the confluence of the East and West Branches (the “Main Stem”).

2. The controversy arises out of an opinion issued by Maine Attorney General, William J. Schneider, to Maine Commissioner of Inland Fisheries and Wildlife, Chandler

Woodcock, and the Colonel of the Maine Game Warden Services, Joel T. Wilkinson (collectively the "Defendants").

3. In the opinion, dated August 8, 2012, Defendant Schneider instructed Defendants Woodcock and Wilkinson that the Nation has no authority to regulate fishing or hunting in the waters of the Main Stem, and that Maine has exclusive regulatory and enforcement authority over all activities occurring there.

4. This directive is contrary to the fishing and hunting rights and related regulatory and enforcement authorities secured to the Penobscot Nation by Congress pursuant to the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§1721, *et. seq.* (the "Settlement Act").

5. This directive is also at odds with a 1988 opinion issued by former Maine Attorney General, James Tierney, and directed to former Maine Commissioner of Inland Fisheries and Wildlife, William J. Vail, recognizing that, by the terms of the Settlement Act, Maine has no authority to regulate sustenance fishing by the Nation's members in waters of the Main Stem of the River.

6. As a result of Defendant Schneider's directive to Defendants Woodcock and Wilkinson, the Defendants threaten to violate the Nation's long-standing fishing and hunting rights, and related regulatory and enforcement authorities, in waters of the Main Stem of the River, which were secured to the Nation by Congress in the Settlement Act.

7. The Nation brings this action to prevent Defendants from violating its rights

and authorities secured by federal law.

## PARTIES

8. The Plaintiff, the Penobscot Nation, is a federally recognized Indian tribe. It has occupied the islands and waters of the Penobscot River from time immemorial.

9. The principal residence of the members of the Penobscot Nation and the seat of its government are located at Indian Island within the Penobscot River, near Old Town, Penobscot County, Maine.

10. Defendant William J. Schneider serves as the Attorney General for the State of Maine.

11. Defendant Chandler Woodcock serves as the Commissioner of the Maine Department of Inland Fisheries and Wildlife.

12. Defendant Joel T. Wilkinson serves as the Colonel of the Maine Warden Service.

13. The Penobscot Nation brings this action on behalf of itself, its members, and its law enforcement officials.

## JURISDICTION

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362. The matter in controversy arises under the Constitution and laws of the United States, it is brought by a federally recognized Indian tribe, and it involves the threatened violation of federal law by state officials.

## VENUE

15. Venue is proper in this district because this action arises within this district and the parties reside or work in this district.

## BACKGROUND

### CONGRESS'S CONSTITUTIONAL PLENARY AUTHORITY OVER INDIAN AFFAIRS, AND ITS SETTLEMENT OF THE PENOBSCOT NATION'S HISTORIC LAND CLAIMS AGAINST THE STATE OF MAINE

16. Pursuant to the Settlement Act, Congress ended the historic land claims litigation brought by the United States, as trustee for the Penobscot Nation, against the State of Maine (the "State") in cases brought before this Court captioned *United States v. Maine*, Civil Nos. 1966-ND and 1969-ND (D. Me.). In so doing, Congress confirmed the Nation's status as an Indian tribal government with a government-to-government relationship with the United States, and ratified the provisions of Maine's Act to Implement the Indian Land Claims Settlement, 30 M.R.S.A. §§ 6201 *et. seq*. (the "Maine Implementing Act").

17. In enacting the Settlement Act to ratify the Maine Implementing Act and thereby compromising and settling *United States v. Maine*, Congress acted as fiduciary on behalf of the Penobscot Nation because the United States represented the interests of the Nation as its trustee and its attorney-in-fact in *United States v. Maine*.

18. Pursuant to Article I, section 8, of the United States Constitution, the Maine Implementing Act could have no force of law absent ratification by Congress.

