UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PENOBSCOT NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket # 1:12-cv-00254-GZS |
| | ) | |
| MAINE ATTORNEY GENERAL, et al., | ) | |
| | ) | |
| Defendants | ) | |

**REPLY IN SUPPORT OF MOTION TO INTERVENE**

Plaintiff-Counterclaim Defendant Penobscot Nation asserts two arguments in opposition to the NPDES Permittees' motion:  (1) the Permittees' interest in not being regulated by the Plaintiff is "completely speculative if not nonexistent"; and (2), if any Permittee interest does exist, the Attorney General can adequately represent it. (Plaintiff's Opposition to Motion to intervene ("P. Opp." at 1).)  Plaintiff is incorrect.

**I.   The Permittees' interests are directly affected by this lawsuit.**

This action seeks to determine whether Plaintiff's Reservation includes the main stem of the Penobscot River.  Plaintiff appears to be arguing that the Permittees' interest in this question is speculative / nonexistent, and that the resolution of this question will not affect them, because it has already been established that Plaintiff cannot regulate the Permittees.  (*See* P. Opp. at 5-6 (noting it "extraordinary" that Permittees suggest otherwise).)

If Plaintiff could not and would not seek to impose its regulations on Permittees' discharges as a result of this lawsuit, then Permittees would have no interest in becoming a party in this action.  So Permittees asked Plaintiff to confirm what it appeared to be saying in its Opposition – that if the Court ruled in Plaintiff's favor, and found that its

Reservation includes the River, Plaintiff would not attempt to regulate Permittees as a consequence of that decision.  (*See* Ex. 1, attached hereto.)  Plaintiff declined to make this representation.  (Ex. 2.)  Hence, it now appears that Plaintiff is not in fact taking the position that it cannot or will not regulate Permittees' discharges if this Court rules that all or part of the main stem of the Penobscot River falls within its Reservation.

There are three potential outcomes to this litigation.  The Court could find that the Reservation includes no part, some part, or all of the main stem of the Penobscot River.  If the Court determines that the Reservation includes all of the main stem, or the parts of the River into which the NPDES Permittees discharge, then it is abundantly clear that, at a minimum, Plaintiff could, sharing the same status under the Settlement Acts as municipalities, seek to regulate those discharges, just like any municipality within the borders of which discharges occur.  *See* 30 M.R.S. § 6206(1) ("the Penobscot Nation, within [its] Indian territories, shall have . . . all the rights, privileges, powers and immunities . . . of a municipality."); *International Paper Co. v. Jay*, 665 A.2d 998 (Me 1995) (municipality could regulate air discharge absent preempting state statute).  Nowhere in its Opposition does Plaintiff acknowledge this point.

There is thus a direct relationship between the issue to be litigated in this appeal and an impact on the Permittees:  if this Court rules that Plaintiff's Reservation includes those parts of the Penobscot River that include Permittees' discharge pipes – as Plaintiff seeks to establish in this suit – then the result will be that Plaintiff can seek to regulate those discharges.  There is nothing "nonexistent," "speculative," or even mildly tangential about this direct and immediate cause and effect.

Indeed, the interests of some of the municipal Permittees are even starker. Putative intervenors the Towns of Howland, Lincoln, and Mattawamkeag, as municipalities bordering the main stem of the Penobscot River, encompass, under Maine law, the land under a portion of the bordering main stem of the River within their town boundaries. *See Perkins v. Inhabitants of Oxford*, 66 Me. 545, 550 (1877) (thread of stream, not bank, constitutes town boundary, absent charter language showing contrary intention). Thus, the instant action makes a direct territorial attack on these putative intervenors: these Towns say, supported by Maine law, that the disputed territory falls within their borders, while Plaintiff argues, to the contrary, that this area falls within its Reservation. It is difficult to think of a more direct interest than that of these Towns in protecting their territorial integrity.[1]

Even if, moreover, this suit established that Plaintiff's Reservation encompassed parts of the main stem of the River, but not the parts in which Permittees' discharge pipes are located, then, as explained in the Permittees' Motion, the Permittees could establish water quality standards for the parts of the main stem within its Reservation, which the State by federal law would have to recognize and consider in issuing the Permittees' discharge licenses. *See* 33 U.S.C. § 1377(e).

