UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PENOBSCOT NATION,                        )
                                         )
                      Plaintiff,         )
                                         )
         v.                              )          Docket # 1:12-cv-00254-GZS
                                         )
MAINE ATTORNEY GENERAL, et al.,          )
                                         )
                      Defendants         )


**EXHIBIT 3**

**TO**

**REPLY IN SUPPORT OF MOTION TO INTERVENE**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Bangor Hydro–Electric Company          )          Project No. 2534
                                                                  (Milford)

STATE OF MAINE'S
RESPONSE TO THE DEPARTMENT OF THE INTERIOR'S
FILING OF PURPORTED 4(e) CONDITIONS
ON JULY 17, 1996

The State of Maine and its State Planning Office (collectively the "State")[1]

respond as follows to the Department of the Interior's ("DOI") July 17, 1996 filing of

purported conditions pursuant to section 4(e) of the Federal Power Act, 16 U.S.C.

§ 797(e), in connection with Bangor Hydro–Electric Company's ("Bangor Hydro")

license application for the Milford Hydroelectric Project, FERC No. 2534, located on

the Penobscot River in Maine.

Briefly stated, the Department of the Interior has no authority to prescribe

section 4(e) conditions for the Milford Project. This is true for two reasons. First

and foremost, the United States has no ownership interest in the Penobscot Indian

Reservation or any lands within that reservation that are within or adjacent to the

impoundment area of the Milford Project. As a result, under *Federal Power

Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 110–15 (1960), the Penobscot

Indian Reservation does not qualify as a reservation within the meaning of section

4(e) of the Federal Power Act.

---

[1]The State Planning Office was granted leave to intervene in these proceedings to represent the interests of the State of Maine on November 21, 1989. In this case, the State's interest is in protecting the integrity of the Maine Indian Claims Settlement Act and in protecting the State's regulatory jurisdiction under its water quality laws and under section 401 of the Clean Water Act.

- 2 -

In fact, as discussed below, DOI's current claim that the Maine Indian Claims

Settlement Act recognizes the Penobscot Reservation as land held in trust by the

United States is directly belied by the testimony of DOI's own representatives before

Congress at the time the Maine Indian Claims Settlement Act was enacted.

While the foregoing is sufficient to refute DOI's claim that it has authority to

prescribe section 4(e) conditions in this proceeding, there is a second reason as well.

Under section 6(h) of the Maine Indian Claims Settlement Act, 25 U.S.C. § 1725(h),

laws of the United States which accord a special status to Indian lands or

reservations and which would affect or preempt regulatory jurisdiction of the State

of Maine are not applicable within the State of Maine.  Because section 4(e) would

affect or preempt the State's regulatory jurisdiction under Maine's water quality

laws, 38 Me.Rev.Stat.Ann. §§ 464–70, and under section 401 of the Clean Water Act,

33 U.S.C. § 1341, section 4(e) is inapplicable in Maine by reason of section 6(h) of the

Maine Indian Claims Settlement Act.  Thus, DOI's assertion of authority under

section 4(e) would fail even if the Penobscot Reservation were somehow found to

qualify as a reservation within the meaning of the Federal Power Act.

I.    THE PENOBSCOT RESERVATION IS NOT A RESERVATION WITHIN THE
      MEANING OF THE FEDERAL POWER ACT.

We note at the outset that the Commission has already ruled on this precise

issue in connection with the 1984 West Enfield Project. *Bangor Hydro–Electric Co.*

(Project No. 2600), 27 FERC ¶ 61,467 (1984).  In that proceeding, DOI concurred that

the tribal lands in question were held by the State of Maine in trust for the Penobscot

- 3 -

Nation and were not owned by the United States.[2]  Based on that advice but also on

its own review of the legislative history of the Maine Indian Claims Settlement Act

(the "Maine Settlement Act" or "MICSA"), the Commission found, relying on *FPC*

*v. Tuscarora Indian Nation*, 362 U.S. 99 (1960), that the Penobscot Reservation did

not qualify as a "reservation" within the meaning of the Federal Power Act because

the United States did not have any proprietary interest in the Reservation:

> An analysis of the legislative history of MICSA confirms
> Interior's and the Applicant's beliefs that Congress did not
> intend that the United States either would own or have a
> proprietary interest in the proposed project lands which
> would be located within the Nation's existing reservation.
> The legislative history confirms that the only Nation's
> lands in which the United States would have an interest
> were those which were to be acquired after the enactment
> of MICSA and not the already existing reservations.

