UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PENOBSCOT NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket # 1:12-cv-00254-GZS |
| | ) | |
| MAINE ATTORNEY GENERAL, et al., | ) | |
| | ) | |
| Defendants | ) | |

## EXHIBIT 1

## TO

## SUPPLEMENTAL MEMORANDUM

## IN SUPPORT OF MOTION TO INTERVENE



**Office of the Chief and Council**

Kirk E. Francis
*Chief*

Bill Thompson
*Vice-Chief*

Wayne T. Mitchell
*Representative*

May 29, 2012

Penobscot Nation
12 Wabanaki Way
Community Building
Indian Island, Maine 04468
(207) 827-7776

FAX (207) 827-6042

**RECEIVED**

**MAY 3 0 2012**

OFFICE OF THE REGIONAL ADMINISTRATOR

H. Curtis Spalding
Regional Administrator
EPA New England Headquarters
5 Post Office Square - Suite 100
Boston, MA 02109-3912

**Re:    Request of the Penobscot Nation for Determination that It Qualifies Pursuant to Section 518 of the Clean Water Act for the Purposes of Seeking NPDES permit Program Approval (40 C.F.R. § 123.32)**

Dear Regional Administrator Spalding:

I write on behalf of the Penobscot Nation to request a determination that the Penobscot Nation qualifies pursuant to section 518 of the Clean Water Act for the purposes of seeking NPDES permit program approval for pollution discharges into the Penobscot River as described herein.

We track the specific provisions of the EPA's governing regulation for this request: 40 C.F.R. § 123.32.

At the outset, we note that 40 C.F.R. § 123.23(f) provides that if the Administrator has previously determined that the Nation has met the prerequisites that make it eligible to assume a role similar to that of a state as provided by statute under the Safe Drinking Water Act, the Clean Water Act, or the Clean Air Act, then the Nation need only provide that information unique to the NPDES program which is requested by the Regional Administrator. Attached as Exhibit 1 are copies of the EPA's previous determinations that the Nation has met such prerequisites. For the sake of completeness, we are providing the details for the categories listed under 40 C.F.R. § 123.32.

We also note that 40 C.F.R. § 123.23(e) provides that the Regional Administrator may, at his or her discretion, request further documentation necessary to support a Tribe's

H. Curtis Spalding
Page 2
May 29, 2012

eligibility. We ask that you inform us at your earliest convenience if any such additional information is needed.

**(a)     A statement that the Tribe is recognized by the Secretary of the Interior**

The Penobscot Nation is a federally recognized Indian tribe. 25 U.S.C. § 1721 *et seq.* (Maine Indian Claims Settlement Act or "MICSA"). *See also* 75 Fed. Register 60812 (2010) (Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs).

**(b)     A descriptive statement demonstrating that the Tribal governing body is currently carrying out substantial governmental duties and powers over a defined area**

   **(1)     The Penobscot Nation's form of government**

   The Penobscot Nation's governing body is its Chief and twelve member Council. The Chief and each Council member serve four year terms. The Chief presides over all meetings of the Penobscot Nation Council, but only votes in the case of a tie. All laws of the Nation are approved by the Nation's members in a General Meeting. The Nation's laws are administrated and enforced by the Nation's various governmental departments. The Nation also has a Tribal Court with a Chief Judge and an Appellate Division. Penobscot Tribal Court judges are appointed by the Chief with the advice and consent of the Council.

   **(2)     Types of governmental functions currently performed by the Penobscot Nation**

   The Penobscot Nation carries out multiple governmental functions through the following departments: Cultural and Historic Preservation, Social Services, Education and Career Services, Finance Department, Public Safety, Grants and Contracts, Housing Department, Indian Health Services, Legal Department, Maintenance and Public Works, Natural Resources, Personnel, Tribal Court, Tribal Historic Preservation Office, Department of Trust Services. Some examples of departments exercising police powers are Public Safety (enforcing criminal laws and traffic infractions), Social Services (enforcing child protection

2

H. Curtis Spalding
Page 3
May 29, 2012

and other family laws), and Natural Resources (enforcing hunting and fishing regulations).

**(3)    The source of the Penobscot Nation's authority to carry out the governmental functions currently being performed**

The source of the Nation's authority to carry out governmental functions is its inherent sovereign authority established under principles of federal Indian law and confirmed by Congress under MICSA.

**(c)    The Nation's proposed NPDES permit program under section 518(e)(2) of the Clean Water Act[1]**

The Nation asserts authority over Penobscot Indian Territory as defined by 25 U.S.C. § 1722(j). The Nation proposes to establish an NPDES permit program for discharges into the Penobscot River originating from point sources and storm water located within Penobscot Indian Territory as defined by 25 U.S.C. § 1722(j). The surface waters at issue are the waters of the Penobscot River from Indian Island and northward thereof. At present there is only one such discharge facility, operating under NPDES permit ME 010311, the Penobscot Nation Pollution Control Facility (PNPCF).

**(d)    A narrative statement describing the capability of the Penobscot Nation to administer an effective, environmentally sound NPDES permit program**

**(1)    A description of the Penobscot Nation's previous management experience which may include the administration of programs and service authorized by the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq. ), the Indian Mineral Development Act (25 U.S.C. 2101 et seq. ), or the Indian Sanitation Facility Construction Activity Act (42 U.S.C. 2004a )**

---

[1] A statement of counsel for the Penobscot Nation, authorized to represent the Nation in all legal matters in court pertaining to the program for which it seeks approval is submitted herewith as Exhibit 2.

H. Curtis Spalding
Page 4
May 29, 2012

The Nation's Department of Natural Resources (DNR) has extensive experience with managing and administering numerous environmental and natural resources related programs. These programs include:

- CWA Section 106 for water quality monitoring, including Treatment in the Same Manner as a State (TAS),
- CWA Act Section 319 Nonpoint Source Management Program (includes TAS),
- Creation and administration of node on EPA Environmental Information Exchange Network,
- Administration of Penobscot Indian Nation Environmental (PINE) database,
- Administration of Performance Partnership Grants (PPGs)

Copies of prior EPA approvals for the Penobscot Nation's "treatment as a state" under a variety of environmental programs are attached hereto as Exhibit 1.

The Nation's various governmental departments administer services authorized by P.L. 638, 25 U.S.C. §§ 450 *et. seq.* The Nation can provide copies of its P.L. 638 contracts upon request or a list of programs operated in accordance with P.L. 638 and other federal programs supporting tribal governmental services.

