# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| PENOBSCOT NATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-cv-00254-CZS |
| | ) | |
| JANET T. MILLS, | ) | |
| Attorney General for the State of Maine, | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants | ) | |

## STATE DEFENDANTS' OPPOSITION TO UNITED STATES' MOTION TO INVERVENE

Defendants Janet T. Mills, Chandler Woodcock and Joel T. Wilkinson, by and through their undersigned attorneys, hereby oppose the United States' motion to intervene because the 1980 Settlement Acts ("Settlement Acts") expressly prohibit the United States from asserting the claims set forth in its proposed complaint on behalf of the Plaintiff Penobscot Indian Nation ("PIN"), the United States' "trust" responsibilities do not provide a basis for its intervention on behalf of PIN, and specifically the United States is not the trustee of the Penobscot Indian Reservation, as more fully set forth below.

## BACKGROUND

The United States' motion to intervene is part of a concerted effort by federal agencies and PIN to remake the Settlement Acts without approval from Congress or the State of Maine. The purposes of the Maine Indian Land Claims Settlement Act, as Congress expressed, are:

> (1) to remove the cloud on the titles to land in the State of Maine resulting from Indian claims;

> (2) to clarify the status of other land and natural resources in the State of Maine;
> (3) to ratify the Maine Implementing Act, which defines the relationship between
> the State of Maine and the Passamaquoddy Tribe, and the Penobscot Nation, and
> (4) to confirm that all other Indians, Indian nations and tribes and bands of
> Indians now or hereafter existing or recognized in the State of Maine are and
> shall be subject to all laws of the State of Maine, as provided herein.

25 U.S.C. § 1721(b).  The Settlement Acts provided (1) tens of millions of federal dollars to PIN for the purchase of  up to 150,000 acres of carefully delineated, agreed upon private land; (2) millions of dollars to PIN for a tribal fund; (3) formal federal recognition providing PIN access to many millions of dollars of federal grant and entitlement funds (4) a limited level of clearly prescribed governmental authority for PIN over its delineated lands; and (5) a carefully circumscribed role for the federal government.  After obtaining all of the benefits of the first three, PIN in concert with various federal agencies, has engaged in efforts to dramatically alter the fourth and fifth by claiming jurisdiction and control over the 60-mile Main Stem of the Penobscot River.  There is simply no support for this in the Settlement Acts or their legislative history.

During the negotiations that led to the Settlement Acts, the State insisted on terms that confirmed its regulatory jurisdiction over Indian lands and waters, with only specifically enumerated and limited exceptions.   These provisions were a foundation of the agreement.  PIN's lead attorney during those negotiations described the significance of these jurisdictional provisions to the Maine Legislative Committee considering the Settlement Acts in 1980 this way:

> The Congressional Delegation responded … that it could not move forward with
> Legislation to effectuate the proposed Settlement until a jurisdictional arrangement
> had been agreed to by State Officials.  Thus, the Tribes opened negotiations with the
> State concerning the question of jurisdiction not because they wanted to do so but
> because they were obliged to do so to obtain a Settlement that they had already
> negotiated with the Federal Government….  Deep feelings of suspicion and mistrust
> had developed….But as the negotiations progressed, these feelings of mistrust began

to break down and a spirit of reconciliation made itself felt in these negotiations. Both sides began to attempt to understand and to the greatest extent possible, accommodate the needs of the other.  For the State this meant, among other things, understanding the Tribes' legitimate interest in managing their internal affairs…. For the Indians it meant, among other things, understanding the legitimate interests of the State in having basic laws such as those dealing with the environment apply uniformly throughout Maine.  Increasingly, both sides found areas of mutual interest as, for example, in the case of the General Body of Federal Indian Regulatory Law which the Tribes came to see as a source of unnecessary Federal interference in the management of Tribal property and the State came to see as a source of uncertainty in future Tribal-State relations.  In the end what we end up with was a blueprint for a governmental relationship between Indians and non-Indians alike -- unlike that which exists anywhere else in the United States

*Transcript of March 28, 1980 Public Hearing before the Joint Select Committee on Indian Land Claims* ("*State Hearings*"), 24-25 (1980) (Testimony of Thomas Tureen, Esq.)  The manner in which the Settlement Acts allocated jurisdiction was then and is today unique to Maine.  "It was generally agreed that the [Settlement Acts] set up a relationship between the tribes, the state, and the federal government different from the relationship of Indians in other states to the state and federal governments."  *Penobscot Nation v. Stilphen,* 461 A.2d 478, 489 (Me. 1983).

