Office of the Chief and Council

Kirk E. Francis
*Chief*

Bill Thompson
*Vice-Chief*

Wayne T. Mitchell
*Representative*



Penobscot Nation
12 Wabanaki Way
Community Building
Indian Island, Maine 04468
(207) 827-7776

FAX (207) 827-6042

August 11, 2010

Via Federal Express

Vicki Forest
Deputy Director
Bureau Division, Trust Services,
US Department of the Interior
1849 C. Street N.W.
Washington, DC 20240

Re: Penobscot Nation Request for Funds to Pay for Attorney Fees and Litigation Support, 2010

Dear Ms. Forest:

The Penobscot Nation (the "Nation") submits this application for funds to pay for legal costs associated with litigation with the State of Maine (the "State") concerning the scope of the Penobscot Reservation within the Penobscot River. The Tribe submits this application in accordance with the requirements of 25 C.F.R. §§ 89.42 and 89.43. Please direct questions to our Legal Analyst, Mark Chavaree (207) 827-7776 (ext. 7324).

Thank you very much for your timely consideration of our needs.

I. THE NATURE AND SCOPE OF THE PROBLEMS FOR WHICH LEGAL SERVICES ARE SOUGHT

In accord with the 1998 opinion of the Acting Solicitor, Edward Cohen (attached as Exhibit A) (DOI Opinion), Penobscot Nation Game Wardens enforce Penobscot Nation permitting requirements for hunting, trapping or taking of wildlife within the Penobscot River, from Indian Island, northward.

The Maine Indian Claims Settlement Act provides that the Penobscot Nation has "exclusive authority . . . to promulgate and enact ordinances regulating . . . [h]unting, trapping or other taking of wildlife" within Penobscot Indian Territory. 30 M.R.S.A. § 6207(1)(A), *ratified and made effective by* 25 U.S.C. §§ 1721 *et seq.* Such ordinances may also "include special provisions for the sustenance of individual members of . . . the Penobscot Nation." *Id.* Penobscot Indian Territory includes the Penobscot Reservation. 30 M.R.S.A. § 6203(8), *ratified and made effective by* 25 U.S.C. §§ 1721 *et seq.*

As set forth in the DOI Opinion, the Penobscot Reservation includes the Penobscot River, bank to bank. This view is confirmed by the decision of the Penobscot Nation Tribal Court in the matter of *Penobscot Nation v. Coffman*, Docket 7-31-03-CIV-4 (attached as Exhibit B). It is also confirmed in the opinion of the Maine Attorney General to the State's Chairman of the Atlantic Sea Run Salmon Commission, dated February 16, 1988 (attached as Exhibit C) (the Commission has no jurisdiction to regulate sustenance fishing by Penobscot Nation tribal members "*in the Penobscot River within the boundaries of the Penobscot Nation*"). As stated in that opinion, by the terms of the Maine Indian Claims Settlement Act, "[n]otwithstanding any . . . law of the State," Penobscot Nation tribal members "may take fish within the boundaries of" the Penobscot Reservation "for their individual sustenance." 30 M.R.S.A. § 6207(4).

The State of Maine is challenging the authority of Penobscot Game Wardens to enforce Penobscot Nation permitting requirements for hunting, trapping or taking of wildlife within the Penobscot River. This is because the State of Maine, through its Attorney General, now takes the position that the Penobscot Reservation does not include the Penobscot River. In the view of the State, the Penobscot Reservation is limited to the islands of the Penobscot River in the main stem, from Indian Island up to Medway, and some undefined riparian rights, unless otherwise "transferred" to non-Indian parties.

The State's Attorney General's Office has made clear that if Penobscot Game Wardens seek to enforce Penobscot Nation permitting laws for hunters taking wildlife on the river, it will commence litigation against the Nation. Because Congress waived the Nation's sovereign immunity from suit, see 25 U.S.C. § 1725(d)(1), such an action can proceed. The State is likely to bring the action in state court, where it would have a more favorable forum than in federal court. Opportunities for the Nation to secure federal court jurisdiction for this litigation need to be explored.

The Penobscot Nation has no intention of relinquishing its authority to regulate hunting, trapping, and taking of wildlife in the Penobscot River. As such, the controversy will come to a head; litigation is inevitable. (Attached as Exhibit D are two summonses issued by Penobscot Nation Game Wardens to duck hunters on the Penobscot River last year. These individuals were fined for failing to carry Penobscot permits. There is every reason to expect that similar enforcement will be required when the hunting season begins this upcoming fall.)

## II.  STATEMENT OF THE TERMS, INCLUDING TOTAL ANTICIPATED COSTS, OF THE REQUESTED LEGAL SERVICES

The Nation breaks down its expected attorney costs associated with this controversy. A copy of our attorney contract is attached as Exhibit E.

