

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

FINAL DRAFT
(PENOBSCOT)    1/10/77

Honorable Peter R. Taft
Assistant Attorney General
Land and Natural Resources Division
U.S. Department of Justice
Washington, D.C.    20530

Attention:  Mr. Myles E. Flint
            Acting Chief,
            Indian Resources Division

Dear Mr. Taft:

This is our litigation report on the Penobscot Indian Nation land claim, United States v. Maine, Civil No. 1969 N.D., U.S.D.C., D. Maine. We have also sent you our separate report on the very similar claim of the Passamaquoddy Tribe. The legal principles underlying both cases are virtually identical. Therefore, to the extent that this report's discussion of such principles is incomplete, please refer to the Passamaquoddy report.

Unlike the Passamaquoddy situation, the question of the existence of a trust relationship between the United States and the Penobscot Indian Nation has not been adjudicated. Nonetheless, a protective complaint in the instant suit was filed in July, 1972 pursuant to a stipulation entered into between representatives of your Department and the Nation. This was done in apparent acknowledgment of the similarity of the Penobscot claim to that of the Passamaquoddies. By letter of July 6, 1972 this office had indicated that it would have no objection to the filing of such a protective complaint.

We must now determine to what extent the decision in Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975), requires the United States



Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-2-

to assist the Penobscots in the pursuit of their claims under the Indian Nonintercourse Act (25 U.S.C. § 177). The Court of Appeals held that the Act should be read to include within its coverage Indian tribes other than those which have been specifically recognized by the federal government. In other words, the Act's restriction against the alienation of tribal lands is applicable to Indian tribes identifiable as such by reference to racial and cultural factors rather than to affirmative governmental action. <u>Id</u>. at 377. Accordingly, as an initial matter we must ascertain whether the Penobscot Indian Nation is an Indian tribe in the racial and cultural sense, and thus entitled to the protection of the Nonintercourse Act.

The Court also ruled that the Act establishes a trust relationship between the United States and the tribes protected by its provisions with respect to tribal lands subject thereto. Thus, unless such a trust relationship has ever been terminated, the Tribe's land claims must be examined to determine whether there has been compliance with the Act, and the United States must then take appropriate action in light of its statutory trust responsibilities. In summary, our inquiry preliminary to the making of a recommendation is:

1) whether the Penobscot Indian Nation is an Indian tribe in the racial and cultural sense;

2) whether any trust relationship arising from the Nonintercourse Act has ever been terminated;

3) what Penobscot tribal lands are covered by the Act; and

4) whether the United States has, as required by the Act, ever consented to the alienation of any such lands.

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-3-

See <u>Narrangansett Tribe of Indians v. Murphy</u>, C.A. No. 750005, U.S.D.C., D.R.I., opinion entered June 23, 1976, at p. 9.

## ANALYSIS

### A. Tribal Existence.

Enclosed you will find a report on the history of the Penobscot Nation as it relates to their land claim. [Appendix AA] This report was prepared by experts available to testify in support of the conclusions stated therein. Also enclosed are copies of the source materials cited in the report. [Appendix BB] Part I of the report provides detailed evidence of continuous Penobscot tribal existence since the seventeenth century. Note that, like the Passamaquoddies, the Penobscots are today recognized as an Indian tribe by the State of Maine. Also enclosed is a copy of an August 6, 1976 memorandum from the Acting Deputy Commissioner of Indian Affairs which offers the Bureau of Indian Affairs' considered opinion that the Penobscot Nation is an Indian tribe in the racial and cultural sense. [Appendix CC]

### B. Trust Relationship.

Having found that the Penobscot Nation is an Indian tribe within the meaning of the Nonintercourse Act, we must determine whether the trust relationship created by that Act has ever been terminated. We can find no basis for concluding that such a termination has ever occurred. No federal legislation appears even to mention the Penobscots by name, much less suggest a termination of any trust responsibilities flowing from the Nonintercourse Act. Of course, it was a similar lack of "recognition" which led the Government to deny the existence of any trust relationship with the Passamaquoddy Tribe during the pendency of <u>Passamaquoddy Tribe v. Morton</u>. However, the courts have held that the Nonintercourse Act is a sufficient source of such a relationship. And we can find no affirmative evidence that this has ever been legislatively undone.

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-4-

The State of Maine may nonetheless contend, as it did before the U.S. Court of Appeals, that the absence of any active relationship between the United States and the Penobscot Nation for over 180 years has served to terminate the Government's trust obligations. But in specific answer to that contention the court held: "[O]nce Congress has established a trust relationship with an Indian tribe, Congress alone has the right to determine when its guardianship shall cease." 528 F.2d at 380.

