RECEIVED
MAY 3 1977

R. F.
TON

MEMORANDUM

TO:      The Honorable William B. Gunter

FROM:    Archibald Cox

RE:      Letter of April 20, 1977.

DATE:    April 29, 1977

In your letter dated April 20, 1977 you set forth
two factual and twelve legal questions.  In this memorandum I,
on behalf of my colleagues, shall attempt to respond to all of
these questions.  For the record, we should state that this
submission is made solely for the purpose of our discussions
with you as special representative of the President.  It is
our understanding that nothing set forth in this memorandum will
be used or in any way referred to by anyone in any other proceed-
ing, including judicial actions.  In short, this memorandum is
presented with a full reservation of all our clients' rights
respecting the future prosecution of their claims.

>      Question (a):    Was the aboriginal title of the
>                       Passamaquoddy and Penobscot
>                       Tribes extinguished by Governor
>                       Pownall by force in 1759?

Answer:  No.  This argument first appears in Attorney
General Joseph Brennan's letter to the Members of the Maine
Legislature dated February 18, 1977:

> In 1755 the French-Indian Wars were
> underway.  The Province of Massachusetts
> declared war on the Penobscot and Passa-
> maquoddy Tribes that year.  By 1759 the
> war in Maine had come to an end.  That
> year Governor Thomas Pownall travelled

PN-002545

up the Penobscot and issued a proclamation declaring that the land of the Penobscot and their allies the Passamaquoddy, had been lost through conquest by Massachusetts. This act of Conquest was subsequently acknowledged by both tribes in various documents in 1760 and later. Although the Tribes continued to occupy some lands in Maine, then eastern Massachusetts, they did so at the sufferance of Massachusetts, the Tribes having lost any right of aboriginal possession.

In its Memorandum in support of its request for further extension of time which the Justice Department filed with the District Court on February 28, 1977, the Department responds as follows:

It has been asserted that the tribes' rights to the use and occupancy of the lands in the modified claim area have been extinguished by various transactions which occurred either before or after the passage of the Trade and Intercourse Act in 1790. There is no question that the sovereign may extinguish aboriginal title. Johnson v. McIntosh, 21 U.S. 543 (1823). The sovereign may extinguish title by purchase, conquest followed by dispossession, or by the exercise of complete dominion over the property adverse to the continued use or occupancy of the tribe. United States v. Santa Fe Pacific R. Co., 314 U.S. 339 (1941), rehearing denied, 314 U.S. 716 (1942). When the transactions discussed hereinafter are viewed in the light of this law, it is clear that the tribes' title was not extinguished.

It is asserted, first, that the tribes' title was extinguished by Pownall, the Royal Governor of Massachusetts, in 1759. At the outset of the French and Indian War in 1754 and 1755, Pownall declared war on all the tribes in eastern Maine, including the Penobscots. Pownall never engaged the Indians in battle or invaded and occupied the areas encompassed within the modified claim area. In 1759 Pownall issued a Proclamation which provided:

-2-

PN-002546

"May 23, 1759, Province of Massachusetts Bay--Penobscot Dominions of Great Britain, Possession Confirm'd by Thos. Pownall, Govr."

Immediately after issuing the proclamation, Pownall buried a leaden plate at the head of the tide on the Penobscot River on which the Proclamation was inscribed. That was the limit of settlement in 1759 and still was in 1790. It also is the southern limit to the modified claim on behalf of the Penobscots. It is argued that by these actions Pownall extinguished the tribes' claims. We disagree.

It is a well-settled principle of law that more is required to extinguish aboriginal title than a mere declaration of dominion over a tribe. Johnson v. McIntosh, 21 U.S. 514 (1823). Circumstances surrounding the issuance of the Proclamation show that the purpose of proclaiming dominion over the Penobscots' lands was an attempt to establish English jurisdiction over them and thereby discourage allegiance with the French. Pownall made no attempt to remove them from their lands. Thus all Pownall did was to establish the relationship necessary for the sovereign to treat the tribal occupancy rights. The action did not impair in fact the tribes' use and occupancy of the land. Johnson v. McIntosh, 21 U.S. at 572.

Pownall's actions followed the well-settled principle of adjusting rights in the New World among competing European sovereigns rather than rights of actual occupancy. Local occupancy rights would only be affected if the conquest were established by actual expulsion of the natives. As the Supreme Court stated in Worcester v. Georgia, 6 Pet. 515, 543 (1832):

"This principle, suggested by the actual state of things, was, 'that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.'"

-3-

PN-002547

This dominion set up the right to deal with the occupants for actual possession:

"It regulated the right given by discovery among European discoverers; but could not affect the rights of those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man. It gave the exclusive right of purchase, but did not found that right on a denial of the right of the possessor to sell."

Except for the fact that the French and the English were at war over their rights to Maine, the situation is no different than the original discovery of the New World, or the Louisiana Purchase or the Purchase of Alaska. In each case, the sovereign dominion obtained merely set the stage for dealing with the actual occupancy of the natives.

Here the tribes actively continued to use and occupy the lands contained in the modified claim area without interruption after the issuance of the Proclamation. That use and occupancy was only ended after the tribes had entered into treaties with the State of Massachusetts after 1790 which were invalid under the terms of the Trade and Intercourse Acts. The fact that the State of Massachusetts dealt with the tribes, is itself proof that the State considered these groups as tribes and recognized the extent of their land use rights. All these factors lead to the conclusion the tribes' use and occupancy had not been extinguished by conquest.

