TO:      Hon. William B. Gunter

FROM:    Archibald Cox

RE:      Memorandum of Joseph E. Brennan, dated May 5, 1977

DATE:    June 11, 1977


The State claims that following the French and Indian War Massachusetts changed its views of the status of Penobscot rights in land and thereby ended that tribe's aboriginal title to lands in Maine.  Prior to the War, the Attorney General argues, Massachusetts treated the Penobscots as having a legally cognizable right in their territory which the colony could acquire only through purchase or cession; after the war, Massachusetts treated the Penobscots as though they had only a permissive use of the land which the sovereign could end at will. From this the Attorney General concludes that as of 1796 the Penobsocts had no interest in land which was subject to protection under the Nonintercourse Act, and that the post 1790 treaties with the Penobscot Nation were not illegal.


The gist of our answer is that nothing done by Massachusetts during or after the French and Indian War impaired the predicates of the Penobscots' aboriginal title.  Aboriginal title flows from permissive use and occupancy of land at the sufferance of the sovereign.  No more is required.  *United States v. Santa Fe Pacitfic R.R.*, 314 U.S. 339, 347 (1941).  Pownall

PN-002583

may have reversed, at least temporarily, the Colony's policy of treating the Indians as though they had more than a bare permissive occupancy of the land.  He may  have claimed "ultimate Dominion," *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 574 (1823), *i.e.,* the fee.  He and some of his successors may even have asserted their right to remove the Indians and open the lands to settlement at will.  None of this would affect the right of aboriginal title.  To extinguish the Penobscot's aboriginal title the sovereign would have had to terminate the tribe's permissive aboriginal use of the land.  While Massachusetts attempted to do this below the head of the tide on the Penobsoct River, it neither attempted nor intended to do so above the head of the tide.  Both Pownall's statements and Massachusetts' actions during the period 1755-1796 confirm the continuance of the Penobscot Nation's use and occupation above the tide.  That use, even though permissive and terminable at the will of the sovereign, gave the Penobscot Nation an aboriginal title good against all but the sovereign and subject to protection under the Nonintercourse Act after it was enacted in 1790.

   1.  The Nature of Aboriginal Title.

   That an aboriginal title good against all but the sovereign flows from Indian use and occupation with the consent of the sovereign has been clear since *Johnson v. McIntosh,*

PN-002584

*supra*.  By virtue of their discovery and establishment of a sovereign foothold in North America, the European nations claimed not only sovereignty but the ownership of the land on this continent, *i.e.*, the fee, subject to a right of occupancy in the aboriginal inhabitants which could be terminated at the sovereign's will.  But the process of discovery and establishment of a sovereign presence, which is termed "conquest" in *Johnson*, simply determined the rights of sovereignty, the ownership of the soil, and the subjugated status of the Indian occupants, who were thereafter considered "merely as occupants." *Johnson v. McIntosh*, *supra*,  8 Wheat. at 591.  The Indian right of occupancy was not itself ended by such "conquest," except where the result was that the land was "no longer occupied by its ancient inhabitants," 8 Wheat. at 591, and the right of occupancy, which later gained recognition as Indian title, was good against all third persons unless and until the sovereign terminated the right.  There is, in short, no inconsistency between Indian use and occupation (which constitutes a predicate for Indian title) and the sovereign's assertion of ownership and the right to terminate Indian occupancy at will.

Since Indian title can be extinguished by the sovereign at will, *Santa Fe*, *supra*, 314 U.S. at 347, as against the sovereign "Indian title is a permissive right of occupancy granted by the federal government to the aboriginal possessors of the

PN-002585

4

land.... It is mere possession not specifically recognized **as**
**ownership.**" *United States v. Gemmill*, 535 F.2d 1145 (1976) cit-
ing *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955).
For this reason, the decisive question in the present case, as
in all others, is not whether the Indians had a "cognizable
legal right," but whether the sovereign, though claiming owner-
ship and sovereignty, permitted the Indians to use and occupy
the land.  The precedents make the point that to constitute ex-
tinguishment of aboriginal title the sovereign must most directly
and unequivocally manifest an intent to immediately end the Ind-
ians' permissive use, and that the continuation of the aboriginal
title is entirely consistent with a sovereign intent to end
tribal possession without tribal consent at some time in the
future.

Thus, the courts have found that aboriginal title survives
the creation of a reservation for a tribe, if it cannot be shown
that the sovereign intended to end the Indians' use outside the
reservation, *Gila River Pima-Maricopa Indian Community v. United
States*, 494 F.2d 1386 (Ct. Cl. 1974), *cf. United States v. Santa
Fe Pacific R.R.*, *supra*, 314 U.S. at 347; that the mere surveying
of Indian land with the expectation of future sale without Indian
consent does not extinguish aboriginal title, *Plamondon v. United
States*, 467 F.2d 935, 937-38 (Ct. Cl., 1972); and that even auth-
orized non-Indian settlement does not necessarily end the Indian

PN-002586

5

title, *Gila River, supra,* 494 F.2d at 1391.  Similarly, actual opening of Indian land to white entry has been found consistent with the continuation of aboriginal title, *United States v. Pueblo of San Ildefonso,* 513 F.2d 1383, 1389 (Ct. Cl. 1975), and when Indian title is found to have been extinguished through actual entry, the courts have ruled that such entry only extinguished the Indian title to the parcels actually entered, *Pueblo of San Ildefonso, supra,* 513 F.2d at 1391.

