...the complete text of the Indian land and damage claims agreement proposed by the White House Work Group on Feb. 6, 1978:

# JOINT MEMORANDUM OF UNDERSTANDING

For several months, representatives of the Passamaquoddy and Penobscot Tribes and a White House Work Group comprised of Eliot R. Cutler, Leo M. Krulitz, and A. Stephens Clay have been meeting to discuss the tribes' land and damage claims in Maine and the federal services to be extended to the tribes in the future. These discussions have produced agreement with respect to both a partial settlement of the claims and future federal services. The parties hope that the terms and conditions described here also will serve as a vehicle for settlement of all the tribes' claims.

### A. The Basic Agreement: A Partial Settlement

The Administration, through the White House Work Group, agrees to submit to the Congress and to seek passage of legislation which would provide the two tribes with the sum of $25 million in exchange for (1) the extinguishment of the tribes' claims to 50,000 acres per titleholder of such land within the 5 million-acre revised claims area (Area I)¹ to which title is held as of this date by any private individual(s), corporation(s), business(es) or other entity(ies), or by any county or municipality;² and (2) for the extinguishment of all their claims in the 7.5 million additional acres (Area II) in the claims area as originally defined (Areas I and II). Thus, every landholder within Area I would have his title cleared of all Passamaquoddy and Penobscot land and damage claims up to 50,000 acres,³ and all titles in Area II would be totally cleared of such claims.

The tribes will execute a valid release and will dismiss all their claims with respect to Area II and with respect to landholders with 50,000 acres or less in Area I. The legislation will not clear title with respect to any of the holdings of any private individual, corporation, business, or other entity which are in excess of 50,000 acres in Area I, nor to any lands in Area I held by the State of Maine.

By preliminary estimate, the $25 million to be paid by the federal government would clear title to approximately 9.2 million acres within the original 12.5 million-acre claims area. All claims against householders, small businesses, counties and municipalities would be cleared. Approximately 3.3 million acres in Area I out of the original 12.5 million-acre claim would remain in dispute. About 350,000 acres of the disputed land is held by the state; the remaining 3.0 million acres is held by approximately 14 large landholders.

### B. Proposed Settlement of the Tribes' Remaining Claims Against the State of Maine and Certain Large Landholders

The tribes and the White House Work Group recognize the desirability of settling the tribes' entire claim, if possible. However, direct discussions between the tribes and the State of Maine or between the tribes and the large landholders either have not occurred or have not been successful.

In an effort to promote an overall settlement, the White House Work Group has obtained from the tribes the terms and conditions on which the tribes would be willing to resolve their claims against the State of Maine and against the large landholders whose titles would not fully be cleared by the Basic Agreement. The tribes have authorized the Work Group to communicate these terms and conditions to the appropriate representatives of the State and the affected landholders. In this context, the Work Group serves primarily as an intermediary with limited authority to settle the remaining claims on the terms set forth by the tribes.

#### 1. Claims Against the State of Maine

The tribes have claims against the State of Maine for approximately 350,000 acres of State-held lands in Area I and for trespass damages. Rulings on several of the defenses originally available to Maine already have been made by the courts in the tribes favor.

The State of Maine currently appropriates approximately $1.7 million annually for services for the Penobscot and Passamaquoddy Tribes. The tribes are willing to dismiss and release all their claims for land and damages against Maine in exchange for an assurance that Maine will continue these appropriations at the current level of $1.7 million annually for the next 15 years. The appropriations would be otherwise unconditional and would be paid to the United States Department of the Interior as trustee for the tribes. Should the State agree to give this assurance, the legislation to be submitted to the Congress by the Administration would provide for the extinguishment of all tribal claims to the affected State-held lands and all trespass damage claims when the last payment is made.

#### 2. Claims Against Large Private Landholders

In exchange for the dismissal, release and extinguishment of their claims to approximately 3.0 million acres within Area I held by the large landholders as described in the Basic Agreement, and in exchange for a dismissal and release of all trespass claims against said individuals or businesses, the tribes ask that 300,000 acres of average quality (approximately $112.50 per acre) timber land be conveyed to the Department of the Interior as trustee for the tribes, and that they be granted long-term options to purchase an additional 200,000 acres of land at the fair market value prevailing whenever the options are exercised. The tribes also ask for an additional $3.5 million to help finance their exercise of these options.

In recognition of the desirability of achieving an overall settlement, the Administration will recommend to the Congress the payment by the federal government of an additional $3.5 million for the tribes, if the affected private landholders will contribute the 300,000 acres and the options on 200,000 acres as set forth in the tribes' settlement conditions. Additionally, the Administration will recommend the payment of $1.5 million directly to the landholders contributing acreage and options to the settlement package. The $1.5 million would be divided proportionately according to the contribution made by the respective landholders.

