# THE PENOBSCOT NATION'S RESERVATION OF THE PENOBSCOT RIVER ACCOMPANYING ITS RESERVATION ISLANDS IN THE PENOBSCOT RIVER IN THE 1796 AND 1818 TREATIES WITH MASSACHUSETTS AND IN THE 1820 TREATY WITH MAINE

**Prepared for the Penobscot nation in Penobscot Nation v. Mills, *et als.*, Civil Action No.1:12-cv-00254-GZS**

**Harald E.L. Prins, PhD**
**University Distinguished Professor of Anthropology**
**Kansas State University**
**11 December 2013**

## SCOPE OF OPINION

I have been asked to provide an expert opinion and report on the understandings of (a) the Penobscot Indian Nation and (b) the Commonwealth of Massachusetts of what was reserved to the Penobscot Indian Nation when the parties agreed that the Nation reserved "the islands in the Penobscot River" in the Treaties of 1796 and 1818. In particular, I have been asked to provide an opinion about what the parties understood with respect to the Penobscot Indian Nation's continued occupancy and use of the Penobscot River attending the reservation of the islands in the main stem of the River. I have also been separately asked to provide an opinion about whether the Penobscot Nation or Maine varied from those understandings when, pursuant to the 1820 Treaty, Maine acceded to the rights of Massachusetts in its prior Treaty of 1818.

My qualifications to provide the opinions herein, including a list of all publications I have authored in the previous 10 years, are set forth in my Curriculum Vitae, attached as Addendum 1.  The terms of my compensation are set forth in the Consultation Agreement attached as Addendum 2.

1

# SUMMARY OF OPINIONS

Below is a summary of the opinions I am prepared to give in the matter of *Penobscot Nation v. Mills*. The facts and data supporting them are set forth in the body of the Report and in the footnotes. This is meant only as a synopsis with some non-exhaustive examples of the supporting material and reasoning more fully delineated in the Report.

1. **As of the 1796, 1818, and 1820 Treaties, the Penobscot Indians did not distinguish between their occupation and use of their islands in the Penobscot River and their occupation and use of the River surrounding those islands.**

In the 1700s and 1800s, the Penobscot tribe consisted of about two dozen related indigenous families, linked together by ties of kinship. They shifted periodically between several main villages and numerous small temporary encampments widely scattered on islands and on both banks of their river, as well as beyond. Collectively, the Penobscot formed a large social network consisting of three core settlements and dozens of small camp sites situated on the east and west river banks and on a number of islands strung like wampum beads in a necklace along the main stem of the Penobscot River that provided them with almost everything they needed to survive. Penobscot Indian villages and smaller camps were almost always situated at a site with easy access to the river and its resources, in particular fish. Because the Penobscot River provided an abundance of fish, which was not only easily caught, but also easy to smoke and preserve, fish was a staple food. Having developed a predominantly river-based culture, as detailed in Part I of this Report, Penobscot Indian communities occupied seasonal encampments or established more permanent settlements with nearby canoe-landings on river islands or river banks. For instance, their major village, established on Indian Island (Panawamskeag), is located immediately above the Old Town Falls where they used to spear or net fish (salmon, shad, and alewives) during spring and early summer. Another village, Passadumkeag (also known as New Town), used to exist upriver on Thorofare Island near a major fish weir where they trapped fish (especially eel) primarily in the late summer and fall. Their northernmost village, Matawamkeag, sat on the Penobscot River's east bank at the confluence with the Matawamkeag, a major tributary. Nearby, Penobscots maintained a very large fish weir, primarily to catch eel. These strategically selected sites provided them easy access to fishing grounds at river falls, rapids, gravel bars, rocks, ledges, and other favored places where they speared, netted, or trapped eel, sturgeon, salmon, trout, shad, alewives, and other fish. Dependent on their canoes as a means of transport, they also hunted moose, deer, and other game animals swimming or wading in the water or walking or grazing or browsing near the river shore. In addition, they used bark canoes to shoot or trap muskrat, beaver, and otter, primarily valued for their thick fur. Moreover, they paddled or poled their canoes when hunting water birds, primarily duck and geese. Last but not least, they used canoes in search of edible plants, nuts, berries, as well as herbal medicines. In short, their traditional way of life before, during, and after the treaty period in question, depended on the

2

waters of the Penobscot River surrounding their string of islands, from bank to bank. In addition to traveling to their fishing sites, trap lines, and other locations in search of food and other vitally-important natural resources, they fished and hunted from their canoes, both by day and by night (using burning torches to attract fish). They also built fish weirs, some of which were very large, some nearly spanning the river from bank to bank. Primarily dependent on fishing, hunting, and food gathering (as well as some food gardening, fertilizing the soil with fish), they pursued a highly mobile way of life, with communities periodically splitting into family groups, each to its own district known as *nzibun*, meaning "my river." During the winter, when their rivers and lakes were frozen, Penobscots traveled on ice, up or down river, to and between islands, pulling their belongings (as well as fish, meat, furs and hides) on toboggans (sleds).  While on the ice, Penobscots engaged in ice fishing as well as hunting game.  Last but not least, as extensively described in this report, the Penobscot river has great spiritual significance as it features in their creation myths and is linked to many water-based family totem animals, including fish. Canoeing up or down the Penobscot River, whether for purposes of fishing, hunting, and trapping, or visiting relatives between Old Town Falls and the Forks (and beyond), Penobscots passed a sanctuary, a spiritually-powerful site in the form of a large granite rock situated in the river just south of Mattawamkeag. This peculiar rock with a deep cavity near the top was used as a deposit for ritual gifts to appease a powerful storm spirit dwelling in Mount Katahdin and in hope for an abundance of fish and game, but also plenty of hides and pelts.  Confronted with white surveyors entering their domain above the head of the tide before the 1796 treaty, Penobscots explicitly claimed the river had always belonged to them and that they had it from the Creator. In short, culturally-adapted to the seasonal rhythm of their riverine ecological system, the Penobscot tribe has historically survived on the basis of an inextricable linkage between land and water in their island domain. Without the water surrounding their islands, Penobscot survival was in peril, as also articulated in their creation myth about Anglebému ("Guards the water"), the giant frog who had gulped up all the water in the Penobscot River. This monster was killed by Gluskábe, their 'culture hero' who thus released the water and rescued his "grandchildren" settled "up the river." In conclusion, the idea that Penobscots could survive by isolating the islands from the water surrounding each of them makes no sense from a cultural ecological, historical and ethnographic perspective.

2. **The Commonwealth of Massachusetts entered into the 1796 or 1818 treaties understanding that it was extinguishing the Penobscot Nation's "Indian title" (also known as "aboriginal title").**

As explained in Parts II-IV of this Report, at the time of the 1796 and 1818 treaties, the Penobscot Tribe had exclusive occupation and use the Penobscot River above the head of the tides (about 5 miles north of Bangor), including the River itself, bank to bank, all islands in it, and the uplands on both sides of the River extending at least six miles back from the River on each side, and Massachusetts recognized this as the exclusive domain of the Tribe, held as "Indian title" (or "aboriginal title") which could only be extinguished through treaty-making.  This is well documented by the

early surveyors, Captain Joseph Chadwick (in 1764) and Captain Park Holland (in 1793), who separately recorded the tribe's firm stance (and their respect for it) that they were in the tribe's domain.  While two Commonwealth attorneys, James Sullivan and Thomas Dawes, entertained the notion that the tribe's aboriginal title had been extinguished as a consequence of military confrontations between the British and the Tribe (and they with instructed a treaty agent, Daniel Little, to try to assert such a position to tribal leaders), this "conquest" theory was not based in historic fact and, ultimately, was dropped as an argument, in favor of extinguishing Indian title by means of a purchase by mutual agreement in a treaty. Asserting that they held their lands from the Creator since time out of mind, Penobscot tribal chiefs walked away from treaty discussions when the notion of having been conquered was suggested, and ultimately, General Knox, one of the largest proprietors in Maine (owner of the Waldo Patent), and a land speculator, as the US Secretary of War in charge of Indian Affairs, as well as other influential Commonwealth officials involved in the drive to consummate the 1796, rejected the conquest theory in favor of title extinguishment by treaty. Land speculators such as Knox, but also foreign bankers like Alexander Baring (the future Lord Ashburton) were interested in extinguishing Indian title from a legal and financial point of view, rather than from a human rights perspective. Familiar with the speculative value of lands increasing once Penobscot Indian title was extinguished in 1796 Treaty, Baring wrote: "the Penobscot Indians and it was finally agreed that this strip of valuable land should not be encroached upon but remain their hunting ground. The tribe resided at Indian Town, about 200 families, became Roman Catholics, lived quietly and crept insensibly into a state of civilization from the vicinity of European settlements. This is sure ruin to the Indians. They fell off, decreased in numbers…. The state has consequently appointed commissioners to treat with them, the result of which is not yet known, but they will certainly agree. The lands will afterwards be sold by the state in townships and we shall pick out some that will be of great service to our lands behind them. The attention of all New England speculators is fixed on these lands and they will sell very high. We can afford to give more than any body and the remainder selling high must give additional value to our lands. I reckon our back tract [northeastern Maine] worth twice as much when the Indians are removed than before…" Regarding the fundamentals, nothing changed in this regard when it came to the 1818 treaty.

3.   **The Penobscot Nation entered into the 1796 or 1818 treaties with the understanding that it was giving up its rights of occupancy and use to the lands, not with the understanding that it was being given lands or rights by Massachusetts.**

As explained in Part IV, Penobscot leaders engaged in the treaties of 1796 and 1818 did not speak English, and translations were not always accurate, but they clearly did not make their marks upon those treaties with an understanding that they were being given lands or rights from Massachusetts.  On the contrary, they zealously claimed dominion over the subject matter of the treaties and understood that they were relinquishing their rights only with respect to the lands above the shores.  There was nothing in the area under consideration to be granted from Massachusetts to the

Penobscots.  Tribal leaders would never have thought otherwise, and as described in the Report, the most influential Massachusetts representatives never thought otherwise.

**4.  Upon entering into the treaties of 1796 and 1818, Massachusetts did not intend to extinguish the Penobscot Nation's occupation and use of the waters of the Penobscot River surrounding islands in the River from Indian Island northward**.

As explained in Parts IV and V, the Commonwealth's treaty efforts focused upon securing the land on either side of the Penobscot River for settlement (and eventually timber extraction), not the River itself.  The River was left to the Penobscot tribe to occupy and use to sustain itself in its way of life attending it settlements on the islands from Old Town falls, northward.  James Sullivan, at the time of the 1796 Treaty was Massachusetts Attorney General. He was quite familiar with the Penobscot Indian "way of life" at the time, and explicitly referred to their dependence on the fisheries on their river, observing: "what those people acquire by the labour of their women in the summer [growing crops], and by the hunting done by the men, lays up but very scanty provision for their long and cold winters. The sturgeon, the salmon, and the great fish, the men will condescend to take, but they feel themselves above the taking of small fish: the catching of shad and alewives they make the business of their women and children. The alewives taken, and some of the salmon, they preserve by hanging them in the smoke." This understanding on the Commonwealth's part is well-confirmed by the February 27, 1812 Resolve of the Commonwealth to re-secure the Tribe's fishing grounds attending its village at Indian island and Old Town falls.  This shows that the Commonwealth understood that, as a result of the 1796 Treaty, the Tribe retained these fishing grounds, made up of bars, rocks, ledges and "small islands" even though they were not the identified "islands" in that Treaty.  Nothing changed from Commonwealth's perspective with it consummated the 1818 Treaty.  In fact, the Commonwealth saw fit in that Treaty to establish the right of its citizens to pass and repass the River to ensure that the Tribe would allow them to use it as a public highway for floating logs and boats that could navigate the shallows.  The Commonwealth knew that the Penobscot Tribe depended upon its continuing occupation and use of the River to sustain its village establishments on the islands and, in fact, protected the Tribe's continued right to occupy and use the River fishery.

**5.  Upon entering into the treaties of 1796 and 1818, the Penobscot Nation did not intend to give up its rights of occupancy and use of waters surrounding islands in the Penobscot River from Indian Island northward.**

Given the Penobscots' way of life described in Part I of the Report, it is inconceivable that the Tribe would ever intend to give up its occupancy and use of the waters surrounding its island villages and family camps from Old Town falls northward in the treaties 1796 and 1818. Indeed, after having failed to convince the old Penobscot Chief Joseph Orono to sign a treaty in 1784, General Knox reported

that Orono's response had been: "The Almighty placed us on the land and it is ours. . . . Orono continued his speech asking Massachusetts [government] to fix the bounds of the Penobscots' land to prevent the new inhabitants from interfering 'with us.' He declared that his people did not sell any land 'to our knowledge, and never will while we live." In 1788, in another failed effort to convince the Penobscots to agree to a treaty based on unacceptable terms, the Penobscot chief spokesman, a war chief identified as Colonel Orsong Neptune (the father of Lt. Governor John Neptune), informed the Massachusetts Commissioner, through an interpreter: 'Brother, God put us here. It was not King of France or King George. We mean to stay on this Island. The great God put us here; and we have been on this Island 500 years. …From this land we make our living." A year later, one of the most powerful and influential political figures in the USA in the post-revolutionary period, Knox reconsidered the concepts of "Indian title" and claims of possession based on the "right of conquest." In his capacity as U.S. Secretary of War (1789, in charge of Indian Affairs) in 1789, Knox wrote:  "The Indians, being the prior occupants, possess the right to the soil. It cannot be taken from them except by their consent, or by rights of conquest in case of a just war. To dispossess them on any other principle would be a great violation of the fundamental laws of nature." In 1793, three years before the 1796 treaty, Captain Park Holland ventured upriver into Penobscot Indian territory above Old Town Falls for a survey. He was met with hostility as an intruder. Obviously, in defense of their homeland, Penobscots were willing to expel or even kill uninvited American whites. He reported in his field journal: "They gave us to understand… that the river was their river, and that they did not wish any white man to go up."  Proceeding upriver, he arrived in Mattawamkeag, where "found another large Indian town, full of inhabitants, who forbade our proceeding any further. They came out to us, and gave us to understand they wished to make a strong talk, the amount of which was, that the river was their own river, and they did not want any whites to go up, for bye and bye the white man would come and buy a little of their land, then a little more, and the further the white men go up, the further the beaver and moose would go, and bye and bye the poor Indian would have no land and no moose meat. Many of these old men, I found to be afterwards, men of sound sense, strict integrity, and good judgement. We satisfied them that we did not come to buy their land, or to injure them, and proceeded on our way…."  Captain Holland's 1793 account depicts not only the Penobscot's vigorous defense of their ancestral domain, but the ready acceptance of that tribe's claim of exclusive use and possession by these prominent agents of a foreign government. The five arduous trips made to Boston by Penobscot delegates between 1797 and 1812, described in Part V of the Report, aptly show, for example, that the Tribe considered its ancient connection to the River attending its island village of "Old Town" to be left entirely intact by the 1796 Treaty. In the early 19th century, soon after James Sullivan took office as governor of Massachusetts, Penobscot Chief Attian Elmut headed to Boston with a tribal delegation to request protection of their fishing privileges near their head village at Indian Island. The language used by the Chief, even as roughly translated, reveals the Penobscots' understanding of their retained fishery in the Penobscot River. (Indeed, years later, Neptune recounted that he "went to Boston and saw Governor Sullivan and told him about *our fishing ground*.")  The Penobscot Chief referred to his own people as the

6

"proprietors of all the Islands both great and small on [the] Penobscot River," and explained that "our Islands and especially Shad Island … has been the greatest support to our Ancestors." Echoing those of past Penobscot leaders describing the Tribe's understanding of its relationship to the River, a note taker at the time wrote that Chief Attian proclaimed in 1807 that "the God of Nature gave them their fishery, and no man without their consent has a right to take it from them." The old chief became utterly desperate by his own inability to obtain recourse:  "Oppressed with anxiety and care for his people, and perplexed with the business on hand, he fell into a state of derangement, and stabbed himself, in Boston, so badly that he soon died…. .an event much lamented."

Nothing changed with the 1818 Treaty.  The Tribe continued to occupy and use the River to support its way of life unquestioned.

**6.  Massachusetts and the Penobscot Nation understood that by reserving the islands in the Penobscot River from Indian Island northward in the 1796 and 1818 Treaties, the Penobscot Nation reserved its occupancy and use of the waters of the Penobscot River surrounding those islands.**

This is established by the synopses above and in Parts I-VI of the Report.  It was understood by the Tribe and by Massachusetts that with the islands, the Tribe retained its continued occupancy and use of the Penobscot River between the islands and from shore to shore to sustain the Penobscot way of life described in Part I of the Report. Because of this symbiosis in their riverine habitat, a severance between their use and occupation of the islands and their use and occupation of the River was inconceivable and would have reduced them to starvation, dooming their chances for survival. Their mode of subsistence and material culture, their social organization and family totems, as well as mythological worldview, all continued through the treaty period in question.  When those treaties were finally executed in 1796 and 1818, all parties were well aware of how and why the Penobscot people were culturally and historically embedded in their river habitat. As the nineteenth century progressed past 1818, non-Indians would encroach upon the River from their developments on the shores, including their sawmills and timber drives, but tribal members would continue to occupy and use the River in all of the ways described in Part I; and there was no assumption that the Treaties would deprive them of doing so in accordance with their ancient traditions.

**7.  In entering into the 1820 Treaty with the Penobscot Nation Maine and the Penobscot Nation understood that Maine was acceding to the 1818 Treaty, with the exception of the Tribe's retention of land and services of an agent in Brewer.**

As fully described in Part VII, when Maine separated from Massachusetts in 1820, it took over the 1818 Treaty between the Commonwealth and the Tribe.  Nothing changed other than the elimination of a small parcel of tribal land and related agent services in Brewer.  The intent and understanding on the part of Maine and the Tribe

7

was that everything agreed to in the 1818 treaty carried over and was confirmed in the 1820 treaty with Maine.

**8.   Maine and the Penobscot Nation understood that following the 1820 treaty, the Penobscot Nation reserved its occupancy and use of the waters of the Penobscot River surrounding those islands.**

As described in Parts VII and VIII of the Report, Maine officials understood and accepted that the Penobscot tribe retained its occupation and use of the Penobscot River. There are numerous reports describing the importance of the fisheries at Old Town Falls, a few hundred yards below their head village at Panawamskeag ("Indian Island"), but also upriver. In addition to dependence of the fisheries, they also continued to hunt and trap, and canoed up and down the river where they established seasonal encampments on the river banks and islands. In the summer of 1820, when Penobscot tribal chief, Lt. Governor John Neptune visited the Governor of the newly-established State of Maine in Portland, he complains that "the white people take the fish in the river so they do not get up to us. They take them with weirs; they take them with dip-net. They are all gone before they get to us. The Indians get none. If you can stop them so that we can get fish, too, we shall be very glad.  There is another thing — our hunting privilege. The white men come and spoil all the game. They catch all the young ones and the old ones. We take the old ones and leave the young ones till they grow bigger and are worth more. We wish the white men to be stopped from hunting.  . . .  We wish your Government to stop the white men from hunting — put their traps in their chests. Let white men have the timber and the Indians have the game weirs had been set up in their river which had obstructed the fish and injured their means of support."

The linkage between the river and the nearly 150 islands reserved by the Penobscots is so self-evident that the 1820 treaty, confirming that the State of Maine simply stepped into the shoes of Massachusetts with respect to the 1818 treaty terms, does not even mention the islands. During the treaty ceremony in Bangor, prior to the actual signing of the document, Captain Francis Lolar spoke on behalf of the Penobscot tribal council. Addressing Colonel Lewis, the treaty commissioner representing the State of Maine, he said: *Brother*.—The Good Spirit who made and placed the red men here, before white men came, gave us all the land from whence the waters run into the Penobscot. He caused the forests to abound with game, and the rivers with fish, for our use and subsistence- we then were contented and happy. When the white men came over the great waters to our country, we received them as friends and brothers: we then were many and strong: they few and weak: we gave them land, and permitted them to live peaceably among us, and have remained their friends. The white men are now very strong; we are weak, and now want them to be our friends.  *Brother*.—We place the greatest confidence in the Governor, Chiefs, and people of the State of Maine, and are willing to put ourselves under their care and protection, helping, and expecting they will perform all their promises to us as faithfully as our good friends the governor, Chiefs, and People of Massachusetts have done."  In his response,  Colonel Lewis confirmed the state's intent to stand in shoes of Massachusetts concerning the specific understandings provided by the Treaty of

8

1818: "It being meant and intended, to assume and perform, all the duties and obligations of the commonwealth of Massachusetts, toward the said Indians, whether the same arises from treaties or otherwise…. So that said tribe may have continued to them, all the payments and enjoy all the immunities and privileges…." After the 1820 treaty, a Penobscot chief guided two surveyors, one of whom was Major Treat. Having witnessed the treaty ceremony in Bangor, Treat was personally familiar with the importance of the Penobscot Indian fisheries on the Shad Islands at Old Town Falls. Traveling by canoe upriver, with Neptune (one of the signers of the 1818 and 1820 treaties), Treat kept a journal and sketched maps of the river, marking numerous wigwam sites, place names, as well as several large fish weirs in the river. There are numerous Indian agent reports, newspaper accounts, and early ethnographic descriptions underscoring the continued importance of the river in the Penobscot way of life, well into the 20th century. In his 1822 *Report to the Secretary of War on Indian Affairs*, published two years later, Dr. Morse observed: "The Penobscots, in government and internal regulations, are independent- The legislative and executive authorities are vested in the sachems; though the heads of all the families are invited to be present at their public meetings, which are held in their house of worship, and conducted with order and decorum…. The tribe has the right to hunt and fish along the banks of the river, to the mouth of Penobscot Bay." Among his major sources of information regarding the Penobscots was the Bangor-based attorney and politician Williamson, the second Governor of the State of Maine and its major 19th-century historian.

Three years after the 1820 treaty, Maine government officials traveled to the Penobscot reservation, reporting Penobscot families encamped on ten islands in the main stem of the river above the falls. A generation later, in 1842, two decades after the final treaty, the Indian agent reported 31 Penobscot families encamped on nine islands. Notwithstanding complaints about diminishing fish supplies due to fisheries below the falls, and dams, or ongoing disputes with local whites, Penobscots continued to spear and net fish at the Old Town Falls just downriver from their head village. Although more remote and less reported on, the same is true for Penobscots residing at Mattanawcook Island and other upriver island communities. They also continued to hunt and muskrat, beaver, and other fur-bearing animals along their river. In various degrees, families continued to depend for their food on fish and game harvest on their islands upriver. Penobscot families retained much of their indigenous way of life as described in the first section of this report until well into the 19th century. Whether the water on their river was low, high, or frozen, they camped on--or traveled between-- the many dozens of islands on their tribal reservation above Old Town Falls. Even in recent decades, several Penobscot families still frequent islands upriver for purposes of fishing, hunting, and trapping.

# REPORT SUPPORTING OPINIONS

## I. Penobscot Indian Way of Life on the Penobscot River

## A. Brief Description of the Penobscot River & Homeland

"The Penobscot Indians refer to themselves as *Pa'nawampske'wiak*, 'People of the white rocks (country),' or 'People of where the river broadens out.'"1 In his authoritative *The History of the State of Maine* (1832), William Williamson, a lawyer (and former State Senator and Governor from Bangor), personally long familiar with the Native peoples then residing in villages on several islands above the Old Town Falls, referred to the Penobscot as "a river, once wholly theirs from its sources to the ocean."2

Since the early 17th century, English explorers and colonists named then Penobscot tribe after their river, the *Penobscot* (variously spelled).3 The name of this river, however, features in French colonial records from the early 1600s onwards as *Pentagoët* (also variously spelled).4

Historically, the ancestral homeland of the Penobscot Indian Nation is more or less coterminous with the drainage area of the Penobscot River on which its families have

---

1 Speck 1940, p. 7. Dr. Frank Speck, an anthropologist who had studied anthropology under Dr. Franz Boas at Columbia University and later joined the University of Pennsylvania where he served as department head, began his ethnographic fieldwork among the Penobscot in 1907, annually returning to this tribal community for the next dozen years. He spoke and wrote their language, and was respected for his interest in their culture and his personal friendships. A number of Penobscots were his personal guests for weeks and even months. Speck's ethnography remains a major authoritative source and was recently republished by the University of Maine Press.
2 Williamson, William. 1832, *The History of the State of Maine*. Hallowell: Glazier, Masters & Co. Vol.2, p.670.
3 See Godfrey 1876, p.1 Godfrey explains: "We find it thus spelled in Strachey's account [1618] of the expedition that sailed from England, in 1606, to establish the Popham Colony. He says that, on the eighth of September, Captain Gilbert with twenty- two others departed in the shallop for the river of 'Penobscot.'" See Godfrey, John E. 1876. The Ancient Penobscot, or Panawanskek. Pp. 1-22. *Collections of the Maine Historical Society*, Vol. VII. Bath: Maine Historical Society.
4 "At the time Champlain sailed up the river, in the autumn of 1605, it was called, by the savages, 'Pentagoet.'" (Godfrey 1876, p.1).

resided since time out of mind.5  "Their tribal hunting territory," as noted by anthropologist Frank Speck, "was the valley on the Penobscot River and its tributaries. Beginning at Penobscot Bay, it extended a short distance back from both shores and spread out, going upriver, reaching almost as far as the Upper St. John River…. Thus nearly all the Penobscot villages were on the Penobscot River, and their hunting grounds bordered it."6

As noted above, French colonial records referred to the Penobscot River as Pentagoët. The indigenous meaning of this place name is thought to refer to "falls of the river."7 Maine historian Fannie H. Eckstorm, born and raised in the Penobscot valley, noted that "Pentagoet was first used of the Bagaduce region [Castine]; later the name was extended to cover the whole Penobscot…. Since the word definitely means 'the falls,' it must have been settled on the tide-falls of the Bagaduce and the tide-falls at Bangor (Pemjedgewok)."8 Another Maine historian and native to the Penobscot valley, John Godfrey, long served as a judge in Bangor. Referring to the "Head of the Tide," he wrote in 1876: "The Indians made peculiar claim to the territory extending from that point up the river and held it, with wonderful tenacity, for years, against the efforts of the white settlers and the Government to obtain it."9

White fishermen and loggers had frequented the coastal shores and  islands in Penobscot Bay since the early 1600s, but the Penobscot River from entrance to source remained exclusively indigenous domain until the second half of the 18th century.

---

5 Snow 1978, Speck 1940.
6 Speck 1940, p.2.
7 Eckstorm, Fannie H. 1978. *Indian Place Names of the Penobscot Valley and the Maine Coast.* Orono: University of Maine Press (4th printing), p.192. Eckstorm offers the following etymology for Pentagoët, or *Pen-tag-wet' – -pen,* 'descending'; *-tegwe*, 'river'; *–t*, locative).
8 Ibid.
9 Godfrey 1876, p. 7.  See Godfrey, John E. 1876. The Ancient Penobscot, or Panawanskek. Pp. 1-22. *Collections of the Maine Historical Society*, Vol. VII. Bath: Maine Historical Society.