## CONGRESS'S CONFIRMATION OF THE PENOBSCOT NATION'S ABORIGINAL HUNTING AND FISHING RIGHTS WITHIN THE PENOBSCOT RIVER

### Congress's Recognition of the Nation's Hunting and Fishing Rights within the Penobscot River and their Protection in the Settlement Act

19. Upon enacting the Settlement Act to settle *United States v. Maine* on behalf of the Penobscot Nation, Congress recognized that the aboriginal territory of the Penobscot Nation is centered on the Penobscot River and that members of the Penobscot Nation had relied upon subsistence fishing and hunting on the River from time immemorial.

20. Pursuant to the Settlement Act, Congress protected the Nation's aboriginal hunting and fishing rights as retained sovereign activities.

21. Pursuant to the Settlement Act, Congress secured the Nation's permanent right to control its members' hunting and fishing activities within the Nation's reservation, free from State authority, leaving Maine only with residual authority to prevent the Nation from exercising its hunting and fishing rights in a manner that could harm stocks in or on adjacent waters or lands, similar to the residual authority other states had been found to have in connection with federal Indian treaty hunting and fishing rights.

### Provisions of the Settlement Confirming the Nation's Sustenance Hunting and Fishing Rights and Its Regulatory Authority Over Hunting and Fishing

22. Upon enacting the Settlement Act, Congress confirmed the Penobscot Nation's aboriginal fishing rights within the Penobscot River by ratifying 30 M.R.S.A. §

6207(4), which provides, in pertinent part, that "notwithstanding any . . . law of the State, the members of . . . the Penobscot Nation may take fish, within the boundaries of their . . . Indian reservation[], for their individual sustenance."

23. The Settlement Act also confirmed the Penobscot Nation's aboriginal hunting rights within the Penobscot River by ratifying 30 M.R.S.A. § 6207(1)(A), which provides, in pertinent part, that the Nation has "exclusive authority within [its] . . . Indian territor[y] to promulgate and enact ordinances regulating . . . [h]unting, trapping or other taking of wildlife" including "special provisions for the sustenance of the individual members of the" Nation. (The phrase "Indian territory," includes the Penobscot Indian Reservation as well as land purchased by the Nation subsequent to the Settlement Act and taken into trust by the United States.)

24. In ratifying the provisions of section 6207 of the Maine Implementing Act described in paragraphs 22-23, Congress confirmed that the Nation would have exclusive authority to regulate sustenance fishing by its members within its reservation and exclusive authority to regulate hunting, trapping or other taking of wildlife by its members and by non-members of the Nation within its Indian territory (including its reservation).

25. Pursuant to the Settlement Act, Congress granted the State certain jurisdiction over the Penobscot Nation and its members "in the manner provided in the Maine Implementing Act," 25 U.S.C. § 1725(b)(1).

26. Congress did not grant Maine jurisdiction over the Nation's sustenance fishing or hunting rights described in paragraphs 22-24, other than by ratifying provisions of the Maine Implementing Act, giving residual authority to Maine's Commissioner of Inland Fisheries and Wildlife (the "Commissioner") to commence an administrative proceeding for the purpose of addressing (and, if necessary, imposing) remedial measures in the event that the exercise of said sustenance hunting or fishing causes, or is likely to cause, "a significant depletion of fish or wildlife stocks on land or waters outside the boundaries of land or waters subject to regulation by . . . the Penobscot Nation." 30 M.R.S.A. §§ 6207(1), 6207(4), 6207(6), *ratified by* 25 U.S.C. § 1725(b)(1).

**Provisions of the Settlement Allocating Enforcement Authority for Violations of the Nation's Laws Governing Hunting and Fishing**

27. Upon ratifying 30 M.R.S.A. § 6210(1) pursuant to the Settlement Act, Congress confirmed that law enforcement officers appointed by the Penobscot Nation would have exclusive authority to enforce Penobscot laws adopted under section 6207(1) of the Maine Implementing Act governing hunting, trapping or other taking of wildlife within the Nation's territory by issuing summonses to both members and non-members.