---

[1] As to the other municipal putative intervenors, aside from their uniform interests with the other Permittees as dischargers, some (East Millinocket and Millinocket) border tributaries and branches of the Penobscot River. If the reasoning applied by this Court as to any inclusion within the Reservation applies equally to the River outside its main stem, then the ruling in this case would undermine their territorial integrity as well.

Contrary to Plaintiff's assertion (P. Opp. at 5-6 and Ex. 2), nothing in *Maine v. Johnson*, 498 F.3d 37 (1st Cir. 2007), states differently.[2]  In *Johnson*, the First Circuit held that Maine can regulate Plaintiff's discharges, wherever located.  The Court did not rule as to the borders of Plaintiff's Reservation or the ability or inability of Plaintiff to regulate discharges as well.  Nothing at page 45 of the decision, cited by Plaintiff, supports its position.  *See id*. at 45 ("we readily uphold the position of the EPA and Maine that the nineteen non-Indian discharge sources draining into tribal waters can be regulated by the state"); *id*. at 43 ("the tribes say, the existence of Maine's authority does not automatically negate concurrent tribal authority over the same subject matter.  But the question here is whether *Maine* has adequate authority to implement permitting as to the tribes' lands') (emphasis in original).

Discarding Plaintiff's mis-assertions, it is clear that Permittees have interests, threatened to be impaired in this suit, squarely supporting their intervention under Rule 24(a).  *See City of Bangor v. Citizen Communications Co*., 2007 WL 1557426, 82 (D. Me.) (Singal, J.), *aff'd* 532 F.3d 70 (1st Cir. 2008) (state had sufficient interest to intervene in RCRA suit; "there is no dispute that the State has an interest in the property that is the subject of the action and that the disposition of this action will, as a practical matter, impact the State's ability to protect that property interest.  In fact, this Court previously found that the State owns the submerged portions of Dunnett's Cove, which

---

[2] As Plaintiff notes, many of the Permittees intervened in that action.  *See Johnson*, 498 F.3d at 41.  In that action, which originated as a petition for review to the First Circuit, Plaintiff opposed the intervention; Judge Lynch provisionally allowed intervention with the ability of the panel later to reconsider; and, after Judge Boudin, on the panel, set argument including a portion of time for intervenors, Plaintiff stated that it was withdrawing its opposition.  (*See Johnson* PACER docket, entries dated April 26, 2004, June 25, 2004, April 20, 2007, and May 3, 2007.)

make up a significant portion of the contaminated area at issue, and also concluded that the Court could order the City and Citizens to take actions to clean up this State-owned property").

## II.   Permittees have met their light burden to show that no existing party will adequately represent their interests.

The latest First Circuit published analysis of the adequacy criterion for intervention is set forth in *B. Fernandez & Hnos. v. Kellogg USA, Inc.*, 440 F.3d 541, 546 (1st Cir. 2006), in which the Court reversed a denial of intervention.  There, the First Circuit noted, *inter alia*, that when a putative intervenor's interest is strong, its burden under this criterion is light.  *Id.* at 547.  One way to meet this burden, the Court stated, is for the putative intervenor "to demonstrate that its interests are sufficiently different in kind or degree from those of the named party."  *Id.*; *see also id.* at 547 ("without a perfect identity of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party"), citing *Tell v. Trustees of Dartmouth Coll.,* 145 F.3d 417, 419 (1st Cir. 1998).

Applying these principles as most recently articulated by the Court of Appeals, Permittees' burden is met.  The Permittees' interests are strong; as noted, for some, their very territorial integrity is at stake.  Their interests also differ from those of the State – for example, all the Permittees are licensed dischargers, unlike the State, with direct interests, not as regulators, but rather as regulated entities.  *See State v. Director, U.S. Fish and Wildlife Service*, 262 F.3d 13, 20 (1st Cir. 2001) (noting that intervention has been granted in the Circuit in actions involving governmental entities when the intervenors had "direct private interests"); *Conservation Law Found. v. Mosbacher,* 966 F. 2d 39, 44 (1st Cir. 1992) (reversing denial of intervention, finding, *inter alia*, that the U.S. Secretary of

Commerce did not adequately represent the interests of fishing groups; "[w]hile the Secretary may well believe that what best serves the public welfare will also best serve the overall interests of fishermen, the fact remains that the fishermen may see their own interest in a different, perhaps more parochial light.").