27 FERC ¶ 61,467 at 61,875 (footnotes omitted).

The State submits that the Commission's conclusion in the West Enfield

proceeding was unquestionably correct.  As discussed below, this follows from the

Supreme Court's *Tuscarora* decision, from the general principles of law applicable to

Indian lands in the original 13 states, and from the language and legislative history

of the Maine Indian Claims Settlement Act.[3]

In *Tuscarora*, the Supreme Court held that section 4(e) applies

---

[2]*See* DOI letter of May 17, 1983 re:  Project No. 2600.

[3]Additional evidence as to the correctness of this conclusion can be seen in the Penobscot
Nation's unsuccessful attempt to enact legislation that would have expressly conferred reservation
status under section 3(2) of the Federal Power Act upon the Penobscot Reservation, as outlined in Bangor
Hydro's letter of November 1, 1994 in this proceeding.  Obviously, no such legislation would be
necessary if, as DOI now insists, the Penobscot Reservation is already a reservation on whose behalf
section 4(e) conditions may be prescribed.

- 4 -

> only if the lands involved are a 'reservation' in the sense
> of that term as defined and used in [the Federal Power
> Act]. That by generally accepted standards and common
> understanding these Tuscarora lands may be part of a
> 'reservation' is not at all decisive of whether they are such
> within the meaning of the Federal Power Act. Congress
> was free and competent artificially to define the term
> 'reservations' for the purposes it prescribed in that Act.

362 U.S. at 111. The Court concluded that the language and legislative history of the

Federal Power Act "leaves us with no doubt" that Congress intended to limit

"reservations" for purposes of sections 3(2), 4(e) and 10(e) of the Federal Power Act

to those reservations *"located on lands 'owned by the United States' . . . or in which*

*[the United States] owns a proprietary interest."* 362 U.S. at 114 (emphasis added).

In reaching this conclusion, the *Tuscarora* court specifically noted that the

general trust relationship between the United States and Indian tribes -- described as

"the national 'paternal interest' in the welfare and protection of Indians" -- was not

sufficient to allow prescription of section 4(e) conditions unless the United States

also owned a *proprietary* interest in the Indian lands in question. 362 U.S. at 114–15.

For this reason, the Court found that the specific Tuscarora lands at issue, which

were held in fee simple by the Tuscarora Indian Nation, did not qualify as a

reservation within the meaning of the Federal Power Act. 362 U.S. at 115.

Looking, therefore, to the specific ownership status of the Penobscot

Reservation, we begin with the well-settled proposition that in the original 13 states

(including Massachusetts, which included Maine until 1820), the United States did

not hold fee title to Indian lands or reservations as it did in the rest of the

continental United States. *E.g., Oneida Indian Nation v. County of Oneida*, 414 U.S.

- 5 -

661, 670 (1974).  In the original 13 states, title to Indian lands was historically either held by the respective states, subject to a tribal right of exclusive use and occupancy, or by the relevant tribe, with the state possessing a preemptive right to purchase upon the extinguishment of the tribe's interest.  *See Oneida*, 414 U.S. at 670.  In either event, however, the United States did not have any proprietary interest.[4]

What this means, simply stated, is that the United States did not historically have any proprietary interest in the Penobscot Reservation and that unless DOI can show that there has been a subsequent transfer of such an interest to the United States, its assertion of authority under section 4(e) must fail.