**(2)    A list of existing environmental or public health programs administered by the Penobscot Nation, and a copy of related laws, regulations, and policies of the Nation**

The Nation has created laws to regulate a variety of land related activities within its territory and land use matters in particular, including the Nation's Comprehensive Land Use Plan for its trust lands and Land Laws for all of its territory. The Nation also has exclusive authority to regulate the taking of wildlife within its territory and has enacted comprehensive laws for such purpose. Additionally, the Nation has a health clinic located on Indian Island that provides a multitude of health services to its members and members of other federally-recognized Indian tribes pursuant to a self-governance compact with the United States and pursuant to the laws and regulations of the Indian Health Service. The Nation has also created a child welfare code, elders' abuse code and domestic violence code administered and enforced by the Nation's Department of Human

4

H. Curtis Spalding
Page 5
May 29, 2012

Services, Department of Public Safety and its Tribal Court. Copies of these laws can be made available upon request.

(3)     **A description of the entities which exercise the executive, legislative, and judicial functions of the Penobscot Nation's government**

Please see section (b)(1).

(4)     **A description of the existing, or proposed, agency of the Penobscot Nation which will assume primary responsibility for establishing and administering an NPDES permit program (including a description of the relationship between the existing or proposed agency and its regulated entities)**

The Penobscot Nation Water Resources Program (PIN WRP) within the Department of Natural Resources will be the agency responsible for establishing and administering the NPDES permit program. The PIN WRP is responsible for protecting and enhancing water quality and aquatic resources of Penobscot territory waters. Primary activities of the PIN WRP include monitoring water quality of surface water; conducting water quality studies; reviewing and providing recommendations on licensing and actions that have potential to affect tribal water resources; implementing practices to control pollution from entering tribal waters; and education and outreach. This department and program are separate and independent from the Penobscot Nation Pollution Control Facility.

The PNPCF is operated by the Penobscot Nation Tribal Utility Department (PIN TUD). Additionally, PIN anticipates administering a NPDES storm water program for storm water originating from Penobscot Indian Territory. The PIN Housing Department, PIN Public Works Department, and PIN TUD are all entities which could potentially be regulated by the PIN WRP. All these Departments are separate and independent from the PIN WRP.

(5)     **A description of the technical and administrative abilities of the staff to administer and manage an effective, environmentally sound NPDES permit program or a plan which proposes how the Penobscot Nation will acquire additional administrative and technical expertise**

H. Curtis Spalding
Page 6
May 29, 2012

The Penobscot Nation has administered its Water Resources Program (WRP) as part of its Department of Natural Resources since the mid-1980s. The program has evolved from a single staff person at its inception to its current staffing of 5 permanent full-time professional staff. The program receives additional staff and technical support from seasonal employees as well other programs within the Nation's Department of Natural Resources (i.e. GIS Coordinator, Wildlife and Wetlands Biologist, Fisheries Biologist, Forester, Air Quality Manager, and Game Wardens).

Functional elements of the WRP include administration, an extensive water quality monitoring program, data management, complaint investigations, permit review, nonpoint source pollution control, and education and outreach. Its base water quality assessment program includes monitoring approximately 120 surface water sites throughout the Penobscot watershed and Penobscot Nation trust lands. The program also regularly carries out monitoring of benthic macro-invertebrate, studies of toxic contaminants in various aquatic media, and continuous monitoring using real-time sondes. The program operates its own analytical laboratory to conduct analyses of commonly monitored constituents including E. coli and coliform bacteria, biochemical oxygen demand, total suspended solids, specific conductance, alkalinity, pH, turbidity, and color. The lab is currently expanding its capabilities to include analysis of chlorophyll a, phycocyanins, and phosphorous. The purpose of most of the monitoring conducted by the WRP is to evaluate attainment of water quality standards and compliance of dischargers with permitted license limits.

The WRP has extensive experience with reviewing, commenting, and providing input on discharge permits within the Penobscot and Piscataquis River basins including NPDES, Maine State Discharge License, and MEPDES. The program has reviewed and provided comments on all discharges to or affecting Reservation waters. Staff from the program have also been an active participants in numerous State of Maine technical advisory and stakeholder groups related to water quality permitting including Penobscot River Discharge stakeholders group, nutrient criteria development (ME DEP rule 06-096 Chapter 583) , ME NPDES delegation, Surface Water Toxics Control Program (ME DEP rule 06-096 Chapter 530) Surface Water Quality Criteria for Toxic Pollutants (ME DEP rule 06-096 Chapter 584), Technical Advisory Group for Surface Waters Ambient Toxics Monitoring Program (SWAT), Technical Advisory Group for Dioxin Monitoring Program,

H. Curtis Spalding
Page 7
May 29, 2012

and other various groups, Cooperative Water Quality Monitoring Agreement with Maine's Department of Environmental Protection (ME DEP), Waste Load Assimilation/ TMDL studies with ME DEP and EPA.

The Nation has established a node on the EPA Environmental Information Exchange Network.  It submits electronic data to EPA's Water Quality Exchange. The Nation also has a Trading Partner Agreement with Maine DEP to exchange data to their EGAD database.

Two staff members of WRP have completed EPA Basic Inspectors Training and 5 staff who have completed 40 hours of OSHA HASWOPR training.

The Nation plans to acquire additional technical expertise related to wastewater treatment plant operation and inspections by having WRP staff accompany ME DEP inspectors on inspections of other municipal wastewater treatment plants and by receiving training for municipal treatment plant operators at the Institute for Tribal Environmental Professionals.

* * *

Should you or any of your staff have any questions, please contact John Banks, the Director of the Penobscot Nation Department of Natural Resources or myself.

The Penobscot Nation appreciates your office's timely attention to this request.

Sincerely,

Kirk Francis
Chief, Penobscot Nation

cc:    Penobscot Nation Tribal Council
       Mark Chavaree, Esq., Staff Attorney, Penobscot Nation
       John Banks, Director, Penobscot Nation Department of Natural Resources



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION I

J.F. KENNEDY FEDERAL BUILDING, BOSTON, MASSACHUSETTS 02203-2211

July 23, 1993

Jerry Pardilla, Governor
Penobscot Nation
Indian Island Reservation
6 River Road
Old Town, Maine  04468

Re:  **Limited Treatment as a State under CWA § 518(e)
     for Purposes of Receiving CWA § 106 Grant**

Dear Governor Pardilla:

I have determined that the Penobscot Nation is eligible for a
limited Treatment as a State (TAS) status under § 518(e) of the
Clean Water Act (CWA), 33 U.S.C. § 1377(e), that would allow the
Penobscot Nation to receive a grant under § 106 of the CWA to
develop a water quality management plan for the Tribe's water
resources in Maine.

This conclusion is based on EPA's legal review of the standards
for granting TAS status as well as the following: the Maine
Indian Claims Settlement Act (both federal and state Acts);
legislative history; EPA statutes, regulations, and guidance;
United States and Maine Supreme Court cases that interpret Indian
jurisdictional issues; legal opinions by the Penobscot Nation's
legal counsel; and submissions by the Penobscot Nation on its
legal governing provisions, resources program, previous grants,
and other materials.  The Penobscot Nation has satisfied the
statutory requirements of the Clean Water Act § 518 and the
regulatory requirements of 40 Code of Federal Regulations Part
130 for the limited purposes of the Clean Water Act § 106 grant.