Having received the benefits of the Settlement Acts, PIN has been assiduously working in recent years to undermine if not eliminate the benefits to the State, and with considerable support from federal agencies.  The present litigation is part of that campaign, in which PIN and federal officials, in the United States Department of the Interior ("DOI") and the United States Environmental Protection Agency ("EPA"), are attempting to rework the Settlement Acts to reflect their own objectives, and to do so with as much secrecy as possible.  The positions taken by this new generation of federal officials differs dramatically from those of federal officials at the time the Settlement Acts were enacted, as well as those who dealt with Maine and the tribes until the 1990's.

By way of example, EPA has entered into a written agreement with PIN in which the

agency agrees to implement its "federal trust responsibility" based not upon the Settlement Acts or even the federal Clean Water Act, but based upon Presidential and EPA policy documents. *Exhibit A,* hereto. Rather than publicly noticing this initiative and seeking comment on it, EPA instead agreed to treat as confidential communications between the two and "make [their] best efforts to protect all such communications, including those that predate [the] agreements that are requested under the Freedom of Information Act." *Id.* In other words PIN and EPA have committed in writing to conceal from public view their communications with one another and their intention to carry out an agenda driven not by duly enacted statutes or regulations, but instead by their own conception of an unwritten and undefined "trust responsibility."

DOI has entered into its own "Memorandum of Agreement" with PIN, which likewise promises to honor trust responsibilities without any reference to the Settlement Acts, and likewise commits the agency to do everything in its power to keep documents and information between them secret. *Exhibit B,* hereto.

In 1999, Maine filed an application with EPA seeking delegation of the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") permitting authority to the State. DOI filed comments with EPA arguing that Maine had no authority over waters in Indian Territory. EPA issued a decision delegating NPDES authority to Maine except as to tribal facilities, including one on Indian Island in the Penobscot Reservation. Maine appealed, and in 2007 the First Circuit ruled that the State's environmental regulatory jurisdiction applies uniformly throughout Maine, including to the Penobscot Reservation. *Maine v. Johnson,* 498 F.3d 37 (1st Cir. 2007). The Court explicitly ordered "as to the two disputed Indian-owned sites, the order is *vacated* and that aspect of the case remanded so that the order can be amended in accordance with this decision…." *Id.* at 49. Despite prodding by Maine and without explanation

for the delay, EPA did not issue such an order until April of 2012. *Exhibit C,* hereto.

One month later, PIN filed with EPA an application for delegation of NPDES authority over the facility dealt with in *Maine v. Johnson*. *Exhibit D,* hereto. In other words, PIN filed an application asking EPA to act in direct contravention of the First Circuit's decision in *Maine v. Johnson.* Apparently honoring their vows of secrecy, neither the EPA nor PIN informed the State of Maine of this application, though it is clear that the two were engaging in regular communications on the matter.

The Clean Water Act also authorizes each State to promulgate water quality standards ("WQSs") for all water bodies in that State. Following the Settlement Acts, EPA regularly approved Maine's WQSs, including those applicable to the Penobscot River. About the time that Maine applied for NPDES jurisdiction in 1999, EPA asserted for the first time that its annual approvals of Maine WQSs did not apply to waters in Indian Territory. Although the State has repeatedly requested that EPA explain the legal basis for distinguishing between Indian and non-Indian waters, asked which water bodies the agency considers to affected by this determination, and asked what water quality standards apply to such waters if in fact Maine's do not, EPA has simply refused to respond. EPA instead published a notice seeking comments on whether Maine has jurisdiction sufficient to apply its WQSs to waters in Indian Territory. *Exhibit E,* hereto.