1.  **Attorney Fees**

    Research and analysis of likely State causes of action and opportunities for removal to federal court.

    80 hours

    Research and analysis of opportunity for original federal court action by Penobscot Nation against State officers to preserve federal court jurisdiction

    80 hours

    Prepare legal and factual analysis on scope of reservation beyond islands: Treaty reviews, legislative history; federal and state law analyses of reservation scope, develop legal arguments regarding "transfer."

    120 hours

    Prepare responsive pleadings for action brought by State (removal motion/Answer/Affirmative Defenses or complaint for original action in federal court (depending upon legal analyses developed)

    40 hours

    Prepare motion or response to motion on removal/federal court issues; prepare and present oral argument on same

    60 hours

    Facts/Expert opinion development for scope of reservation case and discovery related to same

    200 hours

    Summary Judgment Motion Practice (assuming State to file)

    80 hours

    Trial preparation and trial

    200 hours

    Total Attorney Fees (at $165/hour x 860)        $141,900

2.  **Expert Witness Expenses**

    Historian:  Historical analysis of aboriginal occupation of and use of the Penobscot River; treaty review; other research; prepare report; prepare for testimony; provide deposition testimony; provide trial testimony

    150 hours

    Total Expert Witness Fee (at $250/hour x 150)        $37,500

    **Total**        $179,400

### III. CURRENT FINANCIAL STATEMENT AND TRIBE'S ABILITY TO PAY ATTORNEY COSTS

By virtue of State and federal court decisions construing the strictures of the Maine Indian Claims Settlement Act, the Penobscot Nation is unable to engage in gaming pursuant to the Indian Gaming Regulatory Act and thereby obtains no governmental revenues from gaming under the IGRA. It possesses insufficient tribal funds or assets to pay these anticipated attorney fees and litigation costs. The Nation's current financial statement is attached hereto as Exhibit F. As indicated, most of the Nation's funds are in the form of grants and contracts that cannot be spent for this litigation. The Nation's small bingo facility (governed by state law) continues to lose money. The Nation assumed almost a million dollars in debt from a failed mail-order pharmacy business. The General Fund (the Tribe's only real discretionary funds) has a deficit balance and is barely sufficient to cover essential operational needs. (The 2009 operating surplus was due to indirect shortfall recoveries, which does not fully cover the past shortfalls.) For additional information on the Nation's financial condition, please contact Dan Nelson, Director of the Penobscot Nation Finance Department at (207) 827-7776 (ext. 5317).

### IV. REASONS FOR RETAINING PRIVATE COUNSEL AS OPPOSED TO THE DEPARTMENT OF JUSTICE OR DEPARTMENT OF INTERIOR ATTORNEYS

The protection of the Nation's trust resources and the scope of its reservation are at stake. Unless we are mistaken, the Solicitor is unable to provide the services of his office in this matter. (We are copying Christopher Watson, Esq. on this request and ask that he inform us if we are mistaken.) Thus, this application meets the requirements of 25 C.F.R § 89.41(b) and § 89.41(c).

### V. FACTORS FOR CONSIDERATION (25 C.F.R. § 89.42)

#### A. The Merits of the Legal Position which the Penobscot Nation Asserts

The Penobscot Nation has strong grounds for prevailing. The Nation's position is consistent with the Department's Opinion on this subject. Again, the Nation defends the EPA's decision to retain NPDES authority over the tribally-owned facilities.

#### B. The Ability of the Tribe to Pay All or a Part of its Legal Expenses Out of its Own Funds

The Tribe is unable to fund this litigation effort from its own funds, given its financial circumstances as set forth in the Tribe's financial statement. <u>The Tribe's Finance Director, Dan Nelson (207) 827-7776 (ext. 5317) is available for further information</u>.

C.  Whether the Question the Tribe Seeks to Litigate is Being Litigated in Another Case by Another Tribe

No other tribe is litigating this issue. It is unique to the Penobscot Nation.

D.  Whether, as a Matter of Strategy, the Issues the Tribe Seeks to Litigate Could be More Satisfactorily Resolved in Another Forum, In a Different Forum, in a Different Factual Context, or a Different Time
and

E.  Whether the Issue Should be Litigated at All in Preference to a Legislative or Other Solution

There is no legislative or other alternative solution to the problems presented.

\* \* \*

On behalf of the Penobscot Nation, I want to express my gratitude for your Committee's careful consideration of our needs.

Please do not hesitate to contact me should you have any questions.

Sincerely,

Kirk Francis, Chief

cc:  Penobscot Nation Tribal Council
Ira New Breast
Christopher Watson
Al Sedik
Mohamed Baloch
Mark Chavaree
Daniel Nelson
Kaighn Smith Jr.