C.  Penobscot Lands Covered by the Nonintercourse Act.

The Penobscot claim is one based on both aboriginal title and title secured by a number of eighteenth century treaties. Section II of the enclosed report indicates that the Penobscots occupied as their aboriginal territory all of the Penobscot River watershed and also a large portion of the St. John River watershed in northern Maine. Since that report was prepared, additional research has been conducted for purposes of determining what portion of the latter watershed was used and occupied by the Penobscot Nation. We will provide the detailed results of that research as soon as it is available. At present, it appears that there is evidence that the Penobscots possessed what is now the northwestern corner of Maine in aboriginal times, but that the Malicetes used and occupied the northeastern corner. Additional research will enable us to draw an accurate boundary between the two aboriginal territories.

Section II of Appendix AA relates a series of complicated and confusing transactions between the Penobscot Nation and British colonial authorities prior to 1775. While those transactions provided recognition for the sovereignty of the Tribe and its aboriginal claims, they also resulted in the cession of some Penobscot territory. The precise extent of those cessions is far from clear, and this is a subject of our continuing research.

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-5-

Nevertheless, as the report shows, our experts are prepared to testify that at the time of the American Revolution, and until 1796, the Penobscots continued to hold dominion over all of that portion of their aboriginal territory which lay above the head of the tide on the Penobscot River. 1/ This is estimated to be 6 to 8 million acres of land.

### D. Consent of the United States.

The Penobscots' loss of the remainder of their territory is also described in detail in Appendix AA. The first major transaction was in 1796 when the Tribe deeded to the Commonwealth of Massachusetts all its "right, Interest, and claim to all the lands on both sides of the River Penobscot, beginning near Col. Jonathan Eddy's dwelling house, at Nickels's rock, so called, and extending up the said River thirty miles on a direct line," excepting Oldtown island and all the islands above it. The dwelling house referred to appears to have been situated near the head of the tide. There is no evidence that the United States was a party to the transaction or that the Congress approved it in accordance with the Nonintercourse Act.

Other lands in the Penobscot watershed were granted to individuals after 1790 without the consent of either the United States or the Penobscot Nation. We are developing a file of the conveyance instruments used in these transactions as evidence of violation of the Nonintercourse

---

1/  We understand that the head of the tide lay between Oldtown and what is now Bangor during the eighteenth century. However, a modern dam has prevented the tide from reaching beyond Bangor in recent times.

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-6-

Act. It is interesting to note that, unlike the Passamaquoddy situation, very little non-Indian settlement had taken place in Penobscot territory at the time of the enactment of the Nonintercourse Act. Indeed, the 1790 U.S. Census provides no population figures north of the Eddy township which was apparently near the head of the tide. Heads of Families-Maine, U.S. Census (1790) at p. 9.

Most of the rest of Penobscot territory was lost as a result of the treaty of June 29, 1818 between the Penobscot Nation and Massachusetts. Reserved from an otherwise complete cession of all their lands above the thirty-mile tract lost in the 1796 transaction were four townships now identified as Mattamwamkeag, Woodville, Indian Purchase, and Millinocket. Those townships were purchased by the State of Maine in 1833. None of these transactions appear to have been executed in accordance with the Nonintercourse Act. As a result, the Penobscot Nation today holds only the islands in the Penobscot River between Oldtown and Mattawamkeag.

## RECOMMENDATION

We propose that the complaint in the Penobscot Nation claim against the State of Maine be amended to seek ejectment of all persons in possession of Penobscot aboriginal lands north of the head of the tide of the Penobscot River, and also mesne profits for the period of the Nation's dispossession. At the same time we wish to reserve judgment on the Penobscot claim to any lands below the head of the tide until further research has been performed.

PN-001136

Original in
Harvard Law Library
Unauthorized Reproduction
Prohibited

-7-

Our recommendation, of course, involves a huge claim which may have dire consequences for the residents of northern Maine. However, as we have discussed in detail in our Passamaquoddy litigation report, the federal trust responsibility to Indian tribes compels us to recommend the prosecution of claims of this nature. The recent decision of the U.S. Court of Appeals for the Ninth Circuit in United States v. Southern Pacific Transportation Co., No. 74-3333 (Sept. 10, 1976), confirms the correctness of that view. There the United States sued for trespass on behalf of the Walker River Paiute Tribe of Nevada on the ground that the operation of a railroad across Indian lands since 1882 violated the Indian Nonintercourse Act. The appellate court agreed, adding:

> "Although it may appear harsh to condemn an apparent good-faith use as a trespass after 90 years of acquiescence by the owners, we conclude that an even older policy of Indian law compels this result."
> Slip opinion at page 37.

Accordingly, we also recommend that you inform the court by January 15, 1977 that the United States intends to pursue the Penobscot land claims.

For further information or for assistance in the prosecution of this claim, we suggest you contact Lawrence A. Aschenbrenner, Assistant Solicitor for Indian Affairs.

Sincerely yours,