We believe that the Justice Department was clearly correct. In defeating the French and establishing dominion over what is now eastern Maine, Pownall obtained whatever rights the French held in the area vis-a-vis the Indians, but did not thereby automatically extinguish the possessary rights of the Indian occupants. To acquire a complete right of

-4-

PN-002548

possession, Pownall would have had not only to defeat the
French, but would also have had to extinguish the possessary
rights of the Indians as well.[1]  This Pownall failed to do.

Governor Pownall never invaded or occupied any part
of the Penobscot aboriginal territory above the head of the
tide on the Penobscot River, made no attempt to remove the
Indians from that area, and the tribes continued in the un-
interrupted use of those lands after the French and Indian
War.[2]  Nor did the Indians formally cede any lands after the
alleged conquest.  Governor Bernard, Pownall's successor,
agitated for a treaty with the Penobscots, but was thwarted in
his efforts to obtain one.  In the Watertown Resolve of 1775
the Massachusetts Provincial Congress recognized Penobscot
rights by forbidding trespass on the heart of the tribe's
aboriginal territory.  Indeed, the tribes remained in possession
of their land until they were ousted by the series of illegal
treaties beginning in 1794 which are the primary subject of
these claims.[3]

---

1/  The historical summaries submitted as Appendices "C" and
"D" to Professor Cox's letter of March 22, 1977 to The
Honorable William B. Gunter demonstrate that as of the
time of the French and Indian War the Passamaquoddy tribe
had ceded no land and the Penobscot tribe had ceded only a
small tract in the vicinity of St. Georges.

2/  Pownall had no direct dealings whatsoever with the
Passamaquoddies.

3/  For a detailed discussion of all the events, see the docu-
ments cited in Footnote 1, supra.

PN-002549

The State of Maine would argue nonetheless that the Penobscot Nation surrendered to Governor Pownall on April 29, 1760, that in adopting the Watertown Resolve the Massachusetts Provincial Congress did not recognize preexisting land rights in the Penobscots but merely assigned hunting and fishing rights to them in a very limited area, and that the later treaties with the tribe are not proof of aboriginal title since in those transactions Massachusetts and Maine gave land to, but never took land from, the Indians. 4/

The primary evidence of the purported surrender to Governor Pownall is a document dated April 29, 1760 in which four individual Penobscots, on behalf of themselves and their families, agreed to be taken into Pownall's protection. 5/ Apparently Pownall was not able to force the tribe to sign a treaty as such, and attempted instead to get the members of the tribe to surrender individually. 6/  Since only four Penobscots signed, the effort was clearly a failure and, if anything, proves that the Penobscots were not conquered; if they had been, Pownall would have been able to force all of the members of the tribe to sign. 7/  In any event, as the signatories signed only

---

4/   February 18, 1977 letter to the Maine Legislature from Joseph E. Brennan.  The Department of Justice apparently found these arguments so insubstantial as to require no reply.

5/   This document will be supplied separately.

6/   For an example of the kind of language used in a formal treaty on behalf of the Penobscots, see e.g., the treaty of 1818, appendix pp. 2-5.

7/   A note on the document indicated that at the time the Penobscots had five sachems and 73 warriors.

PN-002550

for themselves and their families; the signing of the document did not and could not affect the aboriginal title of the Penobscot Nation.

The Attorney General's treatment of the Watertown Resolve is similarly unpersuasive. There is nothing in either the Committee report which precipitated the Resolve[8] or in the Resolve itself[9] which indicates that the Provincial Congress thought it was granting anything *to* the Penobscots or that the Penobscots did not already have valid aboriginal title to the lands in issue. Indeed, the Committee reported that the Penobscots:

> ... have a large Tract of Land, which they have a right to call their own, and have possess'd accordingly for many Years.
>
> These Lands have been encroached upon by the English, who have for Miles on end cut much of their good Timber.
>
> They ask that the English (sic) would interpose, and prevent such Encroachments for the future; and they will assist us with all their Power in the common defense of our Country.

---

8/ This document will be supplied separately.

9/ This document will be supplied separately.

- 7 -

PN-002551

The Committee clearly understood that the Penobscots still owned a large area,[10/] and the subsequent Resolve sought to protect the tribe by forbidding non-Indian trespass on its land.

The suggestion that Massachusetts and Maine in their treaties with the Passamaquoddy Tribe and the Penobscot Nation assigned land to, but did not purchase land from the Indians is also wholly unfounded. In 1794 the Commonwealth, in consideration of the Passamaquoddies' "relinquishing all their right, title, interest, claim or demand, on any land or lands lying and being within the said commonwealth of Massachusetts..." assigned and set off slightly over 23,000 acres for the use of the tribe.[11/] In all three of the Penobscot transactions (1796, 1818 and 1833) the Indians sold defined parcels for a fixed, although trifling, consideration.[12/] In none of these transactions did Massachusetts or Maine purport to convey any land to the Indians. The whole focus of the 1796 negotiations, for

---

10/ In his report to the Maine Legislature, the Attorney General inexplicably describes the lands involved in the Watertown Resolve as an area "... 6 miles wide and 6 miles long in the area either side of the Penobscot River at the head of the tide (roughly Bangor). The Resolve, on the other hand, forbids trespass "upon any of the lands and territories or possessions beginning at the head of the tide on the Penobscot River, extending six miles on each side of said river...." Thus while the Maine Attorney General suggests to the Maine Legislature that the Water-town Resolve involved an area encompassing 23,000 acres, in fact the Resolve pertained to an area twelve miles wide and over 100 miles long, containing more like 800,000 acres.