The test in each instance is whether the government intended to revoke "the Indians' rights of permissive occupancy." *United States v. Gemmill, supra,* 535 F.2d at 1149.  Neither the sovereign's characterization of the Indians' interest, nor the sovereign's policy as to the manner in which the Indian possession should be ended (*e.g.,* voluntary removal, forceable removal, or inconsistent use), is relevant.  The only question is whether the sovereign clearly and unequivocally manifests a present intent to revoke the permissive use.  In making this determination the courts are obliged to follow the rule that

> ... [A]n extinguishment cannot be lightly implied
> in view of the avowed solicitude of the Federal
> Government for the welfare of its Indian wards.
> As stated in *Choate v. Trap,* 224 U.S. 665, 675,
> the rule of construction recognized without excep-
> tion for over a century has been that "doubtful
> expressions, instead of being resolved in favor
> of the United States, are to be resolved in favor
> of a weak and defenseless people, who are wards
> of the nation, and dependent wholly upon its

PN-002587

6

protection and good faith." *United States
v. Santa Fe Pacific R. Co., supra,* **314** U.S.
**at** 354.

And this rule is equally applicable in evaluating the intent of
a prior sovereign as "...all the colonizing European..." powers
took the position that "[t]he Right of sovereignty over discov-
ered land was always subject to the Right of use and occupancy
and enjoyment of the land by Indians living on the land." *Lipan
Apache v. United States,* 180 Ct. Cl. 487, 493 (1967).  Thus only
a "convincing demonstration" could show that a prior sovereign
"... departed from this consensus of the whole western world."
*Ibid.*

    2.   The History of this case.

    The history recited by the State convincingly demonstrates
that nothing was done prior to 1796 to deny the Penobscot's right
to continued use and occupation of the lands above the head of
the tide on the Penobscot River.  To the contrary, the record
clearly indicates that while Massachusetts may have adopted a
policy of settling Penobscot lands without tribal consent, it
exercised this policy only  below the head of the tide and clearly
permitted the Penobscots to remain in possession above the tide.

    Contrary to what the Attorney General says, the Treaty of
Utrecht did not settle once and for all the boundaries between

territories claimed by the French and English in North America. According to *Johnson*, the French and Indian War was the direct result of the "conflicting claims" which resulted from that treaty. 8 Wheat. at 583. In taking possession of the Penobscot country, Pownall was unquestionably reasserting the dominion of the English *vis-a-vis* the French, as this kind of symbolic taking of possession could have no effect on the Indians' aboriginal title. *Worcester v. State of Georgia*, 31 U.S. (6 Pet.) 405, 544-545 (1832).

This is not to say that Pownall was unmindful of the Penobscots. Prior to the war he had written one of his associates that "as long as an Indian has any claim to these lands, the French will maintain a title to them." (Hist. sum., p. 12) Pownall understood all too well how easy it was for a European power to assert "title" to an area occupied by the tribe, and saw that the ultimate solution to this problem lay in the settlement of the area by the British subjects. To facilitate this objective he abandoned the policy of purchase embodied in Governor Dummer's Treaty and took the position that henceforth the English would settle the Indians' lands at will. He also attempted to convince the Penobscots to abandon their aboriginal territory by offering peace terms which required them to remove to Fort Pownall.

PN-002589

8

Pownall's peace terms were never accepted.  They applied only to those Indians (and their families) who actually accepted and were conditioned on actual removal to Fort Pownall.  Only four members of the tribe purportedly signed the document encompassing the terms of submission, few, if any, moved to the fort, and neither Pownall nor his successors attempted to remove any of the Penobscots from their hunting grounds or villages. And while Pownall began the process of settlement on the lower Penobscot without Indian consent, the pre-Revolutionary war settlements stopped well short of the head of the tide.

It is true that in 1763 when the Penobscot representative Toma told Pownall's successor, Bernard, that "I wou'd be glad to have no English houses as far as we can see up the River as well as we--"  Bernard responded that "The English have conquered this whole Country: and the Indians must not prescribe to them what shall be the bounds of their settlements."  (Doc. #29) But the Governor went on to say:

> Nevertheless the Government desires that the Indians
> shall live plentifully & comfortably, for which
> there cannot be wanting land, let the English settle
> ever so fast.  At present the Government has made
> grants about 15 miles above the Fort, These must be
> supported: and it is not intended for the present
> to carry them further.  (Doc. #29)

Thus Bernard, while reaffirming that the British no longer considered themselves bound to purchase land from the Indians,

PN-002590

agreed to the Penobscot demand concerning settlement, and more importantly, acknowledged that it was the government's policy to leave the Indians in possession above the 15 mile boundary. Bernard went so far as to have the boundary between the white settlements and the Indian territory officially surveyed (Doc. 30), and when the Indians complained of white encroachment on their hunt, did all in his power to stop the intrusions.[1]