If a settlement of the tribes' claims against the large landholders can be accomplished on the terms specified above, the Work Group has agreed to use its best efforts

hunt, fish, trap and gather for non-commercial purposes and to obtain brown and yellow ash on all property from the large landholders within Area I. The tribes will be subject to applicable laws and regulations in the exercise of these easement rights. Additionally, it is agreed that the exercise of easement rights shall in no way interfere with the landholder's use of his property, either now or in the future. If the Work Group's efforts to acquire these easements are unsuccessful, the tribes have reserved the right to reject a settlement with the large landholders.

### C. Other Terms and Conditions

(1) Nothing in this agreement is intended by the parties to be an admission with respect to the value of these claims. If settlement can be accomplished, it will reflect a compromise from every perspective. The tribes regard their claims as worth many times more than any consideration to be received under this agreement. The State of Maine, on the other hand, has taken the position that the tribes' claims are without merit.

The Administration has chosen to evaluate the claims not merely on the basis of their merit and their dollar value, but also in light of the facts that the claims are complex; they will require many, many years to resolve; and the litigation will be extremely expensive and burdensome to everyone and could, by its mere pendency, have a substantial adverse effect on the economy of the State of Maine and on the marketability of property titles in the State.

With these considerations in mind, any settlement will reflect a shared understanding of the reality created by the litigation, rather than one party's view of the equity of the claims. The claims are unique, and resolution of them on any basis other than litigation similarly must be unique.

(2) If a settlement can be reached with the State of Maine, with the large landholders, or with both on the terms described above, the White House Work Group has the option of implementing a settlement on those terms, rather than on the terms of the Basic Agreement specified in Section A. The Work Group has agreed to consult with the tribes before choosing any of the alternatives provided by this agreement.

(3) The tribes recognize that in no event shall the federal government's cash contribution to any settlement exceed $30 million; the federal government will pay $25 million to achieve the Basic Agreement, and an additional $5 million to facilitate a settlement of all claims against private landholders.

(4) The location of the 300,000 acres must be satisfactory to the tribes. However, it is agreed that the 300,000 acres may be in several tracts, so long as the timber land is of average quality. It is also agreed that land will be selected in such a manner as to not unreasonably interfere with the large landholders' existing operations.

(5) The cash funds to be obtained in the settlement shall be paid in trust for the benefit of the tribes on terms agreeable to them and the federal government. No part of the capital will be distributed on a per capita basis. The terms of the trust shall not preclude reasonable investment of the principal, nor shall they affect in any way the right of the tribes to dispose of income. The right to dispose of income shall be wholly a matter for tribal discretion.

(6) All property and cash obtained pursuant to this settlement shall be divided equally between the two tribes.

(7) The federal government pledges that the tribes will be considered fully federally recognized tribes and will receive all federal services, benefits and entitlements on the same basis as other federally recognized tribes.

(8) All lands acquired by the tribes and land currently held by the tribes shall be treated for governmental purposes as other federally recognized tribal lands are treated. The consent of the United States will be given to the exercise of criminal and civil jurisdiction by the State of Maine pursuant to 25 USC 1321, 1322, provided that the United States may effect a retrocession within two years upon request of the tribes.

(9) If a settlement can be reached with the State of Maine, the White House Work Group will use its best efforts to obtain for the tribes assured access under mutually agreeable regulations to a designated place in Baxter State Park for religious ceremonial purposes. If the Work Group's efforts to obtain such assured access are unsuccessful, the tribes have reserved the right to reject a settlement with the State of Maine.

(10) With respect to settlement of the tribes claims against the State of Maine and large landholders within Area I, the White House Work Group has 60 days to accomplish an agreement. If such a settlement cannot be accomplished within that period, the parties will proceed with the Basic Agreement outlined in Section A, above.

(11) The settlement agreement will be executed in a form appropriate to effectuation of the terms of the agreement and will preclude further litigation with respect to all claims settled. Suitable procedural safeguards will be adopted and implemented by court order in the pending litigation to assure that the parties' intent with respect to this settlement agreement is accomplished.

(12) The White House Work Group and this Administration pledge their vigorous support to settlement on the terms and conditions specified in this memorandum.

(13) This agreement is subject to ratification by the tribes on or by February Ninth, Nineteen Hundred and Seventy Eight.

FOR THE ADMINISTRATION:   FOR THE TRIBES

_____
Eliot R. Cutler

_____
Leo M. Krulitz

_____
A. Stephens Clay_____

---

[1] This acreage description of the revised claims area is based on information taken from maps and not from surveys. The final revised claims area, to be determined by the Department of Justice based on information furnished by the Department of the Interior, may vary from this description by plus or minus 5 percent.

[2] For purposes of such extinguishment, titleholding, whether direct or indirect, partial or complete, is deemed to include control, or ability to control, through subsidiaries, partnerships, trusts, or other entities.

[3] For any landholder with holdings in excess of 50,000 acres, the 50,000-acre exemption would apply to lands which are representative of the overall holdings of such landholder.