However, the interior woodlands above Old Town Falls remained  largely *terra incognita* to white settlers and surveyors in New England until Penobscot chiefs, headed by the old sachem Joseph Orono signed the 1796 Treaty in Kenduskeag (Bangor). Throughout this historical period, the Penobscot Tribe maintained its exclusive use and occupancy of their river from Old Town Island northward to support their way of life, including subsistence from hunting, fishing and gathering of plants. By then, the tribe had dwindled in numbers due to foreign diseases and frontier violence.10

Historically, the Penobscot homeland was mostly covered by huge forests, but also includes extensive bogs, marshes, and swamps, as well as lakes and ponds.  Draining the northeastern territories, the Penobscot River's East Branch rises near the headwaters of the Allagash, a tributary of the St. John River; its West Branch rises near Penobscot Lake in the northwestern highlands on the border with Quebec. The main stem of the Penobscot River, which is the focus of this report, begins at Nicatow ("the Fork") where both major branches converge, forming an ever larger river downstream, as it is joined by major tributaries such as the Mattawamkeag and Passadumkeag rising in the east, and the Piscataquis coming in from the west. About 150 islands are located in this majestic part of the river before reaching the Old Town Falls. These large falls are named after the historic Penobscot Indian village of Old Town, at Indian Island.11  Below these falls, after

---

10 The number of Penobscot warriors in 1690 was still estimated at 350 men. By 1726, there were only 90 warriors left.See Aon. 1726. "Memorandum of the Number of Indians in Each tribe from Boston in New England to Canso in Nova Scotia…." *New England Historical and Genealogical Register* Vol.XX, p. 9. The tribe's population continued to dwindle, notwithstanding an influx of indigenous refugees driven from southwestern river valleys by English colonial expansion.
11  Indian Island is historically identified by its indigenous name as Panawamskeag (variously spelled). Situated a few hundred feet above the falls, this island became an important site for a seasonal settlement. In the late 17th century, French Jesuits established a colonial mission post on this island, identified as *Paňna8aňbskek* (see Rasle 1691:542). In the course of the 18th century, this village ("Old Town") developed into the tribe's principal village and became the seat of government for the Penobscot Indian Nation.

an eight-mile stretch with rapids and, historically, about nine smaller falls in the main branch, the Penobscot River's head of tide is reached at Eddington Bend, a location identified by Penobscots as *Wee-quer-gar-wa-suk*.12  Immediately below existed a large rock in the river, named Nicholl's Rock (after an early white settler), traditionally identified by Penobscot Indians as *Sobscook* ("Sea Rock"), indicating that from thereon, the Penobscot River is affected by the sea tides.13

Until signing the 1796 treaty with the Penobscot tribal chiefs, political authorities representing the Commonwealth of Massachusetts recognized the political status of the territories above the head of the tide as "Indian lands."14 Claiming that territory as their ancestral domains, Penobscots considered uninvited strangers as intruders. When a small English colonial survey team journeyed upriver above Old Town Falls in 1764, and notwithstanding that the team had hired eight Penobscot Indian guides, the surveyors ran into problems: "The Indians are so jealous of their country being exposed to this survey," noted the team's major surveyor Joseph Chadwick, "as made it impracticable for us to perform the work with accuracy."15

Notwithstanding growing pressure by armed white settlers on the Penobscot tribe's southern and western frontiers, the indigenous traditional culture persisted in the tribal domains upriver in the period of the treaty-making (from 1784 to 1820) here under

---

12 This translates as "the head of the tide," according to Joseph Nicolar, in his 1887 article "Some of the names that the Indian has Bestowed—Quaint and Old." *Old Town Herald*. Reprinted in Eckstorm 1978, pp.239-241.
13 Eckstorm 1978. *Indian Place-Names of the Penobscot Valley and Maine Coast*. Orono: University of Maine at Orono Press (4th printing), pp.20-21.Noting "there used to be a dangerous rock in the river, called Nichols' Rock" (just downriver from Nichols Falls, as noted on Joseph Treat's 1820 map; see Pawling 2007, p.72),  Eckstorm (1978, p.21) notes that the 19th-century Penobscot Indian historian Joseph Nicolar identified Sobscook as *So-ba—quar-ps-cook*, meaning "sea rock."
14 See also Joseph Chadwick 1764, Park Holland 1794.
15 Chadwick, Joseph. 1764

consideration.16 That is to say that from the first treaty-making attempt by the newly-constituted Commonwealth of Massachusetts in 1784, a year after the conclusion of the American Revolutionary War, to 1820,  when Governor John Attean, Lt. Governor John Neptune, and the Penobscot "captains" (tribal council members) portaged around Old Town Falls and canoed downriver to Bangor to sign the 1820 treaty with the newly-formed State of Maine just separated from Massachusetts, the Penobscot Indian "way of life" -- including their mode of subsistence, technology, social organization, government structure, spiritual beliefs and moral values -- was generally as described in this report.

## B. Penobscot Seasonal Residence Pattern

Adapted to the seasonal rhythms of their natural environment, Penobscots developed a cultural system primarily based on fishing, hunting, and gathering in their river habitat: "They distinguish the four seasons, the opening of the leaves of the trees and breaking of the ice; the warm weather and fishing season; the hunting season, frosts and falling of the leaves; the closing of the rivers by ice, and the deep snow season."17 They traditionally name their months ("moons") after a characteristic feature or predominant activity in the seasonal cycle. For instance, although fishing also took place in other months, April is called *Amusswikizoos*  ("moon in which we catch fish"); August is *Wikkaikizoos* ("moon in which there is a heap of eels on the sand"); October is

---

16 Although the Penobscot were involved in treaty-making ceremonies prior to the American Revolutionary War, the term "treaty period" as used in this report refers to the treaty-making activities from 1784 to 1820.
17 Vetromile 1866, pp. 78-79.

*Assebaskwats* ("there is ice on the banks"); and November they call *Abonomhsswikizoos* ("moon in which the frost fish comes").18

     Families periodically moved to districts where they were most likely able to secure food, for immediate consumption or preservation. This mobile way of life is reflected in their pattern of residence in the Penobscot valley above the Old Town Falls in the 18th and early 19th centuries: "That they had temporary camping-grounds, at the mouths of nearly all the tributaries of the Penobscot, is evident from the fact that great numbers of arrow-heads, stone axes and other Indian implements, have been found there. But there are three localities upon the river which, it is said, were their particular places of rendezvous — Mattawamkeag, Passadumkeag, and Penobscot Falls. The latter locality, was, probably, the beginning or principal point of the ancient Panawanskek [Panawamskeag]. It may be that that name, in its several forms, was applied to the different camping-grounds; or it might have been applied to the whole territory."19 Located on the river bank or islands with easy access to nearby fishing grounds, these settlements were periodically abandoned when families dispersed in their bark canoes for purposes of seasonal fishing, hunting, or trapping elsewhere. One or several closely-related families camped together in bark wigwams, usually erected on an island shore or river bank in their family hunting, fishing, and trapping territory known as *nzibum* ("my river").20

     A few decades before the 1796 Treaty, the English colonial surveyor Joseph Chadwick and a few companions journeyed upriver for an exploration expedition from

---

18 Vetromile 1866, pp.79-80.
19 Godfrey 1876, p.4.
20 Discussing family hunting districts among the Maliseet, eastern neighbors of the Penobscots, Frank Speck and Wendell Hadlock (1946, p. 361, 364, 365, 372) offer several examples why a tribesman would refer to his family hunting district as "my river."

Penobscot Bay to Quebec City in the summer of 1764. Paddling upriver with their Penobscot Indian guides, they passed Sobscook at the head of the tide and entered what was then well understood to be still the exclusive tribal domain of the Penobscot people, or, as Chadwick noted: "Indian Lands so called." After portaging around the Old Town Falls, he made note of the three Penobscot Indian settlements noted above. The first was "Indian Old Town," located at the "Isle of Penobskeag" (Panawamskeag), or "Penobscot," today better known as Indian Island.[21]  Chadwick observed that "the chief value of this place is hunting and fishing." Next, Chadwick landed on Passadumkeag Island, where he noted "the Indians made maple sugar near equal to single refined." Here the Penobscot Tribe had its second principal village, "the Indian Town of Persadonk." There, Chadwick met with three Penobscot Chiefs, "Tomah, Odohando, and Orono**,** who were richly dressed sitting on three packs of Beaver."  As Chadwick noted, "the whole room [was] lined with Beaver, on the other side of the room 3 packs placed for us." Continuing upriver, he came to the third principal Penobscot village at Mattawamkeag Point, today still identified as Mattawamkeag on the eastern shore of the River. Chadwick referred to this ancient settlement as "Mederwomkeeg," and described it as "an Indian town and a place of residence in time of war, but was now mostly vacated… Land high ground and stony, large tracts of old fields and as they say have raised good Indian corn."[22]

---

21  As observed by Williamson (Vol.1, p.474) in 1832: "In later years, *Indian Old-town* has been their village and altogether the place of their greatest resort. Its situation is upon the southerly end of an island in Penobscot river twelve miles above the mouth of the Kenduskeag [Bangor], being partially cleared and containing about 350 acres of very rich and mellow land. At the close of the American revolution, the village contained between 40 and 50 wigwams, about equally divided by a street five rods in width, which passed east and west across the Island; quite compact on each side, and constructed after the old Gothic fashion with the gable ends towards the street."

22 Chadwick, Joseph. 1764. An Account of a Journey from Fort Pownall—Now Fort Point—Up the Penobscot River to Quebec in 1764. *Bangor Historical Magazine* Vol. 4 (1889), pp.141-148.

Primarily depending on fishing, hunting, and gathering, Penobscots continued their seasonal migrations before, during, and after the treaties of 1796, 1818, and 1820, periodically leaving their villages and dispersing for weeks, months, or even longer. Accordingly, when Chadwick traveled upriver, he found Mattawamkeag "mostly vacated," but when a Massachusetts surveyor, Captain Park Holland, reached that same village in the summer of 1793, three years before the 1796 treaty, he described it as a "large Indian town, full of inhabitants…."23

Just weeks after the 1820 treaty ceremony, Major Joseph Treat, a militia officer from Old Town (the name eventually adopted by white settlers for the settlement on the western mainland shore adjacent to the Penobscots' village at Old Town Island) was commissioned by Maine Governor William  King to survey the Penobscot River above the head of the tide. Born and raised in the Penobscot valley, and guided by 53-year old Penobscot tribal leader John Neptune, Treat began his journey, keeping a journal and sketching a detailed map. On page 10, where his map of the Penobscot River above the head of the tide begins, Treat penned the following: "The original Indian name is *Pem ta guaiusk took* – or great or long River but lately called Penobscot from the name of their late cheifs place of residence old Town or Penobscot Island."24  Marking this island, now better known as Indian Island, on page 14 of his map, Treat penned: '"*Pe,no,om skee,ok* or Penobscot.. i.e. Rocky or stony place from which the River is called."25  See Addendum (unnumbered), "14" marked at the top.

For part of the year, even these more permanent settlements were largely abandoned, as village communities periodically broke up in clusters of closely-related

---

23 Cited in Bingham, p.212.
24 Joseph Treat 1820, in Pawling 2007, p.72.
25 Joseph Treat 1820, in Pawling 2007, p. 76.

families and scattered, each band moving to a favorite spot where resources were thought to be plenty that season.26 Some family groups avoided the larger settlements, and retreated to seasonally-occupied small encampments on the islands and along the river banks, especially near rapids and falls, as well as entrance of tributary rivers, where the fisheries were good.27

Periodically dispersing along their rivers, members of the Penobscot communities communicated with each other not only by sending messengers orally transmitting information (and, for official purposes, using wampum strings or belts), but also by means of *wikhegan*, a form of pictographic writing, usually scratched in bark or sketched with charcoal. An illustration of indigenous media on river routes is offered by an 18th-century French missionary among neighboring Abenaki on the Upper Kennebec, telling of a tribesman

> going on his way to carry the news to those of his quarter [district] arrived at a river bank. There he took the bark of a tree, upon which with coal he drew [a picture]. He then put this kind of letter around a stick which he planted on the bank of the river, to give news to those passing by…. A little while after some [Indians] who were passing by in six canoes on their way to the village, took notice of this bark; 'See there a writing,' they said, 'let us find out what it says.'28

Treat's 1820 Journal offers another example from above Old Town Falls. After landing his canoe at Old Town on Indian Island, he noted that it is "the Present residence of the

---

26. "In general the family hunting group is a kinship group composed of individuals united by blood or marriage, maintaining the right to hunt, trap, or fish, in certain inherited districts bounded by rivers, lakes or other natural landmarks. The group is known by a family name and the territories are patrilineally inherited. Trespass, though rare, is punishable" (Bailey, Alfred G. 1969. *The Conflict of European and Eastern Algonkian Cultures, 1505-1800: A Study in Canadian Civilization*. Toronto: U Toronto Press. 2nd edition, p.85).

27 Indigenous occupation of sites in the Penobscot Valley above and below Old Town Falls is very ancient, with archaeological excavations pointing to evidence dated as early as 7,000 years ago. See, for example, the Gilman Fall site in Old Town, located "on the upstream side of a falls at the confluence of the Stillwater River and Pushaw Stream, [where] a 150m3 excavation produced over 600 Middle Archaic artifacts [yielding] dates ranging from roughly 7300 to 6300 BP" (Sanger 2006, p.233; In Sanger, David, and Renouf, M.A.P., eds. 2006. *The Archaic of the Far Northeast*. Orono: U Maine Press, pp.228- 236.

28 Rasle, Sebastien 1723. In *Collections of the Maine Historical Society,* 2nd Series, Vol. 4, p.301.

Penobscot Indians, [but] his has not been their chief place of residence they say more than 1 or 200 years—their Towns were formerly on Now,at, kee, mongon and Passadunkee Islands."29

The indigenous name for this 300-acre island situated immediately above Old Town Falls has been spelled "in not far from sixty different ways — Panouamske, Panawanskek, Pamnaouamske, Panahamsequet, Panamske, Panaomske, Panaouamsde, Panaouamske, Panouamske, Panoumsque, Panouske are some of the forms."30

Anthropologist Frank Speck, who began his ethnographic research in 1907, provided the following historical sketch of Penobscot Indian settlements in the 19th century, based on a combination of oral history and written records: "The bands of the northern part of the country assembled usually at the northern villages, 'where the current piles up sand,' *Madawam'kik* (Mattawamkeag), and *Tcimski'teguk* 'big dead water (Kingman). The central bands held their gatherings often at *Matna'guk*, 'Long Island' (Lincoln), where there is still a dwindling village."31  This village, the name of which is more commonly spelled as Mattanawcook, was visited in 1846 by Henry David Thoreau, who noted several inhabited "wigwams" there.32

Downriver from Mattanawcook, on the southeast side of Olemon Island, stood yet another Penobscot Indian village: *Welama'nesuk*.  Probably the most famous Penobscot

---

29 Treat 1820, in Pawling 2007, p.77. Pawling (2007, p.77, note 7) explains that the "old Penonobscot village at 'Now,at, kee, mongon' is present-day Freese Island, the first island upriver from Indian Island. 'Passadunkee' Island, commonly referred to as Thorofare Island today, is located just upstream of the mouth of the Passadumkeag River." In 1820, 277 Penobscots resided in their tribal village Old Town on Indian Island (Morse 1822, p.68).
30 Godfrey 1876, p.1. In his "A Dictionary of the Abnaki Language" French Jesuit Sebastien Rasle spelled the name of this Abenaki Indian village on the Penobscot as *Paňna8aňbskek*.
31 Speck 1940, p.212. In his book, Speck (1940, p.25) explained that Mattanawcook (or as he spells it, Matna'guk), "is the most northerly permanent settlements [and] located also on a large island about thirty-six miles above Oldtown, opposite Lincoln. There were seven families here in 1912."
32 Thoreau, pp. 294-295. According to the linguist Dyneley Prince (1910, p. 194), the meaning of *Mat'nagwuk* is "large hills."

who lived in this village in the second half of the 19th century was Frank Loring, better known as Chief Big Thunder.[33] By the late 1800s, its population had dwindled, so that only "four or five families" remained when Speck began his ethnographic fieldwork in the early 20th century: "It is so named from the fact that in the olden times they used to obtain there supplies of red ochre for paint."[34]  "Other large camps, possibly villages, are known to have been situated on the Penobscot river," including Mattawamkeag and Passadumkeag (on Thorofare Island).[35] Both settlements were historically significant and still inhabited after the 1820 Treaty was signed. "All [Penobscots], however, had Indian Island (*Panawa'pskik*) for the central tribal headquarters where they held elections and ceremonies as at a capital."[36]

As the various Penobscot place names here discussed show, the indigenous toponymy reflects culturally-embedded information concerning the environment, information of practical use to native speakers of the ancestral language, not only on their seasonal migrations but also when teaching the next generation how to find their way in throughout their riverine homeland.  Many of these place names reveal the tribe's traditional relationship to their river, its wildlife, and geographical features. This cultural

---

33 As Big Thunder's life history well illustrates, Penobscots were often gone from their villages for many months, sometimes even years. Many continued to migrate to the sea coast, camping below the falls (such as at Brewer, opposite Kenduskeag), and on coastal islands (Deer Isle, Mount Desert Island, and so on). (See also Prins 1997).

34 Speck 1940, p.25.

35 Speck 1940, p.26. Note there are two islands on the Penobscot named Thoroughfare Island, the other just upriver from Costigan, known by the Penobscots as *Bosquenuguk* ("Burying Ground Island"), and historically named by English settlers "Broken Island" (see Treat 1820, in Pawling p.78). Eckstorm (1978, p.40) is partially correct in her critical comments about this having been a "Burying Ground for Mohawks," as this location close to Indian Island was an ancient cemetery, but not for burying  Mohawk enemies.

36 Speck 1940, p.212. In his book, Speck (1940, p.25) explained that Mattanawcook (or as he spells it, Matna'gak), "is the most northerly permanent settlements [and] located also on a large island about thirty-six miles above Oldtown, opposite Lincoln. There were seven families here in 1912."

ecological relationship endured above Old Town Falls well into the 19th century, even after the 1820 treaty had been signed.


## C. Traditional Mode of Subsistence on the River

The Penobscot River has been the central artery of an ecosystem supporting Penobscot culture-- their traditional "shared and socially transmitted ideas, values, emotions, and perceptions, which are used to make sense of experience and generate behavior and are reflected in that behavior,' or, in short, their way of life."[37]
To further understand the tribe's way of life in the period leading up to the 1796, 1818 and 1820 treaties, the following sketch offers a basic outline of its relevant historical features in reference to their river.  Illustrations that accurately depict activities carried out by the Penobscots are provided in Addendum 3.

The natural cycle of their natural resources demanded great mobility on the part of Penobscot families depending on foraging, supplemented by small food gardens. They developed a lightweight material culture in which bark, especially birch, was of major importance, not only for their dwellings (wigwams), but also their swift canoes and food containers, skillfully constructed and water tight. As a canoe-faring migratory people, they not only hunted, gathered, and trapped, but also depended to a considerable degree on their fisheries.

Widely ranging through their vast domains, sometimes with their elder, infants, and dogs aboard their canoes, as well as carrying food, furs, rolls of bark, and other essential belongings, Penobscots paddled or poled (or sledded, in winter) up and down

---

37 The concept of culture, as defined in Haviland et al 2014, *Cultural Anthropology: The Human Challenge*. Belmont: Wadsworth (14th edition), p.28.

the Penobscot River and its tributaries, ventured across lakes and saltwater bays, followed shore lines or visited islands, in a never-ending pursuit of natural resources according to the rhythm of nature and its seasonal cycle shifting from periods of easy plenty to scarcity and challenge. Adapting their mode of subsistence to the seasonal cycle, families periodically moved and set up camp at favorite sites along river shores, on islands, and other locations with close access to water.[38] In addition to fishing, hunting, and trapping, they collected bird eggs, harvested bulbs, roots, and berries, and felled trees or burned brush and meadows on fertile soil near their encampments, where they planted, weeded, and harvested their food gardens. In the spring, they tapped maple trees and collected their sweet sap in containers, later to be boiled down. One favorite location was an island eleven miles upriver from Panawamskeag they named *Suga-la-manahn* ("Sugar Island").[39]  On their periodic visits to the seashore and coastal islands, canoe-faring Penobscot often camped near mudflats with clam, mussel or oyster beds.

In the late summer or early fall, Penobscot families moved to their traditional hunting districts in pursuit of fish, fowl, and game, not only moose or deer, but also caribou, as well as bear and other animals: "During this time, the moose, deer, and caribou are driven to seek refuge from the flies that molest them, by resorting to the lakes and rivers. Here the hunters in canoes sought and killed them."[40] This type of hunting

---

38 Penobscot and neighboring Indian communities were often named "according to the various residences in which a tribe, or a part of it, had encamped for some war, hunting, or fishing party. These names were generally taken from some river, pond, etc., in whose vicinity they had pitched their camps." (See Vetromile, E. 1866. *The Abnakis and their History*, New York: J. B. Kirker, p.22).

39 Sugar Island "was so named because, from the maple trees on it, the Indians made quantities of maple sugar" (Eckstorm 1978, p.41). Considering there were maple-tree stands elsewhere, too, it is not surprising that this island was also known by other names, including *Pimimwamkikatook*, as noted by Eugene Vetromile (Eckstorm 1978, p.41). Pawling (2007, p.33, n.19) offer an interpretation for this place name as "the water-town on the gravel."

40 Speck 1940, p.36.

was called *wla'kwhan* ("still-hunting at night in canoe").[41]  Canoes were also

indispensable when they trapped river-dwelling animals valued for their thick furs, such

as beaver, otter, and muskrat along their river banks.[42]

As noted, Penobscot families referred to their own hunting district as *nzibum*

("my river"), exercising stewardship to manage its natural resources, especially

harvesting wildlife.  Articulating their traditional practice, Penobscot chiefs meeting Sir

Francis Bernard, the British Royal Governor of Massachusetts, at Fort Pownall in 1763,

told him: "That there hunting Ground & Streams were all paseled out to Certen famelys,

time out of mind, That it was there rule to hunt every third year & kill 2/3 of the Bevier,

Leving the other third part to breed and that their Beviers were as much their Stock for a

Leving as Englishmens Cattel war his Living."[43]

Protesting the destruction of wildlife, these Penobscot leaders contrasted their

wildlife harvesting with the indiscriminate slaughter by white settlers pushing inland

from the coastal region: "English hunters kill all the bevier they find on said streams.

Which had not only impoverished many Indine famelys but destroyed the bre[e]d of

bevier &c."[44]

Of great significance in the Penobscot mode of subsistence were their fisheries

on their river. Living much of their daily lives on its banks, either on the islands or

mainland, Penobscots had ready access to an abundance --not only of salmon and

sturgeon, but also shad, alewives, and eel. A staple food in Penobscot culture, fish was

---

41 Speck 1940, p.35.
42 Rasle (1833:409), in his Abenaki Dictionary offers the indigenous term *N8ran'k8a*: "I am going beaver hunting by canoe in short while."
43 Chadwick, Joseph 1764. *Journal of a Survey*, Massachusetts State Archives, p.89; See also Butler and Hadlock 1962, p. 18. Butler, Eva L., and Hadlock, Wendell S. 1962. *A Preliminary Survey of the Munsungan-Allagash Waterways*. Bulletin VIII. Bar Harbor: The Robert Abbe Museum.
44  Chadwick, cited in Butler and Hadlock, p.10.

broiled in hot ashes and also smoked, stewed, or cooked in soup. Considerable quantities of surplus fish were sun-dried and smoked for winter food. Especially eel featured prominently in their traditional diet.

Each late spring and early summer, standing on rocky ledges at the river falls, Penobscots used fish spears or leisters to catch anadromous fish such as salmon and river herring (shad and alewives). They also fished and hunted aboard their canoes—hook-lining, spearing, shooting, or clubbing the fish, molting ducks, and other river-based animals on which they subsisted. Even at night, spear-fishers were on the river in their canoes, burning torches to attract salmon, sturgeon, and eel: "To fish at night from canoes with torches made of birch-bark which light up the depths of the river and also draw the fish so that the spearmen can see them."45

The great falls about 200 meters (660 ft) below the old canoe landing on Indian Island, or Panawamskeag, was a great fishing location long favored by Penobscot families.46  Here they congregated in the later spring, after the ice had melted and large schools of anadromous fish, especially salmon and river herring (shad and alewives) began migrating upriver to spawn: "To these Indians, practically all of whom lived near the Penobscot River, the spearing of salmon in their annual run upstream in June, July, or August, was one of the great seasonal events. When the lightning bugs begin to appear late in June, they say it is the sign for salmon spearing. The Penobscot salmon sometimes attain a weight of forty pounds."47

From their tribal settlement on the southern tip of this island, Penobscot Indian fishers had easy access to the dozen small islands and rocky ledges downriver where they

45 Speck 1918, p.218, note.
46 Treat 1820, in Pawling 2009, p.151
47 Speck 1940, pp.82-83.

24

speared and netted an abundance of fish.48 Hours after setting out in their canoes, fishers

residing in Old Town on Indian Island returned home with loads of fresh food and

fertilizer for the food gardens before planting. They also "smoked a large amount of it for

winter upon pole racks over a fire."49

There were numerous other great fishing spots upriver, as well: "During the run,

just above the falls or rapids, the men would occupy some ledge and spear the fish as they

came by. Camps were established in such vicinities. At other times they went in canoes,

the bow man with a spear watching for fish."50  .