28. Upon ratifying 30 M.R.S.A. § 6206(3) pursuant to the Settlement Act, Congress further confirmed that judicial proceedings for violations of the Nation's laws governing hunting, trapping or other taking of wildlife by non-members of the Nation would be through the State courts, while violations of those laws by members of the Nation would be within the exclusive jurisdiction of the Penobscot Nation.

**The Penobscot Nation's Laws Governing Hunting and Sustenance Fishing and Their Enforcement by Penobscot Nation Game Wardens**

29. The Nation exercises exclusive regulatory authority over sustenance fishing by its members in the waters of the Main Stem of the River pursuant to laws duly promulgated and enacted by the Nation.

30. The Nation has promulgated and enacted regulations governing waterfowl hunting by non-members in the waters of the Main Stem of the River. Those laws incorporate the provisions of Maine law governing waterfowl hunting by reference, and they require non-members to carry state hunting permits along with Penobscot Nation permits.

31. The Nation has also promulgated and enacted regulations governing sustenance waterfowl hunting by members of the Nation in the waters of the Main Stem of the River.

32. Pursuant to the terms of the Maine Implementing Act, as ratified by Congress in the Settlement Act, the Nation's game wardens possess the same powers and are subject to the same limitations and training requirements as other corresponding law enforcement officers under the laws of the State.

33. The Nation's game wardens patrol the waters of the Main Stem of the Penobscot River to exercise their enforcement authority under the Settlement Act and the Maine Implementing Act.

**THE CONTROVERSY OVER THE NATION'S AUTHORITIES WITHIN THE PENOBSCOT RIVER**

34. Pursuant to the Settlement Act, Congress ratified the definition of "Penobscot Indian Territory" in the Maine Implementing Act to include the "Penobscot Indian Reservation" as defined in the Maine Implementing Act.

35. The Nation's "Indian territory," in which it exercises the exclusive authorities over hunting, trapping or other taking of wildlife described in paragraphs 23-24, and 27, therefore includes the Nation's "Indian reservation," in which the Nation's members exercise the sustenance fishing rights described in paragraph 22.

36. Congress confirmed the definition of "Penobscot Indian Reservation" in accordance with the Maine Implementing Act to mean, in pertinent part, "the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island . . . and all islands in that river northward thereof that existed on June 29, 1818."

37. In confirming this definition, Congress necessarily understood and intended the sustenance fishing right of the Nation's members and the exclusive regulatory authority of the Nation over that right, subject to the Commissioners residual authority described in paragraph 26, to be exercised in the waters surrounding Indian Island and other islands in the River northward thereof that existed on June 29, 1818.

38. Congress's confirmation of the Nation's sustenance fishing right in the Settlement Act as a retained sovereign activity would be meaningless unless that right

was in the Penobscot River itself; for there is no fishery on Indian Island or any other island in the River. The aboriginal location of the Nation's fishery is in the River.

39. Further, Congress ratified 30 M.R.S.A. § 6207(9) to establish that the term "fish" includes "anadromous" fish, which are migratory fish like Atlantic Salmon, thereby confirming that the right of the Nation's members to "take fish for their individual sustenance" is to be exercised in the Penobscot River itself. No Atlantic Salmon, or any other migratory fish, exist on Indian Island or any other island in the Penobscot River, and the Atlantic Salmon has been central to the Nation's aboriginal fishery and its culture.

40. An opinion by former Maine Attorney General, James T. Tierney, dated February 16, 1988, issued to William J. Vail, then Commissioner of Inland Fisheries and Wildlife for the State of Maine, confirmed that by the terms of the Settlement Act, the Nation's sustenance fishing right is not artificially confined to Indian Island and other islands in the River: it is in the River itself. In that opinion, Attorney General Tierney stated that fishing by members of the Penobscot Nation for their individual sustenance "*in the Penobscot River* within the boundaries of the Penobscot Reservation . . . would *clearly* fall within the purview of" the right of the Nation's members to engage in sustenance fishing, free from state authority by the terms of 30 M.R.S.A. § 6207(4). (Emphasis added.) A true copy of the opinion is attached hereto as Exhibit A.