In the past, moreover, the State has taken a position on the issue presented that is different from that of Permittees, suggesting that portions of the River may fall within the Reservation -- which position if established, would, as noted above, directly and adversely affect Permittees.  (*See* Ex. 3 at 20, paragraph beginning "First").[3]  *See Cotter v. Massachusetts Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 35 (1st Cir. 2000) (reversing denial of intervention where promoted officers and minority law enforcement officers association moved to intervene in civil rights action defended by the City of Boston; "In this case, enough likelihood of conflict or divergence of interest exists to defeat any claim that 'the applicant's interest is adequately represented by existing parties'").  While Permittees hope that they and the State of Maine currently and in the future will share similar views, "[a]n intervenor need only show that representation may be inadequate, not that it is inadequate."  *Conservation Law Foundation*, 966 F.2d at 44, citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972).

In sum, sometimes governmental entities are deemed to provide adequate representation and sometimes not.  When, as here, the nature of the intervenors' interests differs qualitatively from those of the governmental entity and their positions may differ

---

[3] The pleadings to date have not required the State to be precise as to its current position.

on the legal issues, and the outcome of the litigation could have a direct and profound impact on the intervenors, the requirements of Rule 24(a)(2) have been met.[4]

## CONCLUSION

For the reasons given above, the Court should grant the NPDES Permittees leave to intervene, either as of right or permissive, pursuant to F.R. Civ. P. 24.


DATED:  March 19, 2013          */s/ Matthew D. Manahan*  
                                Matthew D. Manahan  
                                Catherine R. Connors  
                                PIERCE ATWOOD LLP  
                                Merrill's Wharf  
                                254 Commercial Street  
                                Portland, ME  04101  
                                207-791-1100  
                                *Attorneys for the NPDES Permittees*

---

[4]  In a footnote, Plaintiff claims a lack of Art. III standing by the Permittees.  (P. Opp. at 6 n.4.)  While such a cursory allusion without any development waives argument, *Harron v. Town of Franklin*, 660 F.3d 531, 535 n.1 (1st Cir. 2011) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived."), Article III standing is a jurisdictional issue that can be raised at any time.  Standing, however, is not a requirement for intervention, and if it were, Permittees would meet that requirement:  their interests, as explained, are not "highly contingent," as Plaintiff asserts.  *See also Daggett v. Comm. on Governmental Ethics & Election Practices*, 172 F.3d 104, 109-110 (1st Cir. 1999) (open question if standing required; in any event, putative intervenors had standing because they had concrete stake in the outcome of the litigation distinct from general population).  *See also Fideicomiso De La Tierra Del Cano Martin Pea v. Fortuho*, 604 F.3d 7, 16 (1st Cir. 2010) (land trust had Art. III standing to challenge law transferring land); *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) (entity seeking federal licensing approval had Article III standing to challenge state regulator's ability to impose conditions; "Because [the state regulator]'s regulatory requirements do affect Weaver's Cove's ultimate ability to receive federal approval, we conclude that Weaver's Cove has standing.").  Regulated entities have standing to participate in litigation deciding who can regulate them, and to participate in litigation determining their territorial borders.

{W3591854.1}

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2013, I electronically filed the foregoing

document entitled Reply in Support of Motion to Intervene with the Clerk of Court using

the CM/ECF system which will send the notification of such filing to the following:

> **KAIGHN SMITH, JR.**
> Drummond Woodsum
> 84 Marginal Way
> Suite 600
> Portland, ME  04101-2480
> 207-772-1941
> Email: ksmith@dwmlaw.com

> **PAUL D. STERN**
> Office of the Maine Attorney General
> Six State House Station
> Augusta, ME  04333-0006
> 207-626-8568
> Email: paul.d.stern@maine.gov

DATED:  March 19, 2013               */s/ Matthew D. Manahan*
                                      Matthew D. Manahan

                                      PIERCE ATWOOD LLP
                                      Merrill's Wharf
                                      254 Commercial Street
                                      Portland, ME 04101
                                      207-791-1100

                                      *Attorneys for the NPDES Permittees*