No such transfer has been made.  Indeed, to the State's knowledge, DOI has not even attempted to show the existence of such a transfer.  Although requested by the Commission staff's July 8, 1993 letter to show "how and when" its title to any reservation land was obtained, DOI has not responded to that request.  Instead, in the June 5, 1992 memorandum which is the only justification DOI has offered for its

---

[4]As support for its claim that the United States has a proprietary interest in the Penobscot Reservation, DOI's June 5, 1992 memorandum relies in passing upon a New York district court decision, *Cayuga Indian Nation v. Cuomo*, 758 F.Supp. 107 (N.D.N.Y. 1991).  That case ruled that, under the specific circumstances presented there, New York did not possess any proprietary interest in certain Indian lands, holding instead at most a preemptive right to purchase the lands in question upon the extinguishment of the Indians' interest.  758 F.Supp. at 116.  The *Cayuga* court also ruled that since Congress has plenary power with respect to Indian tribes and Indian lands, New York's exercise of its preemptive right would be governed solely by federal law.  *Id.*  However, the proposition that federal law governs does not translate into federal ownership.  *Cayuga* did not hold that the United States had obtained any proprietary interest in the lands in question and any contrary interpretation of *Cayuga* would be inconsistent with well-settled law as exemplified by the Supreme Court's decision in *Oneida*, 414 U.S. at 670 (title to Indian land in original 13 states not held by United States).

- 6 -

assertion of authority under section 4(e),[5] DOI relies almost exclusively on the argument that Congress somehow converted the Penobscot Indian Reservation into trust lands owned by the United States when it enacted the Maine Settlement Act in 1980. This claim, however, finds absolutely no basis in the Maine Settlement Act and is in fact directly inconsistent with the Congressional testimony of DOI representatives at the time that the Maine Settlement Act was enacted.

The Maine Settlement Act, Pub.L.No. 96–420, 94 Stat. 1985 (1980), codified at 25 U.S.C. §§ 1721–35, expressly ratified parallel state legislation enacted the same year by the Maine Legislature, Me.Laws 1979, ch. 732, 30 Me.Rev.Stat.Ann. §§ 6201–14 (the "Maine Implementing Act"). Together, the Maine Settlement Act and the Maine Implementing Act were designed to simultaneously settle the claims of the Passamaquoddy Tribe and the Penobscot Nation to a land area covering approximately two–thirds of the State and to resolve issues relating to the jurisdiction of the State over the Maine tribes.

As the Commission noted in its *West Enfield* decision, 27 FERC ¶ 61,467 at 61,874–75, the Maine Settlement Act dealt separately with two categories of tribal lands. The first category consisted of existing tribal reservations, lands that had previously been reserved to the Tribes by treaties with the states of Massachusetts and Maine. *See* 30 Me.Rev.Stat.Ann. §§ 6203(5), (8). The second category consisted of private lands to be acquired by the Secretary of the Interior for the tribes after the

---

[5]Memorandum of June 5, 1992 from Catherine E. Wilson, Associate Solicitor, Indian Affairs, to Eastern Area Director, Bureau of Indian Affairs (Attachment F to August 23, 1993 DOI letter responding to Commission's July 8, 1993 letter).

-7-

enactment of the Maine Settlement Act with funds provided by the Act. *See* 25
U.S.C. § 1724(d).

While the Maine Settlement Act provides that subsequently acquired lands
are to be held in trust by the United States for the benefit of the Tribes, *id.*, there is
absolutely nothing in the Act which changes the status of the existing reservation
lands. Specifically, the Act contains no provision that could remotely be construed
as conveying any proprietary interest in the existing Penobscot Reservation to the
United States. As a result, as the Commission concluded in the West Enfield
proceeding, the existing Penobscot Reservation does not qualify as a "reservation"
within the meaning of the Federal Power Act.

In this connection, it also bears emphasis that when Congress wished to make
specific federal legislation applicable in Maine, it said so expressly. *See* 25 U.S.C.
§ 1727(d) ("For the purposes of this section, the Passamaquoddy Indian Reservation
and the Penobscot Indian Reservation are 'reservations' within the meaning of
section 4(10) of [the Indian Child Welfare Act of 1978]").

The sole statutory provision relied upon by DOI to support its position that
the Reservation was somehow converted by the Maine Settlement Act into land
held in trust by the United States is section 5(i)(1) of the Act, 25 U.S.C. § 1724(i)(1).
That subsection provides that "trust or restricted land or natural resources within
the Passamaquoddy Indian Reservation or the Penobscot Indian Reservation may be
condemned for public purposes pursuant to the Maine Implementing Act." DOI
suggests that the reference to trust land "within" the Reservations demonstrates

- 8 -

that the Reservations were regarded by Congress as land held by the United States in trust. This is simply incorrect.