This approval of TAS status is limited to the water quality CWA
§ 106 grant purposes and to the water resources over which the
Tribe exercises management and protection functions for purposes
of the grant activities.  It is necessary to note these
limitations because of jurisdictional issues presented on the
scope of the Penobscots' authority to regulate land and natural
resources on and near the Penobscot Indian Reservation.  These
limitations do not result in a lesser TAS determination for § 106
purposes; they are intended instead to clarify that determination
of this TAS status does not extend beyond this grant and that any
future applications by the Penobscots for EPA grants that require
TAS may be subject to additional jurisdictional analysis because
of the special Penobscot jurisdictional issues.

I nevertheless hereby approve the Penobscot Nation's Treatment as
a State status under CWA § 518(e) for the purposes of receiving
and administering a CWA § 106 grant.

If you have any questions regarding the Clean Water Act § 106 grant application process and how the Penobscots may proceed, please contact either Anne Fenn at 617-565-3927 or Bill Nuzzo at 617-565-3480.

EPA Region I looks forward to continue to work cooperatively with the Penobscot Nation on developing and maintaining effective Tribal environmental programs.

Sincerely,

Paul G. Keough
Acting Regional Administrator

cc:   John Banks
      Anne Fenn
      Julie Taylor

FILE No.274 04/05 '00 14:28    ID:U.S./E.P.A.-OEP          FAX:6179181505          PAGE    5



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 1
1 CONGRESS STREET, SUITE 1100
BOSTON, MASSACHUSETTS 02114-2023

March 27, 2000

The Honorable Richard Hamilton                                    OFFICE OF THE
Chief                                                             REGIONAL ADMINISTRATOR
Penobscot Nation
Community Building
Indian Island, Maine 04468

Re:    Determination of Eligibility Under Clean Water Act Section 518(e) for the Purpose of
       Receiving a Clean Water Act Section 319(h) Grant

Dear Chief Hamilton:

I am writing in response to the Penobscot Nation's February 28, 2000 application for grant
funding under § 319(h) of the Clean Water Act (CWA), 33 U.S.C. § 1329(h). To qualify for this
funding, the application must demonstrate compliance with the treatment in the same manner as
states (or TAS) requirements of CWA § 518(e). After a review of the Tribe's application,
including its nonpoint source assessment report and management plan, and other relevant
documents, EPA has determined that the Penobscot Nation has demonstrated compliance with
CWA § 518(e) and therefore is eligible to receive CWA § 319(h) grant funding for management
of nonpoint source water pollution pertaining waters of the Penobscot Nation's Territory.

Note, however, that EPA's eligibility determination is limited and applicable only to CWA
§ 319(h) grant funding for the activities described in the Penobscot Nation's February 2000
nonpoint source management plan. Similarly, the Agency's determination that the Nation has
met the TAS requirements of CWA § 518(e) does not extend beyond these activities, and future
matters concerning EPA grants, programs or other issues may be subject to additional analysis.

If you have any additional questions concerning this letter or the CWA § 319(h) grant process,
please contact Roger Fleming, Assistant Regional Counsel, at (617) 918-1032 or Warren
Howard, Regional Non-Point Source Coordinator, at (617) 918-1587.

EPA-New England looks forward to working cooperatively with the Penobscot Nation to
continue the development and strengthening of effective tribal environmental programs.

Sincerely,

Mindy Lubber
Regional Administrator

cc:    Robert Goetzl, EPA-New England OES
       Warren Howard, EPA-New England OES
       Roger Fleming, EPA-New England ORC



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 1
5 POST OFFICE SQUARE, SUITE 100
BOSTON, MA 02109-3912

February 7, 2012

The Honorable Kirk Francis
Chief of the Penobscot Nation
Tribal Administration
12 Wabanaki Way
Indian Island, ME 04468

**Re:    Eligibility Determination for the Purpose of Obtaining Grant Funds under the Clean Air Act**

Dear Chief Francis:

I am pleased to inform you that the U.S. Environmental Protection Agency ("EPA") has determined that the Penobscot Nation (the "Nation") is eligible for treatment in a similar manner as a state ("TAS") for the purpose of obtaining grant funds and administering grants under Section 105 of the Clean Air Act (CAA). To obtain TAS eligibility for the purpose of administering grants under Section 105 of the CAA, a tribal applicant must demonstrate that it meets the criteria set forth by Section 301(d)(2) of the CAA, 42 U.S.C. §7601(d)(2), and codified in the Tribal Authority Rule at 40 C.F.R. §49.6. After reviewing the Nation's application of April 12, 2011, and other relevant materials, EPA has determined that the Nation meets these eligibility criteria, making it eligible to administer grants under Section 105 of the CAA.

EPA evaluates a tribe's eligibility for administering programs on a program-by-program basis. Thus, this eligibility determination applies only to the Nation for the purpose of administering grants under Section 105 of the CAA. As a general matter, future requests for program or grant eligibility under this or another statutory authority may require additional eligibility analyses.

If you have any questions regarding this eligibility determination, please contact Ronald González, Attorney Advisor, at (617) 918-1786 or Eugene Benoit, Air Program Tribal Coordinator, at (617) 918-1639.

I appreciate the Penobscot Nation's dedication to protecting the environment on its trust lands, demonstrated by the application for this eligibility determination. EPA New England looks forward to working with the Nation to continue developing and strengthening effective tribal environmental programs.

Sincerely,

H. Curtis Spalding
Regional Administrator

cc:     Mark A. Chavaree, Staff Attorney, Penobscot Nation
        John Banks, Director of Natural Resources, Penobscot Nation
        William Thompson, Air Program Supervisor, Penobscot Nation
        Melanie Loyzim, Director, Bureau of Air Quality, ME DEP

Toll Free • 1-888-372-7341
Internet Address (URL) • http://www.epa.gov/region1
Recycled/Recyclable • Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 30% Postconsumer)

**40 C.F.R. § 123.32(c)**
**Statement by Counsel for the Penobscot Nation**

The Penobscot Nation proposes to establish an NPDES permit program for discharges into the Penobscot River originating from point sources and storm water located within Penobscot Indian Territory as defined by 25 U.S.C. § 1722(j). The surface waters at issue are the waters of the Penobscot River from Indian Island and northward thereof. At present there is only one such discharge facility, operating under NPDES permit ME 010311, the Penobscot Nation Pollution Control Facility (the "Facility").

The Facility is owned and operated by the Penobscot Nation to service tribal members and others residing at the Nation's principal reservation island, known as Indian Island, within the Penobscot River. Both the Facility and its discharge, which is located within the Penobscot River, are within the Penobscot Indian Reservation.

**Background Principles**

The federal government is firmly committed to tribal self-government. The Nation's request for an eligibility determination under 40 C.F.R. § 123.32(c) with respect to its own Pollution Control Facility is in furtherance of that goal. As the EPA readily understands, "[w]ater quality management serves the purpose of protecting public health and safety, which is a core governmental function, whose exercise is critical to self-government." EPA, 56 Fed. Reg. at 64,879.