Meanwhile PIN applied for, and is apparently receiving, over $150,000 from the federal government to finance this litigation.[1] *Exhibit F,* hereto. So against this background showing a concerted, joint-PIN and federal effort to subvert essential terms of the Settlement Acts, it appears that the federal government is simultaneously paying PIN's attorneys fees, and deploying the Department of Justice to intervene as an "independent" force in this litigation.

---

[1] PIN's request in the summer of 2010 predates by two years Attorney General Schneider's letter which PIN asserts in its second amended complaint is the catalyst of this litigation. *Second Amended Complaint,* ¶ 2.

In sum, EPA and DOI, beginning in the 1990's, have been determined to achieve outcomes for the Tribes that ignore the unique legal framework governing state-tribal matters in Maine. As advocates, these agencies do not pretend to interpret and apply the law objectively. Instead, they apply the gloss of an undefined "trust responsibility" that invariably produces strained pro-tribal results, and do so through a secretive process that is invisible to the public. Fortunately, courts have thus far rejected these efforts, as the First Circuit emphatically did in the *Johnson* case. The United States' current motion to intervene should be understood within this context.

## ARGUMENT

### I.    THE FEDERAL SETTLEMENT ACT BARS THE UNITED STATES FROM INTERVENING.

Beyond noting its existence, the motion to intervene devotes little discussion to the provision in the Settlement Acts that expressly bars the United States from asserting future land claims on behalf of the Maine Tribes. Title 25 U.S.C. § 1723(a) provides:

> **(2)** The United States is barred from asserting on behalf of any Indian, Indian nation, or tribe or band of Indians any claim under the laws of the State of Maine arising before October 10, 1980, and arising from any transfer of land or natural resources by any Indian, Indian nation, or tribe or band of Indians, located anywhere within the State of Maine, including but without limitation any transfer pursuant to any treaty, compact, or statute of any State, on the grounds that such transfer was not made in accordance with the laws of the State of Maine.
>
> **(3)** The United States is barred from asserting by or on behalf of any individual Indian any claim under the laws of the State of Maine arising from any transfer of land or natural resources located anywhere within the State of Maine from, by, or on behalf of any individual Indian, which occurred prior to December 1, 1873, including but without limitation any transfer pursuant to any treaty, compact, or statute of any State.

The original bill considered by Congress did not contain these provisions. *Hearings before the Senate Select Committee on Indian Affairs – United States Senate, 96th Congress, Second Session on S. 2829 to Provide for the Settlement of the Maine Land Claims* ("*Senate Hearings*"), at 10-12

(July 1 & 2, 1980).  The bill contemplated that transfers would be "deemed to have been made in accordance with the laws of the State…."  *Id.* at 10-11.  DOI, however, raised concerns about the working draft, explaining:

> We think this is an inappropriate subject for Federal legislation….  Nevertheless, we have agreed to include in our proposed amendment language in lieu of those two paragraphs which would bar the United States from asserting as trustee for the Indians past land claims arising under State law.  Because of the importance of the language finally extinguishing Indian land claims within the State … we will be providing the Committee with an opinion of our Solicitor on the effectiveness of the extinguishment language … of our proposed amendment.

*Id.* at 97.  The DOI Solicitor thereafter explained:

> It should be noted that Sections 4(a)(1) and 4(b) would approve the …transfers and extinguishment of the Indian claims of title as of the date of the original transfer out of Indian possession….
> Section 4(a)(2) and (3) … as introduced, would have Congress deem transfers of Indian land to have been made in accordance with the laws of the State of Maine, and would ratify any such transfer as of the date of the transfer.  We believe that it is inappropriate for the Federal government to extinguish state law claims.  Those claims should instead be extinguished by the State Legislature and in fact are the subject of Section 6213 of the Maine Implementing Act.  Nevertheless, *we agreed, at the request of the State, to insert language in lieu of those two paragraphs which would bar the United States as trustee for the Indians from asserting past land claims arising under state law.*

*Id.* at 90, 93 (emphasis added).  Thus, what became Sections 1723(a)(2) and (3) was drafted specifically to bar the federal government from doing what it seeks to do here.