11/ Appendix, pp. 12-15

12/ Appendix, pp. 2-5, 10-12, 16-18.

- 8 -

PN-002552

example, was on how much land the Penobscots would sell; after agreeing on the terms, the Penobscots said:

> Furthermore brothers -- as we have come to a settlement about the land, what we now say is exactly right -- now all the land above thirty miles above Col. Eddy's we do not sell. 13/

James Russell Wiggins in a draft of an article he is preparing on the history of the Penobscot Nation raises several additional arguments in opposition to the Justice Department's conclusions concerning the conquest issue.  In an effort to establish that Pownall had conquered the Penobscots, Mr. Wiggins makes reference to a June 1, 1759 report in which Pownall claimed to have taken "possession" of a "large and Fine tract of Land" in the Penobscot Country, 14/ a June 7, 1759 memorandum in which Pownall suggested that the only way to "curb and restrain ye Indians" would be to send troops to "find out their Planting Ground & Settlements and Destroy them, as they do ours," 15/ and a January 2, 1760 report in which Pownall claimed that impediments to white settlement in "Penobscot" had been removed. 16/

None of these events establishes that the Penobscots were conquered.  Indeed, Pownall's statement that the Indians

---

13/  Appendix, p. 34.

14/  Appendix, pp. 42-43.

15/  Appendix, pp. 43-44.

16/  Appendix, pp. 45-46.

- 9 -

PN-002553

could only be restrained by destruction of their planting grounds and settlements cuts the other way, since there is no evidence that he ever did either.  In any event, it is clear that Pownall never went further than the head of the tide on the Penobscot River, and that the lands in which he settled the non-Indians were all below the head of the tide.[17/]

Mr. Wiggins also argues that four of the "chief men" of the Penobscots signed a "treaty" in Boston on April 29, 1760 in which they acknowledged that they forfeited their lands and in which they retained only hunting rights,[18/] that in 1763 Governor Bernard told the Penobscots that they had been con-quered,[19/] and that on October 25, 1784 in a report from the Commissioners appointed to treat with the Penobscots,[20/] and on March 15, 1785 in a report from a committee appointed to state the claims of the Penobscots,[21/] Massachusetts officials argued that the Indians had been "dispossessed" of their lands and driven from their settlements by Pownall.

---

17/  Appendix, p. 48

18/  "Pownall and the Penobscot Tribe," draft copy, April 12, 1977.

19/  Wiggins, p. 5.

20/  Wiggins, pp. 5-6.

21/  Wiggins, pp. 6-9

- 10 -

PN-002554

The April 29, 1760 "treaty" was undoubtedly the individual submission discussed above.  Mr. Wiggins' authority for the proposition that the people who signed this "treaty" were "chief men" is the Maine historian William B. Williamson. While Williamson is a respected historian and wrote the first comprehensive history of the state, he offers no support for his contention, and according to our experts is simply incorrect.[22]  The April 29, 1760 document was not a treaty, and by its own terms affected only those who signed and their families.

Nor does the fact that Bernard took the position in some of his conversations with the Penobscots following the end of the French and Indian Wars that the tribe had been conquered by Governor Pownall establish that they were in fact conquered.  This is especially true in light of the fact that at the same time Bernard was implying in his conversations with the tribe that they were at his mercy, he was seeking permission to hold a treaty with them.[23]

The statements of the Massachusetts commissioners and the Massachusetts Committee in 1784 and 1785 are similarly

---

[22]  The four who signed may have been members of the group of five Penobscots who met with Brigdr. Preble at Fort Pownall on March 2, 1760, and promised to return to the fort in three weeks with their wives and families.  In their conversations with Preble these men had made it clear that while they would attempt to bring word from the tribe itself, they spoke only for themselves.  The document describing the March 2, 1760 meeting will be supplied separately.

[23]  See pp. 14-15 of Appendix "C" referred to in footnote #1.

- 11 -

PN-002555

unpersuasive.  Massachusetts officials in the 1780's had no
more power to change history than did Governor Bernard in the
1760's.  Moreover, it is important to view the statements of
these two groups in historical context.  Massachusetts had been
rather rudely rebuffed in its first attempt to conclude a treaty
with the Penobscots after the Revoluntionary War in 1784.  The
Indians had staunchly refused to sell anything more than a
tiny part of their domain, and had walked out on the negotia-
tions.[24/]  In 1785 and 1786 the Massachusetts officials prepared
to deal with this diplomatic dilemma by constructing arguments
to show that the Indians had no rights, and that their land
could simply be taken.  The various factual allegations made
in the two reports have been refuted elsewhere in this memo-
randum.[25/]  As it turned out, however, Massachusetts did not
rely on these high-handed arguments.  In August 1786, the State
sent new commissioners (Benjamin Lincoln, Thomas Rice, and
Rufus Putnam) "to treat with the Penobscot Tribe of Indians
respecting their claims to Lands on Penobscots River...."[26/]
The Rev. Daniel Little, an observer at the conference, des-
cribed the Commissioner's purpose as being "to purchase the

---

24/  Appendix, p. 53

25/  See e.g., discussion of conquest at pp. 6-7, supra.