Thus, while Pownall and Bernard took the position that Indian consent was not a prerequisite to the extinguishment of tribal possessory rights, during this period colonial Massachusetts, in both its settlement practice and its stated policies indisputably permitted the Penobscots to occupy the area above the head of the tide on the Penobscot River. The Commonwealth even went so far as to acknowledge a formal boundary line between the Indians and the non-Indians. While Massachusetts may have claimed that this was to be "... a flexible line to be moved as settlements were extended...," the sovereign always has the power to extinguish aboriginal occupancy without tribal

---

[1] Bernard promptly ordered the non-civilians, over whom he apparently had adequate authority, to stop their hunting (Hist. Sum., pp. 18-19). He apparently lacked the necessary authority over the civilians, but promptly sought appropriate legislation forbidding non-Indian hunting outside the settled townships (Hist. Sum., p. 21). He naturally prefaced his actions with a statement that he was not obliged to protect the tribe, but that fact, as is pointed out elsewhere, was irrelevant.

PN-002591

10

consent, [2/] and the fact that it decides, for policy reasons, to flaunt this fact in its conversations with Indians does not extinguish the aboriginal right. *Lipan, supra*, 180 Ct.Cl. at 494-495, *cf. Strong v. United States*, 518 F.2d 556, 564 (Ct. Cl. 1975)(attempt by government to obtain favorable cession by telling Indians they relinquished their Indian title through "right of conquest," while not relevant to question of whether tribe obtained recognized title, does not constitute extinguishment).

The coming of the American Revolution brought another shift in Massachusetts' policy toward Penobscot aboriginal rights.  Generally speaking it was only when the non-Indians felt most secure, as Pownall did following the defeat of the Penobscots' French and Abenaki allies in 1759, that they dared openly assert their right to take Indian land without consent.  At other times, particularly when war was eminent, the Europeans were far more solicitous and treated the Indians as though they were the owners of the fee.  Thus in 1775, on the eve of the American Revolution, the Provincial Congress of Massachusetts enacted its resolve forbidding trespass on

---

[2/] This is not to say, of course, that the people of the United States did not later limit the power of Congress in this regard by their adoption of the Bill of Rights. *See* answer to question No. 1 in my letter of April 29, 1977.

11

a twelve mile corridor at the heart of the Penobscots'
aboriginal territory and pledged that the "...inhabitants
of this Colony distain to make use of unjustifiable force
or artifice to rob their unsuspecting bretheren of their
rights."  (Doc. #36).

While the Watertown Resolve did little more than
signal a change in sovereign policy respecting extinguishment
of Penobscot title, it led to a debate during the mid-
1780's concerning the obligation of the Commonwealth to
pay for lands it wanted from the tribe.  The issue arose
when Henry Knox (the famous land speculator) and Benjamin
Lincoln, after returning from their first meeting with the
Penobscots in 1784, questioned whether the General Court
considered the "fee" of all of the tribe's lands to be in
the Commonwealth or whether "the right of some of the lands
at least was in the Indians."  (Hist. Sum., p. 28).  This
led in turn to the report of the "Committee appointed to
State the Indians' Claim to Lands on Penobscot River," which
took the position that as a result of Pownall's conquest
and the 1760 submission "no legal claim to the said lands,"
remained in the Indians.  The committee nonetheless recog-
nized that the "Indians of the Penobscot Tribe have long
inhabited Penobscot River and parts thereto adjacent..." and
concluded that since it would be "hard to deprive" the tribe

PN-002593

of "every part of the said lands" some of the lands should be "assigned" to the Indians.

The committee was undoubtedly correct in its conclusion (if not its logic) that the Commonwealth need not purchase the lands of the Penobscot Nation, but its recommendation was not followed.  The following year the General Court appointed new commissioners to obtain "an acquittal & relinquishment of their Possessions & a release of all their claims & pretentions of title to the said lands."  And while no treaty was concluded in the 1780's, the land was ultimately purchased in 1796.

In the end, of course, it makes no difference whether the Penobscots' aboriginal territory was purchased or not. Extinguishment does not occur merely because the sovereign conquers territory and denies the Indians' ownership of the land.  Since Indian title is, at base, simply the permissive right to use and occupy the land,

> The relevant question is whether the gov-
> ernmental action was intended to be a re-
> vocation of Indian occupancy rights.
> *United States v. Gemmill, supra*, 535 F.2d
> at 1148.

The State is correct when it states that the intent of the sovereign is controlling, but the relevant intent is the intent to revoke the permissive use of the land.  Massachusetts obviously framed no such intention.  Pownall wanted to, and

PN-002594

13

to a large extent did, end the Penobscots' pretensions of ownership, and reduce them to the status which the doctrine of aboriginal title postulates: permissive occupants, remaining on their land at the sufferance of the sovereign. But Massachusetts continued to protect them in that possession above the head of the tide on the Penobscot River, and did not intend to remove them from that area prior to the treaties which are the subject of the present controversy.

PN-002595