Commenting on the importance of the fisheries in the 20th century, anthropologist

Frank Speck noted: "The Penobscot at all times depended to a large extent upon the many

fish of their lakes, river, and bay for a food supply. Some of the old capturing devices are

at times still employed. [For] not only large bay fish, but also river fish--salmon, shad,

and others-- the harpoon . . . was used."51

In their fisheries, Penobscots used a variety of devices, including the scap-net

(*kwa'phigan*), which "consists of a hoop netted with basswood cord on a handle of about

ten feet long. Equipped with such a net, they scooped "fish in shallow places….Salmon

and shad were regularly caught in this way."52 They also used the leister (*e'niga'hk*w), a

special three-pronged fish spear to catch salmon, trout, and bass, as well as shad (river

---

48 Speck(1940:85) noted: "Just below Indian Island, above the falls, there is in the middle of the river a rocky ledge where the men used to get their stock of salmon. Unheard-of quantities were taken here until the dam was built [in 1833]."
49 Speck 1940, p.85.
50 Speck 1940, p.83.
51  Speck 1940, p.87. It is likely that Penobscots also hunted fish with bow and arrows, as reported from the western regions: "… they embark in a canoe with bows and arrows; they hold themselves erect the better to discover the fish, and as soon as they have caught sight of one they pierce it with an arrow" (Rasle 1723. p.279 In: *Collections of the Maine Historical Society* 2nd Series, Vol. IV:265-301.
52 Speck 1940, pp.86-87.

herring).53 Taking their canoes on the water at night, they lured the fish with torches of burning birch bark: "At night a torch . . . was fastened in the bow of the canoe."54  Torch-fishing (*noda'sə·ni.*), a tribesman could spear up to 200 fish during one trip. On his journey into the Maine woods in 1846, Henry David Thoreau later recounted that he traveled by horse and wagon on the "military road' along the east bank of the Penobscot, to the town of Lincoln:

> Learning that there were several wigwams here, on one of the islands [Mattanawcook, we] walked through the forest half a mile to the river, to procure a guide to the mountains. [A] salmon-spear, made wholly of wood, lay on the shore, such as they might have used before the white men came. It had an elastic piece of wood fastened to one side of its point, which slipped over and closed upon the fish, somewhat like the contrivance for holding a bucket at the end of a well-pole.55

For larger fish like sturgeon or sea mammals like porpoise, they boarded their canoes and hunted with harpoon. Speck noted that this Penobscot fish-spearing still took place when he began his ethnographic fieldwork in Maine: "The fish spear (leister) was, and is yet [1940], in general use also for getting pollock and eels. The usual method of spearing from a canoe is followed."56

Penobscots caught an abundance of fish in weirs set in the River, not only shad and alewives, but also eel, bass, salmon, and even sturgeon. Speck noted in the early 1900s that the "one most commonly seen on the banks of the Penobscot…. is a fence of brush or sticks projecting obliquely down stream, or a corral with an entrance on one

---

53 Several museums, including the Penobscot tribal museum at Indian Island and the Maine State Museum in Augusta, have a leister in their collections (see also Bourque 2001, p.299).
54 Speck 1940, p.83. Penobscot Indian fishing by fire light continued until the 1930s, and perhaps later. For instance, Charles Shay, a tribal elder at Indian Island, now 89 years old, remembers how he and other Penobscot boys used to go night fishing for eel in the late 1930s." (p.c. 08/18/2013).
55 Thoreau, p.294-296.
56 Speck 1940, pp 82-83, 85. The anthropologist took a photograph, which he included as an illustration of a Penobscot demonstrating use of the fishing spear.

side. Smaller rivers were fenced across leaving a narrow opening near the middle, where fishermen armed with spears, harpoons, and nets gathered in canoes . . . to capture the fish as they passed through."[57]  Typically, the Penobscot fish weir, called *sikmohka'gan*, was a temporary construction, as the fence made of sticks and brush wood: "The ice destroyed it in the winter, and it was rebuilt every spring, before the big run of the fish."[58]

Perhaps more important than any other fish in the Penobscot traditional diet was eel.[59] Large numbers of this snakelike fish hide in mud, sand or gravel close to shores of the banks and islands where they live together in holes, or "eel pits," about five to six feet under water. Hunting at night and feeding on a variety of insects and other small aquatic prey, eels mature to about 4 feet in length and over 15 pound in weight. Historically, eels have been abundant throughout the Penobscot river system and played a very important role in the tribe's seasonal subsistence cycle. Eels were trapped and speared during several seasons, but especially when water levels in their rivers and streams were low, in the late summer and fall.

To catch large eels, Penobscots constructed special eel weirs throughout the river.  This fishing method is effective, widely practiced, and very ancient.[60]  Penobscots traditionally attribute the invention of the fish weir to their culture hero Gluskabe, as recounted in the myth noted below. [61] Communities built their weirs usually on the same favorite spot in the river, year after year, usually by closely-related tribesmen working

---

57 Ibid., p.90.
58 Speck 1940, p.90, p.?.
59 A review of the historic record shows that Penobsots depended very heavily on eel.
60 Petersen, James B., Brian S. Robinson, Daniel F. Belknap, James Stark and Lawrence K. Kaplan.
1994    An Archaic and Woodland Period Fish Weir Complex in Central Maine. *Archaeology of Eastern North America* 22:197-222.
61 Speck 1918, pp.193-194.

together: "It belonged to those who had cooperated in its construction, and they shared equally in the catch."[62]

Made of a series of wooden stakes driven into the mud or river bottom, and intertwined with brush or branches, some of the largest weirs measured one hundred feet in length or more. At these weirs, Penobscots trapped and speared huge quantities of these fish, not only shad and alewives, but also eel, salmon, bass, and even sturgeon. At the large weirs, large numbers of Penobscots could gather for many days, even weeks, as such places provided them with fish enough to feed multitudes, leaving enough to be smoke-dried and preserved for later consumption.[63] There were several important locations for these indigenous fish weirs on the Penobscot River or near the entrance of tributary streams, sometimes spanning the stream from bank to bank. Speck described the technique as follows: "In places where weirs are set for eels [earth] pits are dug along the shore some three or four feet wide and about three deep, the number of the pits depending upon the quantity of eels caught."[64]

Catching eels, as well as smaller fish such as "shad and alewives," noted a report on Penobscot Indians in 1804, "they make the business of their women and children."[65] Proximity to productive fish-weir sites explains why Penobscots favored places such as Mattawamkeag, Passadumkeag and Kenduskeag (Bangor) for their major settlements.[66]

---

[62] Wallis and Wallis 1955, p.22. See Wallis, Wilson D., and Wallis, Ruth S. 1955. The Micmac Indians of eastern Canada. Minneapolis: U Minnesota Press. Mi'kmaq weir-construction is fundamentally similar to that of their various neighbors, including the Penobscot.
[63] Eckstorm 1978:204-205.
[64] Speck 1940, p. 90.
[65] Sullivan, 1804, p.228.
[66] According to Eckstorm (1978, pp.15-16), these "eel-weirs were on the rapids from State to Franklin Streets" in what is now the city of Bangor. Neighboring tribes of the Penobscot also established villages near fish weir sites.

Vitally important in Penobscot subsistence, a few major eel weirs in the Penobscot River above Old Town Falls have been historically documented. For instance, Major Joseph Treat of Old Town on an official survey trip for the Maine State government soon after the Penobscot Chiefs signed the 1820 Treaty in Bangor marked a few on his manuscript map. He was guided by one of the Penobscot chiefs, a great hunter named John Neptune. One of the large weirs marked on Treat's map spanned across the Penobscot River, almost from bank to bank, just down river from the Penobscot village of Passadumkeag.  See Addendum 4.  On the east bank of the Penobscot River bank, he noted three wigwams close to this large weir, identifying it as an "Indian Eel ware camp."67 See Addendum 4.  He also marked another eel weir adjacent to the historic Penobscot Indian village at Mattawamkeag.68  See Addendum 5.  In the seventeenth century, the French had already made note of a "great eel-fishery" at this settlement on the east bank of the Penobscot River.69

But this long and slippery fish served as a staple food not only for these local villages, but also for those without the benefit of a large eel weir nearby.  In early September 1786, a white settler visited Panawamskeag and observed that most of its inhabitants had departed, canoeing upriver to Mattawamkeag Point "to supply themselves

---

67 This large eel weir spanned the Penobscot near the entrance of Chubabacook Stream [sp?], now known as Pollard Brook.  See Treat's map in Pawling 2007, p.82.

68 This eel weir was located just before the Mattawamkeag runs into the Penobscot, where later the bridge was built (see Joseph Treat's 1820 map, reproduced  in Pawling 2007, p.94). Micah A. Pawling, ed. 2007. *Wabanaki Homeland and the New State of Maine: The 1820 Journal and Plans of Survey of Joseph Treat.* Amherst: University of Massachusetts Press, p.12, see also note 28, and map on p.82).

69  Published in the *Maine Hist. Soc. Collections*, Series IV, p.426; see also Eckstom 1978, p.59.  The eel fishery at the tribal village on Mattawamkeag Point was already mentioned late 17th-century French document, referring to it as *Madaham-ouit*. Mattawamkeag was again mentioned in 1736, by an English captive, John Gyles, later taken to Meductic on the St. John River, and in 1764, by a surveyor named Chadwick, who briefly visited that village while scouting out a riverine route from Penobscot Bay to Quebec.

with food from their eel pots which they left set."70  In addition to constructing eel weirs, Penobscots also made traps, or "pots," woven of rough wood splints, usually brown ash.

To catch eels, Penobscots also mixed crushed and mixed purple pokeberry and Indian turnip root, "strewing the poisoned pulp" in a stretch of river.71 In his 1940 ethnography of the Penobscot, Speck wrote: "In several places up the [Penobscot] river are to be seen, adjoining old villages or camp sites, a series of such [eel pits] overgrown with trees or shrubs, where long ago eeling parties have camped… One prominent locality of this sort is to be seen opposite the Teguk rapids [also known as the Cook] halfway up the west side of Indian Island."72

Like shellfish, especially clams, near the sea shore, eels were also caught on the river in the winter season when moose, caribou, deer, or other game was scarce:

> In the winter time, when hibernating eels have buried themselves in the mud of a cove, some families will repair thither and make camp. The men will go out on the ice, make holes through it and prod in the mud with their spears, drawing out eels in quantities. During times of scarcity of other game in the past, whole communities have had to subsist for months upon eels obtained in this manner.73

Since the second half of the 17th century, continuing through the treaty period and thereafter, Penobscot families made forest clearings near their encampments on river islands or near the shore.  Here, they grew some "Indian corn, pumpkin, squashes, which they produce by the labor of their women on light and easy land."74  The abundance of

---

70 Reverend Daniel Little, 3 September 1786, cited in Deane p.85.
71 Speck 1940, p. 89. As Speck described it: "When the water was so strongly impregnated, . . . [the] torpid eels began to appear on the surface, and before an hour had passed the top of the water was spotted with the bodies of dead or dying fish, which floated belly up, unable to escape. The children of the party… were then forced to enter the water and bring the fish ashore, where they were skinned and salted by the women. After this the eels were placed upon dead limbs and laid in the sun to dry for two days. Then they were hung up in a tent and smoked until there was drip from the suspended bodies."
72 Speck 1940, p.91.
73 Speck 1940, pp.85-86, p.88.
74 Sullivan 1804, p.145.

alewives, shad, and other fish caught at the small islands at Old Town Falls just downriver from their main village at Indian Island, also provided the Penobscot food gardens with an important organic source of nitrogen, phosphorus, and potassium, as well as sulfur--major nutrients that their cultivated food crops need the most.[75] They had no farm animals that provided them with dung and there is no evidence they used human excrement as manure.

The importance of fish in their diet as well as fertilizer for their food gardens underscores that the Penobscots' way of life before, during, and after the treaty period formed part of an eco-system, organically linking their islands and the river water within which these small tracts of land are situated.  Because of this symbiosis in their riverine habitat, a severance between their use and occupation of the islands and their use and occupation of the River was inconceivable and would have reduced them to starvation, dooming their ability to survive.


## D. Penobscot Worldview in a Riverine Habitat

Articulated in myths, the traditional Penobscot Indian worldview symbolically reflects their deep ecological awareness and expresses their understanding of how their daily lives are organically tied to and dependent on the river and its wildlife, both in water and on land. Once that link is broken, they cannot survive. This profound understanding of eco-systemic connectivity and interdependency is evident in their creation myths, telling of the formation of their river, their ancestors, and their close family relationship with the water and shore animals in their traditional habitat.

---

75 Prins, Herbert H Th. Professor of Biology, Wageningen U, The Netherlands, p.c. June 2013.

The central figure in the Penobscot myth cycle is their traditional 'culture hero,' a mythic figure named *Gluskábe* ("the man from nothing").[76] The great adventures of this giant shaman, hunter and fisherman are recounted in an epic saga revealing the deep cultural roots of Penobscots in their river-based homeland:

> Penobscot mythology credits Gluskabe with some twenty major achievements for the benefit of man, to wit: distributing over the world the game animals, food, fish, hares and tobacco; renewing the warmth of summer; protecting the eagle above who regulates daylight and darkness; moderating the destructive force of the wind; tempering the winter; bringing the summer north; reducing giant animals to a harmless size; domesticating the dog; clearing obstructions from the portages along the routes of hunting and travel; smoothing out the most dangerous waterfalls; creating the whole Penobscot river system…"[77]

Forming part of a great narrative tradition articulating a worldview shared and enjoyed in all indigenous encampments up and down the Penobscot River, surviving fragments of this saga have been translated and penned down in short stories since the early 1800s: "Some of the incidents of Gluskabe's journey explain the physical characteristics of the Penobscot valley."[78]  Other myths offer an indigenous explanation of how Penobscot ancestors originally acquired their technology, including the fish weir. Through these ancient stories, each band of related families also made sense of their own place in the

---

76 According to Nicolar (1893, p.11-12), this name, variously spelled, is erroneously translated as "man of falsehood" or "liar," all of which he considered inaccurate. See Nicolar, Joseph. 1893. *The Life and Traditions of the Red Man*. Bangor: C.H. Glass & Co. Regarding his name, Speck (1935,p.6) clarified: "The translation may be Deceiver or Trickster, but the epithet is not uncomplimentary because it refers to the ability to outwit one's enemies by strategy and cunning, He is the legendary hero and transformer personage of the Wabanaki tribes. Even at the present day his performances and his personality are sources of marvel to the Indians, many of whom though they are observing Catholics, nevertheless cherish a superstitious belief in him. Not only actual transformations but unaccountable peculiarities of the whole country are attributed to his agency. He is largely responsible for the present aspect of the earth and its inhabitants."
77 Speck 1935, p.10.
78 Speck 1935 p.7.

world, and the stories gave symbolic meaning to their relationships with the river, rocks, rapids, trees, fish and other animals.79

On one of his many hunting and fishing adventures on the Penobscot River, Gluskábe hired "a Fish-Hawk to go spearing fish by torch-light."80 He also killed a giant moose:

> Then Gluska'be returned and cooked his moose-meat in his kettle near the big lake. When he had eaten, he turned his kettle over, and left it there turned into stone. Now it may still be seen. It is the mountain called Kineo. Then he went back and told his people, his descendants, "Now I have killed the big beast.81

The following myth offers an intriguing Penobscot perspective on the invention of the fish-weir and the traditional indigenous gender division of labor:

> When [Gluskábe] returned to his wigwam, he saw his grandmother [Woodchuck] there fishing. He at last became impatient, as he saw that his grandmother was having a hard time fishing. Then he thought, 'I had better help my grandmother, so that she will not have such a hard time.' Then he made a weir across the mouth of the river, and left an opening half way in the middle, so that the fish could enter. Then he started out upon the ocean, and called everywhere to all the fish, saying to them, 'The ocean is going to dry up, the world is coming to an end, and you will all die; but I have arranged it so that you will all live if you will listen to me. All who hear me, enter into my river, and you will live, because my river will survive! Enter all ye who hear me!' All kinds of fish came, until the fish-weir was full; and then he closed it up and held them there. Then he went to his wigwam, and said to his grand-mother, 'Now, grandma, you will not have to fish so hard, you will only have to go and gather as many fish as you want.' Then Woodchuck went to examine what he had done; and when she arrived, she saw the weir brimful of all kinds of fish that were even crowding one another out. Then she went back, and said to her grandson, 'Grandson, you have not done well by annihilating all the fish. How will our descendants manage in the future, should you and I now have as many fish as we wish? Now go at once and turn them

---

79 Speck (1918, p.216) notes: 'It was believed even until recently by some of the older people that Gluska'be would some day return and restore the country to the Indians; the expulsion of the Europeans to be accomplished by one sweep of the hero's foot forcing them into the sea."
80  Speck 1918, p.219.
81 Speck 1918, p. 204. In a footnote, Speck explained: 'Mount Kineo, on the eastern shore of Moosehead Lake. Folk etymology among the Indians says that the first people who saw the mountain after its transformation declared, '*ki-'i ni-'yu*!' ("oh, [see] here!").

loose!' Accordingly he said, 'You are right, grandmother, I will go and open up [the weir]'; and he went and turned them loose.82

These segments in the Gluskabe epic point to a Penobscot division of labor historically based on age and gender, privileging adult males as hunters whereas women (as well as elders and older children) make a less spectacular (and thus under-valued) contribution to the food supplies by gathering, snaring (small animals like rabbits), shell-fishing (clams and mussels), and fishing behind weirs.

Other Penobscot myths relate to an ancient time when humans and animals were related and talked to each other, went bathing, swimming, and fishing in the river, etc.83

Long ago, Gluskabe's grandchildren, early ancestors of the Penobscot Indians who had settled 'up the river," were dying of thirst, because their river had dried up.84 The cause of this natural disaster was the Anglebému ("Guards-Water"), the giant frog-like monster at Chesuncook Lake, on the upper reaches of the West Branch of the Penobscot River: He had gulped up all the water.85  Hearing his grandchildren were in serious trouble, Gluskábe came to their rescue. With his stone axe, he cut a big birch tree which fell on Anglebému, killing the huge frog:

That's how the Penobscot River originated. The water flowed from him. All the branches of the tree became rivers, all emptied into the main river. From this came the big river. Now all the Indians were so thirsty, nearly dying, that they all jumped into the river. Some turned into fish, some turned to frogs, some turned to

---

82 Speck 1918, pp.193-194. See Speck, Frank G. 1918. Penobscot Transformer Tales. *International Journal of American Linguistics* , Vol. 1, No. 3, pp. 187-244.
83 "She was just as fond of swimming. Once as she waded ashore, after swimming…"; "All of a sudden, looking across the river, they saw some women coming down to the shore to go in bathing" (Speck 1918, p.218).
84 Especially in the late summer and fall, river levels above Old Town Falls could drop low. The Jesuit missionary Eugene Vetromile (1866, p.48), who visited the Penobscot on their river islands in the mid-1800s, noted: "In dry seasons I have known the waters of that river to be so low that I could hardly go from Mattanacook to Oldtown in a canoe."
85 Speck 1915, p.191; Speck 1918, p.200, note 4

34

turtles.86 [Those] who restrain themselves from the water escape transformation and become the ancestors of the human families. These, however, assume the names and to a certain extent the identity of the particular animal into which their nearest relatives were transformed. Furthermore, they seem to have chosen their habitat near the places inhabited by their animal relatives…. Certain physical peculiarities are also attributed to the mythical relationship between the present-day human and animal families."87

These "animal relatives" are identified as *ntútem*, a word also found in other Algonquian languages and now adopted in English as "totem." Literally translated as "my spouse's parents," or "my partner of a strange race," *ntútem* expresses the idea in Penobscot traditional culture that human and animal ancestors are closely related.88

A deep ecological awareness of human dependence on fish, fowl, and game animals in their riverine habitat is underscored by the fact that the totems of about half of the extended families (or clans) in the tribe are water- or shore-based animals: fish (eel, perch, sculpin, sturgeon); reptiles (frog, toad); crustaceans (lobster, crab); mammals (otter, beaver, fisher, whale), and the "water nymph."89   Some specific examples of Penobscot families with fish-related totems are Neptune (eel); Sockalexis (sturgeon), Penewit (yellow perch), and Francis (sculpin).  Penobscot families with a riverine mammal totem include Orono/Tama'hkwe (beaver), Nicola/Nicolar (otter), and Francis (fisher).90  Although these and other animals are mythically related to the various Penobscot families, they could be fished, hunted, or trapped: "There were no taboos

---

86 Speck 1940, pp.216-217
87 Speck 1915, pp.191-192.
88 See also Speck 1940, p.210, where he spells the word as *ndó'dem*, translated as "my co-relative."
89 It is not clear what the "water nymph" exactly is, but Speck 1918, p.235, footnote 2) states that it is a "supernatural creature believed to live beneath the water." Elsewhere, he offers its Penobscot name as Wanagamesu, describes it as an "addle-headed creature," and notes it is the totem of the Nicola/Coley family whose family hunting territory was located on "Russell Stream and Pond" (Speck 1940,p. 215). Frank Siebert identified this totem as Dragonfly.  See: Siebert, Frank T. 1982. "Frank G. Speck, Personal Reminiscences." Pp. 91-142. In *Papers of the Thirteenth Algonquian Conference*, edited by William Cowan. Ottawa: Carleton University.
90  Speck 1928:170, n.3; Speck 1940:209, n.6.

against killing the associated animal, which to a certain degree was depended upon for food."91

After slaying Anglebému ("Guards the water") and thereby releasing the water of the rivers flowing into the main stem of the Penobscot River, Gluskábe boarded his large stone canoe and paddled down the river to the seacoast.

> "Then said Gluska'be to his grandmother, 'Now, grandmother, I am going to travel to search for and transform things, so that our descendants may not have such hard times to exist in the future. Now I am leaving, and shall inspect the rivers and lakes. I shall be gone long, but do not worry.' Then he started off paddling, and entered all the rivers emptying into the ocean. He inspected them. Wherever there were bad falls, he lessened them, so that they would not be too dangerous for his descendants. He cleared the carrying-places. Then he left his canoe upside down, where it turned into stone, and may be seen there yet."92

Beyond myths and legends, there once existed spiritually-important sites along the banks and even within the Penobscot River itself. One such site was a granite rock rising above the surface about 900 yards downriver from the Penobscot village at Mattawamkeag Point. Identified as Maja-Obseoose, or Pimolos Rock" by Major Joseph Treat just weeks after the 1820 treaty-signing ceremony in Bangor, it was described as a "a large Rock of granite in form of a small hay stack—and on the South side near the top is a circular hole in form of a pot 2 feet deep."93  On this survey upriver, Treat was guided by John Neptune, who was not only a chief and formidable hunter, but also had a reputation as a mighty shaman (*medéolinu*) believed to possess great spirit power

---

91 Speck 1915, p.192. "Like the other eastern and northern Algonkian, the Penobscot families each possessed inherited hunting-territories which were designated by the totemic animal names. So we find those families located near the ocean bearing marine-animal names, while the territories of the land-animal families are situated in the interior. The latter trace their origins to independent causes. The family hunting-territory is called *nzi-'bum* ('my river')" (Speck 1918, pp.201-202).
92 Nicolar 1893, p. ; Speck 1918, p.200. Penobscots point to a large rock lying on the shore at the mouth of the Penobscot River, near Castine, as Gluskábe's canoe (Ibid., footnote).
93 Treat 1820, in Pawling 2007, pp.94, 995.

(*ktáhando*).[94] With the help of his invisible totem animal-spirit, a powerful supernatural eel supporting him as his "messenger" (*boahigan*), Neptune could perform magic (*motewolon*).[95] Thus informed by this renowned Penobscot shaman chief, Treat commented on *Maja-Obseoose*: "the Indians say it has been their custom to place in this cavity when the water is low, presents for Pimola, of Tobacco, Pipes, Jackknives &c. and if they are not taken out, they have a bad season for hunting and fishing the next year— and if taken out they have a great good luck in every thing."[96]  Traditionally, the Penobscots believed that Pimola, also spelled as Pamola, Bumole, or *Pemúle*, was a potentially dangerous mythic storm spirit represented as a human-like flying giant residing in Mount Katahdin to be appeased with ritual gifts to secure success in fishing, hunting, or trapping.[97]

Other than this mysterious granite rock in the Penobscot River near Mattawamkeag, there were also other spiritually-important sites within or along their river. For instance, as noted by Speck in the early 1900, "there are certain mysterious local phenomena like the series of markings on a rock by the river between Bucksport and Bangor. Here the old Indians came, to divine from the markings which were constantly changing."[98]

---

[94] Speck (1935. p.4) explained that "*kthán.dowit'* may be translated "great spiritual being."

[95] Speck (1935, p.4) explained: "The term *manitu* itself is not found in Penobscot, its cognate appearing as *wahán.do*, the suffix –*han.do* denoting beings possessed of supernatural power. The ordinary generic term for an evil spirit is *wahán.do*," Penobscot shamans were known as *madeʼolənuwak* (variously spelled). *Medé-oulin*, also spelled *M'té-oul-in* or *Motewolon*, is a Wabanaki shamanic concept referring to a non-ordinary power, or magic, historically also translated as "witchery." See also Eckstorm 1945, pp.5, 97-99, 181-189; Leland 1884, p.260; Speck 1919, p.252. Speck, Frank  G. 1919. *Penobscot Shamanism*. Memoirs of the American Anthropological Association Vol. VI (4), pp. 239-289; 1935: Penobscot Tales and Religious Beliefs. "Journal of American Folklore.Vol.48 (187), pp.1-107.

[96] Treat 1820, in Pawling 2007, p.95

[97]  Leland 1884, p.255-257. See Leland, Charles G. 1884. *The Algonquin Legends of New England; or, Myths and Folk Lore of the Micmac, Passamaquoddy, and Penobscot Tribes*. Boston: Houghton, Mifflin and Company. .

[98] Speck 1935, p.17.

The Penobscot River not only sustained its indigenous occupants with its fish and other natural resources, but also posed risks such as drowning in the swift currents, as told in stories and legends but also indicated in mythic tales and folklore relating to various types of river-dwelling creatures with magic powers:

> "*Alambégwi•no'si•s*, under-water man-dwarf, is a shy man-like dwarfish being who lives in deep pools along the rivers or in lakes. Sometimes these dwarfs dwell singly, sometimes in bands carrying on the ordinary mode of life under water. They possess considerable power. [Some Penobscots] think that the person who sees one will be drowned within a year. A story is told of a water dwarf who lived in a deep pool of the Penobscot river at Milford opposite the village at Indian Island. An Indian who camped there was awakened one winter night by the dwarf who then disappeared through the ice. Within a year the man himself was drowned by falling through a hole in the ice. Another spot in the Penobscot river, about forty miles above Oldtown back of Lincoln Island in a dense growth of pines and hemlocks, is pointed out as the abode of one of these beings. The place is isolated. A deep pool lies at the foot of the ledge."[99]

Other river-dwelling magic creatures include "*Nodə'm'kenowet'*, grabbing-from-beneath-the-water, is a creature of the pools, half fish and half human;" ""*Wanagəméwak*, reckless creatures, are little people of another genus, who inhabit rivers;" "*Wi•wil•yámek^{cw}*, tickler fish, is the snail, who has special supernatural gifts and is capable of living either in the water, on land, or in the trees;" "*Maski• k^{cw}su*, toad creature;" *Awuskhówa*, spy, is an imaginary spirit [who] comes down the Penobscot river and returns over it. An Awuskhówa years ago was discovered leaving Indian Island ensconced in a roll of birch-bark which was moving rapidly up-stream.[100]

Finally, Penobscots also used fish and river-based animals for divination purposes. Applying a ritual technique known as scrying, they searched for messages in the flow of blood from fish or a pattern of spots on a bone, believing these could be interpreted as revealing something hidden (far away or not yet happened). For instance,

---

99 Speck 1935, p.13.
100 Speck 1935, pp.13-17.

Penobscots thought that the flow of blood from a freshly-hooked fish could be a sign: "If the flow was copious the augury was good for the ensuing fishing operations. If hooked fish did not bleed much at the wound the sign was an unfavorable one."[101] Another traditional form of divination ritually practiced by Penobscots involved bones of beaver and muskrat: "The little shoulder-blade of the muskrat, the breast-bone of duck or partridge, if spotted with dark spots, presumably blood, denote good luck in the chase. The hind hip-bone with round opening is held in the right hand, both hands are dropped down on each side. Then the hunter to find out if he is going to have any trouble in finding a certain stream, or hunting place, will say as he slowly raises it above his head, 'To Birch Stream (or any stream) I am going.' By the time he says these words his finger of the left hand has either hit the opening or missed it - if he hits it right, no trouble to find the stream or hunting ground; *gwelmúgwebana*," we shall have good luck."[102]

     The Penobscot tribe's creation myths, animal totem stories, ritual gifting at a sacred rock in their river, river-dwelling magic creatures, and divination involving fish blood or beaver and muskrat bones, not only affirmed the cultural identity of tribal members but also reminded them of their deeply historical, ecological, and spiritual roots in their ancestral homeland and intimate connections to their river and its wildlife. Such was the case in the past, including the treaty period, and remains so today. Their occupation and use of the Penobscot River described above, as well as their mode of subsistence and material culture, their social organization and family totems, as well as mythological worldview, all continued through the treaty period in question.  When those treaties were finally executed in 1796, 1818, and 1820 all parties were well aware of how

---

101 Speck 1935,p.27.
102 Correspondence Penobscot tribesman Roland Nelson (Needahbeh) to Frank Speck, April 22, 1928 and Dec. 1925, cited in Speck 1935, p.28.

and why the Penobscot people were culturally and historically embedded in their river habitat.