41. The United States, through its Departments of Justice and Interior and its Environmental Protection Agency, has long held the view that, pursuant to the Settlement

Act, Congress intended the right of tribal members to take fish for their individual sustenance "within the boundaries of" the Penobscot Indian Reservation to be exercised in the Penobscot River.

42. The Penobscot Nation's exclusive regulatory authority over hunting, trapping or other taking of wildlife by the Nation's members and by non-members "within" the Nation's "Indian territory" (and the related exclusive enforcement authority of its game wardens) as described in paragraphs 23-24, and 27, is in the Penobscot River surrounding Indian Island and other islands in the River northward thereof that existed on June 29, 1818.

43. By letter dated August 8, 2012, Defendant Schneider issued an opinion to Defendants Woodcock and Wilkinson, "regarding the respective regulatory jurisdictions" of the Penobscot Nation and the State of Maine "relating to hunting and fishing on the [M]ain [S]tem of the Penobscot River." A true copy of this letter is attached hereto as Exhibit B.

44. In said letter, Defendant Schneider instructed Defendants Woodcock and Wilkinson that (a) the Penobscot Nation may not regulate activities occurring on the waters of the Main Stem, (b) the Penobscot Nation's authority to regulate hunting and fishing is confined to the islands in the Main Stem, and (c) the State has exclusive regulatory jurisdiction over activities taking place within the waters of the Main Stem.

45. By letter dated August 8, 2012, Defendant Schneider also wrote to Kirk

Francis, Chief of the Penobscot Nation, enclosing a copy of his opinion to Defendants Woodcock and Wilkinson and stating that he had issued the opinion "in order to provide guidance to the Department of Inland Fisheries and Wildlife and the Warden Service as these agencies perform their duties on the River." A true copy of this letter is attached hereto as Exhibit C.

46. In this letter, Defendant Schneider asked Chief Francis to inform him "whether the Penobscot Indian Nation disagrees with [the opinion's conclusions]" and stated that if there were disagreements, "it is important that the matter be resolved in the appropriate forum."

47. Defendant Schneider issued the August 8, 2012 opinion to Defendants Woodcock and Wilkinson at their request to guide them in taking actions in their capacities as state officials on the Main Stem of the Penobscot River.

48. Penobscot Chief, Kirk Francis, promptly responded to Attorney General Schneider's August 8, 2012 letter to inform Defendant Schneider that the Nation disagrees with the views stated in Defendant Schneider's opinion to Defendants Woodcock and Wilkinson and that Defendant's Schneider's views are also inconsistent with the position of the United States.

**REQUEST FOR DECLARTORY AND INJUNCTIVE RELIEF**

49. The Penobscot Nation repeats and realleges the foregoing paragraphs 1 through 48 as if fully set forth herein.

50. As a matter of federal law, confirmed by Congress upon enacting the Settlement Act and ratifying the provisions of the Maine Implementing Act to settle *United States v. Maine* on behalf of the Penobscot Nation,

(a) Penobscot Nation members enjoy the right to take fish for their individual sustenance, free from any state authority, from the waters surrounding Indian Island and other islands in the Penobscot River northward thereof that existed on June 9, 1818, up to the confluence of the East and West Branches of the River, *i.e.* the Main Stem.

(b) the Penobscot Nation has exclusive regulatory authority over its members' exercise of that sustenance fishing right, subject only to the residual authority granted to the Commissioner described in paragraph 26,

(c) the Penobscot Nation has exclusive authority to regulate hunting, trapping or other taking of wildlife within the waters of the Main Stem, and may include special provisions in its laws governing that activity for the sustenance of its members, subject only to the residual authority granted to the Commissioner described in paragraph 26, and

(d) Penobscot Nation game wardens have exclusive authority to enforce the Nation's laws governing hunting, trapping or other taking of wildlife within the waters of the Main Stem.

51. An actual controversy exists between the Penobscot Nation and the Defendants regarding the fishing and hunting rights and authorities of the Penobscot Nation, its members, and its game wardens within the waters of the Main Stem of the Penobscot River as described in paragraph 50.