First, section 5(i) cannot conceivably be construed as conveying the Reservations to the United States, nor can it be construed as converting existing Reservation lands into trust lands. Instead, section 5(i) merely anticipates the possibility that, sometime in the future, trust land *might* exist within the Reservation and be subject to condemnation proceedings.

Under the Maine Implementing Act, the respective tribal reservations are defined as those lands reserved to the respective tribes by prior treaties, excepting any portion of those lands transferred outside the Tribes subsequent to the treaties and prior to the Maine Implementing Act. *See* 30 Me.Rev.Stat.Ann. §§ 6203(5) (Passamaquoddy Reservation), 6203(8) (Penobscot Reservation). In both cases, the definitions also provide that lands originally reserved to the Tribes in the prior treaties that had subsequently been transferred outside the tribes would again be included within the respective reservations if such lands were "hereafter acquired by [either Tribe] *or the secretary on its behalf.*" 30 Me.Rev.Stat.Ann. §§ 6203(5), (8) (emphasis added).[6] Thus, the Act specifically contemplates the possible acquisition of previously transferred reservation lands which, when reacquired, would again be included within the reservations. Moreover, it also expressly contemplates that

---

[6]In the case of the Passamaquoddies, certain lands reserved to the Tribe by the 1794 treaty that had subsequently been transferred are eligible to be reincluded in the Reservation. *See* 30 Me.Rev.Stat.Ann. § 6203(5). In the case of the Penobscots, land within Nicatow Island is eligible to be reincluded within the Reservation. *See* 30 Me.Rev.Stat.Ann. § 6203(8).

- 9 -

such lands might be reacquired by the Secretary on behalf of the tribes, in which case the lands in question would become trust lands within the reservations.

In section 5(i) of the Maine Settlement Act, Congress was merely addressing this latter possibility -- that, sometime in the future, land eligible for reinclusion in the reservations would be acquired by the Secretary as trust land.  Contrary to DOI's contention, section 5(i) does not demonstrate either that Congress regarded the whole of either reservation as trust land or that it believed that there were any existing trust lands within the reservations.  Moreover, the issue of whether trust lands that might be acquired within the Penobscot Reservation in the future would constitute a "reservation" within the meaning of the Federal Power Act need not be decided in this case because DOI has not even argued, let alone demonstrated, that it has acquired any trust lands within the Penobscot Reservation following enactment of the Maine Settlement Act.  Thus, the existence of section 5(i) of the Maine Settlement Act does not in any way alter the conclusion that the United States does not have any proprietary interest in the Penobscot Reservation that would permit DOI's assertion of authority under section 4(e) of the Federal Power Act.

This conclusion is dramatically reinforced by an examination of the legislative history of the Maine Settlement Act.  Indeed, the status of the existing tribal lands was the subject of a specific inquiry when DOI representatives testified before the House Interior Committee in connection with the Maine Settlement Act.  Representing the Department of the Interior at the House hearing were Under Secretary James Joseph, Deputy Assistant Secretary for Indian Affairs Tom

- 10 -

Fredericks, and Tim Vollmann from the Office of the Solicitor.  These officials are
testifying in support of an amendment in the nature of a substitute that was being
offered by the federal government for the legislation as originally proposed. *See*
Hearing before the House Committee on Interior and Insular Affairs on H.R. 7919,
96th Cong. 2d Sess. 29–31 (1980) (hereafter "1980 House Hearing").  At that hearing,
Under Secretary Joseph was specifically asked by Franklin Ducheneaux, Special
Counsel to the Committee, about the status of "the current lands of the tribes" after
enactment of the proposed legislation.  1980 House Hearing at 42.  Mr. Joseph
referred the question to Mr. Vollmann – previously described as having been
closely involved in the negotiations on the bill, *see* 1980 House Hearing at 38 -- and
the following exchange occurred:

> MR. DUCHENEAUX.  Does the substitute provide that
> these lands will now be held by the United States in trust
> for the tribes?
>
> MR. VOLLMANN.  It does not.  None of the parties
> propose that the status of the title of the land be changed
> in any way except that there is a provision in both the bill
> as introduced and in the substitute that would subject
> these lands to Federal restrictions against alienation,
> which in our view they always were under the Indian
> Nonintercourse Act.
>
> The State disputed that.
>
> MR. DUCHENEAUX.  Does the State currently have fee
> title to these lands which it holds in trust for the tribes?
>
> MR. VOLLMANN.  My understanding as to the title of
> those lands is that fee title is held by the State, but that the
> tribes have a right of exclusive use and occupancy to those
> lands.