The Nation appreciates the EPA's recognition of the importance of Indian nations' regulation of their environments and invokes the EPA's pronouncements in requesting recognition of its eligibility to obtain the delegation of federal authority under section 518(2)(e) of the Clean Water Act. *See, e.g.*, EPA, *Federal, Tribal and State Roles in the Protection and Regulation of Reservation Environments* (July, 1991) ("Indian tribes, for whom human welfare is tied closely to the land, see protection of the reservation environment as essential to the preservation of the reservations themselves. Environmental degradation is viewed as a form of further destruction of the remaining land base, and pollution prevention is viewed as an act of tribal self-preservation that cannot be entrusted to others."); 56 Fed. Reg.64,876, 64,878 (Dec. 12, 1991) (The EPA recognizes that "clean water, including critical habitat (i.e. wetlands, bottom sediment spawning beds, etc.), is absolutely crucial to the survival of many Indian reservations."). These statements could not be more true for the Penobscot Nation, whose people have resided on and within the river for whom they are named from time immemorial.

**The Penobscot Nation has inherent authority to regulate the Penobscot Nation Pollution Control Facility and its related discharge into the Penobscot River**

Indian tribes have the "inherent powers of a limited sovereignty which has never extinguished." *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1066 (1st Cir. 1979) (citation, quotations, and emphasis omitted). This includes "inherent sovereign authority over their members and territory." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983). This inherent authority is retained by the Penobscot Nation unless expressly divested by Congress. *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1066 (1st Cir. 1979).

The Penobscot Nation, like other Indian nations, has the inherent power to regulate environmental matters within its reservations. *E.g., State of Montana v. U.S.E.P.A.*, 137 F.3d 1135, 1141 (9th Cir. 1998), *cert. denied*, 119 S.Ct. 275; *City of Albuquerque v. Browner*, 97 F.3d 415, 423 (10th Cir. 1996), *cert. denied*, 118 S.Ct. 410. And this authority, like any other attribute of tribal sovereignty, remains intact unless expressly divested by Congress. *See Penobscot Nation v. Fellencer*, 164 F.3d 706, 709 (1st Cir. 1999), *cert. denied*, 119 S.Ct. 2367; *State of RI v. Narragansett Indian Tribe*, 19 F.3d 685, 694, n.7 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994). Further, if Congress does not act to eliminate that authority, there remains, in the federal government, a fiduciary duty (of the highest order) to protect it. See *HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1245 (10th Cir. 2000).

In the Maine Indian Claims Settlement Act of 1980, Congress did not divest the Nation of this sovereign authority. On the contrary, Congress provided:

> Except as otherwise provided in this subchapter, *the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine*, except that no law or regulation of the United States (1) which accords or relates to a special status or right of or to any Indian, Indian nation, tribe or band of Indians, Indian lands, Indian reservations, Indian country, Indian territory or land held in trust for Indians, and also (2) which affects or preempts the civil, criminal or regulatory jurisdiction of the State of Maine, including, without limitation, laws of the State relating to land use or environmental matters, shall apply within the State.

25 U.S.C. §1725(h) (emphasis added). The final Senate Committee Report on the Settlement Act explained that Congress recognized "the independent source of tribal authority, that is, the *inherent authority of a tribe to be self-governing. Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)." Senate Report at 29 (emphasis added). It

further explained that the Nation's qualified agreement to adopt certain State laws as their own (*see* 30 M.R.S.A. §6206(1)), would "*not violate the principles of separate sovereignty.*" Senate Report at 29 (emphasis added). The report continued, "[t]hough identical in form and subject to redefinition by the State of its laws, the laws are those of the tribes. *Wauneka v. Campbell*, 22 Ariz. App. 287, 526 P.2d 1085 (C.A. 1974)." *Id.*[1]

**Maine's Authority over the Penobscot Nation Pollution Control Facility is No Impediment to the Nation's Eligibility for the Delegation of the NPDES Program**

While the United States Court of Appeals for the First Circuit has held that the State of Maine has jurisdiction to enforce Maine law with respect to the Penobscot Nation Pollution Control Facility, this does not preclude the Nation from also regulating the Facility pursuant to its inherent sovereign authority. The Nation's authority over its own Facility can operate side by side with Maine's authority without affecting or preempting Maine's law in any way. Nothing in the Settlement Act suggests that Maine has authority exclusive of the Nation's inherent authority to regulate the waste treatment and discharge into the Penobscot Indian Reservation generated by tribal members and others residing within the Penobscot Indian Reservation at Indian Island.

---

[1] In *Wauneka v. Campbell*, 526 P.2d 1085 (Ariz. Ct. App. 1974), the Arizona Court of Appeals held that the State of Arizona could not enforce its Motor Vehicle Safety Responsibility Laws against Indians on the Navajo reservation, notwithstanding the fact that the Navajo Tribal Code required all Navajo Indians residing on the Navajo Reservation in Arizona to obtain an Arizona Driver's license. Noting that the Navajo Nation, within its reservation, had police power authority to govern the activities of tribal members, the court held that imposition of Arizona's Motor Vehicle Safety Responsibility Laws would interfere with the Nation's right to self-government. The Nation's adoption of the Arizona Driver's licensing requirements as its own did not prevent it from enacting laws more suitable to its territory and members, nor did it constitute consent to allow state jurisdiction over the reservation. *See id.* at 1088-89. As the court explained:

> The Tribe in requiring its members who drive on the Reservation to be licensed by the state in which they live insures that those driving on the Reservation have demonstrated certain minimal skill and knowledge relative to the operation of motor vehicles. The tribal driver's license statute has not ceded either civil or criminal jurisdiction over Reservation events to Arizona courts or administrative agencies.

*Id.* at 1089.

3

**EPA's Delegation of NPDES Authority to Maine over the Penobscot Nation Pollution Control Facility is No Impediment to the Nation's Eligibility for the Delegation of the NPDES Program**

Under longstanding principles of federal Indian law and EPA policy reflecting that law, the Nation's inherent authority must be given primacy over Maine for the administration of the NPDES program. Thus, while Maine may continue to apply its state laws to the Nation's Pollution Control Facility, the NPDES program with respect to that facility must be administered by the Penobscot Nation, not Maine. *See EPA Policy for Administration for Environmental Programs on Indian Reservations* (Nov. 8, 1984); EPA, *Federal, Tribal and State Roles in the Protection and Regulation of Reservation Environments* (July 10, 1991) at 3-4 (EPA will retain enforcement primacy for reservation pollution when tribe cannot demonstrate jurisdiction over certain sources). *See also HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1245 (10th Cir. 2000) ("The federal government bears a special trust obligation to protect the interests of Indian tribes, including protecting tribal property and jurisdiction.").