"Laws of the State" as used in Section 1723 is a defined phrase, meaning:

> the constitution, and all statutes, regulations*, and common laws of the State of Maine* and its political subdivisions and all subsequent amendments thereto or judicial interpretations thereof;

25 U.S.C.A. § 1722(d) (emphasis added).  The proposed positions of the United States in this litigation rest upon just that:  (1) a claim that the Tribe did not transfer all or a portion of the bed of the Main Stem to others in the late 18th and early 19th century treaties and in deeds between Maine or Massachusetts and PIN, and/or (2) that Maine's common law afforded a portion of the

Main Stem's bed to PIN as owner of the islands before the 1980 Settlement Acts. *United States Proposed Complaint,* ¶¶ 12-16, 18. In either case, the DOJ is attempting to do exactly what the 1980 Act of Congress as signed into law by the President of the United States declared the United States could not do – assert claims on behalf of PIN arising before the Settlement Acts based upon Maine law.

The motion to intervene purports to address this issue with this simple declaration in a footnote: "Neither [Section 1723(a)(1) or (2)] are implicated in the present suit, which turns on whether the boundary of the Penobscot Reservation, as defined by federal statute, 25 U.S.C. §§ 1722(i) & 1725(b)(1), extends into the Main Stem of the Penobscot River." *United States Motion to Intervene,* at 6 n.3. Sections 1722(i) and 1725(b)(1) incorporate the *State Act's* definition of PIN's reservation into federal law. The State Act's definition in pertinent part provides that PIN's reservation "means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity … subsequent to June 29, 1818…." 30 M.R.S.A. § 6203(8). As both the proposed United States complaint, at ¶¶ 12-16 & 18, and PIN's second amended complaint, at ¶¶ 36, 53(a), make clear, to the extent this case turns on the boundaries of the PIN reservation in the Main Stem, it will be decided based upon *state* law.

It appears the United States is arguing that because the federal Act incorporates the State Act's definition of PIN's reservation, Section 1723(a)(2) does not apply. If so, Section 1723(a)(2) never applies to any situation in which there is a dispute over the boundaries, extent or location of a reservation in Maine, and the USDOJ can always "assert[] on behalf of any …

Indian nation … any claims arising under the laws of the State of Maine arising before October 10, 1980…."  Of course, this simplistic approach renders entirely meaningless Section 1723(a)(2), a result both contrary to DOI's explanation in 1980, as set forth above, and certainly the accepted rules of statutory construction.   *United States v. Ahlers,* 305 F.3d 54, 58 (1st Cir. 2002) ("We presume that Congress intended all words and provisions contained within a statute to have meaning and effect, and we will not readily adopt any construction that renders any such words or phrases meaningless, redundant, or superfluous."); *Maine Ass'n of Retirees v. Board of Trustees of Maine Public Employees,* --- F.Supp.2d ----, 2013 WL 3212360 at *12 (D.Me.) (Singal, J.).  Since the United State intends to assert a claim on behalf of PIN based on the meaning, application and construction of state property law, Section 1723(a)(2) bars the claim, and the motion to intervene should be denied accordingly.

## II.   THE SETTLEMENT ACTS SET FORTH THE ENTIRETY OF THE "TRUST" RESPONSIBILITIES OF THE UNITED STATES, DOI, EPA AND DOJ TO THE PENOBSCOT NATION.

The United States also claims some undefined trust responsibility as a basis for its involvement in this case.  As noted above, a key component of the resolution of the jurisdictional and land claims disputes in Maine was to avoid "unnecessary Federal Interference….."  *State Hearings*, at 25 (Testimony of Lead Tribal Counsel Thomas Tureen, Esq.).  As summarized above, an underlying problem in the ongoing relationships between and among the federal government, the Maine Tribes and the State of Maine is that federal agencies assert the existence of an unwritten, over-arching, "trust" responsibility independent from the Settlement Acts and any other federal law in order to justify advocacy on behalf of perceived tribal interests.  To the extent these agencies rely upon Executive Orders or other policy statements to explain their tribal advocacy, these documents do not and cannot be interpreted as effectively preempting statues

9

enacted by Congress and signed into law by the President.  *See Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 179-80 (1947); *Sioux Tribe of Indians v. United States*, 316 U.S. 317 (1942).