26/  Appendix, pp. 60-62.

PN-002556

Indian's Lands on Penobscot River, or settle more certain & advantageous boundaries...."[27]  Moreover, in the 1796 negotiations the Commissioners, who were aware of the 1785 and 1786 reports, never once suggested in their discussions with the tribes that the Indians did not have valid title to their lands, or that their territory had been limited by Pownall or the Watertown Resolve.[28]

It is our position that the aboriginal title of the Passamaquoddy Tribe and the Penobscot Nation  was not extinguished by conquest.

---

27/  Appendix, p. 58.

28/  Appendix, pp. 19-41.

PN-002557

<u>Question (b)</u>: Was the Penobscot Nation claiming only six miles on either side of the Penobscot River for a distance of thirty or more  miles by 1796?

<u>Answer</u>:  No.  The notion that the Penobscots claimed no more than six miles on either side of the Penobscot River has its source in the draft report on the history of the Penobscot tribe prepared by James Wiggins.  At page 10 of the draft Mr. Wiggins says that as of 1785 the Penobscot Indians "supposed they had six miles on either side of the river as far as the river extended", but had given up the claim to "all of the land."  While Mr. Wiggins does not specifically allege that the Penobscots were claiming only six miles on either side of the river in 1796, after noting the appointment of Commissioners to negotiate with the tribe in 1796 he cites the Maine historian William B. Williamson for the proposition that "by the treaty of 1785 the government supposed the Tarratine Indians had nothing remaining but the islands in the river, whereas the chiefs insisted the territory from the head of the tide, six miles in width, on each side of the river, upwards indefinitely was theirs." [1]

While it is true that Massachusetts' agents, following their initial failure to conclude a treaty with the Penobscot Nation in 1784, argued for a time that the Penobscots

---

[1]  The suggestion that the Penobscots only claimed six miles on either side of the Penobscot River may also come from a second reference to Williamson on page 11 of the Wiggins draft wherein Williamson is cited as authority for the proposition that the Indians around 1816 to 1817 "were the possessors or claimants of a tract six miles in width on both sides of the Penobscot River to an indefinite extent above the north line of the nine townships."

PN-002558

had claims, at most, to limited rights within the twelve-mile corridor mentioned in the Watertown Resolve,[2] in none of the documents cited did the tribe itself ever adopt this position. Thus, for example, while the Penobscots may have taken the position in their answer to the Commissioners in 1784 that the Watertown Resolve "fixed their bounds" as the "head of the tide" on the south and the "head of the river" on the north, they said nothing as to an eastern or western boundary.[3]

The most definitive refutation of Mr. Wiggin's argument, however, is provided by the primary document which he cites in support of his position:  the August 30, 1786 letter to Governor Bowdoin.[4]  In that letter the Commissioners reported on an opening meeting which they had during the Commonwealth's second attempt to negotiate a treaty with the Penobscot Nation. The Commissioners reported that in response to their question as to what they claimed, the tribe "did not give a full answer but said they would now limit their claims to a small brook six miles above the head of the tide.  This they considered as giving up the six miles for they had before considered the head of the tide as their bounds."

This statement, of course, is entirely consistent with the position taken by the tribe in its answer to the Massachusetts Commissioners who negotiated with them in 1784,

---

[2] See e.g., Appendix pp. 55-57.

[3] Appendix, p. 51.

[4] Appendix, pp. 60-62.          -15-

PN-002559

wherein they admitted only that the Watertown Resolve fixed their southern and northern bounds. The Commissioners nonetheless attempted to convince the tribe that it could claim no more than a twelve-mile corridor:

> From their silence on the subject we supposed that they had given up the idea of a claim to all the lands on this River as being planted on them by the god of nature, which they strongly urged two years since.--After reminding them that they surrendered to Governor Pownall all their rights and interests in these lands, we mentioned to them that if they had their present possessions in virtue of the Resolve of the provincial Congress of June 1775 they could hold thereby only six miles on each side of the River which lands could not avail them if the Commonwealth should lay out and settle the remainder.--

But the tribe did not rise to the bait. The Indians, according to the Commissioners:

> appeared to be much hurt and disappointed when this was mentioned as they supposed before they had the whole width of land as far as the waters of this River extended East and West -- This led them to complain that as they could not read they were imposed on and that writings were of no value to them. --

Thus as of 1786 the Indians claimed the entire Penobscot watershed, at least above the head of the tide, and interpreted the Watertown Resolve as recognizing their rights to this entire area or, at a minimum, prohibiting trespass on part of their lands without predicating that protection on a denial of their right to the remainder.