## II. Penobscot Territory That Became Object of the Treaties

This Part briefly describes the historically documented understandings of Penobscot Indian leaders and Massachusetts government officials that the Penobscot tribe possessed rights of self-government and self-determination in their ancestral homeland, in particular the riverine territory that became the object of their 1796 and 1818 treaties with the Commonwealth of Massachusetts.

As a consequence of threats of violence and military raids up the Penobscot tidal river by white militia from New England from the late 17th century onwards, Penobscot Indians recognized the risk of maintaining settlements in the coastal region of their tribal domain. Although they still hunted, fished, and trapped in the region below the falls, their seasonal encampments downriver and in the bay area were usually small and temporary. Until the treaty period, Penobscots had successfully guarded their traditional way of life in their ancestral homeland upriver, as detailed in Part I. Penobscots regarded any strangers portaging around the great falls just below Panawamskeag (Old Town Island, or Indian Island) as potentially hostile intruders. Consequently, as far as the English on the Maine seacoast were concerned, the tribal territory above the head of the tide remained largely *terra incognita* until the late 18th century, as is also evident when reviewing historic maps of this period.

This situation changed, albeit slowly, soon after the conclusion of the so-called French and Indian War in 1763. On 23 July that year, the British royal governor of

Massachusetts, Sir Francis Bernard, instructed one of his navy captains to invite a Penobscot delegation to come to Boston: "You may inform them that no formal Treaty will be held with them, but only, if they desire it, consideration will be had of a proper time & place for such treaty."103 A month later, three tribal delegates were welcomed by the British governor and other high-ranking government. At the "Indian conference," Governor Bernard asked the delegates:"… are you willing to renew the antient Treaties with Us?" They responded: "We are willing to renew all the Treaties our Fathers have made with you."104 In mid-September, the Massachusetts Governor sailed to Fort Pownall, the recently-constructed British colonial stronghold at the entrance of the Penobscot River, where he met with a delegation of Penobscots headed by Chief Tomah.105 Representing the British Crown, the Governor informed the Penobscots: "The English have conquered this whole Country: and the Indians must not prescribe to them what shall be the bounds of their [English] settlements. Nevertheless the Government desires that the Indians shall live plentifully & comfortably, for which there cannot be wanting land, let the English settle ever so fast."106  Bernard knew very well that his immediate predecessor, Governor Thomas Pownall, had not sent militia or any other military troops upriver to invade Penobscot territories above the head of the tide, let alone actually capturing or conquering their villages above Old Town Falls.

As was well known at the time, Pownall did not "conquer" the Penobscot homeland, but only ordered the construction of the English military fort named after him. Instead of waging an actual "conquest," he staged a ritual, symbolically taking "formal

---

103 *Documentary History of the State of Maine*, Vol. 24, p. 116.
104 *Documentary History of the State of Maine*, Vol. 24, p.117.
105 Guarding the entrance of the Penobscot River, Fort Pownall had been built at Cape Jellison (near Stockton Springs) in 1759, five years before this survey expedition.
106 In Baxter vol.24, p.129.

possession of the country east of that river."[107] Pownall's so-called "Certificate of Possession" was a "leaden plate" inscribed with the text "*May 23, 1759. Province of Massachusetts Bay, Penobscot, dominions of Great Britain. Possession confirmed by Thomas Pownall, Governor*," ceremonially buried (without any Penobscot witnesses invited) "on the east side of the river of Penobscot, three miles above marine navigation."[108] The location chosen by the English was a place Penobscots called *Arquer—kek*, meaning "Steep Hill," but there is no evidence that the Penobscots were ever informed of this "Certificate of possession."[109]  One reason Pownall did not venture beyond this point is that, as the Penobscot Indian ambassador Colonel Louis had earlier reminded the English of a long-standing treaty agreement:

> that the English should inhabit the lands as far as the salt water flowed, and no further; and that the Indians should possess the rest…. Brethren, as I have said before, so I now say, that the lands we own, let us enjoy; and let nobody take them from us. We said the same to those of our own religion, the French. Altho' we are a black people, yet God hath planted us here: God gave us this land, and we will keep it. God decreed all things; he decreed this land to us; therefore neither shall the French or English possess it, but we will…. What I say, all the Indians say.[110]

We do not know whether the interpreter translated Governor Bernard's assertion that "English have conquered this whole Country," but there is no documentation that the elected Penobscot tribal chiefs ever surrendered or formally conceded their homeland had been conquered. While no treaty was concluded at Fort Pownall in 1763, Governor Bernard promised the Penobscots "That the English should not Extend there Settlements

---

107 Williamson, Joseph. 1859. Gov. Pownall's Certificate of Possession, 1759. pp. 335-338. *Coll. of the Me Hist Soc* vol. 6 (1859), p. 336.
108 Williamson, Joseph. 1859. Gov. Pownall's Certificate of Possession, 1759. *Coll. of the Me Hist Soc* vol. 6 (1859), pp. 335-338.
109 Eckstorm 1978, pp.21-22, 65.
110 Coll. of the Maine Historical Society, vol. 4, p.174.

above the Falls" above Sobscook (at Eddington Bend).[111]  This was just beyond the endpoint for ships' navigation and demarcated the southern boundary of Penobscot tribal territory. Notwithstanding this official agreement between the leaders of the Province of Massachusetts and the Penobscot tribe, local whites continued to encroach on tribal territories upriver.

Meanwhile, three weeks after this meeting at Fort Pownall, the British sovereign, King George III, issued the Royal Proclamation on 7 October 1763.[112] This official announcement aimed to stabilize political relations with the indigenous nations in British North America through regulating trade relations and white settlement expansion on the frontier.[113] It became the template for all future relations with the Indian tribes of America, centralizing the authority to dispossess Indians from their lands with the Crown and, later, the federal government of the United States.  It thereby prohibited any land transactions with Indian tribes that were not authorized by the Crown, by stating, in pertinent part:

> that no private Person do presume to make any purchase from the said Indians of any Lands reserved to the said Indians, within those parts of our Colonies where We have thought proper to allow Settlement: but that, if at any Time any of the Said Indians should be inclined to dispose of the said Lands, the same shall be Purchased only for Us, in our Name, at some public Meeting or Assembly of the said Indians, to be held for that Purpose by the Governor or Commander in Chief of our Colony respectively within which they shall lie…

---

111 Chadwick, Joseph. 1764, p.6. The author's transcript from photocopy of original manuscript, "Joseph Chadwick Journal," Massachusetts Historical Society, Massachusetts State Archives. See also Chadwick, Joseph. 1764. An Account of a Journey from Fort Pownall—Now Fort Point—Up the Penobscot River to Quebec in 1764. *Bangor Historical Magazine* Vol. 4 (1889).
112 http://avalon.law.yale.edu/18th_century/proc1763.asp
113 Sprague, Peleg. 1830, p.25. *Speech… upon the Subject of the Removal of the Indians*. Washington: Office of the National Journal. Peter Force.

Sir Francis Bernard then ordered Captain Joseph Chadwick (an artillery officer, engineer and surveyor),114  "to go up & mark out a Line, and acquaint the [white] people that thay ware not to make any Settlements above sd Falls---In Obed[i]ence to the above Orders [from Governor Bernard] I mark[ed] out a Line & acquainted the [white] people [recently settled on the tidal river] & Gave the Indines a Sketch."115  In the late Spring of 1764, Chadwick, accompanied by Captain John Preble (an interpreter based at the fort), another surveyor and an assistant, ventured beyond the head of the tide to survey the Penobscot "Indian lands so called" and chart a travel route to Quebec. However, the survey team encountered problems with their eight Penobscot Indian guides upon reaching Indian Island above the great falls.116 In his Journal, Chadwick penned the following brief account:

> The Indians are so jealous of their country being exposed by this survey, as made it impracticable for ous to preform the work with acqurice ;…yet (at Penobscot Island) three of the party Refused to go forward. And the despot between our party & the other Indeins was so Great as to com to come to a fray. Which after two days dispute. The Result was. That I should proced with this Restriction That I Should take no Draughts of any Lands but only wrightings. And [the Penobscot guides] saying that when thay waer amongst English Men thay obayed their [English] Commands & now best way you do obay Indeins Orders."117

More than ten years later, the American Revolution began. In May, 1775, the Provincial Congress in Boston sent the Penobscot tribe a letter, urging their support:

114 Brigham, Clarence S. 1969. Paul Revere's Engravings. New York: Atheneum, p.40.
115 Chadwick, Joseph. 1764, p.6.
116  Assong Neptune's first name is a misspelling of the French name Jean, or John. His son John Neptune was years later elected Lt. Governor of the Penobscot Tribe.
117  Chadwick's expedition was the result of an earlier meeting in 1764 with Penobscot chiefs at Fort Pownall to address the Tribe's "Indian Lands so called." At this conference, as reported by Chadwick in his 1764 Journal, "the Indines ple[a] was [that] thay surposed themselvs to have a Right to injoy there Lands …." They explained "that their hunting ground and streams were all paseled out to certen familys, time out of mind" (p.6). They continued to complain about encroachments by English, and the harm caused to the beaver population on the River through indiscriminate hunting practiced by the Whites.  (ibid.). See Chadwick, Joseph. 1764, p.6,  my transcript from a photo copy of the original manuscript, Joseph Chadwick Journal, Massachusetts Historical Society, Massachusetts State Archives). For a published transcript, see also Chadwick, Joseph. 1764. An Account of a Journey from Fort Pownall—Now Fort Point—Up the Penobscot River to Quebec in 1764. *Bangor Historical Magazine* Vol. 4 (1889).

> Our liberty and your liberty are the same, we are brothers, and what is for ours for your good, and we, by standing together, shall make those wicked men afraid and overcome them and be all free men.118

On 19 June 1775, a small Penobscot delegation headed by Chief Joseph Orono, accompanied by their own interpreter arrived in Cambridge, just two days following a defeat of the rebel forces the Battle of Bunker Hill. They went before the Provincial Council, where Orono delivered his speech which was translated and recorded:

> They have a large Tract of Land, which they have a right to call their own, and have possess'd accordingly for many years. These Lands have been encroached upon by the English, who have for Miles on end cut much of their good Timber. They ask that the English would interpose, and prevent such Encroachments for the future; and they will assist us with all their Power in the common defense of our Country; and they hope if the Almighty be on our side the Enemy will not be able to deprive us of our Lands.119

A Committee was appointed, charged with considering the Penobscot Indian protests, and submitted the following report, stating:

> We hereby strictly forbid any person or persons whatever from trespassing or making waste upon any of the lands and territories and possessions beginning at the head of the tide on the Penobscot river and extending six miles on each side of said river now claimed by our brethren, the Indians of the Penobscot tribe as they would avoid the highest displeasure of the Congress. We thank our brethren of the Penobscot Tribe for their generous offers of friendship and assistance in our present war with our brethren in Great Britain who are endeavoring by murder and violence to rob us our lands & property and hereby engage to their just claims against every invader.120

Acting on their promise, the Penobscots on New England's eastern frontier helped the rebel colonists in the Commonwealth of Massachusetts (which included the District of Maine) win their independence. While it was generally accepted before,

---

118 "Maine Indians in the Revolution." Pp.105-112. *Sprague's Journal of Maine History* Vol.6 (3),p.106.
119 L. Kinvin Wroth. 1975. Province in Rebellion: A Documentary History of the Founding of the Commonwealth of  Massachusetts 1773-1785 (Harvard U Press), p.2294.
120 Watertown Conference, American Archives, 4th Series, vol.2 (1775), p.1433.

during, and after the Revolutionary War, that the Penobscot tribe maintained its exclusive
possession of their ancestral domain above the head of the tide, including their fishing
grounds and hunting  territories  within a tract of six miles on both sides of their river,
once the war was concluded at the 1783 Treaty of Paris, the political authorities could do
little to stop white poachers from encroaching on those tracts, or white squatters from
moving upriver. Thus, the Penobscot tribe's continued occupation and possession of the
uplands became a focus of attention for the "extinguishment" of "Indian title" to that
land, a process that will be described further in Part III.

In early 1793, Massachusetts commissioned two experienced land surveyors to
chart the Penobscot tribal territory above the Chadwick Line at the head of the tide.[121]
This expedition was headed by Captain Park Holland (1752-1844), a Massachusetts
legislator and a war veteran who had served as a militia captain. Holland was instructed
to make a detailed record of "the nature of the soil, the quality of the timber, as well as
the situation of the waters, so that an accurate map could be made of the course of the
rivers, which is a very essential point…."[122] That summer, the survey team sailed up the
Penobscot, landing at Colonel Jonathan Eddy's home "at the head of the tide."[123] As
Captain Holland later recounted:

> From Colonel Eddy's we made use of birch-bark canoes, to take us still farther
> up, and hired Sabatis, an old and very respectable Indian of the Norridgewock
> tribe [from the Kennebec], to act as an assistant, guide and interpreter…. We
> proceeded as far as Oldtown, a distance of nine miles, without much difficulty,
> where there were then a great number of Indians, very few of whom could speak a
> word of English, and who were strongly opposed to our going any farther. One

---

121 Park Holland, 1834. Memoir, in Bingham, p. 212.
122  Cited in Bingham, p.269.
123 Cited in Bingham p. 211.  By Resolve dated June 29, 1785, the Massachusetts legislature granted free
lots of about 9,000 acres on the east bank of the Penobscot River, at the head of the tide, to veterans such as
Colonel Jonathan Eddy and fellow Nova Scotia exiles in recognition of their military service in the
Revolutionary War.

came out with his gun, and in pretty good English threatened to shoot us…They
gave us to understand through him, that the river was their river, and that they did
not wish any white man to go up. After a while we made them consent to let us
pass unmolested, by assuring them that we only came to mark off their own land,
so that the white people should not hunt, or otherwise trespass upon their
property, and not to do them injury…. We moved along rather slowly, surveying
and measuring the river, and taking sketches of the islands until we reached
Mattawamkeag. Here we found another large Indian town, full of inhabitants, who
forbade our proceeding any further. They came out to us, and gave us to
understand they wished to make a strong talk, the amount of which was, that the
river was their own river, and they did not want any whites to go up, for bye and
bye the white man would come and buy a little of their land, then a little more,
and the further the white men go up, the further the beaver and moose would go,
and bye and bye the poor Indian would have no land and no moose meat. Many of
these old men, I found to be afterwards, men of sound sense, strict integrity, and
good judgement. We satisfied them that we did not come to buy their land, or to
injure them, and proceeded on our way….”[124]

Not unlike the opposition encountered by Chadwick a generation earlier, the

hostile reaction from tribesmen in Panawamskeag (Old Town) and Mattawamkeag, at the

time, the tribe's two primary settlements above Old Town Falls, as described by Captain

Holland indicates that the Penobscots considered themselves a sovereign nation in

possession of their own territory. In defense, they were willing to expel or even kill

uninvited American whites as foreign intruders. The surveyor's accounts of Chadwick

and Holland depict not only the Penobscot's vigorous defense of their ancestral domain,

but the ready acceptance of that tribe's claim of exclusive use and possession by these

prominent agents of a foreign government. Distrustful of New England whites, the tribe

had resisted selling its undisputed "Indian title" to tracts of land adjoining their river to

the Massachusetts government. Three years after Holland's 1793 survey of their river,

and facing growing pressure, the chiefs finally agreed to a treaty with Massachusetts and

---

[124] Cited in Bingham, pp.212-213.

47

relinquished their title to almost 200,000 acres on both sides of their river, as discussed below.

Considering the significance of the fisheries for their survival on the river, as well as their spiritual relationship with their animal relatives (totems), and numerous other fundamental aspects of their way of life, these canoe-faring woodland Indians recognized the vital linkage between their islands and the natural resources in their river. As such, it is inconceivable that Chief Orono or any of his successors in tribal government would or could have accepted treaty terms that would result in the loss of their river. In fact, there is no historic documentation to that effect.

The great significance of the river to the Penobscot therefore informs my opinion of what the Penobscots understood, and what Massachusetts and Maine intended, upon agreeing that the Tribe reserved the islands in the Penobscot River as provided by the treaties of 1796, 1818, and 1820.

## III. Concepts of "Indian Title" and the Pre-Emptive Right to Extinguish

In the immediate aftermath of the American Revolutionary War, the political authorities of the Commonwealth of Massachusetts, and those lobbying them to treat with the Penobscots, were fully aware of the legal constructs needed to free lands from tribal possession. Although they did consider the military option, the idea of gaining possession of Penobscot domains by means of armed conquest was deemed unacceptable. The idea of applying the "conquest theory" to Indian country was also rejected by the newly-established federal government of the United States. This position was articulated by the Revolutionary War General Henry Knox of Massachusetts, almost a year after he had

48

been commissioned to make a treaty with the Penobscot Indian tribe. In 1785, soon after being appointed US Secretary of War, Knox stated: "The Indians, being the prior occupants, possess the right to the soil. It cannot be taken from them except by their consent, or by rights of conquest in case of a just war. To dispossess them on any other principle would be a great violation of the fundamental laws of nature."[125] A year later, in 1786, the War Department headed by General Knox took control over the Department of Indian Affairs.

Instead of a military annexation by means of violence, Massachusetts (and US federal) authorities subscribed to the idea of extinguishing "Indian title," a legal concept also known as "aboriginal title."[126] This concept derives from "the proposition that immemorial possession gives the possessor a right to remain on the land, at least until that right is lawfully extinguished, appears self-evident. The notion that long occupation is to be deemed lawful, in the absence of proof to the contrary, is as ancient as the concept of property itself; indeed, the right to use that which one has created, possessed or occupied without wrongfully taking from another, is fundamental to any legal system."[127] Also referring to Felix Cohen's *Original Indian Title* (1947), Gordon Bennett

---

125 McNickle, D'Arcy (1993). *Native American Tribalism: Indian Survivals and Renewals*. New York: Oxford University Press, p.52.

126 In the landmark US Supreme Court decision *Johnson v McIntosh*, Chief Justice John Marshall opinioned that "discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession. [However, this principle could not] annul the previous rights of those who had not agreed to it. It regulated the right given by discovery among the European discoverers; but could not affect the rights of those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man. It gave the exclusive right to purchase, but did not found that right on a denial of the possessor to sell. [The original inhabitants] were admitted to be the rightful occupants of the soil, with a legal as well as a just claim to retain possession of it, and to use it according to their own discretion" (21 U.S. (8 Wheat.) p.574. Cited in Bennett 1978, pp.620-621. See also Berman, Howard R. 1978. The concept of Aboriginal Rights in the early Legal History of the United States. *Buffalo Law Review* Vol.27(4), pp.642-656.).

127 Bennett, Gordon I. 1978. Aboriginal Title in the Common Law: A Stony Path Through Feudal Doctrine. *Buffalo Law Review* Vol.27 (4), pp.618-619.Bennett (p.619) further explains: "The rights of first

explained "The Spanish Laws of the Indies (1594) contained provisions to a similar effect [and] were clearly grounded in a belief that possession of itself demanded respect for the Indian title. This approach was shared by Spain's northern rivals, and it became a guiding principle in the colonisation of North America."[128]

Commenting on the concept of Indian title in the United States, Judge James F. Davis at the U.S. Court of Claims succinctly stated: "Once established in fact, it endures until extinguished or abandoned…."[129] With respect to the Penobscot Indian domain, these lands were situated within the territorial boundaries claimed by the Commonwealth of Massachusetts, and over which it asserted the right of sovereignty and jurisdiction. With this came the Commonwealth's presumed right of pre-emption, "that is, the right of the state as far as the state has any, and sole right to purchase or agree with the Indians, which must be done amicably," by purchase in a treaty.[130] Based on that pre-emptive right, the Massachusetts authorities pursued its policy to extinguish "Indian title" to Penobscot tribal lands above the head of the tide. In fact, the successive colonial governments of Massachusetts had a historical record of treaty-making with the Penobscot and neighboring tribes on its long-disputed eastern frontier since the 1670s.[131]

occupants have been widely supported by moral philosophers…, and in their early developments almost all legal systems acknowledged continuous use and occupation as the sole source of title…. First to argue for these principles to native lands was the Spanish theologian Francisco de Vitoria, in *De Indis et de jure Belli Relectiones*….. Vittoria's theory received papal support from the [Papal] Bull *Sublimus Deus* of 1537. …"
128 Ibid., p.620. On the basis of this principle, colonists in the New England and New Netherlands (New York) purchased tracts of land from their native owners by means of "Indian deeds," thus legally documenting their claims.
129 Judge James F. Davis served as a trial judge at the U.S. Court of Claims in *Lipan Apache Tribe v United States*, 180 CT. Cl. 487 (1967), p.492. Cited in Bennett 1978, p.621. See also McHugh, Paul G. 2011. *Aboriginal Title: The Modern Jurisprudence of Tribal Land Right*s. Oxford: Oxford U Press, p.17.
130 Alexander Baring, cited in Bingham, pp. 608, 611-612. The Union, i.e. the US federal government, supposedly had this prerogative as a consequence of the 1790 Non-Intercourse Act. However, the states of Massachusetts and New York asserted that this did not extend to the Indian-claimed territory situated within their (still ill-defined) boundaries.
131 Ghere, David L. Diplomacy & War on the Maine Frontier, 1678-1759. Pp.120-142. *Maine: The Pine Tree State from Prehistory to the Present.* Eds. Richard W. Judd et al. Orono: U Maine Press. See also

From 1763 onwards, however, the British Crown as the sovereign power in the North American colonies reserved this particular privilege through the Royal Proclamation referenced above, in part to protect tribes within its territorial boundaries against loss of lands by fraud, threats, or other unlawful means of dispossession. At the 1783 Treaty of Paris, which officially concluded the Revolutionary War, this privilege had been transferred to the newly-independent United States.

In 1784, a year after the Treaty of Paris, the Massachusetts government resolved to act on its presumed pre-emptive right to lawfully extinguish Indian title to tracts of land within its territorial boundaries and appointed commissioners to purchase Penobscot Indian lands above the head of the tide. This resolve is predicated on the Commonwealth's recognition of the fact that the Penobscot tribe still retained "immemorial possession" of their ancestral lands, granting its members their inherent right to occupy and use those territories. This recognition is indicated by a statement made by the treaty commissioners appointed by the Massachusetts Governor, General Knox and General Benjamin Lincoln, in their report submitted to the Massachusetts General Court in Boston on 5 March 1785: "That your Committee has satisfactory evidence that the Indians of the Penobscot Tribe have long inhabited the Penobscot River and parts thereto adjacent, & claimed the lands laying on the same River by right of Prior occupancy..."132

---

Morrison, Kenneth M. 1984. *The Embattled Northeast: The Elusive Ideal of Alliance in Abenaki-Euramerican Relations*. Berkeley: U California Press, pp.102-164.

132 Lincoln, Benjamin, and Henry Knox 1784 The Report of the Commissioners appointed to confer with the Indians of the Penobscot Tribe. Manuscript filed with 1784 resolves, Chapter 168. Massachusetts Archives; Lithgow, William 1785 Report of the Committee appointed to State the Indian Claim to Lands on Penobscot River, March 5, 1785. Manuscript filed with 1784 resolves, Chapter 168. Massachusetts Archives. (The source of this citation document was brought to my attention in November 2013 by Dean Snow, who referred to this in his unpublished 1977 report.)

Four years after the Massachusetts government engaged in its first unsuccessful effort to convince the Penobscot chiefs to sell tribal lands, the U.S. Constitution came into force, followed two years later by the 1790 Non-Intercourse Act, in which US Congress asserted its sovereign right regarding Indian treaty-making.[133]  Treaties, of course, are supposed to reflect the formal agreements of sovereign governments.  Thus, the extinguishment of "Indian title" by treaty must be premised upon the identification of an Indian tribal government with authority over a defined territory.  During the period under consideration in this report, the Penobscot had maintained their sovereign status as a self-governing tribe, or nation, retaining exclusive authority over a domain comprising the Penobscot River from the head of the tide, northward.

Any further historical discussion of the legal concepts of Indian title, pre-emptive rights, and treaties is  beyond the scope of this report. The purpose of the historical narrative above is simply to show that Massachusetts authorities were aware of the legal construct regarding Indian title when they pursued a treaty-making policy and purchased vast tracts of lands from the Penobscot tribe. Their primary objective, as will be shown below, was to purchase legal title to those lands for financial purposes.

---

[133] The original Non-Intercourse Act passed and signed into US federal law by President George Washington on 22 July 1790, stipulated that that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States" (Act of July 22, 1790, Pub. L. No. 1-33, § 4, 1 Stat. 137, 138).

## IV. Drive to Extinguish Penobscot Tribe's "Indian Title" to Lands on Either Side of Penobscot River above Head of the Tide

The Penobscots were among the very first Indian tribes to ally themselves with the American Revolutionary movement.134   On June 21, 1775, Penobscot Chief Joseph Orono addressed a special committee of the Provincial Congress, headed by General James Warren of Plymouth, President of that newly-constituted institution then located in Watertown. Speaking on behalf of his tribe, in much the same manner as his predecessor, Chief Tomah, conveyed to Sir Francis Bernard, Governor of Massachusetts, eleven years earlier, he protested against whites trespassing upon Penobscot lands. Orono promised "if the grievances under which his people labored were removed they would aid with their whole force to defend the country." In response, the committee made the following report: ". . . we hereby strictly forbid any person or persons whatever from trespassing or making waste upon any of the lands and territories and possessions beginning at the head of the tide on the Penobscot river and extending six miles on each side of said river now claimed by our brethren, the Indians of the Penobscot tribe as they would avoid the highest displeasure of the Congress."135   This declaration became known as the "Watertown Resolve," a governmental affirmation of the Penobscot tribe's long-standing ancestral claims (or "Indian title") to their tribal domain above the head of the tide. After returning to their tribal villages above Old Town Falls, Chief Orono and fellow Penobscot leaders committed their warriors to fight with their American "brethren"

---

134 Regarding Soldiers of the American Revolution: Maine Indians in the Revolution. Pp.105-111. *Sprague's Journal of Maine History,* Vol.VI (3), Pp.105-111; Prins, Harald E.L. 1985. "Two George Washington Medals: Missing Links in the Chain of Friendship Between the United States and the Wabanaki Confederacy." Pp.9-11.*The Medal,* no. 7. London: The British Museum.