52. As a result of Defendant's Schneider's instructions to Defendants Woodcock and Wilkinson that the Penobscot Nation "may not regulate activities occurring on . . . the River" and that "the State of Maine has exclusive regulatory authority over activities taking place on the River," Defendants (and all of their agents) purport to exercise authority to interfere with the federal rights and authorities of the Penobscot Nation, its members, and its game wardens set forth in paragraph 50.

53. The Defendants threaten to violate the federal rights and authorities of the Penobscot Nation, it members, and its game wardens set forth in paragraph 50.

54. The Penobscot Nation, its members, and its game wardens face irreparable harm if the Defendants violate the federal rights and authorities of the Nation, its members, and its game wardens set forth in paragraph 50.

55. The Penobscot Nation is correct with respect to the merits of its claims that the Penobscot Nation, its members, and its game wardens enjoy the federal rights and authorities set forth in paragraph 50.

56. The public interest will be not be harmed by an injunction preventing Defendants from violating the federal rights and authorities of the Penobscot Nation, its

members, and its game wardens set forth in paragraph 50, and any harm, if any, to the Defendants from an injunction preventing them from violating said rights and authorities is outweighed by the harm that would befall the Nation without the injunction.

57. The Penobscot Nation has no adequate remedy at law.

WHEREFORE, the Penobscot Nation respectfully requests that this Court enter judgment in its favor against the Defendants and issue a declaratory judgment that:

(a) Defendant Schneider's directives to Defendants Woodcock and Wilkinson that the Penobscot Nation has no authority to regulate hunting or fishing activities within the waters of the Main Stem of the Penobscot River, and that Maine has exclusive regulatory authority over all such activities, are incorrect and misstate the Nation's rights and authorities confirmed by Congress in the Settlement Act;

(b) Penobscot Nation members enjoy the right to take fish for their individual sustenance, free from any state authority, from the waters of the Main Stem of the River;

(c) the Penobscot Nation has exclusive regulatory authority over its members' exercise of that sustenance fishing right, subject only to the residual authority granted to the Commissioner described in paragraph 26;

(d) the Penobscot Nation has exclusive authority to regulate hunting, trapping or other taking of wildlife within the waters of the Main Stem of the Penobscot River, subject only to the residual authority granted to the Commissioner described in

paragraph 26; and

(e) Penobscot Nation law enforcement officers have exclusive authority to enforce the Nation's laws governing hunting, trapping or other taking of wildlife within the waters of the Main Stem of the River.

The Nation further respectfully requests that this Court issue an injunction, enjoining the Defendants and their agents, employees, representatives, or anyone else subject to their authority, or acting on their behalf, from engaging in any action that would violate, or threaten to violate:

(a) the right of Penobscot Nation members to take fish for their individual sustenance, free from any state authority, from the waters of the Main Stem of the Penobscot River;

(b) the exclusive authority of the Penobscot Nation to regulate its members' exercise of said sustenance fishing right, subject to the residual authority granted to the Commissioner described in paragraph 26;

(c) the exclusive regulatory authority of the Penobscot Nation over hunting, trapping or other taking of wildlife within the waters of the Main Stem of the Penobscot River, subject to the residual authority granted to the Commissioner described in paragraph 26; and

(d) the exclusive authority of Penobscot Nation law enforcement officers to enforce the Nation's laws governing hunting, trapping or other taking of wildlife

within the waters of the Main Stem of the River.

The Penobscot Nation further respectfully asks that this Court grant it costs and such other or further relief as this Court deems just or equitable.

Dated: November 6, 2012

*/s/ Kaighn Smith Jr.*
Kaighn Smith Jr., Esq.
James T. Kilbreth, Esq.
Adrianne E. Fouts, Esq.
Michael L. Buescher, Esq.
Attorneys for Plaintiff Penobscot Nation

Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101-2480
207-772-1941
ksmith@dwmlaw.com