- 11 -

MR. DUCHENEAUX.  That will not change by this legislation?

MR. VOLLMANN.  That will not change.

MR. DUCHENEAUX.  That is all, Mr. Chairman.

1980 House Hearing at 42–43.

This testimony directly belies DOI's current claim that the Maine Settlement Act either recognized the existing Penobscot Reservation to be trust land in which the United States held a proprietary interest or converted the existing Penobscot Reservation into such trust land.  It is all the more powerful because the legislation of which Mr. Vollmann was speaking -- the amendment in the nature of a substitute proposed by the Department of the Interior -- became, with certain additional changes, the version of the Maine Settlement Act that was ultimately enacted.[7]  Specifically, the substitute as to which Mr. Vollmann was testifying was the source of the provision that eventually became Section 5(i) of the Act.  *See* section 5(h) of Interior's proposed substitute, 1980 House Hearing at 149.  Since DOI both authored section 5(i) and unequivocally represented to Congress that the substitute legislation -- including section 5(i) -- did not change the status of existing tribal lands or provide that those lands would be held in trust by the United States, it is simply untenable for DOI to claim the contrary in this proceeding.

Finally, as the Commission noted in its West Enfield decision, the relevant House and Senate Committee Reports both unequivocally confirm that the Maine

---

[7]The substitute legislation proposed by the Department is reprinted in the 1980 House Hearing at 136–58.

- 12 -

Settlement Act did not transfer or create any federal proprietary interest in the

existing tribal reservations.  27 FERC ¶ 61,467 at 61,875.  Thus, both Committee

Reports expressly state:

> The settlement envisions four categories of Indian land in
> Maine:  individually assigned existing reservation land,
> existing reservation land held in common,
> newly–acquired tribal land within "Indian territory," and
> newly–acquired tribal land outside "Indian territory."
> Only newly–acquired land within Indian territory and
> newly–acquired tribal land to be held in trust for the
> Houlton Band of Maliseet Indians will be taken in trust by
> the United States.  *Existing land within the reservations,*
> *whether held by individuals pursuant to a use assignment*
> *or in common by the Tribe as a whole, will not be taken by*
> *the United States in trust.*  These lands will simply be
> subject to a federal restriction against alienation which
> will prevent their loss or transfer to a non–tribal member.

S.Rep.No. 96–957, 96th Cong., 2d Sess. 15 (1980); H.R. Rep. No. 96–1353, 96th Cong.,

2d Sess. 15–16 (1980), *reprinted in* 1980 U.S.C.C.A.N. at 3791 (emphasis added).

     In sum, neither the Maine Settlement Act nor the Maine Implementing Act

evidences any intent to change the existing status of Maine's Indian Reservations.

At most, those Acts indicate that federal trust lands would exist within the

Reservation only if the Secretary subsequently acquires reservation land originally

reserved to the Tribes but subsequently transferred away.  Moreover, DOI expressly

represented to Congress that its proposed substitute legislation would not alter the

status of existing tribal lands, and the relevant Congressional reports confirm that

the existing tribal reservations were not trust lands held by the United States.  The

only possible conclusion is that the United States has no proprietary interest in the

Penobscot Reservation that could serve as the basis for section 4(e) conditions.

- 13 -

Under these circumstances, DOI's resort to the principle that ambiguous statutory provisions should be construed in favor of Indians is fully answered by the statement of the Supreme Court in *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986);

> [t]he canon of construction regarding resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist, nor does it permit disregard of the clearly expressed intent of Congress.

II.  ALTERNATIVELY, THE APPLICATION OF SECTION 4(e) TO THE PENOBSCOT RESERVATION IS PRECLUDED BY SECTION 6(h) OF THE MAINE SETTLEMENT ACT.