Thus, upon approval of the Nation's application under section 518(e)(2), the EPA will have immediate "[g]rounds for program revision." 40 C.F.R. § 123.62(a).

**The Facility, its Discharge, and the Water Resources at Issue are Located within the Penobscot Indian Reservation**

Pursuant to the Settlement Act, Congress expressly reserved to the Penobscot Nation "the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island . . . and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to [October 10, 1980]." 25 U.S.C. § 1722(i) (defining "Penobscot Indian Reservation") *ratifying* 30 M.R.S.A. § 6203(8). As a consequence of reserving the islands and by the plain language of the 1818 Treaty, the reservation includes the riparian rights to the beds and banks of the Penobscot River. *See* Letter from Deputy Solicitor Edward B. Cohen, United States Department of the Interior, to John P. DeVillars (September 2, 1997) ("Interior Letter of 9/2/97") at 6.[2]  At the time of the Settlement Act, the State of Maine clearly understood this to be the case, for its own Joint Select Committee on Indian Land Claims reported that the reservation included "any riparian or littoral rights expressly reserved by the original treaties with Massachusetts or by operation of State law." *Report of the Joint Select Committee on Indian Land Claims* at 3.[3]

---

[2] A copy of the Interior Letter of 9/2/97 is attached hereto.

[3] A copy of the *Report of the Joint Select Committee on Indian Land Claims* is attached hereto.

In addition to confirming the reservation of the Penobscot River islands and related waters from Indian Island northward, Congress confirmed the Nation's right to "take fish . . . .for sustenance" within the river. 25 U.S.C. § 1721(b), *ratifying* 30 M.R.S.A. § 6207(4).[4] The final Committee Reports of Congress describe the Tribe's sustenance fishing right as an "expressly retained sovereign activit[y]" of the Tribe. S.Rep. No. 96-957 at 15; H.R.Rep. No. 96-1353 at 15, *reprinted in* 1980 U.S.C.C.A.N. at 3791.

Attendant to the Tribe's reserved sustenance fishing right is the right to water in sufficient quantity, and of sufficient quality, to preserve sustenance fishing. *See United States v. Adair*, 723 F.2d 1394, 1408-11 (9th Cir. 1983), *cert. denied*, 467 U.S. 1252 (1984). *See also Stanton v. Trustees of St. Joseph's College*, 254 A.2d 597, 600-01 (Me. 1969) (riparian owner has right to water quality). The Nation's reserved right to take fish "for sustenance" is more than a mere right of tribal members to dip their nets into the water in the hopes of catching a fish. *See Washington v. Washington State Commercial Passenger Fishing Ass'n*, 443 U.S. 658, 676, 679 (1979). Rather, it is (at the very least) a legally protected interest to have fish in the river of sufficient health and quantity to provide tribal members with a "moderate living." *Id.* at 686; *United States v. Adair*, 723 F.2d at 1414-15.

The Penobscot Nation Pollution Control Facility at Indian Island, its discharge within the Penobscot River, and the water resources impacted by the discharge are, therefore, within the Penobscot Indian Reservation and fully subject to the inherent regulatory authority of the Penobscot Nation.

Dated: *May 25, 2012*                     Dated: *May 24, 2012*

*Mark A. Chavaree*                          *Kaighn M.*
Mark A. Chavaree, Esq.                      Kaighn Smith Jr., Esq.


Counsel for the Penobscot Nation

---

[4] Section 6207(4) of the Maine Implementing Act provides that "Notwithstanding any rule or regulation . . . of the State, the members of the . . . Penobscot Nation may take fish, within the boundaries of their. . . reservation[] for their individual sustenance." 30 M.R.S.A. § 6207(4).



## United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington. D.C. 20240

SEP 2 – 1997

John P. DeVillars
Regional Administrator
Environmental Protection Agency
Region 1
J.F.K. Federal Building
Boston, MA   02203-0001

Re:  Penobscot Indian Nation Request for Evidentiary Hearing
     Lincoln Pulp & Paper NPDES permit No. ME0002003

Dear Mr. DeVillars:

The Department of the Interior (Department) has reviewed the correspondence filed with you by the Penobscot Indian Nation (PIN), Lincoln Pulp and Paper Company (Lincoln), and the State of Maine, Department of the Attorney General (State), in the above-referenced Request for Evidentiary Hearing concerning NPDES Permit No. ME0002003.  Certain of the positions set forth in those filings cause concern to this Department, in its role as primary agency within the Federal Government charged to act on behalf of Indian Tribes.  Consequently, my intent in this letter is to ensure that your agency is fully aware of the positions of this Department, and of the United States, concerning certain issues relevant to the Maine Indian Claims Settlement Act, the Federal Trust responsibility to Maine Indians, and the fishing rights of the Penobscot Indian Nation.[1]

I address three major points, as follows:

1.  The Nature of the Federal Government's trust responsibility to the PIN;

2.  Interpretation of PIN's fishing rights;

3.  PIN's right to appeal the NPDES permit

---

[1]  The First Circuit has recognized the Secretary of the Interior as the administrator of the Maine Indian Claims Settlement Act (MICSA).  Passamaquoddy Tribe v. State of Maine, 75 F.3d 784, 794 (1st Circuit, 1996).  Moreover, the Department of the Interior is recognized to have reasonable power to discharge effectively its broad responsibilities in the area of Indian affairs, and its actions in interpreting tribal rights are accorded substantial deference.  Parravano v. Babbitt, 70 F.3d 539, 544 (9th Cir. 1995), cert. denied, 116 S. Ct. 2546 (1996).

1

1.  <u>The Nature of the Federal Government's trust responsibility to the PIN</u>

As you know, the United States has a trust responsibility to protect the lands and resources of federally recognized Indian Tribes. In the exercise of this trust responsibility, the United States is held to the most exacting fiduciary standards. <u>Seminole Nation v. United States</u>, 316 U.S. 286 (1942). This fiduciary responsibility extends to all agencies of the Federal Government, including the Environmental Protection Agency (EPA). <u>Nance v. EPA</u>, 645 F.2d 701, 711 (9th Cir. 1981).

The Department acknowledges that the Maine Tribes came late to federal recognition and protection. However, as of 1975, when the First Circuit recognized that the protections of the federal Trade and Intercourse Act (1 Stat. 137 (1790), now codified at 25 U.S.C. § 177) did apply to the Maine Tribes (<u>See Joint Tribal Council of Passamaquoddy Tribe v. Morton</u>, 528 F.2d 370, 379-380 (1st Circuit, 1975)), the United States has recognized and acted in furtherance of its trust responsibility to protect the lands and natural resources of the Maine Indians, beginning with the United States advocacy on the Tribes' behalf in the Maine land claims litigation. This litigation, which alleged that Massachusetts and Maine illegally took lands of the Maine Indians without federal involvement or consent in violation of the Trade and Intercourse Act, was settled through the enactment by Congress in 1980 of the Maine Indian Claims Settlement Act (MICSA), 25 U.S.C. § 1721, et seq., which ratified Maine's Act to Implement the Maine Indian Claims Settlement, 30 M.R.S.A. § 6201, et seq. (Implementing Act).