Moreover, the approach these agencies have taken to tribal issues in Maine seems designed to bring about conformity with notions of federal Indian law that have no place under the Settlement Acts.  The situation in Maine is unique.  Congress' authority to legislate over Indian affairs is plenary, and Congress can abrogate or limit an Indian tribe's sovereignty by treaty, statute or necessary implication. U.S. CONST., art. I, § 8, cl. 3; *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *United States v. Wheeler*, 435 U.S. 313 (1978);  *Morton v. Mancari*, 417 U.S. 535, 551-53 (1974).  Congress has enacted settlement statutes that resolve issues and claims for various tribes in different ways, taking into account the peculiar circumstances of each situation.  *See generally* 25 U.S.C. §§ 1701, 1721, 1741, 1751, 1771, 1772, 1773, 1774, 1775 (discussing Congressional role in resolving disputes in Rhode Island, Maine, Florida, Connecticut, Massachusetts, Washington State, and New York); *Connecticut ex rel. Blumenthal v. U.S. Dept. of Interior*, 228 F.3d 82, 90 (2d Cir. 2000) (noting that differences in the provisions between tribal settlement acts are given effect).  The apparent efforts of EPA and the DOI to advocate for greater tribal sovereignty in states like Maine, as evidenced by the agency's execution of confidentiality  agreements with PIN (*Exhibits A & B,* hereto), directly contravene the work of Congress to tailor settlements that take into account the differences regarding each tribe in each state.

The Courts have appropriately rejected this free floating view of tribal-federal trust relations, which agencies appear inclined to treat as license to decide any issue affecting a tribe in whatever manner the agency sees fit.

> T]he applicable statutes and regulations "establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities." When "the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, ... neither the Government's 'control' over [Indian assets] nor common-law trust principles matter." The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute.

*United States v. Jicarilla Apache Nation,* 131 S.Ct. 2313, 2316 -2317 (2011).  In

*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18 (1st Cir. 2007), the Court had before it a

"trust obligation claim" tendered by members of the Passamaquoddy Tribe.  The Court

explained, "the 'general trust relationship between the United States and the Indian people" is

insufficient to establish specific fiduciary duties.  Substantive statutes and regulations must

expressly create a fiduciary relationship that gives rise to defined obligations." *Id.* at 31

(citations omitted).  The Court in *Nulankeyutmonen Nkihtaqmikon* rejected a claim to a trust

relationship because the federal government did not manage the Passamaquoddy Reservation in a

fiduciary fashion.  *Id.  See also United States v. Mitchell (Mitchell I),* 445 U.S. 535, 542 (1980)

(no fiduciary duty to Indian allottees where "[t]he Act [in question] does not unambiguously

provide that the United States has undertaken full fiduciary responsibilities as to the management

of allotted lands").  The United States' relationship with the Penobscot Reservation is exactly the

same under the Settlement Acts as its relationship with the Passamaquoddy Reservation.  The

federal government does not claim to manage the Penobscot Reservation –  nor could it.  The

federal government simply has no trust relationship with the Penobscot Reservation that permits

it to have a role in the determination of its boundaries.

As DOI itself explained both before and after the Settlement Acts, moreover, the federal

government is not the *trustee* of the reservation – the State of Maine is.  *Hearing before the*

*House Committee on Interior and Insular Affairs on H.R. 7919*, 96th Cong. 2d Sess. August 25,

1980, at 43 (U.S. Department of the Interior explained that the State of Maine would continue to hold fee title to any tribal lands but that the tribes have a right of exclusive use and occupancy); Letter dated May 17, 1983, from Lawrence J. Jensen, Assoc. Solicitor, DOI, to Kenneth Plumb, Secretary, FERC (*Exhibit G,* hereto); *Bangor Hydroelectric Co. (Milford),* 83 FERC P61,037, 61,086 (1998).[2]  *See also Maine v. Johnson,* 498 F.3d at 47; House Report No. 96-1353, *Providing for the Settlement of Land Claims of Indians, Indian Nations and Bands of Indians in the State of Maine....,* at 15 (September 19, 1980) ("Existing land within the reservation .. will not be taken by the United States in trust.  These lands will simply be subject to a federal restriction against alienation....")