It appears that Mr. Wiggins may have been led into his misreading of the letter to Governor Bowdoin by his

-16-

PN-002560

reliance on Williamson.  As was noted above, Williamson is not always a reliable secondary source, and he clearly is not reliable on the    corridor issue.  His statements concerning "the treaty of 1785" quoted at page 11 of Mr. Wiggins' draft, for example, are wholly inaccurate.  To  begin with, there was no 1785 treaty:  Massachusetts failed both in 1784 and 1786 to conclude an agreement with the tribe, and no agreement was attempted in 1785.  More importantly, in the proposed 1786 treaty Massachusetts did not suppose that "the Tarratine Indians had nothing but the Islands in the River, whereas the chiefs insisted that the territory from the head of the tide, six miles in width, on each side of the River, upwards indefinately was theirs," as Williamson suggests.  As we have seen, the Indians took the position that they had "the whole width of land as far as the waters of this River extended East and West," and it was Massachusetts that claimed that the tribe "could hold...only six miles on each side of the River...."[5]

The ultimate proof that the Penobscots did not limit their claims to a twelve-mile corridor is provided by the proposed 1786 treaty and the deed which effectuated the negotiations in 1796.  In neither document were the ceded lands described in terms of a twelve-mile corridor.  In 1786 the Penobscots would have relinquished "...all the lands on the West side of the Penobscot River from the head of the tide up to

_____

[5] Appendix, pp. 60-62

-17-

PN-002561

the River Pisquataquiss, being about forty-three miles as also all the lands on the East Side of the River from the head of the tide aforesaid up to the River Mantawankeektook being about eighty-five miles ...." In 1796 the tribe purported to cede "... all the lands on both sides of the River Penobscot, beginning near Col. Jonathan Eddy's dwelling house, and Nichel's Rock, so called, and extending up the River thirty miles on a direct line ...." [6] Despite their attempts to convince the Penobscots to claim less, when it came time to draft the crucial documents, the Massachusetts Commissioners acted on the assumption that the Penobscots were claiming "the whole width of land as far as the waters of this River extended East and West."

---

[6] It should be noted that the unidentified individual who assembled and commented on the documents filed with the Massachusetts Resolves of 1796, Jan. Sess. C. 86, Appendix pp. 19-41, seems to assume that the Indians were limiting their claims to the twelve mile corridor as of 1796. See e.g., the remarks of the commentator at Appendix p. 21 to the effect that "...it appears the Indians are considered as making claims to land 6 miles on each side of Penobscot River from the head of the tide thereon to the Head or Source of that River...." His assumption, however, finds no support in the resolution of the Massachusetts General Court which authorized the negotiations, Appendix p. 19, or the Governor's instructions to the commissioners, Appendix pp. 20-21, and neither the commissioners or the Indians mentioned such a corridor in their negotiations.

PN-002562

Question 1.        Is there any legal obstacle to total
                   extinguishment by Congress without
                   compensation to the tribes of all
                   the tribal property claims in Maine?

Answer.  Yes.  Before discussing the law, we feel com-
pelled to state our view that to recommend the total extinguish-
ment of the tribes' title without any form of recompense would--
by any moral standard--disgrace President Carter's administra-
tion; [1]/ it would also disgrace the Nation, if Congress were to
adopt it.

Such action would carry a simple but shameful message:
when the law gives Indians a substantial claim to land taken by
white men which the regular courts of justice may sustain, the
white men will change the rules rather than permit a decision
according to existing law.  A broader message would be inferred:
Indians cannot obtain justice even in the white men's courts.

The Constitution, we submit, does not permit such in-
justice; and, if necessary, we will press the point through the
courts.  Tee-Hit-Ton Indians v. United States, 348 U.S. 272
(1954) may stand for the proposition that every extinguishment
of aboriginal title is not a taking which gives rise to an im-
mediate claim for just compensation.  Congress has power, under

---

1/  We recognize that you have not recommended--and are confident
    that you will not recommend--such action.  We also submit that
    any such recommendation would be inconsistent with President
    Carter's promises.  See President Carter's campaign policy state-
    ment on American Indians, wherein he said he promised a "strength-
    ened reaffirmation of our legal and moral trust responsibilities
    to the American Indian...," and the 1976 Democratic Platform in
    which the Democratic Party reaffirmed and strengthened its legal
    and moral trust responsibilities to the American Indian.

-19-

PN-002563

Tee-Hit-Ton, to legislate concerning the property of Indian tribes but that regulatory power, like all other regulatory powers, must be exercised in conformity with the Bill of Rights, including the Due Process Clause of the Fifth Amendment.  An exercise of Congressional power over Indian affairs which would simply confiscate the interest of the Indians would violate the guarantees of fundamental fairness embodied in the Due Process Clause.

The principle that Congress must exercise its power over Indian affairs consistently with the Due Process Clause of the Fifth Amendment lies at the heart of the recent decision in Delaware Business Committee v. Weeks, ____ U.S. ____, 51 L.Ed.2d 173, 45 U.S.L.W. 4202 (February 23, 1977) (hereinafter Weeks).  In that case the court held that the validity of a given legislative solution involving tribal property rights depends on whether it "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians...." 51 L.Ed. 2d 183, 45 U.S.L.W. 4205, citing to Morton v. Mancari, 417 U.S. 535 (1974).  The opinion cites United States v. Alcea Band of Tillamooks (Alcea I), 329 U.S. 40 (1946) for the proposition that the "power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." 329 U.S. at 54.