135 Cited in Leger 1929:166-167.  As Williamson (1832 Vol.1, p.474) described it, "Massachusetts protected them, and prohibited all trespasses upon *their lands*, six miles in width on each side of the Penobscot, from the head of the tide upwards." (emphasis added).

against the British.136 Moreover, "a company was raised by order from Government, which consisted of twenty white men and ten Indians . . . . acting as rangers."137

The Penobscots paid for their military alliance with the American revolutionary forces, losing at least four fighters when participating in a naval battle to dislodge British troops recently entrenched at Fort George (Castine) in the summer of 1779. Suffering big losses, the American fleet was largely destroyed.138 Having been defeated, the commander of the land forces, Brigadier General Solomon Lovell, retreated upriver where the Penobscot chiefs welcomed him at the "Penobscot Indian Settlement," probably at Panawamskeag. On 16 August 1779, General Lovell appeared before the tribal council, expressing his gratitude:

> My Brethren, I heartily thank you for your faithful services while with me at Majabigwaduce [Castine] a true Representation of which I will not fail to make to the Grand Councel at Boston; we here have suffered a little disappointment but notwithstanding your Brethren will still continue to protect you and Your families till the pleasure of Councel can be known who I doubt not will do all in their power for your welfare and prosperity, — I am heartily sorry to see you and Your little ones drove from your Habitations and even your dependence, (Your Bread and part of your Hunting,) but fear not you will be Restored to it again shortly. — I wish it was in my power to Relieve you a little at present but I have lost all myself —
> The Chiefs answered. — They were sensible the Gen1 Had lost every thing, and would help him all in their power. That Five Canoes and Eight Indians should forward him towards his friends at Kenebeck that his Visit[in]g their Wigwams and the notice he had taken of them had given them a satisfaction they had never before Received. That they should continue their sincerity. That a little misfortune would not make them change their Hearts they would ever be friends with the

---

136 As Godfrey recounts, the Penobscots resolved to stand together with "our Brethren of Massachusetts and oppose the people of Old England that are endeavoring to *take yours* and our Lands and Libertys (sic) from us." Godfrey, John E. 1872. The Ancient Penobscot, or Panawanskek. *Historical Magazine and Notes and Queries concerning the Antiquities, History, and Biography of America*. 3rd Series, Vol.1, No.2, pp.85-92.

137 *Hist. Mag*. 1874:164-65.

138 Leamon, James S. 1993. *Revolution Downeast: The War for American Independence in Maine*. Amherst: University of Massachusetts Press, Pp.104-134.

Grand Councel and open enemies to the Tories and Brittish Troops who had hurt their young Men, and that their faith was firm…."139

The war was barely over when the Penobscots faced an entirely new pressure from its former military allies making up the now liberated Massachusetts government:  the effort to extinguish their Indian title to land on either side of the River above the head of the tide, as earlier marked on Chadwick's 1764 sketch map.  As noted by the Bangor judge John Godfrey: "After the War, it was found that the Indian claim to this tract was an obstacle to the settlement of the country. The whites encroached upon it, and some ill-feeling was likely to prevail unless the Indian title could be extinguished; therefore, the Massachusetts Government commenced negotiations in order to obtain a release of it."140

        As discussed below, the government of the commonwealth of Massachusetts as well as private investors and white settlers coveted the Penobscot tribe's lands (and timber) above the head of the tide on either side of the Penobscot River.  Pressured into paying off enormous war debts (plus interest payments), Massachusetts' authorities desperately needed revenue, not only from taxes, but also from selling "public lands" and eyed valuable tracts still possessed by the Penobscot tribe by virtue of its "Indian title." Private investors engaged in land speculations also expected to profit, as did prospective white settlers and squatters already established on Penobscot Indian lands. Considering the admixture of private and public interests quite acceptable, government officials, elected politicians, militia officers, land speculators, and other private entrepreneurs saw enormous value in Penobscot Indian lands; all were eager for the Massachusetts

---

139 Substance of a Conference between Brgadr Gen1 Lovell and the Indian Chiefs. Penobscot Indian Settlemt  Aug 1 16th 1779. *Baxter Manuscripts*, vol.17, p. 12, 14.
140  Godfrey 1876, p.8. John E. Godfrey (1809-1884) was a prominent Maine lawyer and historian. He served as a judge in Bangor from 1834 until his death.

authorities to extinguish the tribe's Indian title by lawfully purchasing tracts of tribal lands in a treaty.[141]


## A. The First Treaty Attempt:  1784

In January 1784, the Massachusetts government requested that the U.S. Congress abolish the Eastern Indian Department, presuming it could thereby unilaterally engage in political relations with the Penobscot tribe.[142]  That same month, without waiting for the federal approval (which occurred in March), the state's legislature passed a Resolve empowering Major-General William Lithgow, a lawyer from Georgetown on the lower Kennebec, and others, "to treat with the Penobscot Tribe of Indians, respecting their claims to lands on Penobscot River."[143]  In July, Massachusetts replaced the appointed commissioners with an even more powerful team, consisting of former Revolutionary War generals, Henry Knox and Benjamin Lincoln, and George Partridge, a Massachusetts Representative to US Congress. Knox, who was 34-years old at the time, had ranked immediately below George Washington and just quit his top-military post in Philadelphia.  Their task was to induce the Penobscot chiefs to relinquish title to lands above the head of the tide forty miles up the river.[144]  Specifically, the commissioners

---

141 Henry Knox represents one of the more spectacular examples of mixing private and public interests, as were numerous others in his circle, including William Bingham and William Duer. See Gilje, Paul 1993. Review, "'The King of the Alley': William Duer--Politician, Entrepreneur, and Speculator, 1768-1799, *Business History Review* Vol.67(2), p.308.  See also Cowan, David J. (2009, Spring). William Duer and America's First Financial Scandal. *Financial History*, 97, 20–35.
142  In Allen 1858, p.256.
143 *Supplement to Acts & Resolves*, vol.1, 1780-1784, p.414, c.168. *Supplement to Acts & Resolves of Massachusetts,* vol.1,  p. 233, c.57.
144 Ch. 28, in *Acts & Resolves,* pp.246-247; Drake, Francis S. 1873. *Society of Cincinnati of Massachusetts*, p.171.

were "…'to endeavor to form some compromise with the Penobscot Indians respecting the lands which they now occupy.'"145

On 16 July 1784, Knox wrote to his friend, fellow Revolutionary War General Benjamin Lincoln in Boston, to make travel arrangements with the state yacht.146 Soon afterwards, he "wrote Lincoln that they should decide on the nature and quantity of the gifts to be presented to the Indians: We shall appear ridiculous enough in their eyes to ask them for their land."147  Both generals boarded the yacht in Boston and set sail in August 1784, arriving on the Penobscot later that month. There they retained three Revolutionary War veterans who had long resided in the valley, and who were familiar with the Penobscot.   All three spoke the Penobscot language so they served the commissioners as interpreters, and arranged for a meeting with seven Penobscot tribal leaders, including Chief Orono, John Neptune, Squire Orson, Nicktumbowit, Peelsock, Wine [Meesor] and Wine Aremooglit. The chiefs attested that their tribe, at the time, consisted of forty families, one hundred of which were males older than twelve.148

On 4 September, Knox and Lincoln jointly penned a letter, reflecting their address to the Penobscot leaders.  Referring to the Penobscots as "Brethren" and to themselves as "your Brethren," the two Generals told the leaders that it was

> the Desire of the [General] Court that you should have a Quantity of Lands assigned you sufficient for all your Purposes, that the Bounds should be so fixed & known to all Men, that none may trespass thereon.
>
> [T]he Sovereign Power of this Commonwealth . . . will not suffer Individuals to purchase those Lands which you are permitted to occupy.

---

145 in Mattern, David B. 1998. *Benjamin Lincoln and the American Revolution*. U South Carolina Press, p.155.
146  http://wardepartmentpapers.org/document.php?id=510
147 Mattern 1998, p.156. My emphasis.
148 Gilder Lehrman Collection #: GLC02437.03046.

If, however, it is your Wish to change the Limits assigned you by the Provincial Congress, and you are willing to take all which may be necessary for you to occupy on one Side of the River, or on both Sides higher up, so that the Interest of the State shall be promoted. We are willing to treat with you on the subject, by the Authority and on the good Faith of the Commonwealth.,

Knox recounted Chief Joseph Orono's response:

"The Almighty placed us on the land and it is ours. . . . The English will come on us from before and you on the other side so that we shall have but little left." Orono continued his speech asking Massachusetts [government] to fix the bounds of the Penobscots' land to prevent the new inhabitants from interfering 'with us.' He declared that his people did not sell any land 'to our knowledge, and never will while we live.'[149]

The conference broke up without any agreement and the general returned to Boston without a treaty. A few months later, in January 1785, they reported on their failed treaty-making with the Penobscot to the Massachusetts General Court in Boston and explained that the Penobscot Tribe "suppose they have an exclusive right to all the lands six miles in width on each side [of] Penobscot River from the head of the tide to Canada line & this claim they rest on their prior Occupancy and on the doings of the Provincial Congress at Watertown in 1775."[150] On 5 March 1785, the report by the treaty commissioners was entered in the Legislature. Among others, it states:

That your Committee has satisfactory evidence that the Indians of the Penobscot Tribe have long inhabited the Penobscot River and parts thereto adjacent, & claimed the lands laying on the same River by right of Prior occupancy... That your Committee views the before mentioned [1775 Watertown] Resolve of the [Massachusetts] Provincial Congress as conveying no new Rights to the said [Penobscot] Indians which they had not previous to the passing of it, and that it can only be construed as a confirmation of those Rights formerly granted them of

---

149 The Answer of the Indian Chiefs to the Commissioners, by Chief Joseph Orono, September 4, 1784, Doc. #2, 1784 Resolve, Chapter 168, approved March 18, 1785, original legislative papers MaSA, cited in Pawling 2010, p.47-48; N.E. Gen. Soc., 17, 119, Knox Ms. Cited in Leger 1929, p. 31; Gilder Lehrman Collection #: GLC02437.03046.
150  Doc.42.

hunting and fishing on those Lands, and in the River and Streams running through the same…151

This reveals that one of the most powerful and influential political figures in the USA in the post-revolutionary period, Henry Knox, had reconsidered the concepts of "Indian title" and claims of possession based on the "right of conquest."152 In his capacity as U.S. Secretary of War (and in charge of Indian Affairs) in 1789, Knox wrote:  "The Indians, being the prior occupants, possess the right to the soil. It cannot be taken from them except by their consent, or by rights of conquest in case of a just war. To dispossess them on any other principle would be a great violation of the fundamental laws of nature."153

## B. The Second and Third Treaty Attempts:  1786 and 1788

After the failed attempt to negotiate a cession of the Penobscot lands in 1784, another attempt was made in 1786.   On July 6, 1786, the Massachusetts General Court appointed General Benjamin Lincoln, General Rufus Putnam, and Dr. Thomas Rice (a former Judge and State Senator living in Wiscasset) as "Commissioners to treat with the

---

151 Lithgow Jr., William 1785.  The Committee Appointed by the [Massachusetts] Senate to State the Indian Claim to Lands on Penobscot River. Manuscript filed with 1784 Resolves, Chapter 168. Massachusetts Archives (photocopy of typewritten copy. Courtesy Dean Snow).

152  The Committee thought that the Commonwealth of Massachusetts had a claim on Penobscot tribal lands based on the "right of Conquest," and asserted (without supporting historic evidence) that "by the success which crowned our efforts and our Arms in the said [1755-1763] War the said [Penobscot] Indians were dispossessed of their Lands & driven from their settlements on the same [Penobscot] River."  It continued, "Yet as it might be hard to initially deprive the said Indians of every part of the said lands your Committee thinks it advisable that such part of the said lands thereof may be assigned them & in such places as the General Court may think proper…."  The Committee Appointed by the [Massachusetts] Senate to State the Indian Claim to Lands on Penobscot River. Manuscript filed with 1784 Resolves, Chapter 168.  Massachusetts Archives.  Although, as discussed in subpart B, below, remnants of this theory may be found in later attempted treaty negotiations (meeting with failure), the consensus that won the day was that the only way to extinguish the Penobscot Tribe's "Indian title" to its domain above the head of the tides was pursuant to a negotiated treaty.

153 McNickle, D'Arcy (1993). *Native American Tribalism: Indian Survivals and Renewals*. New York: Oxford University Press, p.52.  Report of Henry Knox on the Northwestern Indians (June 15, 1789). *American State Papers: Indian Affairs*, I:

Penobscot tribe of Indians, respecting their claims to lands on Penobscot River." The Commissioners subsequently met with Penobscot leaders and claimed thereafter in their Report to the General Court of August 30, 1786 that they had an agreement.[154]  As Maine historian Williamson (a Bangor attorney and the state's second governor) later summarized: "By this agreement, the [Penobscot] Indians released all claims to the lands on the Penobscot, from the head of the tide to the mouth of the Piscataquis, on the western side, and to the Metawamkeag, on the eastern side; reserving only to themselves, Old-town Island, and all the others in the river above it, to the extent mentioned. — In consideration of which the government engaged, that the tribe should enjoy in fee all the reserved Islands, and also White Island and Black Island, near Naskeag point; that all the lands on the waters of Penobscot river, above Piscataquis and Metawamkeag, should lie as hunting grounds for the Indians, and should not be laid out or settled by the State, or engrossed by individuals; and that 350 blankets, 200 pounds of powder, with a suitable proportion of shot and flints, should be given them as a present."[155]  Before the Penobscot chiefs actually signed or put their personal marks on the treaty document, General Lincoln had been assigned by Massachusetts Governor James Bowdoin to repress the Shay's Rebellion in western Massachusetts, which consumed his time and attention well into the following year.

---

154 The Commissioners reported that the Tribe agreed, in pertinent part, that it "would relinquish all their claims and interests to all the lands on the west side of Penobscot-River, from the head of the tide up to the River Pasquataquis, being about forty- three miles ; and all their claims and interest on the east side of the River from the head of the tide aforesaid, up to the River Mantawomkuktook, being about eighty-five miles; reserving only to themselves the Island on which the old Town stands, about ten miles above the head of the tide, and those Islands on which they now have actual improvements, in the said River, lying from Sunkhaze-River, about three miles above the said old Town, to Passadunkee-Island inclusively, on which Island their new Town, so called, now stands." *Acts and Laws of the Commonwealth of Mass*. Boston: Adams & Nourse, 1786, pp. pp.70-71; Acts and Laws of the Commonwealth of Massachusetts " (Boston, 1786), Chapter I., pp. 487, 488; See also Farnham Papers, pp.80-82.
155  Williamson 1832, vol. 2, p.517.

60

On October 11, 1786, the Massachusetts General Court passed the "*Act Confirming Treaty with Penobscot tribe*" whereby it appointed John Lee, the state's Collector of Customs in Castine 156, to finalize the "deed of relinquishment" from the Tribe and deliver the woolen blankets and other gifts promised them by Lincoln's team.157  When he arrived at the Penobscot River, with the Articles ["the blankets, and the several Articles of public property, designed for the Indians"] to be delivered to the Indians, they were on their fall hunt, and were not likely to return, till the beginning of the Winter."158  This prevented Lee from completing the task of consummating the supposed agreement.159

On March 4, 1788, General Lincoln, wrote to the newly elected Governor Hancock, regarding the recent history and status of the state's treaty negotiations with the Penobscot Indians and noted he had delivered the agreed-upon goods and left a quit-claim deed for the tribe to sign.  He explained that the Penobscots were now ignoring the agreement and had not claimed the goods or signed the deed; and he urged state action to prevent hostilities that "would put a great check if not a total stop to the sale of land in that country."160  Less than two weeks later, impatient with the Penobscot chiefs unwilling to accept the terms predetermined by his government, but reluctant to invade and conquer an unknown wilderness above the falls, Hancock calculated the costs and wrote on March 17, 1788:

---

156 Then called Bagaduce, a sea port designated as the county seat as the most important town in the Penobscot region.
157 *Acts and Laws of the Commonwealth of Mass*. Boston: Adams & Nourse, 1786, pp. pp.70-71; Acts and Laws of the Commonwealth of Massachusetts " (Boston, 1786), Chapter I., pp. 487, 488;  See also Farnham Papers, pp.80-82.
158 *Acts and Laws of the Commonwealth of Mass*. Boston: Adams & Nourse, 1786, pp.873, 874.
159 Governor James Bowdoin, Council Chamber, November 11, 1786.  *Acts and Laws of the Commonwealth of Mass*. Boston: Adams & Nourse, 1786, pp. 953-954.
160 Ayer, Edward E.; gift; 1911. Newberry Library, Special Collections, Chicago

> "[It] appears that the line of property between the Commonwealth's land, & those of the Penobscot tribe of indians, is not formally settled [This] is of great consequence to the Commonwealth, for though perhaps a very small force may subdue or extirpate that Tribe of natives, if they should commence hostilities, yet the effecting it, would be more expensive & troublesome, than compleating a Treaty respecting their Lands, can be. I need not observe, that it is much more consistent with humanity to conciliate their affections, than to subdue them by force."[161]

In June 1788, Governor Hancock replaced John Lee with Daniel Little, a protestant missionary from Wells, as the new "Commissioner to the tribe of Indians at Penobscot." Having accompanied General Lincoln on his aborted treaty-signing mission in 1786, Little accepted because of "some advantages arising from my personal acquaintance with the Indians."  Massachusetts Governor Hancock selected two attorneys, James Sullivan and Thomas Dawes, both "Councellors" to the General Court, to "prepare his instructions."[162]  Little's task was to deliver the stored blankets and ammunition, in exchange for obtaining their release of the desired territory.  Little sent his interpreter, Major Robert Treat, to Indian Island to invite tribal leaders down to the head of the tide for a meeting, but they refused, saying that the Massachusetts representatives should come to them.  The Commissioner then "notified them that he would meet them, at their town [at Indian Island]… a party, consisting of Major Treat, Reverend Seth Noble, Colonel Lowder, Colonel Brewer, Mr. John Lee [who had kept the 1786 treaty goods in store at Bagaduce], and Mr. William Colburn.[163] Mr. Little proposed the treaty terms that General Lincoln claimed to have proposed and consummated in 1786 and gave the following account of the response from Orsong Neptune [Col. John Neptune] their speaker…: [thru interpreter Treat]

---

161 John Hancock, Council Chamber, March 17, 1788. In: *Acts and Laws of the Commonwealth of Mass.* Boston: Adams & Nourse, 1786, pp.999-1000. My emphasis.
162 Amory, *The Life of James Sullivan*, p. 238.
163 Colburn's father was  surveyor Jeremiah of Dunstable, Mass., first settler of Orono, in 1774.

"BROTHER,… when we were at Conduskeag [two years earlier, in 1786], we had not a right understanding of matters; and…we were pressed to make that Treaty contrary to our inclinations.

"BROTHER, God put us here. It was not King of France or King George. We mean to stay on this Island. The great God put us here; and we have been on this Island 500 years. …From this land we make our living. This is the general speech of all our young men. We don't know any thing about writing. All that we know, we mean to have a right heart, and a right tongue.

"BROTHER, we don't incline to do any thing about the Treaty made at Conduskeag, or that writing," *[pointing to the paper I held open to them, with full explanation, of it.]*

My Reply [Rev. Little]. "FATHERS AND BROTHERS OF THE PENOBSCOT TRIBE,….  you must remember that the lands you now hold is by the doings of the Massachusetts Government. At Conduskeag, General Lincoln told you, in Governor Pownall's day, in a former War, against us, you lost all your lands in this part of the country. That, in the year '75, the Massachusetts Government gave you six miles on each side of the river, from the head of the tide on which you must rest your claims, to which you there consented; and you must remember…. For those two strips of land, by the river, Massachusetts Government, according to the agreement made by General Lincoln, now gives you, up in the county, four times as much land for hunting, two Islands in the Bay, with all the town and Islands in the river you now occupy, with three hundred and fifty blankets, &c. …. Will you make your mark for your names against the seals on this paper, which tells what land you give to Government, and accept of this parchment, which is the act of the General Court, giving land to you, and then receive the blankets, &c? Will you do this or not?"

[Col. John Neptune]: "We don't know any thing about writing. We have put our hands to many papers, at Albany, New York, and elsewhere: but we will not put our hands to this paper, now, nor any more papers now; nor any other time forever hereafter."

Mr. Little left disappointed, and "was obliged to report to the Government his want of success."164

---

164 Godfrey, John E. 1872. The Ancient Penobscot, or Panawanskek. *Historical Magazine and Notes and Queries concerning the Antiquities, History, and Biography of America*. 3rd Series, Vol.1, No.2, pp.85-92.

## C. The Fourth Treaty Effort: The Coalescence of Private and Public Interests (1791-1796)

Beyond public interest in purchasing tracts of Penobscot Indian lands, there were also private investors (including high-ranking military officers, state officials, international bankers, and land speculators), not only individuals, but also groups forming investment companies, and banks. By far, the biggest speculator in Maine was General Henry Knox.  On 2 June 1791, Knox and his business partner, New York Senator William Duer signed "Principles of Agreement" in New Brunswick, planning to buy no less than 1 million  and no more than 4 million acres of land in Maine, ideally for 6 cents per acre, but no more than 10 (or 12).[165]  Knox would later refer to the land at issue as the "Penobscot Million."

Aware of the economic potential of lands with easy access to navigable rivers, they instructed their agents to "always giving preference to the townships that shall have been actually survey'd contiguous to navigation and settlements."[166]  They knew full well that that wresting Penobscot lands abutting the River from the Tribe had to be part of the equation.  Their instructions continued:

> It is understood that the Indians have some sort of claim to the lands on Penobscot River, founded on a certain resolve of the legislature or convention of the State of Massachusetts in the year 1775. It will be proper after the principles of the purchase shall be generally settled to advert to this circumstance, as an argument for lessening the price of the land. At any rate the assistance of the State should be stipulated for to extinguish the same, at as short a period as may be, to be defined in the agreement."[167]

---

165 in Bingham 40-43. Nota bene: Bingham in all reference should be: Allis, Frederick, S. 1954. *William Bingham's Maine lands, 1790-1820.* Colonial Society of Massachusetts.  This was the last attempt on the part of any representative of Massachusetts to espouse the notion that the Commonwealth had a right to the Penobscots' Indian country above the head of tides by means of "conquest."  The only accepted approach hereafter was to extinguish its Indian title to that domain by treaty.
166 Signed Knox and Duer, in Bingham, p.45,
167 Ibid.

After Duer defaulted and ended up in a debtor's prison, Knox found a new investment partner in Pennsylvania Senator William Bingham, a wealthy banker in Philadelphia said to be "undoubtedly the richest man in this country."168   Bingham, like Knox, understood the legal concept of "Indian title" and the process for extinguishing it.169  On 23 March 1793, he wrote to a fellow land speculator that in "the state of Massachusetts. I have about 2,250,000 acres [in Maine]. The lands I possess [adjoining Penobscot tribal lands] lay in the most eligible situation for settlement, and having the Indian titled extinguished, can be disposed of, free of all incumbrances; an object of vast consequences, as it regards European sales, with a view to settlement. The Penobscot tract enjoys more advantages on account of facilities for emigrants, than any other tract of unlocated land, in the United States."170  In early April, 1793, writing from Boston, the agent for Knox and Bingham notified the latter that the "Penobscot Million" should be surveyed "into townships."171

In 1795, Knox (after a decade of service as the U.S. Secretary of War) retired, at the age of 45, to Maine, where he tended to his large estate and continued to speculate in land with Bingham.  In March of that year, Knox's Boston land agent, General Henry Jackson, advised him and Bingham to work directly with surveyor Captain Holland, a member of the Massachusetts legislature (described earlier in this Report) with respect to

---

168 This was said by the British financier Alexander Baring, as cited in Bingham, note 9, pp.644-45. Baring  married Bingham's daughter and gained a reputation as "an extremely shrewd bargainer." Bingham, p.642.
169 In August 1794, Bingham received news from his agent in Europe that Dutch merchant bankers in Amsterdam who had invested in major land purchases in territories claimed by the Iroquois were concerned about securities: "They are all of them I find exceedingly dissatisfied with Mr. [Robert] Morris for not having extinguished the Indian title…." (Cited in Bingham, p.265).
170 Cited in Bingham, pp.240-241.
171 Bingham, p. 101.

the Indians "claim on the Penobscot River."172  In the meantime, Bingham, well-connected with European banking houses, recruited financing through Alexander Baring, a brilliant young British financier (later ennobled as Lord Ashburton), who represented a partnership of two international banks, one in Amsterdam and the other in London. Baring, like Bingham and Knox, understood the concept of "Indian title" and the challenges it presented for land speculators and their investors in America.  Nevertheless, he, like Bingham and Knox, was prepared to bring his banks into the Eastern Maine land speculation business, but only with due diligence: a full understanding of the necessity to extinguish that title.  On 8 December 1795, he reported to the bankers at Hope & Co soon after his arrival in Boston:

> No sales can ever succeed in Europe because the concerned are totally ignorant of the mode of proceeding for the purpose and they fail in what Europeans chiefly look to—the *Indian title*. The holders do not pretend to possess these titles and avow that the lands must be purchased of the Indians. They have only purchased of the state the right of pre-emption as it is called, -- that is, the right of the state as far as the state has any, and sole right to purchase or agree with the Indians, which must be done amicably.  . . . The Penobscot Indian lands are not yet sold, nor is any arrangement with the Indians made as yet. It is uncertain whether they hereafter will and at all events the state sells quite by retail and no mass could be purchased.173

The following month, on January 11, 1796, having met Baring, General Knox wrote to Bingham, explaining that Baring "has come to America principally upon the object of the Maine lands," primarily for the purpose of investing in "the Penobscot Million" (southeast of the Penobscot River).  He "seems to think well of the back tract [northeast of the Penobscot River], and after a bargain should be made for a portion of the lower million  Knox continued that Baring "would also like to be concerned in purchasing the

---

172 in Bingham, p.560.
173 Cited in Bingham, pp. 608, 611-612, Emphasis added.

preemptive right of the State of Massachusetts of the Indian lands on Penobscot." Knox

then suggested that Bingham write to their agent General Henry Jackson in Boston

about the Penobscot tract; that is, to purchase the pre-emption right at any price.

> Perhaps the State will undertake to extinguish the title, and sell the lands under that idea, which would be better than to purchase the pre-emption right and for us to extinguish. Mr. Baring is also apparently desirous of this purchase. He says that [Massachusetts Attorney General] Judge [James] Sullivan and other companies are forming for this purpose. But no persons can give so much as we, because they are not so valuable to any other class."174

Excited about the possibility of having Baring invest European capital in their land

speculation business, Knox wrote to Bingham: "I shall expect your ideas either here or at

Boston, but here [New York] if possible, about the Indian lands on Penobscot River; if

Mr. B. and you agree we ought to have them. They will illustrate, and enhance the other

lands beyond all belief."175   Then, in the week before finalizing the investment terms

with the two European banking houses represented by Baring, Bingham wrote to Henry

Knox, then in Boston, on 6 February 1796: "You will be so good, as to have the

Massachusetts Committee [for the Sale of Eastern Lands] sounded about the Penobscot

Indian lands, and let me know the results."176

　　　　By mid-February 1796, Baring had purchased 1,225,000 acres of Knox and

Bingham's land in Eastern Maine for £107,000 ($3.5 million today) in notes drawn on the

House of Baring in London-- three-quarters of which for the Amsterdam merchant bank

of Hope & Co.. This not only included half of the "Penobscot Million," situated "between

---

174  Cited in Bingham, 629, 630-631.
175 Cited in Bingham, p.633.
176 Cited in Bingham p.671-72.

the rivers Schoodic and Penobscot," but also "One equal undivided half of one million of acres of land in the rear" (Aroostook County), referred to as  the "rear tract."177

Nearly two weeks after this Anglo-Dutch investment deal, General Knox wrote to Bingham on 25 February:

> As to the Indian lands [on either side of the Penobscot River above present-day Bangor] no opinion can be had of the Committee [for the Sale of Eastern Lands] or other persons in the legislature as price. It is however probable that they will be sold in single townships at pretty high prices. Some plan may be formed at the time of sale to purchase as many as we think proper, and we ought to purchase many of them, at any rate at which they will be sold.178

On 5 March, 1796, Bingham wrote to General Knox:

> I shall have no objection to the Indian lands being sold at high prices, as the consequence will inevitably be, to raise the value of the adjacent property. It ought to be most forcibly impressed on the Committee [for the Sale of Eastern Lands] and the General Court [of Mass], that it is absolutely necessary to dispose of the lands in the neighborhood of the Penobscot, as the surrounding country can never flourish, until these townships, which are the key to the District, on both sides of the river are settled. If they sell at high prices, so much the better and I shall have no objection to making some considerable purchases of them.179

On 26 May 1796, just months after the Dutch and British Banks made their huge investment in the "Penobscot Million"180 and the abutting "rear tract"181 situated a few miles east of the Penobscot River, Baring reported on the pending treaty effort with the Penobscot Indian tribe to his Amsterdam banking partners:

> The Penobscot is one of the finest rivers in America and its banks will become the center of population in Maine. It is navigable for ships of any burthen to within a few miles of Indian [Old] Town and for [flat-bottomed] boats almost it is source…., our lands range all along within six miles of it and from its branches will have the benefit of its navigation. Six miles on each side the river were the lands the Bostonians wrote about and very valuable they are. When the District of

---

177 Baring, in Bingham, pp.672-673, 676.
178 Cited in Bingham, p.702.
179 Cited in Bingham , p.710.
180 One million acres in what is now Hancock and Washington Counties.
181 Situated north of the "Penobscot Million" and east of the Penobscot River, this huge tract was located primarily in what is now Aroostook Couny.