In view of the conclusion that the Penobscots do not live on a "reservation" within the meaning of the Federal Power Act under *Tuscarora*, the issue of whether section 4(e) is applicable in Maine under the Maine Settlement Act need not be reached.  Assuming for the sake of argument, however, that the United States were somehow found to possess a proprietary interest in the Penobscot Reservation, we submit that section 4(e) would not be applicable in the State of Maine by reason of section 6(h) of the Maine Settlement Act.  That section provides as follows:

> Except as otherwise provided in this Act, the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine, except that no law or regulation of the United States (1) which accords or relates to a special status or right of or to any Indian, Indian nation, tribe or band of Indians, Indian lands, Indian reservations, Indian country, Indian territory or land held

- 14 -

> in trust for Indians and also (2) which affects or preempts
> the civil, criminal, or regulatory jurisdiction of the State
> of Maine, including, without limitation, laws of the State
> relating to land use or environmental matters, shall apply
> within the State.

25 U.S.C. § 1725(h).

Section 6(h) is one of several provisions in the Maine Settlement Act and the

Maine Implementing Act which were designed to implement a crucial premise of

the settlement from the State's point of view -- the principle that, except as

specifically provided in the Act, Maine Indians and Indian lands shall be subject to

the laws of the State "to the same extent as any other person or lands . . . ."

30 Me.Rev.Stat.Ann. § 6204.  This principle was specifically "approved, ratified, and

confirmed" by Congress in section 6(b)(1) of the Maine Settlement Act, 25 U.S.C.

§ 1725(b)(1).[8]  Section 6(h) is also consistent with the statement by the attorney for

the tribes at the time of settlement that federal Indian law was excluded in Maine

"in part because that was the position the State held to in the negotiations . . . [and] it

is also true to say that the tribes are concerned about the problems that existed in the

West because of the pervasive interference and involvement of the federal

government in internal tribal matters."  Hearings before the Senate Committee on

Indian Affairs on S.2829, 96th Cong. 2d Sess. 181–82 (1980).

---

[8]As the Maine Supreme Judicial Court noted in *Penobscot Nation v. Stilphen*, 461 A.2d 478,
488–89 n.7 (Me. 1983), *appeal dismissed for want of a substantial federal question*, 464 U.S. 923 (1983),
the attorney for the tribes at the time of settlement acknowledged that the subjection of the tribes to
state jurisdiction was the essential *quid pro quo* which the tribes had to offer to obtain the State's
agreement to a settlement. *See* March 28, 1980 Statement of Thomas N. Tureen before the Joint Select
Committee on Indian Affairs of the Maine Legislature (Addendum A to this Response) at A3–A4.

- 15 -

In particular, section 6(h) is designed to protect against any incursion upon Maine's regulatory jurisdiction by federal laws giving a special status to either Indians or Indian lands.  If section 4(e) were not otherwise inapplicable by reason of the fact that the United States has no proprietary interest in the Penobscot Reservation, it would potentially constitute precisely the kind of incursion which section 6(h) of the Maine Settlement Act is designed to address.

First, there is no doubt that section 4(e) accords a special status or right to those Indian reservations in which the United States has a proprietary interest. Indeed, DOI argues that "Congress inserted § 4(e) into the FPA for the purpose of protecting Indian lands."  June 5, 1992 memorandum at 8.

It is also evident that section 4(e) -- if otherwise applicable -- would "affect[ ] or preempt [ ] the . . . regulatory jurisdiction of the State of Maine."  In this connection, it bears emphasis that by its use of the words "affects or preempts," section 6(h) is not limited to protecting state laws against preemption but goes further to protect Maine's regulatory jurisdiction from being affected in any way.

This conclusion is supported by the Senate Committee Report, which lists the Indian Child Welfare Act as an example of a federal statute that is specifically made applicable within Maine under section 8 of the Maine Settlement Act, 25 U.S.C. § 1727, but which would otherwise be inapplicable pursuant to section 6(h) because it would "affect" the civil jurisdiction of the State over child custody proceedings. S.Rep.No. 96–957, 96th Cong., 2d Sess. 30 (1980).  The Senate Committee Report also lists the Clean Air Act, 42 U.S.C. § 7474, as an example of a federal statute which

- 16 -

accords special rights to Indian tribes and Indian lands and which would not be applicable in Maine because it would interfere with the State air quality laws. *Id.* at 31.