Contrary to the assertions made in several of the filings before you, the United States did not through MICSA limit its trust responsibility. While the MICSA did create a unique relationship between the State of Maine and the Maine Tribes, the federal trust obligation to protect the lands and natural resources of the Maine Tribes continues. The Penobscot Nation is a federally recognized Indian Tribe (61 Fed. Reg. 58211, 58213 (1996)) and, as such, is entitled to those rights and benefits which the United States provides to Indians based upon their status as Indians. <u>See</u> 25 U.S.C. § 479a-1(a); H. Rep. No. 96-1353, p. 18, *reprinted in* 1980 U.S.C.C.A.N. 3786, p. 3794. The Penobscot Reservation is a federal reservation under the jurisdiction of the United States. 25 U.S.C. §§ 2 and 9.

The Department thus finds erroneous the views expressed which suggest that EPA has no special relationship with the Penobscot Indian Nation. In MICSA, Congress formally confirmed the federal recognition of the Penobscot Nation, the Passamaquoddy Tribe and the Houlton Band of Maliseet Indians. 25 U.S.C. §§ 1722, 1721, 1725(i). (Subsequent Congressional action extended this federal recognition to the Aroostook Band of Micmacs. Pub. L. No. 102-171, 105 Stat. 1143 (1991).) Congress has declared that this

2

recognition requires that the United States protect tribal
resources through the trust responsibility. Pub. L. No. 103-454,
108 Stat. 4791 (1994).

The Department further finds no merit in the claim that MICSA
extinguished PIN's sovereignty.   Federal recognition connotes
recognition of a Tribe's inherent sovereignty.   Pub. L. No. 103-
454, 108 Stat. 4791 (1994). See also Rhode Island v. Narragansett
Indian Tribe, 19 F.3d 685, 694 (1st Cir. 1994).   Passage of MICSA
did not terminate the Maine Tribes and thus did not extinguish
PIN's sovereignty.   Instead, as noted in the legislative history,
the "settlement strengthens the sovereignty of the Maine Tribes."
H. Rep. No. 96-1353 at 15 (1980), reprinted in 1980 U.S.C.C.A.N.
3786, p. 3790.   See also Senate Rep. No. 96-957, pp. 14-15 (1980).

. It has been asserted that section 1725(h) of the MICSA, a
section of the Act which reflects the unique relationship between
the Maine Tribes and the State, prevents the application of the
trust responsibility and federal case law interpreting its
requirements in Maine (25 U.S.C. § 1725(h)).   Through this section,
Congress provided that the application of federal Indian law
(including case law) in Maine can be precluded, but only if such
law would affect or preempt the civil, criminal, or regulatory
jurisdiction of the State.   If Maine's jurisdiction is unaffected,
federal law does apply. See H.R. Rep. No. 96-1353 at 19-20 (1980),
reprinted in 1980 U.S.C.C.A.N., 3786, pp. 3794-5; Senate Report No.
96-957 at 30 (1980).

In the Department's view, section 1725(h) has no applicability
to this situation.[2]   The NPDES program has not been delegated by
the United States to the State of Maine; it thus remains a federal
program for which EPA is the permitting authority.   EPA's
consideration of federal law to determine its obligations to the
PIN in making the NPDES permit decision, therefore, is required in
this case.[3]

_____

[2]   While the State does have authority under section 401 of
the Clean Water Act to certify that a proposed discharge meets its
water quality standards, this does not mean that EPA cannot impose
a more stringent standard in its permit.   40 C.F.R. § 124.55(c)
provides that a state may not condition or deny a certification on
the grounds that State law allows a less stringent permit
condition.

[3]   There is also no merit to the claim that, because MICSA is
an Act of Congress rather than a treaty, EPA cannot consider
federal case law in determining tribal rights and federal
obligations. As with a treaty, MICSA is similarly the "supreme law
of the Land," and creates rights and liabilities which are
virtually identical to those established by treaties.   See
Parravano v. Babbitt, 70 F.3d 539, 544 (9th Cir. 1995), cert.

Since there exists a trust relationship between the Maine Tribes and the United States, EPA must act as a trustee when taking federal actions which affect tribal resources. When taking such actions, EPA's fiduciary obligation requires it to first protect Indian rights and resources. See Parravano v. Babbitt, 70 F.3d 539 (9th Cir. 1995), cert. denied, 116 S. Ct. 2546 (1996); Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F. Supp. 252 (D.D.C. 1972), rev'd in part on other grounds, 499 F.2d 1095 (D.C. Cir. 1974), cert. denied, 420 U.S. 962 (1975) (holding that for the Secretary of Interior to fulfill his fiduciary duty to Tribe while determining amount of water to be diverted from dam for benefit of irrigation district and to detriment of tribal fishery in downstream Pyramid Lake, the "Secretary must insure, to the extent of his power, that all water not obligated by court decree or contract with the District goes to Pyramid Lake"); Northern Cheyenne Tribe v. Hodel, 12 Indian L. Rep. 3065 (D. Mont. May 28, 1985) (Rejecting Secretary's argument that national interest in developing coal resources outweighed trust duty and stating that "identifying and fulfilling the trust responsibility is even more important in situations such as the present case where an agency's conflicting goals and responsibilities combined with political pressure asserted by non-Indians can lead federal agencies to compromise or ignore Indian rights.") Thus, fulfillment of EPA's trust responsibility must entail considerations beyond the minimum requirements in the Clean Water Act (CWA) and in MICSA to fully protect the PIN's rights and resources.

2.   Interpretation of PIN's fishing rights

The historic treaties between PIN and Massachusetts (Maine then being part of the Massachusetts territory) provide the basis for rights expressly confirmed to the PIN through the Implementing Act and MICSA. As a result, PIN's fishing right has two components - the aboriginal right retained through treaty and confirmed by MICSA, and a statutory right included within the Implementing Act.

a.   PIN's confirmed aboriginal fishing rights

Through a series of treaties which culminated in the 1818 Treaty with Massachusetts, the PIN retained the islands and natural resources, including fishing rights, within the Penobscot River, beginning at Indian Island and extending upriver. Congress, through its ratification in MICSA of the Maine Implementing Act which defined the retained Penobscot Reservation, confirmed this reservation of lands and resources, including fishing rights, to the PIN. See 30 M.R.S.A. § 6203(8); 25 U.S.C. §§ 1722(i); 1725(b)(1). While Section 1723(b) of MICSA did extinguish

---

denied, 116 S. Ct. 2546 (1996); Felix Cohen, Handbook of Federal Indian Law, p. 127 (1982 ed.).

aboriginal title to lands or natural resources given up by the PIN
through transactions illegal under the Trade and Intercourse Act,
MICSA did not extinguish aboriginal title to lands or natural
resources retained by the PIN. Rather, Congress confirmed those
retained aboriginal rights to the PIN. According to the
legislative history of MICSA, fishing rights are an example of
natural resources considered "**expressly retained sovereign
activities**." H.R. Rep. No. 96-1353 at p. 15 (1980), *reprinted in*
1980 U.S.C.C.A.N. 3786, p. 3791 (emphasis added).