In addition, the federal Act makes clear that pre-settlement and post-settlement "laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes" do not apply in Maine where they accord special rights or status to tribes or to land held in trust for tribes.  25 U.S.C. §§ 1725(h) & 1735(b).  In particular, Section 1725(h) establishes that the laws and regulations of the United States generally applicable to "lands owned by or held in trust for" Indian tribes do not apply in Maine where they accord a special status to tribal lands or lands held in trust, *and* where those federal laws affect or preempt the jurisdiction of the State of Maine, including laws relating to environmental matters.  Here, the United States is asserting a generally applicable trust responsibility (which, if it exists, must be founded in federal law) to support intervention in order to create a special status for PIN that undermines Maine's jurisdiction over the Main Stem – exactly what Section 1725(h) prohibits.  Section 1735(b)

---

[2] As further explained by the Federal Energy Regulatory Commission on August 9 of this year: "*Beginning with the 1984 relicensing of the West Enfield Project, the Commission has consistently concluded that the United States does not have a proprietary interest in the aboriginal lands (i.e. the river islands) of the Penobscot Nation, and so these lands are not a 'reservation' within the meaning of the Federal Power Act*."  *Mattaceunk Hydroelectric Project,* P-2520-072, Scoping Document 2, at § 2.2.1 (italics in original), *available at* http://elibrary.ferc.gov.

establishes that post-Settlement Act federal laws made for the benefit of Indian tribes "shall not apply within the State of Maine, unless such provision … is specifically made applicable within the State of Maine."  DOJ fails to cite any laws authorizing any federal agency to intercede in property disputes between PIN and Maine.[3]

The amorphous "trust" the United States invokes, to the extent it exists anywhere, is exactly what Congress made inapplicable in Maine as a means of ensuring that the Settlement Acts themselves were the sole source of federal law regarding the tribes in Maine.  Thus, to the extent any statute, policy, regulation or Executive order of general application exists that speaks to federal trust responsibilities, it would not apply in Maine.

## CONCLUSION

Congress expressly barred the United States from making the very claims it presents here, and the United States is not the trustee of the Penobscot Nation reservation under the Settlement Acts and by application of clear precedent.  The motion to intervene should be denied accordingly.

---

[3] Moreover, the policy of specificity underlying Section 1735(b) should defeat the federal government's effort here to rely upon post-Settlement Act general policies and Executive orders cited by DOI and EPA in their confidential agreements.  *Exhibits A & B,* hereto.  None of these nonstatutory documents mention Maine.

WHEREFORE, State Defendants respectfully ask this Court to deny the pending motion to intervene.

Dated:  August 30, 2013                         Respectfully submitted,


                                                JANET T. MILLS
                                                Attorney General

                                                /s/ Paul Stern
                                                PAUL STERN
                                                Deputy Attorney General
                                                (207) 626-8568
                                                paul.d.stern@maine.gov

                                                GERALD D. REID
                                                Chief, Natural Resources Division
                                                (207) 626-8545
                                                jerry.reid@maine.gov

                                                Office of the Attorney General
                                                6 State House Station
                                                Augusta, Maine 04333

                                                Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on this, the 30th day of August, 2013, I electronically filed the above

document with attachments with the Clerk of Court using the CM/ECF system which will send

notification of such filing to all parties.


Dated: August 30, 2013                    /s/ Paul Stern_____
                                          PAUL STERN
                                          Deputy Attorney General
                                          Office of the Attorney General
                                          Six State House Station
                                          Augusta, ME 04333-0006
                                          Tel. (207) 626-8568