In Alcea I the plurality opinion held that the United States does not have power to extinguish Indian property rights, including unrecognized aboriginal title, without providing compensation.  According to that opinion, the taking of "original

-20-

PN-002564

Indian title without compensation and without consent "... does
not satifsy the 'high standards of fair dealing' required of
the United States in controlling Indian affairs...," and gives
rise to "more than a merely moral claim for compensation."
329 U.S. at 47.  The opinion in Alcea II (341 U.S. 48 (1951))
casts doubt upon that holding.  The Tee-Hit-Ton opinion re-
pudiates the language in Alcea I. [2/]

But nothing in Tee-Hit-Ton or Alcea II is inconsistent
with the fundamental principle upon which we stand and which
we find at the heart of the Weeks case.  Tee-Hit-Ton and Alcea
II are both confined to the narrow question of whether a parti-
cular "taking" entitled an Indian tribe to immediate just com-
pensation under the "just compensation" clause of the Fifth
Amendment.  Neither case involved the question whether a
particular exercise of  plenary control over Indian property
was so derelict in respect to Congress' obligations to the
Indians and so fundamentally unfair to them as to violate the
Due Process Clause.  Nor was there room for such a claim.
In Tee-Hit-Ton, for example, the Secretary of Agriculture was
authorized to contract for the sale of timber from certain
lands, including lands claimed by the Tee-Hit-Ton Indians.

---

2/  The quotation in Weeks from the plurality opinion in Alcea
I suggest that the Court is ready to reexamine Alcea II and
Tee-Hit-Ton.  Certainly legislation of the kind suggested
in this question would provide an appropriate occasion for
such a reevaluation.

- 21 -

PN-002565

The proceeds of any such sales were to be held in a special account in the Treasury until the timber and land rights, which were then in question, were finally resolved.  The Indians could attempt to establish their rights in the land and thus the proceeds of the fund.  The case, therefore, did not involve a situation in which Congress had unilaterally extinguished aboriginal rights, but rather one in which Congress carefully safeguarded such rights.

While the facts and holdings of these and other cases are consistent with our constitutional position, some of the language can be read more broadly.[3/]  We would point out, however, that none of these cases involved total congressional disregard of the property interest of the Indians on the scale suggested by this question.  Even if they had, the statements are mere dicta, inconsistent with current constitutional ideas of substantive due process.  A fortiori they are inconsistent with the Court's latest expression in Delaware Business Committee v. Weeks.

---

3/ "Extinguishment of Indian title based on aboriginal possession is of course a different matter.  The power of Congress in that regard is supreme.  The manner, method and time of such extinguishment raise political, not justifiable, issues.  Butz v. Northern Pacific Railroad, supra, p. 66.  As stated by Chief Justice Marshall in Johnson v. M'Intosh, supra, p. 586, 'the exclusive right of the United States to extinguish' Indian title has never been doubted.  And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts.  Beecher v. Wetherby, 95 U.S. 517, 525."  United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 347 (1941).

PN-002566

Our position is supported by Congress' traditional posture, which is one of respecting Indian claims.  Indeed, there is a clearly discernible pattern to Congress' treatment of Indian lands from 1789 to the present.  As a House Committee Report stated in explaining the Alaska Native Claims Settlement Legislation:

> The consistent policy of the United States in its dealings with Indian Tribes [has been] to grant to them title to a portion of the lands which they occupied, to extinguish the aboriginal title to the remainder of the land by placing such land in the public domain, and to pay the fair value of the title extinguished.

H. Rep. No. 92-523 at 4, 92nd Cong., 1st Sess. (1971).  See also Cohen, Original Indian Title, 32 Minn. Law Review 28, 34-38 (1947), and Alcea I, 329 U.S. at 47-49.

The precedents also support our view that while Congress has broad latitude in determining what is best for the Indians, it cannot use its extensive guardianship powers as a device for simply transferring Indian lands to non-Indians without either compensation or any other means of improving the Indians' lot.  "That would not be an exercise of guardianship, but an act of confiscation."  Lane v. Pueblo of Santa Rosa,

- 23 -

PN-002567

249 U.S. 110, 113 (1919). Such action would not meet the standards of Weeks for it would not be rationally tied to the fulfillment of any of Congress' unique obligations to Indians. Congress cannot exercise its extraordinary powers over Indian affairs for the sole purpose of quieting non-Indian title. See, e.g. United States v. Antelope, 45 U.S.L.W. 4361, 4363 n.8 (April 19, 1977); Shoshone Tribe v. United States, 299 U.S. 476, 497 (1937); United States v. Creek Nation, 295 U.S. 103, 109-110 (1935); Sunderland v. United States, 266 U.S. 226, 234 (1924); Lone Wolf v. Hitchcock, 187 U.S. 553, 565 (1903); and Cherokee Nation v. Hitchcock, 187 U.S. 294, 306 (1902); and United States v. Kagama, 118 U.S. 375 (1886). If Congress should choose to act in some capacity other than guardian, it may only do so through an exercise of its powers of eminent domain upon payment of just compensation. See Fort Berthold Reservation v. U.S., 390 F.2d 686 (Ct. Cl. 1968).

It may be argued that the cases last cited deal with recognized Indian title. In weighing this distinction, it should be recalled that the opinion of the court in Alcea I, joined by four Justices, argued that it made no difference whether the title was recognized or not. Furthermore, even if the distinction retains some validity in dealing with technical claims to "just compensation," there is no basis for resorting to it where the          action is so arbitrary and capricious as to deny due process of law, as would clearly be the case in

-24-

PN-002568

a total extinguishment of the possessary rights in issue here without compensation.