Maine began to settle fast and the State of Massachusetts sold the lands in it, it became necessary to make some arrangement with a tribe of Indians that molested them called the Penobscot Indians and it was finally agreed that this strip of valuable land should not be encroached upon but remain their hunting ground. The tribe resided at Indian Town, about 200 families, became Roman Catholics, lived quietly and crept insensibly into a state of civilization from the vicinity of European settlements. This is sure ruin to the Indians. They fell off, decreased in numbers…. The state has consequently appointed commissioners to treat with them, the result of which is not yet known, but they will certainly agree. The lands will afterwards be sold by the state in townships and we shall pick out some that will be of great service to our lands behind them. The attention of all New England speculators is fixed on these lands and they will sell very high. We can afford to give more than any body and the remainder selling high must give additional value to our lands. I reckon our back tract [northeastern Maine] worth twice as much when the Indians are removed than before, for it would have been difficult to settle with a wilderness of six miles between it and the finest river, in addition to the real advantages that must result  from our holding some choice spots. The truth of this will appear evident from the map."182

Within a month, a treaty ("bargain") with the Penobscot would be concluded.


## V. The 1796 Treaty

The immediate apparent cause for the new attempt at a treaty was "a controversy… between the settlers and the Indians in relation to the title to the territory above the Head of the Tide — the former [white squatters] supposing it to have been relinquished to [them] the whites.  The Government appointed another Commission to quiet the Indians and bring the matter to a conclusion."183  The "back story," and a far more significant cause for the new treaty attempt, however, was the efforts of private investors, with their revolving door relationships to the members of the Massachusetts legislature, to secure large tracts of land on both sides of the river for purposes of logging and agricultural settlements..

---

182  Baring to Hope & Co, 26 May 1796, in Bingham, p.653.
183  Godfrey 1876, p.19.

Those on the Massachusetts side of the "treaty bargaining table" were fully appraised of, and, indeed, accepted the Penobscot Tribe's exclusive use and occupancy of the Penobscot River from Indian Island northward.  The same was true, as noted earlier, for wealthy bankers, influential senators and militia officers, sometimes all rolled into one, as was the case with Bingham.184

The private/public partnership in this effort was well-exemplified by the survey expedition of Park Holland (a member of the Massachusetts legislature) who set out on behalf of Knox and Bingham on the urging of their Boston lobbyist to mark off tracts of land, defined as townships, bounded by the River and Penobscot territory.  These tracts were later surveyed and measured in terms of townships, each bounded by the Penobscot River. As described in Park Holland's field journal on the 1793 survey upriver, Penobscot Indians at their village on Indian Island as well as those residing at Mattawamkeag Point strongly asserted exclusive tribal ownership of their river above the head of the tide.185 The Attorney General of the Commonwealth at the time was well aware of the Penobscots' "way of life" in reference to the river, observing:

> What those people acquire by the labour of their women in the summer [growing crops], and by the hunting done by the men, lays up but very scanty provision for their long and cold winters. The sturgeon, the salmon, and the great fish, the men will condescend to take, but they feel themselves above the taking of small fish: the catching of shad and alewives they make the business of their women and children. The alewives taken, and some of the salmon, they preserve by hanging them in the smoke, but seldom salt them, as the white people do.186

To have any success in finally securing a treaty, the commissioners would have to have fully accepted that the Penobscots would reserve their use and occupancy of the River – their way of life -- attending the retention of their islands.  Any suggestion to the contrary

---

184 See, for example, Bingham pp.240-241.
185 Park Holland's Journal, in Bingham pp.212-213.
186 Sullivan, 1804, p.228.

70

would risk angering the chiefs, as they might walk off again without signing the treaty document as they had done upon sensing threats to their continued way of life during prior treaty attempts.

On 26 February 1796, the Massachusetts General Court (legislature) resolved to treat with the Penobscot Tribe to purchase their lands on either side of the Penobscot River, without addressing the River itself:

> Whereas the Interests of the commonwealth requires that the claims of the Penobscot Tribes of Indians to certain lands lying on each side of the Penobscot River . . . from the Head of the Tide to the source thereof should be ascertained and extinguished, Provided the same shall be done by & with the free & voluntary consent of the said Indians-- And the Principles of Justice, Humanity & Policy dictate that compensation should be made for their releasing such rights, & that some permanent annual Provision for their Support should be established..."[187]

The Governor appointed three treaty commissioners, all with ties to General Knox: William Shepherd (a former military officer in the Revolutionary Army and a state militia leader also close to General Lincoln); Nathan Dane (a Harvard-educated lawyer then serving in the Massachusetts Senate who had worked with Knox on legal issues concerning the Waldo Patent and the "rear tract" north of the Penobscot Million close to the Penobscot River's east bank), and "a friend of Knox" named Daniel Davis, one of Portland's "leading lawyers" (with a promising future as Solicitor General).[188]

That summer, the commissioners sailed from Boston up the Penobscot and came ashore at Kenduskeag (Bangor), by then a quickly-growing white town at the head of navigation.  At the time, Chief Orono was still alive.  A year earlier, Attorney-General Sullivan had written of the "aged Savage . . . now existing in the Penobscott tribe who has numbered one hundred years since his birth, and who is treated with very great

---

187 Cited in Ronald Banks n.d., p.42, Emphasis added.
188 Cited in Bingham, p.910

respect by his tribe."189   Remarkably, given his advanced age, Orono was still strong enough to make the journey from Panawamskeag downriver to Kenduskeag below the falls for the treaty discussion on August 1, 1796.  He was accompanied by several other Penobscot chiefs -- Squire Orson, Nictum Bawit, Joseph Pease, Wiarro-Nuggasset, and Sabbatis Neptune. Missing, however, was Colonel Orsong (John) Neptune (c.1745-1836), who had repeatedly represented his tribe in foreign affairs and rejected early treaty overtures from Massachusetts. This time, the overture prevailed.  The chiefs opted for a tribal policy of accommodation and sat down to affirm that they were willing to relinquish their claims to vast tracts of tribal lands "on each side of the Penobscot River." Of course, few Penobscots spoke English, none could write, and all depended on interpreters, so understanding the treaty proceedings must take that into account. Nonetheless, the Penobscots would never have signed a Treaty that relinquished their use and occupation of the Penobscot River and, as noted, Massachusetts authorities knew that and made no attempt to establish otherwise by the terms of the Treaty. By the terms of this treaty, the Penobscot tribe agreed to

> grant, release, relinquish and quit claim to the said Commonwealth, their the said Tribes right, Interest, and claim to all the lands on both sides of the River Penobscot, beginning near Colonel Jonathan Eddy's dwelling house, at Nichol's rock, so called, and extending up the said River thirty miles on a direct line, according to the General Course of said River, on each side thereof, excepting however, and reserving to the said tribe all the Islands in said River, above Old Town, including said Old Town Island, within the limits of the said thirty miles.190

189  Sullivan 1795, p.106.
190 Treaty of 1796 (Addendum 6) in Deloria and DeMallie 1999, p.1094. On 3 May 1809, this treaty text was "Transcribed from a certified copy of the original," Hancock County Registry of Deeds (Ellsworth, Me), Book 27, pp.6-7.  Published in Deloria Jr, Vine, and DeMallie, Raymond J. 1999. *Documents of American Indian Diplomacy: Treaties, Agreements, and Conventions, 1775-1979*. Vol.2 (Legal History of North America Vol.14.) Norman: U Oklahoma Press.

In exchange, the Commonwealth committed itself to compensate the tribe with gifts and commodities, specifically identified and quantified: "150 yards of blue woolens; 400 lbs. shot, 100 lbs. of [gun]powder; 100 bushels of corn; 13 bushels of salt; 36 hats, and a barrel of rum; and agreed to pay them, so long as they should continue a tribe, a certain stipend every year, at the mouth of the Kenduskeag, consisting of 300 bushels of Indian corn, 50 lbs. of powder; 200 lbs. of shot, and 75 yards of blue woollen, fit for garments."191

Having come from across the river, Colonel Jonathan Eddy attended the signing ceremony, which acknowledged that the state had purchased specifically-identified tracts of land long claimed by the Penobscot tribe as theirs and, consequently, formally extinguished its Indian title to these tracts.192

The non-Indian public perception did not differ from the language of the Treaty, the Resolve that authorized it, the views of Massachusetts representatives, and the obvious understanding of the Penobscot chiefs, that the Treaty relinquished only lands on the sides of the River, not the Tribe's continued use and occupation of the River itself. The newspaper *Argus* of 13 October 1796 reported:

> We hear from the Province of Maine that the commissioners appointed by the general court to purchase lands from the Penobscot Indians have effected a purchase on the Penobscot River of 30 miles upon each side, from the head of tide water [commonly identified at the time to be at the so-called 'Nichol's rock,' Eddington Bend]. For this tract, the government are to pay an annuity of 300 bushels of Indian corn, 50 pounds of gunpowder, 200 lbs shot, and 75 yards of cloth for blankets. By this purchase ten townships of the best land in the District of Maine, situated along the banks of the finest river on that coast, will, it is said, be immediately opened and settled.193

---

191 Williamson vol.2, p.571.
192 As specifically had been anticipated in those terms by Knox, Duer, and Bingham, among others.
193 *Argus* no 448, p.3, Oct 13, 1796. my emphasis; See also *Greenleaf's New York Journal*, 14 Oct, 1796

The objective of the 1796 treaty was to extinguish Indian title to *lands* within a 30-mile track above the head of the tide. Having asserted that the Penobscot was "their river," the tribe only ceded its aboriginal title to the lands on either side of the river, but not to their islands, which, as has already been detailed in this report, provided them with ready access to their fisheries and other vitally-important natural resources in their habitat. By expressly reserving the islands, the parties understood that the Penobscot tribe retained its traditional use and occupation of its river.

The narrative of the 1796 Penobscot Treaty would be inadequate without a brief description of the tribal lands sold and the views of the most important land speculators in this treaty's aftermath. The following year, in 1797, these vast tracts of land on either side of the Penobscot River above the head of the tide (Eddington), later collectively distinguished as the "Old Indian Purchase," were surveyed under the direction of General Salem Towne into nine townships by Captain Park Holland, John Chamberlain and Jonathan Maynard.194 The townships were laid out beginning on the Penobscot River and extending to the six-mile limit.195 Comprised of 189,426 acres, the "old Indian Purchase" became Orono, (Old Town,) Bradley, Milford, Greenbush, Argyle, Passadumkeag, Edinburg, Howland, and Lagrange.196

On 7 March 1797, Bingham wrote to General David Cobb, a close associate of Knox and now his land agent in eastern Maine:

> There is one position, founded on just principles—that where there are lands situate on navigable waters, they ought to be surveyed in convenient tracts and

---

194 Originally, the estimate had been ten townships, but once surveyed there were just nine,
195 Porter, Joseph W. ed. 1886. Ancient Land Grants East of Penobscot River. *The Bangor Historical Magazine* vol.1:.30.
196 Porter, Joseph W. 1895."Old Indian Purchase on Penobscot River, 1796. p.75. T*he Maine Historical Magazine* Vol.9; "Early Settlements on Penobscot River," The *Bangor Historical Magazine* vol.1, pp. 208-209.

offered for sale and settlement, for the rivers and streams are natural road, that open a communication of neighbourhood and facilitate the conveyance of produce from one place to another, in order to satisfy the reciprocal wants of the settlers. I therefore think that those townships situate on rivers, should obtain a preference in our views of settlement.[197]

On July 21, 1797, Bingham wrote to Cobb again, about the selling of the Penobscot Indian lands, purchased by the State the previous year: "The public sales of the lands on the borders of the Penobscot, if purchased in small quantities by settlers, will have a very auspicious effect, as relative to increase of population. The lands are excellent in quality, and the advantages are incalculable, with respect to local population, from living on the borders of such a navigable stream. I therefore suppose that settlements will progress in this situation with great rapidity, from which, we shall derive an advantage tantamount to an occupancy of our own lands, as this is the natural door of admission into our district. Mr. Baring and myself had serious intentions at one time of purchasing one of these townships, but on reflection, I can observe no great advantage would result from it, as their improvement would be equally advantageous, whether resulting from our own efforts or the exertions of others."[198]

The motives and course of dealings of the land speculators lobbying Massachusetts authorities to extinguish the Penobscot "Indian title' to lands bordering the river by means of the 1796 treaty, coupled with the tribe's traditional river-based culture and assertions regarding "their river," support my opinion that the parties to the 1796 treaty agreed that the Penobscots had not relinquished its aboriginal title to the Penobscot River that sustained their traditional way of life.

---

197  Cited in Bingham p.841.
198 Bingham to Cobb, in Bingham, pp 853-854.

## VI. Post-Treaty Evidence That Massachusetts and the Penobscot Nation Understood that Tribe's Reservation of "Islands" Encompassed Its Continued Occupation and Use of The River:  The Struggle Over the Fishery at Old Town Falls

That the parties to the Treaty of 1796 well-understood that the Penobscot tribe

retained its aboriginal title to the river surrounding the islands referred to in the 1796

treaty is shown by post-treaty behavior and statements of representatives of the Tribe and

of Massachusetts.  This is best exemplified by the tribe's long struggle to defend its

fishery at Old Town Falls against white rivals.

In June 1797, six Penobscot tribal leaders sailed to Boston to register "a complaint

in behalf of their tribe" with newly-elected Massachusetts governor Increase Sumner and

the state's General Court.  The translated version of their complaint states that they told

of "ill disposed persons [who] have lately entered on certain islands, lying in the

Penobscot River," islands that "in the Grant to Government" (the 1796 treaty) the tribe

said it had reserved for the purpose of retaining important "Hunting grounds, as well as

for their own residence."[199] The intruders had "almost deprived them of the benefit of

their Salmon fishery."[200]   Claiming that they had been "ill treated" by settlers,

Penobscots requested a local state agent who could put a check on the abuses and assist

them "in obtaining redress."[201]

Since the only "islands" referenced in the 1796 Treaty were those "above Old

Town, including said Old Town Island," not islands downstream at, within, or below the

Old Town Falls, it is plain that the Penobscots understood that they did not relinquish

---

199 Letter by Governor Increase Sumner to the Gentlemen of the Senate and House of Representatives, June 22, 1797, Acts and resolves of Massachusetts, 1796-1797. In *Acts and Laws of the Commonwealth of Massachusetts*. Boston: Young & Minns. 1797, p.653.
200 Ibid.
201 Ibid.

their use and occupation of those parts of the River attending their continued residence at their principal village at Indian Island: they presumed that by reserving Old Town Island, they necessarily reserved their continued use and occupation of the River at their most prized fishery, Old Town Falls; separating the two, was, in fact, inconsistent with their cultural ecology described in Part I.  See Addendum (unnumbered), "14" marked at the top.

The available documentation shows only that Governor Sumner agreed to pay for the cost of the Penobscot leaders' stay in Boston, commenting "humanity as well as policy seem to dictate that those poor natives should have all the assistance & protection that our laws and Government can afford them."[202]  Later, after Sumner died in office, Massachusetts appointed a superintendent to address the Penobscots' complaints.[203]  But neither this agent, nor those appointed subsequently, could prevent continued encroachments upon the Old Town Falls fishery, and intimidation turned into bloodshed when white thugs beat up Penobscot fishermen, overturned their canoes, even killing some of them.[204]  Between 1801 and 1804, the state-appointed land agent for the Tribe acted completely at odds with their claimed rights and sold small islands and ledges that made up part of the complex mix of geographic features (rocks, ledges, bars, and small islands) constituting the falls to a local white entrepreneur, Joseph Treat, who promptly began the construction of a mill and a smoke house a few hundred yards downriver from Indian Island, thereby staking out ownership of the Tribe's most favored fishing

---

202 In Pawling p. 28.
203 *The Bangor Historical Magazine*, vol. 2 (1887), p.57-58.
204 Horatio Belch, Letter to James Sullivan, Bangor, July 7, 1807. Cited in Pawling 2007, pp.46,47; Horatio Balch, letter to Mass. General Court, n.d., 1809 resolve, chapter 160, approved March 3, 1810. Cited in Pawling 2007, p.47.

grounds.205  Penobscot chiefs bitterly contested the land agent's right to sell any of the

geographic features they identified as part of their ancient fishing grounds attending their

village at Panawamskeag, the fishery upon which they depended to sustain their families

and fertilize their food gardens.206

      Two years later, the situation was documented by Horatio Balch, a medical

doctor practicing in Bangor, appointed to serve as the tribe's superintendent.  He

reported:

> In their little commerce & traffick with the whites, they are very much exposed to
> be taken advantage of—a circumstance to be regretted, but difficult to prevent,  . .
> . . "About two years ago some small Islands near Old Town (the place of their
> residence) were sold to several persons whereby the Indians have been interrupted
> in their fishing—This is a most serious privation to them—they say they never
> ceded those Islands to Govt. and had rather be deprived of their whole supplies on
> payment for the Ten townships which the Government purchased of them."207

But Massachusetts lacked the means and willpower to prevent or punish white

trespassers and thugs threatening Penobscots fishing on their tribal reservation or

elsewhere on the river. James Sullivan, formerly Massachusetts Attorney General, who

had been involved in the early treaty efforts, having become Governor, revealed the

resigned attitude in a speech to the legislature in 1808:

---

205 *The Maine Historical Magazine*, Vol.9, p. 1; A survey map, sketched in 1812, depicts these twelve
"islands," including "Shad Island," the one purchased by Treat as part of Old Town Falls. See Pawling
2007, p.20, pp.22-23; With the exception of Island no.2, which was known as "Goat or Sand Island," and
No4, which Penobscots referred to as "Pine island, …. [This] elongated island, which continued to diminish
in size throughout the nineteenth century owing to flooding, no longer exists today" (Pawling 2007, pp.22-
23); Treat's Journal, 1820, in Pawling 2007, p.77.; Pawling, Micah, 2010, *Petitions and the
Reconfiguration of Homeland: Persistence and Tradition among Wabanaki Peoples in the Nineteenth
Century*. Orono: University of Maine, Dept. of History, Ph.D. thesis,  p.113..
206 Today, it is easy to underestimate the importance of these islands, not only because the historical
record is unclear whether there was just one "Shad Island," or several, but it is clear that the falls consisted
not only of a number of features that might be described as "small islands" but also, as described by a
Massachusetts Resolve discussed below, "rocks" and "ledges." Ever since the dam was built above Old
Town Falls in 1833, raised water levels have diminished the surface of those islands that remain and are
still visible.
207  Report by Indian agent Horatio G. Balch to the General court of Massachusetts, n.d., 1807, cited in
Pawling 1010, p.114-115.

No one man, however able he may be, can perform the duties of a Guardian or Superintendent, over three hundred and fifty miserable savages, spread over one hundred and eighty thousand acres of Wilderness; or protect such a vast extent of Territory from depredations. People in that wide spreading Country, will find maneuvers to deceive and defraud him.208

After the death of their renowned head chief Orono (1687?-1801), the Penobscots had chosen Attian Elmut as their "chief sagamore" for life.209  Soon after Governor James Sullivan took office, Chief Attian headed to Boston with a second delegation that included young John Neptune.  The language used by the Chief, even as roughly translated, reveals the Penobscots' understanding of their retained fishery in the Penobscot River. (Indeed, years later, Neptune recounted that he "went to Boston and saw Governor Sullivan and told him about *our fishing ground*."210)  The Penobscot Chief referred to his own people as the "proprietors of all the Islands both great and small on [the] Penobscot River," and explained that "our Islands and especially Shad Island … has been the greatest support to our Ancestors."211 The newly-constructed dam for a saw mill below the falls obstructed the annual fish run, he explained, and consequently his people have been deprived of Subsistance and we pray your honour to put an immediate Stop to the English encroachment on our rights."212 Chief Attian continued: "Lives have been frequently threatened and ourselves put into water and Kept there until relieved by our brethren. We pray your honour to put a stop to those atrocities as we consider our lives in

---

208 Speech by Massachusetts Governor James Sullivan to the Senate and House of Representatives, Feb 18, 1808, cited in Pawling 2010, p.116.

209 As indicated by his name Elmut, this chief probably possessed shamanic power and is believed to have been one of Madockawando's descendents. (Eckstorm 1945, pp.104-108). Derived from the French name Etienne, his name is also spelled Aitteon or Atian Michael.

210 Deposition of Penobscot Lieutenant Governor John Neptune, April 16, 1836, cited in Pawling 2010, p.117. (emphasis added).

211 Petition of Penobscot Governor Atian Michael, n.d., 1807 resolve, chapter 149, approved March 10, 1808, cited in Pawling 2007, p.43.

212 Petition of Penobscot Governor Atian Michael, n.d., 1807 resolve, chapter 149, approved March 10, 1808, cited in Pawling 2010, p.117.

danger."213  In words echoing those of past Penobscot leaders describing the Tribe's understanding of its relationship to the River, a note taker at the time wrote that Chief Attian proclaimed that "the God of Nature gave them their fishery, and no man without their consent has a right to take it from them."214

About a year later, confronted with unrelenting intimidation in their fishery at Old Town Falls, Chief Attian led another small tribal delegation to Boston to register complaints (the third since the 1796 treaty).  On this diplomatic mission, "Old Attian" became utterly desperate by his own inability to obtain recourse:  "Oppressed with anxiety and care for his people, and perplexed with the business on hand, he fell into a state of derangement, and stabbed himself, in Boston, so badly that he soon died…. .an event much lamented."215  Not long afterwards, the Penobscot chose Joseph Lolar as Attian's successor, and the burden now fell on his shoulders.216

In early 1810, Chief Lolar traveled to Boston with yet another delegation (now the fourth since the 1796 treaty) to formally request redress for violations of the fishing rights that they understood to remain intact with their possession of Panawamskeag (Old Town Island), describing them as "privileges." In the rough translation of his address to the members of the Massachusetts legislature, Chief Lolar declared:

213 Petition of Penobscot Governor Atian Michael, n.d., 1807 resolve, chapter 149, approved March 10, 1808, cited in Pawling 2010, p.118.
214 Petition of Penobscot Governor Atian Michael, n.d., 1807 resolve, chapter 149, approved March 10, 1808, cited in Pawling 2010, p.118; Penobscot Indian Conference notes, see Pawling 2010, p.118, n.66.
215 Williamson, in Coll. Of Mass. Hist. Soc. Vol.9, 3rd Series, p. 90). This author, familiar with the Penobscot community in later years, probably based his opinion on second-hand information. He surmises this suicide occurred "about the year 1811," but, given the chronological reconstruction, it is more likely he died in early 1809. Lorenzo, basing his narrative on Williamson, later wrote "Care probably induced insanity, and he died by his own hand…" (*The Christian Examiner*, 1857, p. 34).
216 His second name, as a Penobscot variation of the French name Laurent, is variously spelled in the English records as Loran, Lorain, Loring, Lolan, Lola, or Lolar. Since the next few passages concern the same individual, and unlike Pawling (2007, 2010), I prefer using only one spelling version, opting for the last, as that is usually the spelling of his son's second name, Captain Francis Lolar.

> Brothers: The beautiful situation of Old Town or Penobscot Island, and the excellent privildges for taking fish on the Islands in the vicinity induced our forefathers to build their wigwams here, their descendants through many generations have enjoyed those benefits [;] here we have held our national councils under the government of Mondowomack-Modocowondo-Osonsoo-Orono and other Governors and Chiefs. We have here our Church, and consecrated ground for burying our Dead. We wish to remain here and enjoy all the privildges of our Fourfathers [sic].217

There is no record that this met with any specific response from Massachusetts.

In January, 1812, Chief Lolar, led a fifth delegation to Boston seeking redress for this fishery.  According to the translation, his party explained that "their ancestors, many years ago, seated themselves at Old Town on the Penobscot River, principally (according to their Tradition) for the benefit for taking fish at the falls," but now they "were driven from the rocks and small Islands making the said Old Town falls, their nets destroyed & themselves greatly abused."  They referred to the 1796 Treaty and noted that the falls formed "the [riverine] bar of the falls & in the whole does not contain one acre of ground including the rocks."  They pointed out that the rocks and ledges making up the heart of the falls were "hardly deserving the name of Islands" and thus possibly lost sight of in the 1796 treaty.218  See Addendum (unnumbered), "14" marked at the top.

A month later, the Massachusetts Legislature finally responded favorably to the pleas of the Penobscot chiefs to protect the tribe's traditional fishery at Old Town Falls. The Legislature's resolve of 27 February 1812, provided, in relevant part, as follows:

> Upon the petition and representation of certain Indians calling themselves the governor and chiefs of the Penobscot tribe, setting forth their right and claim to the fisheries upon certain rocks and small islands near to and below Old Town falls (so called) in Penobscot River; and whereas it appears to this Legislature,

---

217 Resolve, chapter 143, 1811; Resolve 1810, chapter 93, Mass. State Archives, quoted in Jacques Ferland, 2007. Tribal Dissent or White Aggression? *Maine History* vol.43(2)124-170, pp. 142,144.
218 Petition of Penobscot Governor Joe Lolar (&c), January 24, 1812, 1812 resolve, ch 143, legislative papers, Massachusetts State Archives, cited in Pawling 2007, pp.49-50.

that sundry rocks, ledges, and small islands, situated in said Penobscot river, between the said Old Town falls and Nicholas' rock (so called) have been sold and conveyed by Salem Towne Esq. under a mistaken construction of a [prior] resolve of the Legislature . . . and it also appearing that the further interposition of the Legislature is necessary . . . to protect their interest . . .  and upon the lands belonging to the Commonwealth situated on each side of said Penobscot river. Therefore,

*Resolved*, That, in the opinion of this Legislature, the said Salem Towne Esq. was not authorized **. . .** to make sale of any of the rocks, ledges, small islands or fishing privileges in said Penobscot river, situated between the said Old Town falls and Nicholas' rock, and that it was not the intention of the Legislature, that said rocks, ledges, small islands, or fishing privileges, should be sold or conveyed by virtue of the resolve aforesaid. Resolved, That the Attorney or Solicitor General be, and they, or either of them, are hereby authorized, empowered and directed, to institute and prosecute an inquest of office, or any other legal process, in the name of the Commonwealth, to *recover possession of any or all of the rocks, ledges, fishing privileges and islands* (except Marsh's Island) situated between said Old Town falls and Nicholas' rock, in the river aforesaid, against any person or persons in possession of the same.