The specific section of the Clean Air Act which the Senate Committee Report cites as being inapplicable in Maine, 42 U.S.C. § 7474, is a provision that permits tribes to supplant state air quality standards by designating their own air quality standards for tribal lands.[9] If otherwise applicable, section 4(e) would have essentially the same effect in that it would authorize DOI (acting on behalf of the Penobscot Nation) to supplant Maine's application of its water quality standards, as applied to the Milford Project in the State's section 401 certification, with new water quality standards for the special benefit of the Penobscot Nation.

For example, with respect to downstream passage of anadromous fish, DOI's section 4(e) condition No. 1 goes far beyond the measures approved by the State in its 401 certification by effectively setting a "no net loss" standard with all losses to be compensated for by off–site in–basin mitigation measures. DOI's condition No. 1 also includes an open–ended requirement that Bangor Hydro shall "implement [any future] measures identified by the FWS as necessary for improving fish passage" in light of future studies.

Thus, DOI has simply overridden the conditions which the State found were adequate to meet state water quality standards and substituted its own, far more onerous conditions. Obviously, the State's regulatory jurisdiction is affected if the

---

[9]The Clean Water Act has a similar provision. *See* 33 U.S.C. § 1377.

- 17 -

conditions imposed by the State to meet the State's water quality standards can be rendered irrelevant by whatever new conditions DOI sees fit to impose on behalf of Indians.[10]

Similarly, the directives set forth in paragraph 6 of DOI's section 6(e) conditions ("Water Quality") consist of requirements that the State did not find necessary to impose and, perhaps even more importantly, include requirements with respect to contaminants that, in the State's view, are not properly the responsibility of the Applicant. Absent any hard evidence that the Milford Project is causing or contributing to any contamination of the river by heavy metals or chlorinated benzene compounds (and the State is aware of none), it is wholly unwarranted to require the Applicant to implement measures to remediate such contamination. *See, e.g.,* ¶ 6(c)(v) of DOI's section 4(e) conditions. The proper targets of any effort to remedy the presence of such contaminants as heavy metals and dioxin are the upstream sources discharging those contaminants into the river. The State's water quality program is based on this premise. DOI's proposal to use section 4(e) as a lever to compel Bangor Hydro to remediate a contaminant problem which it did not cause is contrary to state policy and plainly in contravention of section 6(h) of the Maine Settlement Act.

Several of DOI's other conditions are consistent with the State's section 401 certification conditions except that, in each case, DOI has substituted detailed

---

[10]We are not suggesting that the State's decisions in its 401 certifications cannot be affected by further requirements imposed by federal agencies. Section 6(h), however, protects the State's regulatory jurisdiction from federal incursions based on statutes giving a special status or special rights to Indians.

- 18 -

requirements dictated by DOI in the first instance.  In contrast, the comparable state conditions allow the Applicant to devise the measures to be taken and submit them for governmental approval.  *See, e.g.*, DOI conditions 5 and 17, compared with State conditions 2(C) and 8(B).[11]  Obviously, state regulatory jurisdiction is affected whenever the federal government supplants the consultative process envisaged by the State by dictating detailed requirements in its stead.

Other glaring examples of how DOI's section 4(e) authority — if otherwise applicable -- would affect the regulatory jurisdiction of the State in contravention of 25 U.S.C. § 1725(h) are conditions 2, 3 and 7 of DOI's July 16, 1996 submission.  Those conditions contain detailed requirements with respect to upstream and downstream passage of eels and detailed requirements with respect to an alleged erosion problem.  These issues were not addressed in the State's section 401 certification for one reason:  neither the passage of eels nor the issue of erosion were raised as significant issues in the State's section 401 proceeding, either by the Penobscot Indian Nation or by anyone else.  However, the State's regulatory jurisdiction is clearly "affected" within the meaning of section 6(h) of the Maine Settlement Act if a Maine tribe can simply bypass the procedure set by the State for the issuance of a section 401 certification, *see* 38 Me.Rev.Stat.Ann. § 464(4)(F)(3), and then utilize DOI's exercise of prescriptive section 4(e) authority to raise relevant issues for the first time.

---

[11]In this respect, DOI consistently takes a more authoritarian approach than the State, perhaps motivated by the philosophy that "he governs best, who governs most."