I attach the brief filed by the United States in Maine's
Supreme Judicial Court in <u>Atlantic Salmon Federation v. Maine Board
of Environmental Protection</u>, 662 A.2d 206 (Me. 1995), in which the
United States position regarding the PIN's fishing right is set
out. In short, the brief states that:

> The Penobscot Nation's right is a reserved right, meaning it
> was reserved from the greater aboriginal rights of the Nation
> to the use and occupancy of its territory which had not been
> validly extinguished under 25 U.S.C. 177, prior to the
> enactment of the Maine Implementing Act and the federal
> Settlement Act ratifying its terms. The fishing right,
> therefore, is not a grant from the state of Maine in the
> exercise of its sovereign authority over fish and wildlife
> within its borders; it is a reservation from the aboriginal
> rights given up by the Penobscot Nation in the settlement
> which finally extinguished its aboriginal rights.

Brief for the United States as Amicus Curiae, filed before the
Supreme Judicial Court of Maine in <u>Atlantic Salmon Federation, et
al., v. Maine Board of Environmental Protection</u>, Law Docket No.
Ken-94-779, January 27, 1995, (p. 15).

b.  <u>PIN's statutory fishing right under the Maine Implementing Act</u>

In addition to PIN's retained aboriginal fishing rights within
its Reservation, the Maine Implementing Act expressly confirmed to
PIN a fishing right, providing that

> the members of the . . . Penobscot Nation may take fish,
> within the boundaries of their respective Indian reservations,
> for their individual sustenance ...

30 M.R.S.A. § 6207(4). The State of Maine has only a residual
right to prevent the PIN from exercising its fishing right in a
manner which has a substantial adverse impact on fish stocks in or
on adjacent waters - the legislative history compares this residual
power to that which other states retain with respect to federal
Indian treaty fishing rights. <u>See</u> H.R. Rep. No. 96-1353 at p. 17
(1980), *reprinted in* 1980 U.S.C.C.A.N. 3786, p. 3793. Indeed, the
State of Maine has acknowledged that, in recognition of
"traditional Indian activities" such as fishing, preferential

treatment is to be provided to Maine Indians. See letter from Attorney General Richard Cohen to Senator John Melcher (August 12, 1980), reprinted in U.S. Senate, Select Committee on Indian Affairs, Hearings on S. 2829, Proposed Settlement of Maine Indian Land Claims. See also Letter from Maine Attorney General James Tierney to Atlantic Sea Run Salmon Commission Chair William Vail (Feb. 16, 1988), in which the State recognized that the Penobscot Nation possesses a right to take fish from the Penobscot River for consumption in a manner otherwise prohibited by state law, due to the provisions in the Maine Implementing Act. (Copies attached.)

As provided in the Implementing Act, the PIN fishing right applies within the boundaries of the Penobscot Reservation, as it is defined in the Implementing Act. The Reservation is defined to expressly include the islands in the Penobscot River, beginning at Indian Island and continuing upriver, which were reserved by the PIN in its historic treaties. 30 M.R.S.A. § 6203(8). In those treaties, the PIN ceded lands beginning at the river's edge and extending upland, thereby retaining its rights to the beds and banks of the Penobscot River. See Wilson & Son v. Harrisburg, 107 Me. 207, 210 (1910). Pursuant to the 1818 Treaty, PIN's riparian ownership to the bed and banks of the river is limited only by the commonly recognized right of the public to use the river for navigation. See Pearson v. Rolfe, 76 Me. 380, 386 (1884). In confirming the PIN Reservation, the Implementing Act recognized the retention of PIN's riparian rights to the Penobscot River, including the beds and banks of the river.[4]

As a riparian owner, PIN possesses certain rights under state law which relate to the interpretation of its statutorily-based fishing right. Maine law recognizes that a riparian proprietor, such as the PIN, has a legal right:

to take fish from the water over his own land, to the exclusion of the public. Waters v. Lilley, 4 Pick. (Mass.) 145, 16 Am. Dec., 333. He does not own the water itself; but he has the right to the natural flow of the stream, and the right to the use and benefit of it, as it passes through his land, for all the domestic and agricultural purposes to which it can be reasonably applied, and no proprietor above or below can unreasonably divert, obstruct or pollute it. Waluppa Reservoir Co. v. Fall River, 147 Mass., 548, 554, 18 N.E. 465, 1 L.R.A., 466; Auburn v. Water Power Co., 90 Maine 576-585, 38 Atl. 561, 38 L.R.A., 188.

---

[4]  Report of the Joint Select Committee on Indian Land Claims Relating to LD 2037, "An Act to Provide for Implementation of the Settlement of Claims by Indians in the State of Maine and to create the Passamaquoddy Indian Territory and Penobscot Indian Territory," included within Appendix, Senate Select Committee on Indian Affairs, hearing July 1-2, 1980.

The only limitation upon the absolute rights of riparian proprietors in non-tidal rivers and streams is the public right of passage for fish, and also for passage of boats and logs. ... All these rights which the riparian proprietor has in the running streams are as certain, as absolute, and as inviolable as any other species of property, ...

Opinion of the Justices of the Supreme Judicial Court, 118 Me. 503, 507 (1919) (emphasis added).

The PIN Reservation encompasses the area into which Lincoln discharges its outfall. As such and as a riparian proprietor, PIN possesses certain rights under Maine law, including the right to take fish and the right that others not unreasonably pollute the waters overlying those lands.

## 3.   PIN's right to appeal

The Department finds particularly questionable the attempt to have EPA deny the PIN's right of appeal. We have examined the NPDES regulations which define standing to request a hearing in this matter.  In the Department's view, PIN is an "interested person" as provided in 40 C.F.R. §124.74, which is the sole indicated criterion for filing a request for hearing. Moreover, the PIN meets the criteria under the definitions for "Indian Tribe" and of "person" under 40 C.F.R. § 124.2 as well.  The definition for "Indian Tribe" specifically states that "[f]or the NPDES program, the term 'Indian Tribe' means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation." 40 C.F.R. § 124.2.  PIN meets these requirements. There would appear, thus, no grounds on which to contest PIN's status to request an evidentiary hearing in this proceeding.

Thank you for this opportunity to provide the views of the Department.  Please contact me if you have any further questions.