PN-002569

<u>Questions 2 and 3</u>.   Is there any legal obstacle to federal ratifications of the "taking" of the tribal properties by Massachusetts in 1794-96?

Could such ratification (referred to in Question 2) retroactively provide a complete legal defense to the tribes' trespass claims?

<u>Answer</u>.   The concept of ratification appears inapplicable to the Passamaquoddy and Penobscot claims.   First the candidates for ratification, <u>i.e.</u>, the suspect treaties, are unconstitutional on their face.   Article 1, Section 10, of the Constitution expressly bars states from entering into treaties.   We know of no doctrine that would permit Congress to ratify an unconstitutional act.   <u>See</u>, <u>e.g.</u>, A.L.I., Restatement of Agency, 2d (1958) §§ 84 and 92.   Second, there must be some agency relationship for ratification to be effective. <u>Standard Oil Company of Texas</u> v. <u>Manley</u>, 178 F.2d 136 (5th Cir. 1950); <u>Pullen</u> v. <u>Dale</u>, 109 F.2d 538 (9th Cir. 1940).   We know of no evidence of anyone involved in the negotiations of the suspect treaties was at any relevant time acting, or even purporting to act, as agents of the ratifier, that is, the federal government.

Aside from the ratification doctrine, which we think is clearly inapplicable to our situation, the question remains whether Congress can extinguish the Tribe's claims without agreement or compensation.   The trespass claims are protected by the "just compensation" requirement of the Fifth Amendment,

- 26 -

PN-002570

Edwardsen v. Morton, 369 F. Supp. 1359, 1378-1379 (D.D.C. 1973) and cases therein cited; Graham v. Goodcell, 282 U.S. 409, 426 (1931), Cf. Capitan Grande Band of Mission Indians v. Helix Irrigation District, 514 F.2d 465, 468 (1975), cert. den., 423 U.S. 874; and Wilson v. Iseminger, 185 U.S. 55, 62-63 (1902), and thus cannot be taken without just compensation. The possessory claims, as explained in the last section, are protected at minimum by the guarantee of fundamental fairness embodied in the Due Process Clause. Thus, any congressional action would ultimately be judged by these constitutional standards.

PN-002571

Questions 4 and 5.    Would the fact that the Federal
government had authorized the
payment of a fixed sum of money in
lieu of trespass damages have any
effect on the sufficiency of the
ratification defense?

Would the amount of money provided
by Congress in lieu of trespass
damages affect the sufficiency of
the defense?

Answer.    The tribes possess a cause of action in
trespass for which they are entitled to full compensation under
the Fifth Amendment.  If Congress purported to extinguish the
trespass claims and provided a payment that the tribes considered
inadequate, the tribes would still have several remedies.  They
could proceed with the claims against the alleged trespassers,
or depending on the statute, against the United States in the
District Court or the Court of Claims.  In other words, we see no
way in which Congress could compel the tribes to accept an
extinguishment of their trespass claims in return for a sum of
money that, in the tribe's view, was not sufficient to compensate
them for the loss of their Fifth Amendment rights.  However, if
the tribes accepted the settlement and agreed to relinquish their
claims, Congress could accept and validate that relinquishment
in its legislation.

It is conceivable that the amount of money provided by
Congress could affect the validity of any such extinguishment.
The defendants in any action brought by the tribe could pre-
sumably defend on the grounds that the tribe had already received
adequate compensation.  Whether the compensation provided by

-28-

PN-002572

Congress was in fact adequate, as measured by Fifth Amendment standards, would most probably become an issue.

PN-002573

Question 6.    Assuming that the Congress can extinguish aboriginal title with or without compensation, is there any legal obstacle to selective extinguishment?  By selective extinguishment, I mean:  Can Indian title to private, improved property be extinguished, leaving the issue of Indian title or no Indian title to public and unimproved property for judicial determination?

Answer.   No.   We see no legal obstacle to selective extinguishment as you use that term, subject to the qualifications set forth in our answer to question Number 1.

-30-

PN-002574

Question 7.    Is there any legal obstacle to the exercise of federal eminent domain power to acquire lands for the tribes in Maine?

Answer.  No.  The federal government has exercised its power of eminent domain to acquire lands for the benefit of Indians.  See, e.g., 43 U.S.C. §15kk(c).  We have not found a single instance where the exercise of this power has been challenged.[1]

The only two grounds upon which a challenge could conceivably be mounted are that acquisition of lands for Indians is not a "public purpose" or that it amounted to invidious racial discrimination.  There can be no doubt that the government has broad power to effectuate its unique obligation toward the Indians.  United States v. McGowan, 302 U.S. 535 (1938); Morton v. Mancari, 417 U.S. 535 (1974).  And the exercise of that power cannot be assailed on the grounds that it would constitute unlawful racial discrimination.  United States v. Antelope, _____ U.S. _____, 45 U.S.L.W. 4361 (April 19, 1977); Morton v. Mancari, supra.  Thus there would be no legal obstacle to such an exercise of federal eminent domain power.

---

[1]  For an example of legislation presently before Congress which would permit the exercise of federal eminent domain powers on behalf of Indians see 123 Cong. Rec. 5,3469 (daily ed. March 4, 1977, remarks of Sen. Edward Kennedy re S.905).