*Resolved*, That the said Attorney or Solicitor General, or either of them, be, and they are hereby authorized and empowered, either by themselves or their agents, by them or either of them, for that purpose duly and legally appointed, to adjust, compromise and settle all disputes between the Commonwealth, and all or any of the persons in possession of the rocks, ledges, islands and fishing privileges aforesaid, upon such terms and conditions as they shall consider just and reasonable. And whereas the powers and instructions heretofore given to the superintendant of Indian affairs for the said Penobscot tribe, appear to be insufficient to enable him to prevent the numerous and wanton trespasses which are annually committed upon *the lands of the Commonwealth, situated upon each side of said Penobscot river*, and upon the islands in said river situated above said Old Town, which are claimed by said Penobscot Indians**.**[219] (emphasis added)

The language used by the petitioning Penobscot tribal leaders over the course of their five recorded visits to Boston to address their fisheries at Old Town Falls (including the one led by Chief Lolar), and that used  by the responding Massachusetts legislators reveal the understanding of both parties with respect to the Penobscots' retention of  Indian title to

---

[219] *Resolves of the General Court of Massachusetts*, CXLIII. Boston: Adams, Rhoades & Co, 1810, Pp.370-371.  The remainder of the resolve instructed the superintendent to seize timber unlawfully cut and found on "any of the *Commonwealth's lands situated upon each side of said Penobscot river*" and on any of the Tribe's islands and to sell it and provide an accounting to the legislature. (Emphasis added.)

their river attending the Tribe's head village at Panawamskeag (Old Town Island) by the terms of the 1796 treaty. Both parties were referring directly to their views of what that treaty accomplished. For Massachusetts, it was well understood that the treaty accomplished the cession, from the Penobscot tribe, of its Indian title to the uplands "situated upon each side of said Penobscot River" within the 30-mile stretch, and that the tribe had retained its "fishing privileges in said Penobscot river" in and amongst the "rocks and ledges" constituting the Old Town Falls or "Shad Islands," upon which the tribal community at Old Town Island directly depended for its survival.   For the Penobscot tribe, as also evidenced by their leaders' repeated travels to Boston (and most tragically Chief Attian's suicide), it was inconceivable that the treaty could have ceded its possession and use of this fishery attending their head village at Panawamskeag (Old Town Island). The reservation of the islands comprised the river water surrounding them (including their traditional fishery at Old Town Falls).  Beyond this, the remainder of the Penobscot River, and the lands on each side of it above the 30-mile tract remained Indian lands.220

The end result was hardly as one might have thought from the strong language of Resolve.  Attorney Daniel Davis, who was very familiar with the Maine "wild lands" (as he had worked for Knox), and informed about the Penobscot Indian tribe (having served as a state commissioner in the 1796 treaty signing ceremony at *Kenduskeag* (Bangor)) had risen to a powerful position as the Commonwealth's Solicitor General.  In

---

220 As discussed in Part VI, Commonwealth officials would later focus on extinguishing the Penobscot tribe's Indian title to the lands bordering the river in this domain in 1818, and it was well-understood that this territory, including the river, was exclusively occupied by the tribe. A Portland newspaper at the time, reflecting this understanding, reported that the West Branch "of the river has never been explored except by the Indians." See "Eastern Lands," reprinted in the Portland newspaper *Gazette* Vol.21 (20), p.2, 25 August 1818.

that capacity, he worked out a deal with Joseph Treat, who had earlier purchased one of the "Shad Islands" within the Penobscot fishery of the village at Panawamskeag. On 31 March 1812, Davis wrote to General Blake, the Massachusetts-appointed Superintendent to the Tribe, to announce that he had an agreement involving "Mr. Treat and others, by which right to fish on Shad Island is surrendered to the Indians for this year," and continued:

> I am so far satisfied with this arrangement, that I shall take no further measures to recover possession of this or other Islands, until after the next session of the General Court. I expect, however, that early application will be made to the next Legislature [of Massachusetts], and something finally be done, by Mr. Treat and others, or I shall consider myself obligated to carry into effect the provisions of the Resolve, and I consent to this delay, wholly upon your Representation that the Indians will be satisfied with Shad Island for this year.221

As it turned out, the Resolve was never effectuated according to its terms.   But Joseph Treat was not required to relinquish his illegally-acquired interest in the small island improperly sold to him by General Salem Towne, the Eastern Lands Agent.222

## VII. The Treaty of 1818

Inhabiting a region bordering on Maine's long-disputed northeastern frontier with British North America (Quebec and New Brunswick), the Penobscot tribe found itself in a precarious political situation in 1814, when a British squadron sailed into Penobscot Bay. With about 500 soldiers, they defeated Maine Eastern Militia an American militia of about equal strength force commanded by General Blake (the state-

---

221 Davis, Daniel, 1812, in Fanny H. Eckstorm's papers, Box with Census info folder.  See also Copy: Commonwealth of Massachusetts Land Office, Boston 3 May 1830 http://windowsonmaine.library.umaine.edu/objects/4-86_3.jpg
222 See Chapter CLV, *Resolves of the General Court of Massachusetts,* 1813, pp.143-144.

appointed Penobscot Indian agent) in Hampden.[223]  A few days later, Bangor fell without resistance and white settlers feared Penobscots would take revenge and drive them out. Gradually, their fears subsided: "There was no sound of war, no savage outbreak to justify these fears or to brand this small dwindling tribe with any intended barbarities."[224] British invasion troops remained garrisoned in Castine. After the War of 1812 had ended, the British troops retreated to Nova Scotia in late April 1815.[225]

In the Fall of 1815, the Indian agent General Blake took a census of the Penobscot tribe, noting there were 302 "souls," including 84 "huntsmen."[226] The following year, during an important ceremony hosted in the tribe's main village at Panawamkeag, two new "Life Chiefs" were elected: John Attean (1778-1858), son of the tragically deceased Chief Attian, was ceremonially inaugurated as Governor, and John Neptune (1767-1865), son of Colonel John Neptune, as Lt. Governor.[227]  Born on *Suga-la-manahn* ("Sugar Island") during the Revolutionary War in 1778, John Attean's principal residence was at *Mattawamkeag*.[228]  Neptune's primary residence at the time was at *Panawamskeag*.

---

223 Loring 1880, p.224-228. See Loring, Amasa 1880. H*istory of Piscataquis, Maine; From its First Settlement until 1880*;See also Chapman, Harry J. 1914. The Battle of Hampden. *Sprague's Journal of Maine History* Vol. II (4), pp. 185-193.
224 Loring 1880, pp.227-228. See Loring, Amasa 1880. H*istory of Piscataquis, Maine; From its First Settlement until 1880*. Portland: Hoyt, Fogg & Donham.
225 Chapman, Harry J. 1914. The Battle of Hampden. *Sprague's Journal of Maine History* Vol. II (4), pp.185-193. Williamson 1904, p.157. See Williamson, Joseph 1904. The Proposed Province of New Ireland. Pp.147-157. *Collections of the Maine Historical Society*, 3rd Series, Vol. 1.
226 Blake, John. 1815. Roster of Penobscot Tribe of Indians for Fall of 1815. By Indian Agent John Blake, of Brewer. *Bangor Historical Magazine*, Vol.6 (1890), p.76.
227 Williamson 1832 Vol.1, pp. 495-498; See also Eckstorm 1945, p.7, 123.
228 See Eckstorm 1945, p.107. In 1826, Attean's family was driven from Mattawamkeag Point and relocated to Mattanawcook Island.  Sugar Island "was so named because, from the maple trees on it, the Indians made quantities of maple sugar" (Eckstorm 1978, p.41). Considering there were maple-tree stands elsewhere, too, it is not surprising that this island was also known by other names, including Pimimwamkikatook, as noted by Eugene Vetromile (Eckstorm 1978, p.41). Pawling (2007, p.33, n.19) offer an interpretation for this place name as "the water-town on the gravel."

The years between 1816 and the treaty of 1818 were marked by the onset of what might best be described as a "timber rush" in the Penobscot Valley, with the inevitable, ongoing attendant encroachments upon the Penobscots' way of life, including their fisheries and hunting territories on the River and uplands above the thirty mile tract ceded to the Commonwealth in 1796.  In early January 1818, a Penobscot delegation once again journeyed to Boston to seek redress for the lawless encroachments they suffered.229   It is unclear how long they remained in the Massachusetts capital, but by February they were on the road, walking via Salem230, Newburyport 231, all the way back home.

If the Penobscots had expected that the state authorities would do more to uphold the law and punish the whites trespassing on their lands and intimidating their fishermen, they were mistaken. Instead, the government saw an opportunity to extract a further cession of their tribal lands. On 13 February 1818, the Massachusetts General

---

229 A Boston-based newspaper, the *Independent Chronicle & Patriot*, reported at the time:
> As great plunder and waste of timber has been made on [Penobscot] Indian lands by lumberers, under pretence of obtaining leave from the Indians, and without being any benefit to them, it is probably that some of our people will be base enough to endeavor to influence the Indians against making an arrangement, thereby supposing that the log-men, mill-men, and traders connected with them, may continue their system of depredation.

Later reprinted in the *Hallowell Gazette* (Vol.5, Issue 10), p. 3 (11 March 1818).  General David Cobb of Gouldsborough, Maine, repeatedly complained about white squatters and settlers alike plundering Maine's timberlands, whether on private or public land. While serving his last term as a Mass. Representative to the 3rd US Congress, he vented his frustration: "one of the unhappy sources of trouble in this government… arises from a disposition of the people of these states that border on the natives not to be subjected to the principles and laws of the general government" (in Bingham, p. 489).

230 "Occasionally some Indians came through [Salem] town. Two chiefs of the Penobscot tribe were present in February 1818. William Manning introduced them to Dr. Bentley, who said that 'they had none of the tinsel about them that the other company had, of whom they complained they were too noisy'"(WB, *Diary*, 4:502).

231  According to the *Newburyport Herald* of 10 February 1818:
> On Thursday last nine *head-men* of the Penobscot tribe of Indians passed through town, on their way home from the metropolis; where, we understand, they have been to see the Legislative Fathers of the Commonwealth, to endeavor to get redressed some grievances that exist in their tribe.  Their behavior was decent, and they were neatly clad in a costume peculiar to the sons of the forest.

"Aboriginals," in *Newburyport Herald*, vol.21, issue 90, p.2.

Court passed a Resolve to "Sell Penobscot Lands," by the Commissioners of the Land

Office, which stated:

> Whereas the Penobscot tribe of Indians, in virtue of various resolves and doings of the government of Massachusetts, are in possession of a tract of land, extending on both sides the Penobscot River, the width of six miles, and up said river from the north line of the nine townships of land released by said tribe to this Commonwealth, by [the 1796 Treaty], an indefinite extent up said river, for special uses, but excluded from the right of cutting timber thereon; and they are in the continual exercise of acts of absolute ownership thereof, by selling and disposing of timber**,** to the great diminution of the value of the lands, and the exclusion of all settlements thereon, and no part thereof is cultivated for their use []; the connexion which this tribe have with the aforesaid lands operates to prevent settlements on the adjoining lands of the Commonwealth, and presents a material obstacle to the sale and settlement of the public lands in that section of the District of Maine; and this tribe, notwithstanding the many advantages of hunting, fishing, and of cultivating their cleared ground on the fertile islands they own… are poor and destitute, as is abundantly proved by their frequent applications to the General Court for relief.

> * * * Therefore,

> *Resolved* That his Excellency the Governor, with advice of Council, be, and he hereby is authorized and empowered to appoint and commission three suitable persons, to treat with the Penobscot tribe of Indians, at Bangor, on the last Wednesday of June next, ….for the purpose of examining into the circumstances and situation of the said tribe of Indians, and the lands they possess; and ….of agreeing with them for a relinquishment of their right and claim to such parts of the land on both sides the Penobscot River, and such islands in said river, as the tribe now possess or claim, and shall be inclined voluntarily and freely to dispose of, for an equivalent to be agreed upon with them . . . ."232

---

232 *Resolves of the General Court of the Commonwealth of Massachusetts, Passed at the several Sessions of the General Court, Commencing May 31, 1815, and Ending February 20, 1819*, Vol. VII, Boston: Russell & Gardner 1819, pp.507-509.  As indicated by the language of the Resolve, the commonwealth was motivated by its own financial pressures to access timber resources and sell lands abutting the River that the Tribe retained.  As recounted later by an unnamed Maine historian: "The Indians . . . claimed title to the territory six miles wide, on both sides of the river, above the thirty miles relinquished in 1796, to an indefinite extent, and assumed to sell the timber from it. To prevent this, the Government of Massachusetts appointed another Commission, in 1818…" (Anon. 1882 *History of Penobscot County*, *Maine*, Cleveland: Williams, Chase, & Co., pp.57-58).

The Massachusetts Land Office for the sale of Eastern Land was responsible for the oversight and management of the commonwealth's lands in Maine.[233] Senator William Williamson of Bangor, as the Chairman of the Committee on Eastern Lands in 1817, reported his committee was "specially constructed to consider the expediency of opening the sale on the reserved townships on Penobscot River, or any part thereof…"[234] In mid-February 1818, General John Brooks, as Governor of Massachusetts, appointed three high-ranking militia officers as Land Office commissioners: Colonel Edward H. Robbins [235]; Colonel Lothrop Lewis [236]; and Colonel Joseph Lee of Bucksport, "one of the Commissioners of Eastern Lands."[237] Soon afterwards, a Penobscot treaty commission was formed, also headed by Colonel Robbins, a former Lt. Governor of Massachusetts and then Judge of Probate. Two additional treaty commissioners were appointed: the Honorable Mark Langdon Hill and the state's Solicitor General Daniel Davis.[238] Their designated task was to obtain the required signatures or personal marks

---

[233] Its employees were tasked with making arrangements for "the laying out and making roads, quieting settlers, and for exploring and surveying," they promoted white settlement and recruited individuals and families all over New England to migrate to tracts of land along the Penobscot and its tributaries and elsewhere on Maine's eastern frontier. Williamson 1832 vol. 2, p.669.

[234] Williamson 1817, pp.424-425. See Williamson, William. 1817. Resolve concerning the nine townships of land on Penobscot River. June 13th, 1817. *Resolves of Massachusetts* 1815-1819, Ch. 36, pp. 424-429.

[235] A Judge of Probate for Norfolk County, Robbins had been an attorney after graduating from Harvard College. Having served as Speaker of the House, he became Lt. Governor of Massachusetts (1802-1806). Since 1786, he had been proprietor of an eastern Maine township bordering the Schoodic waters, named after him: Robbinston. See also Williamson 1832, vol.2, pp.581-582.

[236] Surveyor-General of the public lands, Lewis was a former Senator residing in Gorham, Maine.

[237] *Resolves of Massachusetts* 1815-1819,p.438. Colonel Joseph Lee was a nephew of John Lee, the first Collector of Customs in Castine, who had been commissioned to finalize the 1786 Penobscot Treaty, but failed to accomplish this. Born in Massachusetts, Joseph Lee (1774-1861) joined his uncle in Castine at a young age. Wheeler 1875, p.225. See Wheeler, George A. 1875. *History of Castine, Penobscot, and Brooksville, Maine, including the Ancient Settlement of Pentagoet*, Bangor: Burr and Robinson.

[238] Mark Langdon Hill, a merchant from Phippsburg. He became a judge on the Court of Common Pleas in 1810, was elected first to the House, then to the Senate of Massachusetts, and ultimately to US Congress, (March 1819-21) where he voted for the Missouri Compromise to get independence for Maine. The Commonwealth's Solicitor-General, Daniel Davis was originally based in Portland. He had been one of the state commissioners at the 1796 Penobscot treaty signing ceremony. Davis had also served as legal counsel for General Knox and Senator Bingham in their massive land speculation efforts in Maine during the 1790s—the largest land speculators in Maine history.

on the Penobscot treaty. As constituted, the Massachusetts treaty team had familiarity with the Penobscot tribe's land claims based on Indian title, possessed ample legal and political expertise, and, last but not least, represented the vested political, economical, and military interests of the powerful white establishment in the Massachusetts Commonwealth.

On 24 June 1818, the day designated for the beginning of the treaty-making ritual, a Penobscot delegation of 27 tribesmen arrived in a small fleet of bark canoes. Led by their head chiefs Attean and Neptune and described as "rather noble looking sons of the forest and showily dressed," they were escorted by their superintendent General John Blake and two fellow militia officers, Major Joseph Treat and his business partner Captain Ebenezer Webster to the court house for the treaty-signing ceremony.   Bangor attorney, Senator William Williamson, and later Maine's governor and first official historian, functioned as the justice of the peace. Lt. Governor Neptune, and probably some fellow Penobscots, certainly recognized one of the treaty commissioners--the Honorable Daniel Davis. His dealings with the Penobscot tribe reached back at least a dozen years.  Originally based in Portland, as noted in the margin, Davis had been one of the Commonwealth's commissioners at the 1796 Penobscot treaty signing ceremony. More recently, as the state's Solicitor-General, he had successfully prosecuted a Penobscot tribesman in a well-publicized 1817 murder trial in Castine, downriver.[239] The Commonwealth's highest ranking lawyer, apart from its Judges, Davis took the word:

---

239 *History of Penobscot County, Maine*, Cleveland: Williams, Chase, & Co., 1882, pp.57-58. "Solicitor-general Davis – who, tradition says, had a kindly regard for the fairer portion of the Tribe – addressed them" (Godfrey 1876, p.22). See Godfrey, John E. 1876. The Ancient Penobscot. *Collections of the Maine Historical Society* Vol. VII, pp. 1-22.

"*Chiefs* and *Brother*s of the Penobscot Tribe, We acknowledge the goodness of Almighty God, the Great and Good Spirit who made both you and us, and from whom all blessings are received, that we are permitted to meet you here this day in peace and friendship. . . .

*Brothers,* The General Court have empowered us to agree with you for the purpose of your rights to the land and—We therefore ask you to tell us plainly and explicitly, whether you are willing to sell us your right to these lands and Islands—This is the first thing that we ask you to tell us; and we shall wait patiently for your answer, before we make you any particular proposals.

*Brothers,* If you tell us that you are willing to sell your right to these lands and Islands, we now declare to you that we are authorized to give and deliver you therefore, such articles as will feed and cloth you, and your women and children, while you shall be hunting in the forest, and they shall be suffering in the cold and storms of winter.240

The Solicitor-General's forceful speech with poetic metaphors and literary references may have been appreciated by most of the white men in the audience, but it was foreign language for the Penobscots and was most likely not understood. If there was an interpreter or translator, the historical record does not tell. And even if there had been one, we must ask whether or not the translation would have been accurate, exactly conveying what was actually said.

---

240 The Solicitor General continued his address to the Penobscot chiefs:

       *Brothers,* We pray you to think well upon these things, and to give us a plain and ready answer—for we assure you that we mean to deal plainly and honestly with you—We should feel the vengeance of the Great Spirit, who hates and punishes all falsehood and deception, if we should attempt to deceive you—and we also assure you, that the General Court, and your good father, our excellent Governor, would highly disapprove our conduct, and severely punish it, if we should attempt to do anything that was not for your good, and that of the Commonwealth.

       *Brothers* If you should agree to sell us your right to these lands and Islands, and if we can agree to the terms thereof, we further declare to you, that we are authorized and commanded, by the General Court, to examine into your situation and condition as men."

       The General Court consider you as their children; for they know that you were made and are protected and governed by the same kind Parent and Benefactor as ourselves. We will therefore propose and are ready to agree upon all proper means to improve your moral and religious habits and feelings — to learn \sic~\ you the use of tools for the improvement and tillage of the land — for it is the express command of the Great Spirit that we shall till the ground and subdue it — To afford you the means of obtaining useful knowledge for yourselves and your children — To persuade you to live industrious and useful lives — To abstain from the use of spirituous liquors, which is the poison that has destroyed so many white men and Indians, and caused them to melt away like snow before the fire. But, above all things, to persuade you to love and obey God and his son Jesus Christ; so as that when you come to die and leave the land to your children, and your mortal bodies be buried in its bosom, you may be prepared to live forever with your good friends and fathers that have gone before you" (*Newburyport Herald* Vol.22 (30), p.1 14 July 1818).

Finally, it was the Penobscot's turn to be heard.  Lt. Governor John Neptune, "a Chief of commanding figure, of great dignity of manner, and extensive influence among his people, made the reply."241  But what this Penobscot leader (who "spoke in broken English"242) actually said, we do not know, as the historical record does not tell. Remarkably, Bangor lawyer and then Massachusetts Senator William Williamson, who oversaw the proceedings did not reveal a word about the Penobscots' delivered response in his famous first official history of Maine.243

The treaty commissioners took five days to finalize the precise wording of the official record documenting the tribe's cession of the large tracts on both sides of their river above the 30-mile tract that had been the object of the 1796 treaty.  There is no evidence that the Penobscot chiefs, or any other party representing their interests, were consulted or participated in formulating its final terms.  Considering that General Blake was appointed by the Commonwealth as the Tribe's superintendent, there is no good reason to assume that he would have advocated for the interests of the Tribe.

Not far from Blake's home in Brewer, Penobscot tribal leaders were awaiting instructions when their presence was called for. They stayed in wigwams on the river bank opposite "*Kenduskeag*-point," a place of memory for tribal elders who had considered it part of their tribe's homeland just decades earlier.244   On 29 June, Governor Attean, Lt. Governor Neptune, several "captains" and a few other leading

---

241 This suggests the treaty was a "done deal;" the state commissioners did not negotiate and only sought official tribal affirmation of what the government in Boston had already resolved earlier that year.
242 Williamson Vol.1: 501-502.
243 Reflecting on the treaty-making process in more general terms, Judge Lorenzo Sabine, an attorney born and raised in Maine, found "there is record of dishonest and ignorant interpreters at the 'talks' or conferences; of incompetent and ill-disposed commissioners, who stated their terms in vague language, or disposed of the business with which they were entrusted in hot haste, and before the chiefs could understand what was required of them" Sabine, Lorenzo 1857. Indian Tribes of New England. Pp.27-55. *The Christian Examiner and Religious Miscellany*, Vol.LXII.4th Series.; See also Vetromile 1866, p.136.
244  See Williamson 1832 vol. 2, p.670, note 1.

91

tribesmen crossed the river to meet with the treaty Commissioners and affix their signatures to the document.

The treaty provided, in pertinent part, that "in consideration of… four hundred dollars" and goods to be delivered, as later described, the Penobscot tribe agreed to "grant, sell, convey, release and quitclaim to the Commonwealth of Massachusetts, all their rights, title, interest and estate, in and to all the lands they claim, occupy and possess by any means whatever on both sides of the Penobscot river, and the branches thereof, above the tract of thirty miles in length on both sides of said river, which said tribe conveyed and released to said commonwealth by [the Treaty of 1796], excepting and reserving from this sale and conveyance, for the perpetual use of said tribe of Indians, four townships of land of six miles square each" further described in the treaty. In exchange, the Commonwealth covenanted the Penobscot tribe "shall have, enjoy and improve all the four excepted townships described as aforesaid, and all the islands in the Penobscot river above Oldtown and including said Oldtown island." The Commonwealth further promised to:

> pay and deliver to said Indians for their absolute use, within ninety days from this date, at said island of Oldtown, the following articles viz : one six pound cannon, one swivel, fifty knives, six brass kettles, two hundred yards of calico, two drums, four fifes, one box pipes, three hundred yards of ribbon, and that annually, and every year, so long as they shall remain a nation, and reside within the common wealth of Massachusetts, said commonwealth will deliver for the use of said Penobscot tribe of Indians at Oldtown aforesaid, in the month of October, the following articles viz : five hundred bushels of corn, fifteen barrels of wheat flour, seven barrels of clear pork, one hogshead of molasses, and one hundred yards of double breadth broad cloth, to be of red color one year, and blue the next year, and so on alternately, fifty good blankets, one hundred pounds of gunpowder, four hundred pounds of shot, six boxes of chocolate, one hundred and fifty pounds of tobacco, and fifty dollars in silver.

And finally, the Commonwealth provided that:

*it is further agreed by and on the part of said tribe,* that the said commonwealth shall have a right at all times hereafter to make and keep open all necessary roads, through any lands hereby reserved for the future use of said tribe. And *that the citizens of said commonwealth shall have a right to pass and repass any of the rivers, streams, and ponds, which run through any of the lands hereby reserved, for the purpose of transporting their timber and other articles through the same.*245

To appreciate the cross-cultural encounter between the Penobscot tribal leaders and the white militia officers and lawyers in full control of this historic treaty-making ceremony, the following snapshot offers a perspective on the dominant role played by the 65-year old Indian agent in charge.246

"At the time of the execution of the deed, Mr. Robbins [who headed the treaty-making committee] had some difficulty in getting it acknowledged, owing to the ignorance of the Indians. After they had made their signatures he asked them the usual question, 'Do you acknowledge this to be your free act and deed?' They made no reply, but assumed an expression of imperturbable gravity. He repeated the question, and the expression became intensified. General Blake saw the difficulty at once, and turning to Mr. Robbins, said: 'Oh, you don't understand them, let me try.' Then taking the deed in his hand and turning to the Governor [Attean] he said: "You willing — and all the rest of the Indians willing?' '*Oui*!' was the prompt and emphatic reply.247

---

245 A copy of the original 1818 Treaty is attached as Addendum 7.  In another provision of the treaty which was later breached, the Commonwealth agreed to "purchase of their [the Penobscots'] use as aforesaid, two acres of land in the town of Brewer, adjoining Penobscot river, convenient for their occupation, and provide them with a discreet man of good moral character and industrious habits, to instruct them in the arts of husbandry, and assist them in  fencing, and tilling their grounds."

246 Blake's patronizing behavior reflected the political process of subordination. About a dozen years later, such arrogance had become formalized in Maine state law, as noted the front page of the Portland-based newspaper *Eastern Argus* of 24 August 1830: "the Legislature of this State last winter assumed to exercise the right of *guardianship* over the *independent* and *sovereign nation* of Penobscot Indians, as if they were **minors, spendthrifts, or non-compos mentis**. [It] has taken it upon itself to determine, that the *sovereign nations of the Penobscots* and *Passamaquoddies* are not competent to judge for themselves—not competent to take care of themselves." 246

247 *History of Penobscot County, Maine, with Illustrations and Biographical Sketches*. Cleveland: Williams, Chase & Co. 1882, p.581. Nearly 40 years later, after reviewing the treaty-making history, Judge Lorenzo Sabine (1857: 44-45) who was raised in Bangor, concluded that commissioners sometimes "disposed of the business with which they were entrusted in hot haste, and before the chiefs could understand what was required of them" (See Sabine, Lorenzo. 1857. Indian Tribes of New England. Pp.27-55. *The Christian Examiner and Religious Miscellany*, Vol.LXII.4th Series, Vol. XXVII). For almost sixteen years, Penobscots had a French-speaking priest officiating at Indian Island who had just left his mission post to return to France. General Blake's wife was of French Huguenot descent, and spoke French with visiting Penobscots (Blake, Charles, M. 1886. Memoir of Major General John Blake, of Brewer, and his Descendents. *Bangor Historical Magazine*, Vol.2 (1), p.7, footnote.