- 19 -

It is of course possible that issues involving eel passage and erosion only became important to the Penobscot Nation subsequent to the issuance of the State's section 401 certification in October of 1992. However, if DOI has section 4(e) authority, it would be entitled to exercise that authority in any future case even if the Penobscot Nation deliberately chose to bypass the State's water quality certification procedure in its entirety. Indeed, if section 4(e) is applicable, it would be cost effective for the Penobscot Nation to ignore the State procedures and focus entirely on section 4(e). In this respect, Maine's regulatory jurisdiction under its water quality laws and under section 401 of the Clean Water Act would be rendered irrelevant so far as issues involving Maine tribes are concerned.

Plainly, if Maine's regulatory jurisdiction would be rendered irrelevant insofar as Maine tribes are concerned, that jurisdiction would be "affected" within the meaning of section 6(h) of the Maine Settlement Act. If Maine tribes can simply bypass the State's certification procedure and if DOI's section 4(e) authority can trump any conditions imposed by the State in any event, section 6(h) of the Maine Settlement Act would come into play and would preclude the exercise of section 4(e) authority on behalf of Indian tribes or Indian lands within the State of Maine.

III.    OTHER ISSUES.

Because the State believes that the foregoing arguments are sufficient to refute DOI's claim that it has authority to prescribe section 4(e) conditions with respect to the Milford Project, we see no reason to elaborate on other issues that

- 20 -

have been raised in this proceeding but that are not necessary to a disposition of the

section 4(e) issue.  We will, however, briefly state our position with respect to three

issues that relate to the Maine Settlement Act and the Maine Implementing Act.

First, the State believes that members of the Penobscot Indian Nation have a

right to take fish for individual sustenance pursuant to the provisions of the Maine

Implementing Act from that portion of the Penobscot River which falls within the

boundaries of the Penobscot Indian Reservation.  To the extent that it has been

argued that the Penobscots have no sustenance fishing rights in the Penobscot

River, we disagree.  Although no specified amounts or types of fish are guaranteed,

sustenance fishing rights are set forth in and subject to the provisions of

30 Me.Rev.Stat.Ann. § 6207(4).[12]

Second, the State emphatically does not agree with DOI's apparent contention

that the Penobscot Nation did not cede any portion of the Penobscot River to

Massachusetts in 1818 but instead retained all its rights to the entire river.  *See* DOI

letter of December 13, 1995.  Neither the 1818 Treaty nor any applicable principles of

law support DOI's interpretation in this regard.

Third, the State believes that the provisions of the Maine Settlement Act that

extinguish all tribal claims with respect to any transfers of land or natural resources

that occurred prior to the Act, *see* 25 U.S.C. §§ 1723(a)–(c), have to be given effect in

this proceeding.  "Transfer" is broadly defined to include "any act, event, or

---

[12]It is also pertinent, however, that except as provided in the Maine Implementing Act, tribal members are subject to state law to the same extent as any other persons. 30 Me.Rev.Stat.Ann. § 6204, as expressly ratified and confirmed by 25 U.S.C. § 1725(b)(1).

- 21 -

circumstance that resulted in a change in title to, possession of, dominion over, or control of land or natural resources." 25 U.S.C. § 1722(n).  Under this definition, the construction of the Milford Dam in 1904 and the consequent flowage of reservation land effected a transfer.  In the Maine Settlement Act, that transfer was ratified, 25 U.S.C. § 1723(a), and any tribal claims resulting therefrom were extinguished. 25 U.S.C. § 1723(c) — a proposition reinforced by the dismissal with prejudice of the Penobscot Nation's trespass complaint in *Taylor and Tribal Council of Penobscot Nation v. Bangor Hydro–Electric Co.*, Civil Action No. 1970 (D.Me., April 22, 1981).

Although we do not believe that resolution of these issues is necessary to the resolution of the section 4(e) issue, all of these issues are potentially very important to the State, and to the extent that the Commission believes it necessary to reach these issues, the State requests the right to brief them in greater detail.

DATED:  Augusta, Maine
        August 15, 1996

Respectfully submitted,

THOMAS D. WARREN
Assistant Attorney General
Six State House Station
Augusta, Maine   04333-0006
Tel.  (207) 626-8800
Attorney for State of Maine and State
Planning Office