Sincerely,

Edward B. Cohen
Deputy Solicitor

Enclosures

cc:   The Honorable Francis Mitchell, Chief, PIN
      Patty Goldman, Sierra Club Legal Defense Fund
      Paul Stern, State of Maine, Office of the Attorney General
      Kate Geoffroy, Pierce Atwood

EPA, Office of General Counsel, Washington, D.C.
EPA, Office of Regional Counsel, EPA, Boston
EPA, Indian Desk, Washington, D.C.
Department of Justice, Indian Resources Section
Department of Justice, Office of Tribal Justice
Office of the Regional Solicitor, Boston
Bureau of Indian Affairs, Office of Trust Responsibilities
Bureau of Indian Affairs, Eastern Area Office
Fish and Wildlife Service, Maine Field Office

REPORT
of
JOINT SELECT COMMITTEE
on
INDIAN LAND CLAIMS

    The Joint Select Committee on Indian Land Claims would like to present for the record its findings and intentions in voting on L.D. 2037, "AN ACT to Provide For Implementation of the Settlement of Claims by Indians in the State of Maine and to Create the Passamaquoddy Indian Territory and Penobscot Indian Territory."  During the course of its deliberation on this bill, the Committee received a great deal of information from the office of the Attorney General and representatives of the Passamaquoddy Tribe and Penobscot Nation, including their counsel.  The information and interpretation developed during the committee deliberations are an integral part of the committee's understanding of the bill and were included in the committee's discussion and decision.

    It is the understanding of the Committee that L.D. 2037 is a basic document establishing the principles of the relationship between the State and Indians residing in the State.  It is more of an organic document than a specific bill, and thus it seeks to establish the broad and basic provisions of this relationship, rather than the intricate details.  Because of this nature of the bill, it was not drafted to refer to specific provisions of state law, but to refer to the basic principles of state law that have remained constant.  Thus, it is important that the Committee state that it was considering this bill in the context of present state law, and in some instances, understood that certain specific statutory determinations found elsewhere in State law applied to its intent in the bill.  The Committee did not amend the bill to reflect the specific statutory understanding because that would interfere with the bill's purpose of establishing basic principles.

    It is the understanding and intent of the Committee that this bill establishes the basic principle of full state jurisdiction over Indian lands within the State, including Indian Territory or Reservations.  The bill provides specific exceptions to this principle in recognition of traditional Indian practices and the federal relationship to Indians.  The Committee understands that these exceptions are being granted to resolve the long-standing disputes between the State and Indians, and intends that this resolution will provide the basis for harmoniously developing the relationships between Maine's residents. Except for the specific provisions of this bill, Maine's Indians are to be full citizens of the State with all the rights and duties incumbent on that relationship.

    It is the understanding and intent of the Committee that the answers to specific questions posed by legislators contained in the memorandum to the Committee from Attorney General Richard S. Cohen, dated April 2, 1980 applies to this bill and accurately interprets its provisions.

It is further the understanding and intent of the Com-
mittee that the following specific interpretations apply to
the bill:

1.  The definitions currently used in Title 12, section
7001 relating to inland fisheries and wildlife apply to the
use of those terms in this bill, unless the context clearly
indicates otherwise.

2.  The authority of the Passamaquoddy Tribe, Penobscot
Nation and Tribal-State Commission under this bill are limited
to regulating the taking and possession of fish and wildlife.
That authority does not include any authority over stocking,
propagation and selling or disposition, which remain subject
to general state law.

3.  The provision on transportation of fish and wildlife
permits transportation within the State but outside of Indian
Territory if the fish or wildlife was legally taken in Indian
Territory.  This provision does not exempt that transporta-
tion from other legitimate state police power regulation, in-
cluding requirements relating to public health, sanitation,
registration, sale or disposition.

4.  The provisions relating to Indian sustenance hunting
and fishing apply only to hunting or fishing for personal or
family consumption.  They do not apply to hunting or fishing
to maintain a livelihood or other commercial purpose.

5.  The jurisdictional provisions relating to fish and
wildlife use the term "sides of a river or stream" which means
the mainland shore and not the shoreline of an island.

6.  This bill continues without restriction the power
of the State to determine the assistance it will offer for roads
or highways.

7.  The exemption from State taxation for the income from
the settlement fund is an exemption from state income taxes.

8.  The provision for payment by the Tribe or Nation of a
fee in lieu of taxes on real property will apply only to the
real property in the Territory that is actually located within
the jurisdiction of the taxing authority.  Thus, payments to a
county in lieu of county taxes would be based on the valuation
of the portion of Indian Territory that is within that county's
boundaries.

9.  The tax exemption granted by this bill to Indian property
is not a new exemption under the Maine Constitution, Art. IV, Pt.
3, §23.  Because of the "municipal status" granted to Indian
Territory by this bill, the existing exempt status of "government
purpose" municipal property applies.

10.  The scope of the tax exemption for "governmental pur-

-2-

poses" granted to the Indians under this bill is to be governed
by the limitations established by the general statutes, rules
and case law governing those exemptions in all other municipali-
ties in the State.

11.  The definition of "business capacity" under the tax-
ation provision of this bill means that capacity and resulting
acts which any resident of this state could take in a private
or corporate form without being a governmental agent or agency.

12.  The requirement for municipal approval under section
6205, sub-§5, before property within the municipality may be added
to Indian Territory or Reservation applies to property acquired
in any manner, including property received in return for property
taken by eminent domain or property purchased with the proceeds
of a taking under eminent domain.

13.  The selection process and requirements for selecting
a tribal school committee are internal tribal matters governed
solely by tribal law.  The standards for operating the school
and school committee, including teacher certification, curri-
culum, hours, records and other operational requirements are
governed by State law.

14.  The boundaries of the Reservations are limited to
those areas described in the bill, but include any riparian
or littoral rights expressly reserved by the original treaties
with Massachusetts or by operation of State law.  Any lands
acquired by purchase or trade may include riparian or littoral
rights to the extent they are conveyed by the selling party or
included by general principles of law.  However, the Common
Law of the State, including the Colonial Ordinances, shall
apply to this ownership.  The jurisdictional rights granted by
this bill are coextensive and coterminus with land ownership.

Finally, it is the understanding of the Committee that
Congress may provide that certain provisions of this bill may
not be amended without the consent of the Indian Tribe, Nation
or Band that will be affected by the amendment.  However, it is
also the understanding and intent of the Committee that the state
retains exclusive and unlimited discretion and authority to amend
or repeal any statute relating to Indians that is not contained
in this bill and to enact, amend or repeal any general law even
though it may have an effect on the powers or duties of the Tribe,
Nation or Band as provided by this bill.

This Committee believes that subject to this interpretation,
this bill will provide a firm basis for a strong and sound re-
lationship between Maine's Indians and other citizens.  It is a
major accomplishment of all parties that this difficult, complex
and possible devisive controversy can be resolved in such a rea-
sonable and satisfactory manner.

Signed.

Senate:                                    House: Bonnie Post
Senator Samuel Collins, Jr.                Representative Bonnie Post
           Chairman                                  Chairman

-3-