- 31 -

PN-002575

Question 8.   What is the proper measure of damages
for trespass claims?

Answer.   The proper measure of damages for the
tribes' trespass claims present difficult and complex issues.
Rather than present a treatise on the issue at this time, we
will set forth what we perceive to be the guiding principles.

The remedy for violations of the Nonintercourse Act
is a matter of federal law to be fashioned by the federal
courts. Oneida Indian Nation v. County of Oneida, 414 U.S.
661, 674 (1974); J. I. Case v. Borak, 377 U.S. 426, 433 (1964);
Clearfield Trust Company v. United States, 318 U.S. 363 (1943);
and United States v. Sommerville, 324 F.2d 712, 714-716 (3d
Cir. 1964).  See also Utah Power & Light Company v. United States,
243 U.S. 389 (1917).

Interest may also be an appropriate part of an award
for trespass damages.  Royal Indemnity Company v. United States,
313 U.S. 289 (1941); Miller v. Robertson, 266 U.S. 243, 258
(1924); and Rodgers v. United States, 332 U.S. 371 (1947).  The
usual rule awards simple interest on the rental value accruing
from each year of wrongful possession.  Hodgkins v. Price, 141
Mass. 162 (1886), Parker v. Simson, 180 Mass. 334 (1902).  See
Longfellow v. Quimby, 33 Me. 457 (1851).

The standard measure of damages in an ejectment case
involves recovery of mesne profits, i.e., an award to the owner
of the income he should have received had he remained in
possession.  The mesne profits are the rents and proceeds of

-32-

PN-002576

the land while it is withheld from the owner's possession.  U.S.
v. Raiche, 31 F.2d 624 (W.D. Wis. 1928).  The rents and profits
are normally measured by the reasonable rental value of the
land, Watson v. U.S., 263 F. 700 (8th Cir. 1920), and reasonable
rental value is the general rule for measuring mesne profits.
See, Restatement of Torts 1st, Section 931 (1939); 27 C.J.S.
Ejectment, §§144A and 144B; 25 AM.Jur.2d, Ejectment, §151;
Hilliard, Remedies for Torts, 220 (1873); and Tyler, Ejectment
and Adverse Enjoyment, 848 (1870).  The rental value of the
land may be shown by expert testimony to the fair annual value.
Schradsky v. Stimson, 76 F. 730 (8th Cir. 1896); see, also,
Deakyne v. Lewes Anglers, 204 F. Supp. 415 (D. Del. 1962).  The
rental value may also be shown in appropriate cases by actual
income received from the property.  Powers v. Trustees of
Caledonia County Grammar School, 83 Vt. 220, 106 Atl. 836 (1819);
Falejczyk v. Meo, 31 Ill.App.2d 372, 176 N.E.2d 10 (1961);
Strasser v. Powell, 172 N.E.2d 439 (Indiana Court of Appeals
1961).  It has sometimes been held that a trespasser who has
improved property in good faith is liable only for the rental
value of the property without the improvements.  One who tres-
passes on Indian land in violation of federal law is on notice
of a defect and cannot take advantage of this exception. United
States v. Gilbertson, 111 F.2d 978 (1940); United States v.
Joyce, 240 F.610.

-33-

PN-002577

In forested areas, there is an additional element of damages for the loss of the trees.  <u>Amy</u> v. <u>Augusta Lumber Company</u>, 128 Me. 472 (1930).

We are not aware of any cases which would prescribe a different measure of damages for privately as opposed to publicly held land.

PN-002578

Question 9.       What set-offs or counterclaims for damages do the defendants-owners have?

Answer.   To begin with, it is essential to understand that a tribe's ability to recover possession of lands taken in violation of federal law cannot be predicated upon or limited by its ability to pay any counterclaim. Heckman v. United States, 224 U.S. 413 (1912). Thus, even if the defendants could assert a counterclaim, there is no guarantee that they could collect damages that might be awarded.

It appears, however, that the defendants in these actions, can avail themselves of neither set-off nor counter-claim. The general rule is that such a claim for improvements requires that the party asserting the claim have acted in good faith under color of title and in the exercise of such adverse possession as could ripen into title. As the defendants are deemed to have been on notice of the statutory restrictions against occupation of plaintiff's land, the requisite good faith cannot exist, United States v. Gilbertson, 111 F.2d 978 (1940); States v. Joyce, 240 F.610 (1917), and they will be correspondingly unable to establish that they were adversely holding in a manner which could ripen into title. United States v. Burrill, 107 Me. 382.

-35-

PN-002579

Question 10.        What time limitation is applicable
                    to trespass claims, 1794-96 to
                    date, or some lesser time?

Answer.    1794-96 to date.   Capitan Grande Band of
Mission Indians v. Helix Irrigation District, 514 F.2d 465
(9th Cir. 1975), cert. denied, 423 U.S. 874.

PN-002580

Question 11.        Has the limitation period
                    established by 28 USC 2415
                    run with respect to any portion
                    of the tribes' trespass claims?

Answer.  No.

PN-002581

Question 12.                    Has it been resolved as a matter
                                of law that the United States is
                                not subject to statutes of lim-
                                itation defenses in cases where
                                the relief sought is merely money
                                damages and is not equitable in
                                nature.

Answer.                         Yes.  United States V. Summerlin,
                                310 U.S . 414 (1940).

PN-002582