The following attributes of the 1818 Treaty are noteworthy as to the mindset of the Penobscot and Massachusetts representatives. First, is the amount of land ceded.  As the Commonwealth's Resolve authorizing the Treaty made clear, pursuant to the 1796 Treaty, the tribe retained the uplands above the specific 30-mile tract ceded by that treaty to "an indefinite extent up said river." As later also underscored by Maine's prominent 19th-century historian Williamson himself, the Penobscot Indians before concluding the 1818 treaty, were "the possessors or claimants of a large territorial tract, six miles in width on both sides of Penobscot river, *to an indefinite extent above the north line of the nine townships* — an estate of sufficient value, had they known how to estimate and manage it, to have afforded the tribe an ample support."[248]  By the terms of the 1818 treaty, that huge swath, extending from either side of the river northward for "indefinite extent," was granted to Massachusetts for articles and things of comparably little value. The land was the focus. Massachusetts extinguished Indian title to it at minimal cost, leaving the Penobscot tribe to continue its traditional way of life on their river from Old Town Falls northward, just as it had done in the 1796 treaty.

Second,  the Tribe retained "all the islands in the Penobscot river above Oldtown and including said Oldtown island," in terms identical to the 1796 treaty.  As evidenced by the language used by Solicitor General Davis in greeting the Tribe, the object of the treaty (as it was in 1796) was to obtain the Penobscot tribe's "rights to the land," not to extinguish the tribe's continuing Indian title to the river attending the islands identified. Indeed, the Commonwealth representatives saw fit to carve out from the tribe's retained aboriginal title to the river a right in the "citizens of the Commonwealth" to "pass and repass . . . for the purpose of transporting their timber and other articles."  There is no

---

[248]  Williamson 1832, vol.2, p. 669. Emphasis added.

indication that Tribal members needed the same; for the Tribe's continued occupation of the river for hunting, fishing, and trapping and traveling between their riverine communities was well-understood and accepted.[249]  Furthermore, the Penobscot tribe retained uplands on either side of the river associated with the four townships described in the Treaty, which included the ancient village of *Mattawamkeag*, located on the Penobscot River bank and home to Chief Attean.[250]

The bargain on behalf of his government successfully concluded, Colonel Robbins (who headed both the treaty-making and the land office committee) returned home, whereas his colleagues Lewis and Lee retained Treat as surveyor.[251] They "went up the river for the purpose of locating the four townships reserved by the Indians and of exploring the West Branch to its source."[252] As reported by the *Bangor Weekly Register*:

> They have now gone up the river with the view of exploring the great west branch (so called) of Penobscot to its source, and also, for the purpose of locating the four Townships which the Indians have reserved to themselves in their late treaty with our commissioners. [This] branch of the river has never been explored except by the Indians, and the time which may be spent in exploring it will be well employed.[253]

---

249 See, for example, Treat's 1820 Map and Journal, in Pawling 2007; Morse 1822 (see below); Speck 1940; See also Indian Agent reports for the Penobscot Tribe in the 19th century.

250 According to Major Treat in late 1820: "Madawamkee Point, North of the [Mattawamkeag] Stream, the present residence of John Attien, the Indian Governor…."  in Pawling 2007, 95.

251 News about this "treaty" was widely published, incl. the Mass. newspaper  *Berkshire Star* vol.30 (Issue 9), p. 2, on Jan 28, 1819.

252 *History of Penobscot County, Maine*, Cleveland: Williams, Chase, & Co. 1882, pp.581-582.

253 My emphasis.  "Eastern Lands," reprinted in the Portland newspaper *Gazette* Vol.21 (20), p.2, 25 August 1818. Of course, this was not entirely true, as Chadwick (1864) had roughly mapped that canoe route to Moosehead Lake and Quebec.  But, this statement is indicative of the fact that American whites had been reluctant to penetrate that deep into "Indian Country," a term that until well into the 20th century connotes hostile territory.

## VIII. The 1820 Treaty: Penobscot Tribe & State of Maine

In 1820, the District of Maine separated from the Commonwealth and gained statehood.   A prerequisite to the separation was the new state's accession to the treaty obligations of Massachusetts. In 1819, the US Congress approved admission of Maine only upon approval of the proposed Constitution, containing the Articles of Separation, Part 5 of which reads:

> The new State shall, as soon as the necessary arrangement can be made for the purpose, assume and perform all the duties and obligations of this Commonwealth toward the Indians within said District of Maine, whether the same arise from treaties or otherwise; and for this purpose, shall obtain the assent of said Indians, and their release to this Commonwealth of claims and stipulations arising under the treaty at present existing between the said Commonwealth and said Indians.[254]

In early July 1820, a Penobscot delegation headed by Lt. Governor John Neptune arrived in the seaport of Portland, capital of the newly-proclaimed independent state and location of its fledgling government.  Their July 6, 1820 meeting with Maine's first Governor, William King and other leaders in the Senate Chambers, was front-page news in the Portland newspaper.   As in the case in previous government-to-government meetings between the tribe and its treaty counterparts since 1796, a foremost issue on the mind of the tribal leaders was their besieged fishery in Penobscot River and the health of their subsistence resources there.

The newspaper recounted the Governor's greeting before quoting Neptune in translation:

> [The Governor] complimented them upon the services their fathers had rendered the country in fighting the [British] 'red coats' during the revolutionary war, and

---

[254] *The Revised Statues of the State of Maine, passed April 1857, to which are Prefixed the Constitutions of the United States and of the State of Maine.* Bangor: Wheeler & Lynde. 1857, p.45.

observed, that he did not doubt but they would have been equally prompt in the last [1812-14] war, had their services been required. . . .

Neptune replied through an interpreter [Capt Francis Lolar]: "I thank you for the good you say. You see us well today.  . . . .  One thing in particular I wish to say to-day. Perhaps we get nothing for it. The white people take the fish in the river so they do not get up to us. They take them with weirs; they take them with dip-net. They are all gone before they get to us. The Indians get none. If you can stop them so that we can get fish, too, we shall be very glad.

There is another thing — our hunting privilege. The white men come and spoil all the game. They catch all the young ones and the old ones. We take the old ones and leave the young ones till they grow bigger and are worth more. We wish the white men to be stopped from hunting.  . . .  We wish your Government to stop the white men from hunting — put their traps in their chests. Let white men have the timber and the Indians have the game.255

    As paraphrased by the newspaper:

After some preliminary remarks, [Neptune] made complaints of the encroachments of the white men upon their accustomed privileges, and wished the Government to prevent them.  He stated that weirs had been set up in their river which had obstructed the fish and injured their means of support --
That white men had invaded their hunting grounds, killed their game, and disturbed them in their mode of life; and particularly that they killed the young game, which made the destruction more serious, while the Indians only took the old; he observed, that white men had oxen to draw longs into the water, and obtained their living in that manner; they ought therefore to be prevented from sitting [setting] their traps on their soil and interfering with their business which was important to them, and in which they had been brought up. They complained too that the white men had cut their timber, and were destroying their forests. They asked the protection of government in these particulars.256

Governor King replied to the Penobscots chiefs complaining about the ruination of their fisheries: "What you have said about the wares [weirs], the dipnet, and hedges down the Penobscot Bay, and the injury they have done your fishery, will be attended to; we hope they will not be much longer a subject of complaint…"257  The opening words

---

255 *History of Penobscot County, Maine*, Cleveland: Williams, Chase, & Co., 1882, p. 495. (emphasis added).
256 *The Gazette*, Vol.23, Issue 17, on 11 July 1820 [transcribed by author]; See also the *Salem Gazette* Vol.34, no.56, 14 July 1820, p.3., cited in Pawling 2007, p.281-282.
257 See *Niles' Register,* July 22, 1820, p.564, from the *Boston Gazette.*

exchanged between the leaders of the Penobscot tribe and the head of the new State of Maine indicate that both understood the tribe retained its "fishery" and "hunting privileges" in the river attending its reservation island- and riverbank communities.

Forty days after this meeting, a large Penobscot delegation of fifteen tribesmen headed by Governor Attean arrived in Bangor in mid-August for completion of the treaty with Maine.[258]  The Commissioner representing Maine was 55-year old Colonel Lathrop Lewis, the land surveyor who had been a witness at the 1818 treaty signing in Bangor.[259]

Colonel Lewis "made the proposition that Maine would take upon itself the obligations of Massachusetts, provided the Tribe would release Massachusetts. The Chiefs – who were the same who made the last Treaty with Massachusetts – took time to consider."  Two days later, Chiefs Attean, Neptune, and thirteen other Penobscot leaders, including the deceased head-chief's son Francis Lolar as orator, returned to the Courthouse in Bangor, "dressed in scarlet coats or robes, ornamented with silver brooches and with [wampum] beads, after the Indian mode of that day, [making] quite a distinguished appearance."[260]  Conforming to diplomatic protocol, Captain Francis Lolar "made a speech in the Indian language, which was translated and read, as is substantially as follows:

> Our Good Friend, Col. Lewis.
> *Brother*, It gives us great satisfaction, that in greeting you as the Commissioner for the State of Maine, we also meet an old friend and acquaintance. . . .

---

258 *Boston Daily Advertiser* Vol.30, 31 August 1820.

259 Lewis, Lathrop. 1820. *Appointment of Lathrop Lewis, esquire, of Gorham, as Commissioner on the part of the state to meet and conclude a treaty with the Penobscot Tribe of Indians*. Portland; *The Gazette*, Vol.23 (17), 11 July 1820;*History of Penobscot County, Maine*, Cleveland: Williams, Chase, & Co., 1882, p. 495. In 1818, Lewis had been in Bangor as a state-appointed commissioner of the Land Office and signed the 1818 treaty as a witness. See: "Acts and Resolves passed by the Twenty-third Legislature of the State of Maine" (Augusta: William R. Smith & Co, 1843, pp. 253-255).

260 Godfrey 1876, p.21. In a footnote, Williamson (1832, vo.1, p.508) who personally knew the Penobscot tribal leaders quite well, explains: "Aitteon, the chief, cannot speak English with facility; but John Neptune and Capt. Francis can pronounce the language pretty freely — and both are communicative and intelligent."

*Brother.*—The Good Spirit who made and placed the red men here, before white men came, gave us all the land from whence the waters run into the Penobscot. He caused the forests to abound with game, and the rivers with fish, for our use and subsistence- we then were contented and happy.  When the white men came over the great waters to our country, we received them as friends and brothers: we then were many and strong: they few and weak: we gave them land, and permitted them to live peaceably among us, and have remained their friends.
The white men are now very strong; we are weak, and now want them to be our friends.

  *Brother.*—We have considered on what you have said to us, and are much pleased with your talk—You say that since the last treaty, by the consent of the governor and people of the old State, and our father, the President of the United States, Maine has been formed into a new and independent State; . . . You also say that the governor and people of the new State, wish to take us under their care and protection, and that they will do and perform all things promised us, by our good friends the governor and people of Massachusetts, if we will relinquish our claim on the old State.

  *Brother.*—We place the greatest confidence in the Governor, Chiefs, and people of the State of Maine, and are willing to put ourselves under their care and protection, helping, and expecting they will perform all their promises to us as faithfully as our good friends the governor, Chiefs, and People of Massachusetts have done.

  *Brother.*—By the last treaty made with Massachusetts, we relinquished the claim to all our lands, except four townships, and the islands in Penobscot River, above and including Old Town, which our good friends, the commissioners, Messrs. Robbins, Davis, and Hill told us we were to hold for our use, improvement and benefit, so long as the sun shines; waters run; trees grow, & the world lasts. This is the tenure under which we hold the land we now possess. We wish the government of Maine to understand this, and fulfill all the promises made us, by our good friends the governor and chiefs of the Old State.

  *Brother.*—We wish to express to you, our satisfaction with all the arrangements made for us, by our good friends the Governors Chiefs and people, both of the old and new State; - and we hope they will continue to be our friends, and that the new State may always be governed and ruled by good men. And that under the protection of the Great Spirit, it may soon be the most powerful State in the Union.

  *Brother.*—We are now ready to relinquish our claim on the old, and make a new treaty with the new State; and we most sincerely pray that the good Spirit may guide and direct you, and us, to do right in this negociation—and that He may now and ever have us in his holy keeping."261

---

261 Reported in the *Bangor Weekly Register* (vol. 5, issue 34, page 3) , 24 August, 1820 (emphasis added); See also *Boston Daily Advertiser* Vol.30, 31 August 1820.

Representing the State of Maine, Colonel Lewis offered his response and confirmed the state's intent to stand in shoes of Massachusetts concerning the specific understandings provided by the Treaty of 1818:

> It being meant and intended, to assume and perform, all the duties and obligations of the commonwealth of Massachusetts, toward the said Indians, whether the same arises from treaties or otherwise…. So that said tribe may have continued to them, all the payments and enjoy all the immunities and privileges, in as full and ample a manner, under this indenture or treaty, as they could have received or enjoyed, under the said treaty, of the twenty ninth of June, eighteen hundred and eighteen, if this present treaty had not been made.[262]

The diplomatic exchanges here show that that the parties fully intended nothing whatsoever to change with the State of Maine acceding to the Treaty of 1818.[263]  On that memorable day, 17 August 1820, Governor Attean, Lt. Governor Neptune, and leaders representing the Penobscot Tribe signed two treaties, one releasing the Commonwealth of Massachusetts from all further obligations under the 1818 treaty and the other substituting the State of Maine in the place of the Commonwealth.[264]   The pertinent language of the 1820 Treaty with Maine is as follows:

> [T]he said Penobscot tribe of Indians, in consideration of the covenants and agreements, hereinafter mentioned, on the part of said Commissioner, in behalf of said State, to be performed, kept and fulfilled, do hereby grant, sell, convey, release and quit-claim, to said State, all their, the said tribe's right, title, interest and estate, in and to, all the lands and possessions, granted, sold and conveyed by us, to the commonwealth of Massachusetts, by [the 1818 Treaty], saving and excepting, the reservations, in said indenture made and expressed.  Meaning and intending hereby, to substitute and place, the said state of Maine, in the stead and place, of the said commonwealth of Massachusetts, to all intents and purposes whatsoever, as it regards [the 1818 Treaty] with the said tribe of Indians, so that

---

262 Cited in Pawling 2007, p.290.

263 With the stated exception of one item stipulated in the 1818 Treaty, namely that "the commissioners will purchase for their [Penobscot] use as aforesaid, two acres of land in the town of Brewer, adjoining Penobscot river," which was a promise never kept.

264 The treaty with the State of Maine is printed with " Resolves of the Nineteenth Legislature of the State of Maine" (Augusta, 1839), 168-171 ; and again, with other Indian treaties, by order of the Council in " Acts and Resolves passed by the Twenty-third Legislature of the State of Maine" (Augusta, 1843), 258-261; it is also printed by Joseph W. Porter, editor, *Bangor Historical Magazine*" (Bangor, 1886-87), II., 96-98. The text adopted is that of the " Resolves " of 1839.

all and singular, the lands, rights, immunities or privileges, whatsoever, which said commonwealth of Massachusetts did, might, or could hold, possess, exercise and enjoy, under or by virtue of said indenture, or treaty, or by any other indenture, treaty or agreement whatsoever, shall be held, possessed, exercised and enjoyed in as full and ample a manner by said State of Maine. And the undersigned commissioner, on his part, in behalf of said State of Maine, in consideration of the premises, and of the foregoing covenants and engagements of said tribe, does hereby covenant with said tribe, that they shall have and enjoy, all the reservations made to them, by virtue of [the 1818 Treaty]…. Saving and excepting the two acres of land, which were by the treaty of June twenty-ninth, eighteen hundred and eighteen, to be purchased for the use of said tribe, in the town of Brewer, the performance of which, has been relinquished by the said tribe to the commonwealth of Massachusetts.265

By these treaty terms, which do not even mention the four reserved townships or the islands referenced in the 1818 treaty, Maine simply acceded to the Commonwealth's treaty of 1818 as required by the Articles of Separation. The only exception was the elimination of the Brewer-based tribal land and facility to support the Penobscot tribe in the last sentence quoted above. Otherwise, everything else remained the same, including the parties' fundamental understanding that the Penobscot tribe retained its Indian title to the Penobscot River attending the reserved islands identified in the 1796 and 1818 treaties with Massachusetts. 266

---

265 Farnham Papers, pp. 204-208. See Farnham, Mary F. ed., 1902. *Documentary History of the State of Maine, Vol. VIII, Containing the Farnham Papers 1698-1871*. Portland: Maine Historical Society.

266 Two years after the 1820 Treaty was signed, Dr. Jedediah Morse completed a survey report commissioned by the US Secretary of War, John C. Calhoun, then in charge of the country's Indian affairs, approved by President James Monroe.  Assigned to "acquire a more accurate knowledge of their actual condition," and his journey funded by the federal government, Morse obtained "a general letter of introduction to the superintendents and agents for Indian affairs, with a list of their names and residences, who will afford you all the information and facilities in their power."  Among his major sources of information regarding the Penobscots was the Bangor-based attorney and politician Williamson, the second Governor of the State of Maine and historian.  In his Report to the Secretary of War on Indian Affairs, published two years later, Morse observed:

The Penobscots, in government and internal regulations, are independent- The legislative and executive authorities are vested in the sachems; though the heads of all the families are invited to be present at their public meetings, which are held in their house of worship, and conducted with

101

## IX. Post-Treaty Evidence That Maine and the Penobscot Nation Understood that the Tribe's Reservation of "Islands" Encompassed Its Continued Occupation and Use of The River:  Treat Survey and the Penobscots' Maintenance of their Way of Life

Paddling upriver with the Penobscot chief, Lt. Governor John Neptune (who resided at Indian Island) as their guide, Major Joseph Treat and his nephew Captain Jacob Holyoke made note of numerous Penobscot Indian camps on their survey trip upriver, on both shores and numerous islands.  Having received his official instructions from Governor King, on 16 September, one month after the treaty-signing ceremony in Bangor, Treat and his two companions began their canoe trip in order to survey the upper river and the canoe route to the Upper St. John (frontier territory still in dispute with the British).  Informed by Neptune, Treat sketched a map depicting Penobscot camps, recorded indigenous place names, and identified some major fish weirs in shallow stretches between islands and the river bank.

Just downriver from *Passadumkeag* rapids ("Passadunkey Rips"), Treat sketched a huge W-shaped weir, stretching across the Penobscot River. He marked three Indian camps on the opposite shore and penned, "Indian Eel ware camp."  See Addendum 4. Nearby, were a few wigwams on small islands.  Upriver, just above the entrance of *Passadumkeag* Stream, Treat's 1820 map shows the Indian village of Passadumkeag with a total of 15 wigwams on two small neighboring islands, collectively identified by him as "*Passadunkee* Island" (later renamed Thorofare Island).  See Addendum 4.[267]  Further

---

order and decorum…. The tribe has the right to hunt and fish along the banks of the river, to the mouth of Penobscot Bay.

Morse, Jedediah. 1822, p.68.  Morse, J. 1822. Report to the Secretary of War on Indian Affairs. New Haven. See also Aon. 1882. History of Penobscot County, by Williams, Chase & Co, p.45.

267  See Pawling 2007, pp. 12, 82).

upstream, having passed the entrance of the *Piscataquis* River and made their way around *Kos, kee, jo, cook* (Piscataquis falls in the Penobscot River), Treat marked a number of other Indian encampments (between Howland and Lincoln), including three on the west shore at *Cossanunganumkeag* Rips & Isl[an]ds, or Eel ware Rips." After a stretch of quiet water, they reached the next rapids, "*Namockranock* or Mohawk Rips,' also a fishing site associated with Mohawk Point.268 This site on the east bank, marked with three Indian camps, is opposite a tributary identified as "*Madamiscontis* or Young Alewives Stream." Next, Treat passed "*Cuinega* or Otter Stream" opposite *Namockanock* Island, entering the Penobscot from the east.269 Further upriver, he reached *Madanacook* Island [Mattanawcook, near Lincoln], with two small encampment, each with three wigwams. Having marked several other riverbank camps at the entrance of *Au,gum,ball,alsus* Stream, the party reached a small island with five camps just below *Kissus,keen,augus* Island and *Essbon,agick* Island. Paddling upriver, they then reached *Sologismoodic*, or Five Island Falls, with three camps on the river's west bank: "Five Island Rips we had to haul up our canoes—water very low."270 Just above these falls, the *Sologismoodic* Stream runs into the Penobscot, with three more camps on the west bank.271

Paddling upriver, the surveyors guided by Neptune reached "a large Rock of granite in form of a small hay stack" in the Penobscot River itself.272 His 53-year old Penobscot Indian guide John Neptune (noted above) was not only a tribal leader and

---

268  Mohawk Point is a site traditionally associated with a historical raid by the Iroquois in the mid-1600s, and also with a Penobscot legend of *Mándowa•-'mek*$^{ew}$ ("Spirit Fish"), guided by riverine spirit beings ('water nymphs) in defeating these long-feared enemies. This legendary warrior is the totemic ancestor of the Nicola and Coley family. See Speck 1935, p.85; 1940, p.215.

269 Treat 1820, in Pawling 2007, p.86.  This Abenaki word for otter is found in the 1691 Abenaki Dictionary by Sebatien Rasle transcribed as *ki8níghé*.

270 Treat identified these low falls as rips in his journal. See Pawling 2007, p.93.

271 Pawling (2007, n.16) explains that this is present-day Houston Island, north of Winn.

272 Treat 1820, in Pawling 2007, p.94, 95.

formidable hunter with a reputation for his powerful *m'teoulin* (spirit power or magic).[273] A mysteriously shaped rock, known as "*Maja obseoose or Pomolos Rock*," had "on the South side near the top… a circular hole in the form of a pot 2 feet deep—the Indians say it has been their custom to place in this cavity when the water is low, presents for Pimola [storm spirit residing at Mount Kathadin], of Tobacco, Pipes, Jackknives &c., and if they are not taken out, they have a bad season for hunting and fishing the next year—and if taken out they have great good luck in everything."[274] Having crossed the southern boundary (marked as the "Indian line") of the two Indian Townships on the main stem of the river as determined in recently concluded treaty, Treat and his companions reached *Mattawamkeag* Point on the east bank of the Penobscot. Here Treat penned on his map, "Governor Attions Seat and buildings," marking a large double wigwam, surrounded by ten other camps and five more on the opposite shore.[275] About 250 yards from this settlement, he marked another huge eel weir across *Mattawamkeag* River, this time a large V-shaped construction, from bank to bank, just a few hundred yards before this tributary joins the Penobscot.[276]  See Addendum 5.  (Unfortunately, in the late 1820s, several families relocated from this village on the east bank of their river to the island of Mattanawcook (near Lincoln) when white thugs threatened its inhabitants, including Chief Attean, who lost possession of his precious eel-weir site: "He had with enough

---

273 Eckstorm, Fannie H. 1945, *Old John Neptune and other Maine Indian Shamans*. Portland: The Southworth-Anthoensen Press.
274 Treat 1820, in Pawling 2007, p.95.
275 Considering Treat marked 15 wigwams at Passadumkeag on Thorofare Island, the settlement at Mattawamkeag in 1820 was a bit larger and less concentrated. Indicative of the seasonal nature of these settlements is the Treat wrote about Mattawamkeag in his Journal for 29 September 1820: "there are three very good Wigwams here, and they have raised this season 60 bushels of con—200 bushels of potatoes—beans and peas &c.- The corn is of a small yellow kind and ripened early and is good. Arrived at the governor's camp at 7 P.M. and stay here this night" (in Pawling 2007,p. 95).
276 Pawling 2007, p.94).  The Penobscot Indian village at Mattawamkeag Point, including the eel weir, was described by Chadwick in 1764. Surveyor Park Holland also described it in 1793, as did Joseph Treat in 1820, who also sketched it on his map. Originally a much larger settlement, it had dwindled in size by 1820, but was still the home base for several families, including Governor John Attean (1778-1858).

labor constructed an eel-wear [weir] with which great lots of that fish were to have, & quantities of them salted down. This they destroyed."277

Major Treat's sketched map of the Penobscot River above the head of the tide, coupled with his description in his journal kept during the survey he made with the help of his Penobscot Indian guide John Neptune, constitute detailed geographic and ethnographic documentation of the Penobscot tribe's continued occupation and use of the waters of the Penobscot River and related tributaries as the parties to the 1796, 1818, and 1820 treaties understood that they would. 278

\* \* \*

By using the words, "[a]ll the islands in said River, above Old Town, including said Old Town Island," in the 1796, 1818, and, by reference, in the 1820 treaty, the treaty-makers understood and agreed that the Penobscot tribal community had retained its traditional way of life on their river, in particular their fisheries. They understood the meaning of the word "island" to be "land surrounded by water," and that without their River Penobscot Indian families encamped on the islands or along the river banks, primarily surviving on fishing, hunting, and trapping, would be isolated and condemned

---

277 In addition to destroying the eel-weir, white vigilantes "also dug up & carried away his provisions, his pork, his fish, his potatoes &c. Finally, they burnt his cabins to the ground. It is treatment of this sort that has prevented the Indians hitherto from settling on some of their Islands, & on their Townships." (Letter from the Penobscot Tribal Governor and Council, Old Town 5 Nov, 1829. Maine Executive Council, Indians Box 1829 Folder. http://windowsonmaine.library.umaine.edu/view.aspx?objectId=4-116&currentFile=0).

278 Geographic evidence of the extinguishment of Penobscot "Indian title" is obvious when comparing the maps of 1795, 1815 and 1820. Osgood Carleton's 1795 "map of the district of Maine drawn from the latest surveys and other best authorities," drawn for James Sullivan's *History of the District of Maine,* Boston 1795. http://www.mainememory.net/artifact/9166/zoom. The words "Land reserved for the Indians" are lettered along the East Bank, beginning below Passadumkeag and well up the East Branch towards the Canadian border.

Greenleaf, Moses. 1815. *Map of the District of Maine from the Latest and Best Authorities*. Boston: Cummings & Hilliard. http://www.oshermaps.org/img/flat/pri07.jpg

Greenleaf, Moses. 1820. *A Map of the State of Maine from the Latest and Best Authorities*. Boston: Cummings & Hilliard. http://www.oshermaps.org/search/zoom.php?no=931.0001#img0:

to starvation. As set forth in Part I, the tribe's very creation myth of the Penobscot's ancient hero Gluskábe slaying the monster "Guards-the-Water" articulated the understanding that its mode of subsistence continued to be based on occupying and using their river—bank to bank, island to island. This was also understood by the Massachusetts and Maine treaty delegations facing Penobscot tribal leaders at the treaty sites described in this Report, and no member could possibly have contended otherwise; indeed, they never did.  Their words and actions, after each treaty – from the Massachusetts' February 27, 1812 Resolve confirming the Penobscot tribe's fishery at the Old Town Falls, to the Massachusetts' treaty commissioners securing, from the tribe, the right of passage on the River for the citizens of the Commonwealth, to Maine Governor King's recognition of the tribe's fishery in 1820, to major Treat's post-treaty map and journal—all confirm that the treaties did not have the objective of extinguishing the Penobscot tribe's Indian title to their ancestral river. To the contrary, the parties agreed that with the reserved islands, the Penobscot tribe retained its ancestral Indian title (its use and occupation) of the river surrounding those islands, which was essential to their survival and wellbeing.

Dated:  December 11, 2013          */s/ Harald E.C. Prins*
                                   Harald E.L. Prins, Phd.