**Report on the aftermath of the 1796 and 1818 treaties between the State of Massachusetts and the Penobscot Indian Nation**
**Submitted by**
**Pauleena MacDougall, PhD.**
**June, 2014**



**The Penobscot River, Maine**

# Contents

List of Illustrations ........................................................................................................................ 3

Introduction ................................................................................................................................... 4

The Treaty of 1796 ....................................................................................................................... 10

The 1818 Treaty ............................................................................................................................ 13

After the 1818 Treaty ................................................................................................................... 16

Surveys .......................................................................................................................................... 17

The 1820 Treaty with Maine ....................................................................................................... 20

Protection of the fisheries .......................................................................................................... 23

Maine's Indian Agents and Penobscots Continuing Problems with Trespassers ...................... 25

Logs and Leases ............................................................................................................................ 27

Dams and fish ............................................................................................................................... 32

Summary and Conclusions: ......................................................................................................... 37

   1. The Penobscot Nation is primarily a river-based culture. ................................................... 37

   2. The State was granted the right of passage--not ownership--of all of the waterways in the Penobscot territories specifically for the transportation of timber and other goods. .................................................. 40

   3. Throughout the historic period the Penobscot Tribe has regularly and vigorously sought redress in the maintenance and/or restoration of their fishing rights and fishing stations on the Penobscot River by petitioning the authorities in Massachusetts and Maine. ...................................................................... 40

   4. In contrast to the Penobscots constant concern for the protection of fish stocks in the river, the State did not consider itself steward of the Penobscot River resources as a result of the 1818 treaty. ............ 42

   5. Throughout the nineteenth and early twentieth centuries, the State recognized the Penobscot Nation's ownership interests in the river as demonstrated by the leases cited in this report. ............................... 43

## List of Illustrations:

Title page: Penobscot River drainage in Maine

1. Charles Osgood Map of Maine, 1802/12

3. Lothrop Lewis Survey map of Town of Bradley, East side of Penobscot River 1819/18

4. Survey of West Side of Penobscot River/20

5. Photo of logs in river during spring (ca. 1900)/29

6. Illustration of booms anchored along the shore with men sorting/30

7. Illustration of the log works along the shore of White Squaw Island/31

8. Sketch of lumber mill and dam at Old Town Falls/32

## Introduction

I have been retained by the United States Department of Justice as an expert witness to address the importance of the Penobscot River to the Penobscot Nation and the events in the aftermath of the 1796 and 1818 treaties with the State of Massachusetts, which collectively resulted in the sale of most of the land the Nation retained at the time of the treaties.  I have reviewed the report prepared by Professor Harald Prins in this litigation and focused my work mainly on events that are not covered by Professor Prins's report.  Specifically, I have been asked whether those events occurring after the treaties of 1796 and 1818 were executed shed light upon or are consistent with a view that the Penobscot Nation understood itself to be retaining ownership of the Penobscot River when it retained islands in the river in those treaties.

I have consulted primary documents relating to the treaty negotiations in the Massachusetts and Maine State Archives, the Maine Historical Society and the Special Collections Library at the University of Maine; I have reviewed the Laws, Acts and Resolves of Massachusetts for the period.  I have also looked at the Acts of the Legislature and Governor's Council in Maine and the writings of other scholars.  I believe myself well-qualified for this work.  I have studied the language, culture and history of the Penobscot Indian Nation for some 35 years, wrote my dissertation on the history of the Penobscot Nation, and published a book about their traditions and interactions with European immigrants.  I conclude from the historical records referred to in the following report, that neither the Commonwealth of Massachusetts nor the Penobscot Nation understood that ownership of the Penobscot River or the Penobscot Nation's rights to fish were transferred from the Tribe to the State by the treaties of 1796 and 1818.

In order to begin to understand the Penobscot Nation's perspective on the treaties, it is

necessary to understand what the Penobscot River means to them culturally and historically. The Penobscot people have a story about the origins of the river that also speaks to the origins of the names of the families who were part of their community.

> *"Agelibemu is the monster frog that swallowed all the waters of the world causing a drought which was broken when Gluskabe slew him. The released waters formed the Penobscot River, and many of the thirsty people in their haste to get water were turned into fish."*[1]

The quote above is from a Penobscot creation myth that explains how the various families in the tribe received their names.  According to the tale, a great frog held back the water in the Penobscot River so that the people were starving (from lack of fish) and dying of thirst. The Penobscot culture hero, Gluskabe slayed the frog by laying a yellow birch tree across its back and all of the river water came out of the giant frog's mouth back into the Penobscot River. The people, overjoyed, dove into the Penobscot River and many became fish.  The allegorical tale illustrates the essential relationship of the Penobscot people to their river.  Their entire culture is based on living along and upon the river: the canoe that travels the river in summer, the snowshoes and toboggans that are used to travel the river in winter, the fish and eels that are smoked and sustain the people through the long winters and the deer, moose and especially beavers that are hunted on the islands and shores of the river and inland territories.  In addition, in the spring the Penobscots practice the gathering of fiddleheads along the banks or the river and its tributaries, as well as roots, berries and herbs for food and medicine.

The Penobscot people are named for the river they dwell upon: *panawahpskek* means "place where the rocks widen, spread out," [2] a term used specifically for a former village at Verona Island in the river. They call themselves the Penobscot Indian Nation but were for many years called by the English the "Old Town Indians" named for Old Town Island—now known as

---

[1] Frank G. Speck, "Penobscot Tales and Religious Beliefs" *The Journal of American Folk-Lore* 48 (187) (January-March, 1935), 15.
[2] Penobscot Dictionary, unpublished manuscript in author's possession.

Indian Island where they historically had their church and currently have their main village and seat of government.

The Penobscots have hundreds of names for rivers and parts of rivers and as well as directions and place names that provide a window into their world view or perspective that comes from living in a riverine-based culture.  A small example from the Penobscot Dictionary is listed here.

| | |
|---|---|
| amíltehkame | he shoves off from shore (in a boat or canoe) |
| wisáwihtəkʷe | the river narrows at this point |
| wálintəkʷ | cove in a river |
| wáhsehtəkʷ | East Branch of Penobscot River |
| sìpo | river |
| sákohki | land where the river comes out |
| pkákihtəkʷe | it is a bend in the river |
| pəməlákʷihtan | the ice flows, goes out of the river, the ice floats along in the river |
| pɑnáwihtəkʷe | the river widens |
| nóhsohtəkʷe | he follows/travels on the course of the river, |
| néhtəkʷihke | there are many points on the river |
| náwihtəkʷe | it is in the center or middle of the river |
| nahəyáləkʷe | he/it floats downstream[3] |

The Penobscots are one of four tribes in Maine. The Passamaquoddies have two reservations in eastern Maine, while the Maliseets and Micmacs live in Aroostook County.  The Penobscots are descended from a larger Abenaki (Wabanaki)[4] nation that once inhabited much of Maine from the Union River and Mount Desert Island on the east near the border of Passamaquoddy territory, west to and including the Kennebec and Androscoggin Rivers and Merrymeeting Bay, south to Damariscotta and north to Millinocket and Moosehead Lake to the

---

[3] Penobscot Dictionary, unpublished manuscript in author's possession.

[4] *Wabanaki* is a Penobscot word meaning a person of the east or dawn land and is used to designate all the eastern peoples, but also as a term for a confederacy of Maine tribes. Abenaki/Wabanaki are alternate spellings of the same word.  Historians and anthropologists use both terms, while linguists use the term Abenaki to designate specific languages spoken in the Northeast: Eastern Abenaki is used to refer to Penobscot and other languages spoken in western Maine, Western Abenaki is used for languages spoken in Vermont, New Hampshire and Quebec.

edge of the territory of the neighboring Maliseet tribe.  Historically, the geographic central home and seat of government of the Penobscots is the Penobscot River— 240 miles (West Branch to Bucksport). The river's drainage basin (including all tributaries) is 8,610 square miles.[5]

The Penobscot people view the river as their homeland.  The Penobscot homeland was traditionally divided up into family territories or *wekatónkakan* "his hunting territory", assigned by clan or family name to provide resources to all members of the community. Each family was provided with enough land and river territory to support the families through hunting, fishing and gathering.  There was no such thing as individual ownership in the European sense of selling or transference of land.  The edges of hunting territory boundaries were somewhat malleable, and could never be transferred between families except through the unanimous decision of tribal council. Boundaries tended to be natural –such as rivers, streams and mountains.  Boundaries between tribes were also very malleable and the relations that Penobscots had with their immediate neighbors, the Maliseets and Passamaquoddies were cordial. Land disputes between families (if any) would be brought to tribal council for resolution.[6]

In addition to their spiritual beliefs and cultural connections to the river, the Penobscots lived on the river for two very important practical reasons. The first was because of the presence of abundant fish and other food resources such as fiddleheads, roots and berries that could be gathered in the spring and summer seasons. Fish has long been an important subsistence resource for the Penobscots. The Penobscots settled in areas of the river where fishing resources were plentiful.  When the Penobscots gathered in community they put their homes quite close together

---

[5] According to Speck, "The tribal hunting territory was the valley of the Penobscot River and its tributaries "from Penobscot Bay to the upper St. John River.  Frank G. Speck, 1940. *Penobscot Man: the life history of a Forest Tribe in Maine*, (Philadelphia: University of Pennsylvania Press, 1940): 7; DeLorme Mapping Company *the Maine Atlas and Gazetteer* (13th edition) (1988) ISBN 0-89933-035-5 maps 15, 23, 33, 43 & 44.
[6] Monique Crochet. Trans. "Eastern Indians' Letters to the Governor, July 27-28, 1721" *Maine Historical Society Quarterly*, 13:3 (winter, 1974); Roger B. Ray, "The Maine Indians' concept of Land Tenure," *Maine Historical Society Quarterly*, 13:1 (summer, 1974).

usually near fishing places.[7]

Historically, the Penobscot Indians ranged from the River's Bay to far upstream, capturing a variety of fish with a variety of implements. In the bay the Penobscots also captured flounder.  Mackerel, Pollock and other schooling fish were taken with hooks weighted with stones.  In addition, Penobscots used nets for scooping shad and other fish running upriver in shallow places such as Shad Rips.  They also used large nets, seines to capture and harpoons to spear salmon and shad.  The Penobscots also made a splint basket trap that they could weight with stones and submerge in the water to catch fish and especially eels.  The Penobscots used several kinds of weirs.  The most common was a kind of fence made of brush placed across a stream with a small entrance. Many fish or eels could be scooped up when they became trapped in the weirs.  All of the fish would be cleaned, dried and smoked by the women standing by to prepare the fish as they were caught.[8]

Penobscots have always had a reverence for the land, the water and the plants and animals that sustain them.  The Gluskabe legends, representing the primary pre-Christian spiritual beliefs of the Penobscots, attest to their beliefs in the protection of species through judicious hunting and gathering practices.  Penobscots had traditional tribal hunting and fishing rules that preserved game for future generations and frowned upon over use of natural resources that might endanger their descendants.[9]  For example, John Neptune, Lt. Governor of the Penobscot Nation told William King, first Governor of Maine that hunting rules provided that

---

[7] Frank G. Speck, 1940. *Penobscot Man: the life history of a Forest Tribe in Maine*, (Philadelphia: University of Pennsylvania Press, 1940): 232-236.
[8] Frank G. Speck. *Penobscot Man: the life history of a Forest Tribe in Maine*, (Philadelphia: University of Pennsylvania Press, 1940): 82-90.
[9] Frank G. Speck, "Penobscot Transformer Tales," *International Journal of American Linguistics*, 1 (3) (August, 1918): 187-244.

only the older animals should be taken, never the younger; the younger should be left to grow.[10]

The second reason was for transportation. The river was the best way to travel throughout the heavily forested landscape of Maine by canoe in the warm seasons and by snowshoes in the winter.[11]  As noted above, the fish and other resources of the river were located all along the River necessitating travel back and forth from the Bay to far upstream.  The Penobscot's relationship to the entire river and surrounding landscape is reflected in their names for places in and along the river.  These uses include spiritual and cultural as well as sustenance.  An examination of place names along the Penobscot River reveals places for birch bark gathering, red paint, eel fishing places, women's painting place, shad fishing place, place for tanning hides, and so on.[12] Other place names warn the traveler of shoals and rock outcroppings and other natural features from the perspective of being on the river.  Current Maine place names such as Nicatous, "fork in the river," Sunkhaze, "outlet emerges suddenly," and so on are Penobscot in origin and bear testament to the intimate relationship the Penobscots have with the river.[13] These

---

[10] "Friday; Lieut. Governor; Penobscot; Indians; Council; Senate; Chamber; Government; Maine". *Repertory*, XVIII (67) (Boston, Massachusetts, Friday, July 13, 1820), 2.

[11] Frank G. Speck, 1940. *Penobscot Man: the life history of a Forest Tribe in Maine*, (Philadelphia: University of Pennsylvania Press, 1940): *37, 41.*

[12] Treat, Joseph. "Journal and Plans of Survey by Joseph Treat—1820." Maine Land Office Field Notes, volume 14, Maine State Archives, 24. Reprinted edited and with an introduction by Micah Pawling as: *Wabanaki Homeland and the New State of Maine: The 1820 Journal and Plans of Survey of Joseph Treat*. (Amherst: University of Massachusetts Press and Penobscot Indian Nation, 2007), 12-36.

[13] Joseph Treat. "Journal and Plans of Survey by Joseph Treat—1820." Maine Land Office Field Notes, volume 14, Maine State Archives, 24. Reprinted edited and with an introduction by Micah Pawling as: *Wabanaki Homeland and the New State of Maine: The 1820 Journal and Plans of Survey of Joseph Treat*. Amherst: University of Massachusetts Press and Penobscot Indian Nation, 2007, 12-36. Pauleena M. MacDougall, "Indian Island, Maine: 1780 to 1930". (PhD Dissertation in History, University of Maine, August, 1995), 151; Pauleena M. MacDougall, *Dance of Resistance; Tradition in the History of a People*. (Hanover: University of New Hampshire Press, 2004) 16, 38-39.

examples from the language illustrate the Penobscot people's world view:  they are a people who live upon and are adapted to a river.  Both the Penobscots' concepts of land stewardship and their place names show the strong cultural and economic ties the Penobscot people have always had to the Penobscot River.

Archaeological, historical, and cultural records confirm that the Penobscots have lived along the Penobscot River and made it the center of their very existence.  That relationship with the river would continue through the treaty period with the Nation ceding land to the State of Massachusetts but never giving up its islands and the river itself. And it would continue during and after the treaty period—through their actions and petitions to the government, which repeatedly sought to affirm and protect their rights to their lands, their river, and to the fish which sustained them in the Penobscot River.

## The Treaty of 1796

The Commonwealth of Massachusetts, after a decade of effort achieved a treaty with the Penobscot Nation in 1796, and obtained the lands they wanted on both sides of the Penobscot River.  But with the lands they received, they also acquired a responsibility to respond to the complaints and needs of the Tribe for seemingly an unlimited time "as long as they remain a nation."[14] The Penobscots, for their part, ceded some territory, but they understood that they retained the rights to their resources, the river, their main villages on the islands in the river and the patronage of the State.

The treaty also set the boundaries for Penobscot lands on the shores of the Penobscot River, defining the public lands as those on the east and west sides of the river, none being within the bounds of the river itself.  Surveyors laid out townships on both sides of the river. On

---

[14] Report of Nathan Dane and other Commissioners, Boston June 17, 1796. Includes a summary of all documents and meetings re: 1796 treaty. Massachusetts State Archives.

the west side was from Bangor north Orono, M4 (public land) Waterville College, M2 and M1 and Howland and then lands reserved for the Indians. On the east side across from Bangor was Brewer then Eddington, Lot 4, M3, Lots 2 and 1, Joseph Treat's 5,000 acre lot, then lots numbered 10-4 and finally lots reserved for the Indians.[15]

---

[15]  Moses Greenleaf, "Map Exhibiting the principle original grants and sales of lands in the State of Maine." M231 Special Collections, Fogler Library, University of Maine, Orono.

**Excerpt from Osgood map of 1802: the State's survey of lands along the Penobscot River.**



## The 1818 Treaty

With the Treaty of 1818, the Penobscots ceded much more land than they intended or requested—well over the ten townships they had originally indicated they would be willing to sell. However, they did manage to hold onto their islands.  The definition of Penobscot lands in this treaty included all islands above and including Old Town Island, a two-acre piece of land in Brewer along the riverfront, four upper townships—two of which were located on each side of the river near their village at Mattawamkeag point, and two located near present Millinocket, Maine.

The treaty states in part:

…in consideration of the payments by them [the Penobscots] now received of said commissioners, amounting to four hundred dollars, and of the payments hereby secured and engaged to be made to them, by said commonwealth, do hereby grant, sell convey, release and quitclaim to the commonwealth of Massachusetts all their, the said tribes right, title, interest and estate in and to the all the lands they claim, occupy and possess by any means whatever, on both sides of the Penobscot river and the branches thereof above the tract of thirty miles in length on both sides of said river, which said tribe conveyed and released to said commonwealth by their deed of the eighth of August, one thousand seven hundred and ninety six, excepting and reserving from this sale and conveyance, for the perpetual use of said tribe of Indians, four townships of land of six miles square each…And the said tribes do also release and discharge, said commonwealth from all demands and claims of any kind and description in consequence of said tribes indenture and agreement made with said

13

Commonwealth on the eighth day of August one thousand seven hundred ninety six by their commissioners William Sheppard, Nathan Dane and Daniel Davis Esquires… and we the undersigned commissioners on our part in behalf of said commonwealth, in consideration of the above covenants, and release of the said Penobscot tribe, do covenant with said Penobscot tribe of Indians, that they shall have, enjoy and improve all the four excepted townships described as aforesaid, and all the islands in the Penobscot river above Old town and including said Old town Island. And the commissioners will purchase for their use as aforesaid, two acres of land in the town of Brewer …[16]

The Commissioners also promised to provide the Penobscots with someone to instruct them in the arts of husbandry and assist them in fencing and tilling their grounds and raising crops. They promised to erect a store on the Indian Island or contiguous thereto in which to deposit their yearly supplies, make necessary repairs on their church and deliver their goods within ninety days.

Finally, the treaty provides that the Commonwealth shall have a right, at all times to make and keep open all necessary roads through any lands reserved for the future use of the Tribe and that all citizens shall have a right to pass and repass, any of the rivers, streams and ponds which run through any of the Indians' lands, for the purpose of transporting their lumber and other articles. [17]

This last statement is especially important, because no treaty with the Penobscots had ever specifically addressed the dominion of the Penobscots over their river and in this case, the

---

[16] 1818 Treaty. Resolve on a report of the Commissioners of the Land Office." In Senate, Feb. 13, 1818. Acts and Resolves, Volume 1819 chapter 120, p. 507.

[17] The papers documenting the negotiations for all previous treaties but this one are housed with the treaties in the Massachusetts State Archives.  The treaty council documents for the 1818 are not among them.

treaty only awards the citizens of the Commonwealth the right to pass and repass and carry their goods on the waters.  Furthermore the 1818 treaty, like the 1796 treaty, bounded the lands ceded by the Penobscots on the east and west sides of the Penobscot River.  The State received no specific grant of ownership or jurisdiction over the Penobscot River in the treaty.

The State achieved its aim of securing most of the timber land along both sides of the Penobscot River.  The Penobscots' perspective on the outcome of the treaty was quite different. They had a longstanding tradition of living on or near fishing sites on the river. We know from nineteenth century sources that the Penobscots lived in several communities on Mattanawcook "mountain island" near present Lincoln, Maine, Hemlock, Sugar, Olamon "red paint", Orson (named for Chief Orson), and Indian Island (Old Town Island).  The seat of government was not always at Indian Island, as it is today. Governor John Attean resided on Mattanawcook Island, for example, and Joseph Treat was told by Penobscots in 1820 that Old Town Island had not always been their chief place of residence.[18]

Indeed, the Penobscots had a choice of living sites that extended over a very large geographical area allowing them to take only the game and fish they needed, and avoid over utilizing their natural resources.  These riverine villages provided transportation and access to game, fish and other essential resources.  Thus, while having ceded much of their lands to the State, the Penobscot Nation had at least continued to retain the core area central to their tribal existence.

---

[18] Joseph Treat, Report to Governor King: The 1820 Journal and Plans of Survey of Joseph Treat ms. Maine State Archives: 14. Reprinted in Pawling, Micah. *Wabanaki Homeland and the New State of Maine: The 1820 Journal and Plans of Survey of Joseph Treat.*

## After the 1818 Treaty

In order to satisfy the terms of the treaty, the State's Eastern Land Commissioner Edward Robbins wrote to Governor John Brooks in October, 1818, and sent him a copy of the treaty made with the Penobscot Indians. He requested that the articles listed in the treaty be sent by the quartermaster to the Indian agent, General John Blake.[19]

The Commonwealth passed a resolve in Senate in 1819 approving the treaty and ordering that a copy be deposited in the Secretary's office and ordered him to carefully preserve the original.   The Senate also ordered the governor with advice of council to fulfill the requirements of the treaty "in good faith …in such manner as he shall judge most honorable to the Commonwealth and beneficial to the Penobscot tribe of Indians."  The Resolve appropriated funds "not exceeding two thousand dollars in any one year unless there shall be a future appropriation by the legislature for that object." It also approved the payment of $600 to the Commissioners and $1541.16 for goods used in the negotiations.  In addition the Resolve ordered that that "no grant of land made or to be made shall be located on any of the lands acquired by this treaty unless such location shall be expressly authorized by a future grant of the legislature and that this reservation be expressed in the deeds which may be given to the Commissioners of the land office."[20]

Once the treaty was signed, the State moved quickly to have the lands on both sides of the Penobscot River surveyed into lots.  The Commonwealth passed a resolve approving the treaty with the Penobscot Indians and empowering the governor to fulfill its stipulations and

---

[19] Extract of a letter from Hon. E.H. Robbins to the Gov. Jan'y 9, 1819. 1818 treaty papers. Massachusetts State Archives.

[20] In Senate February 16, 1819. Resolves 1818 Chapter 272, approved Feb. 20, 1819.Resolves May 1815-February 1819 (Boston: Secretary of the Commonwealth), p. 711.

directing the Commissioners of the land office to have the lands surveyed. [21] The Eastern Land Commissioners Edward Robbins, John Lee and Lothrop Lewis organized surveys of the Indian townships.  In a letter to the Governor, Robbins reported on the survey of four townships reserved by the Indians in the 1818 treaty. He had been ordered to explore the lands relinquished by the Indians on the Penobscot and survey the reserved townships.[22]

## Surveys

The actual surveying work was conducted by James Irish and Lothrop Lewis. Their field notes and maps of the surveyed towns are housed at the Maine State Archives.  The surveyors began their work "near" the east side of the Penobscot River and using existing trees or stakes as markers, typically moved east for 320 rods (a rod is 5.5 yards), then north 100 rods and then west 300 rods to "near" the Penobscot River marking off a section of land of some 216 acres.  They continued to mark off similar lots of varying sizes moving north beginning with one of the corners of the lots just marked along the eastern side of the Penobscot River until they reached the southern edge of Indian lands.  They then moved further east and marked off additional lots parallel to the first moving south.  These lots were all laid out with their western boundary "near" the Penobscot River.[23]  The illustration below is a sample from Lothrop Lewis's survey map of the town of Bradley showing how lots were laid out on the eastern side of the Penobscot River in 1819.[24]

---

[21] Resolves 1818 Chapter 272, approved Feb. 20, 1819.Resolves May 1815-February 1819 (Boston: Secretary of the Commonwealth), p. 711.

[22] Letter from Hon. E.H. Robbins to the Gov. Jan'y 9, 1819. 1818 treaty papers. Massachusetts State Archives.

[23] Maine State Archives Map Index # 19040 microfilm Bradley. James Irish, 1818, field notes volume 100, p110-121.

[24] Maine State Archives Map Index # 19040 microfilm Bradley. Lothrop Lewis, 1818, Volume 9 pp 57-58.



**The map above illustrates the survey lines of lots to be sold to settlers beginning at the eastern bank of the Penobscot River.**

Lewis reported to the state government that the two Indian townships on the eastern side of the river were measured and bounds marked including the mouth of the Mattawamkeag River. The extreme bounds North and South of the two opposite townships were established but all the lines not completed, according to Robbins, "to the entire satisfaction of the Indians." Robbins

reported that Joseph Treat was particularly employed in this business because "he was their friend."  Ironically, this is the same Treat who had been involved in the dispute over whether the Penobscots had retained their accustomed fishing places around Indian Island in the wake of the 1796 treaty, as discussed in Professor Prins's report.

Robbins also enclosed a letter from the surveyor general who reported that much had been done upon the roads from the tide waters of the Penobscot River up to the late Indian purchase on the east side of the river and that it was now passable.  He also reported that they were in the process of building a second road on the west side of the river.[25] The western side of the Penobscot River was also surveyed into lots in the same manner as had been done on the eastern side as shown by the maps below.

---

[25] Extract of a letter from the Hon. E.H. Robbins to the Gov. Jan'y 9, 1819. 1818 treaty papers. Massachusetts State Archives.



**Survey maps illustrating how lots were laid out for settlers beginning on the western bank of the**

**Penobscot River.**

## The 1820 Treaty with Maine

In June of 1819, Massachusetts passed an Act separating Maine from Massachusetts and

in that Act transferred the duties and obligations of Massachusetts relating to the Penobscots to

Maine, paying Maine $30,000 compensation "to be raised from the sale of lands" to pay for the

State's obligations to the Indians.[26]  Massachusetts's obligations under the 1818 treaty made with the Penobscots were transferred to Maine in a new treaty that was signed by the Penobscots in August, 1820.[27]

Before the treaty was signed, Penobscot leaders went to Portland to meet with the new Maine Governor, William King in July.  King thanked the Penobscots for not taking up arms in the War of 1812 and told them that they would have everything from Maine, if they requested it, that Massachusetts had promised but they must depend on Maine alone.[28]

Penobscot Lt. Governor John Neptune replied through an interpreter.  One of the central concerns of the Penobscot was the state of their fisheries in the river around their islands. Although Massachusetts had restored the Penobscots' fishing stations near Shad rips, that had been taken following the 1796 treaty,[29] the Penobscots still had great difficulty getting access to fish because non-Indians were setting up weirs below Indian Island to catch the fish before they reached the Indian part of the river.  Neptune explained that the white people were taking up all the fish so they could get none and he requested that King put a stop to it. In addition, the white people were catching all the game, young and old and leaving none to reproduce. Neptune told

---

[26] Acts 1818-1822 Chapter CLXI June 19, 1819. *Laws of the Commonwealth of Massachusetts*. Boston: Russell, Cutler and Co. for the state. 1822.

[27] Treaty made by the Commonwealth of Massachusetts with the Penobscot tribe of Indians, June 29, 1818 and Treaty made with the Penobscot tribe of Indians, August 17, 1820, in *Acts and Resolves passed by the Twenty-Third Legislature of the State of Maine, A.D. 1843* (Augusta: Wm. R. Smith & Co., 1843), 253-260. Original documents are in the Massachusetts State Archives, copies appended to this report.

[28] "Penobscot Indians." *Bangor Weekly Register* July 20, 1820 Volume V Issue 29 page 2

[29] The dispute over the islands around Shad rips is discussed in detail in the Prins Report.  In the 1796 treaty, the Penobscots reserved Old Town Island and the islands north of it.  The State's leadership in Boston thought that Old Town included only the island we identify today as Indian Island, but the Penobscots included the twelve islands below (but in the vicinity of) Indian Island as part of their town.  These small islands occupy a space on the river that is about a mile long and the site of their spring fishing.  One reason for their importance was the presence of a number of species of fish that the Penobscots relied upon for their subsistence.  Schools of fish going upstream to spawn were forced to swim between the islands, thus concentrating them in a way that allowed the Penobscots to scoop them up in weirs.  This area, particularly Shad Island (no. 5) was a favorite spring fishing place for Penobscot families where they could capture migrating Alewives, Atlantic Salmon, Atlantic Sturgeon and American Shad as they ran upstream to spawn in freshwater.

him that they had always taken the old ones and left the young in order to preserve their resources for the future. He requested that the white men be stopped from hunting. Also, the Indians had no oxen to haul timber. He also requested a new agent. He continued that they were very poor and requested some clothing or powder and shot.[30]

King replied to Neptune that he was aware of the problem with the fisheries and promised that the obstructions (weirs, dip nets and hedges in Penobscot Bay) to the fish would be removed. He did not follow up on his promise.[31] But he said it was not in his power to prevent the hunting of game. He clearly did not understand the economic dire straits that the Penobscots were experiencing because he then suggested that the Indians purchase oxen to plow their gardens and haul timber. King did agree to provide a new agent.[32]

The State did not act on the issues raised by the Penobscot leadership and instead began to negotiate a treaty for the specific purpose of transferring to Maine the obligations of Massachusetts listed in the 1818 treaty.

The judge and historian John Edwards Godfrey described the 1820 treaty negotiations in some detail. He wrote that on August 15, 1820 Lothrop Lewis on behalf of the State met the chiefs of the Penobscot Indians at the Court House in Bangor. According to Godfrey, Mr. Lewis addressed the chiefs in a friendly way, whereupon they asked for time to consult the Tribe and then August 17, 1820 was appointed as the time for giving their answer.

According to Godfrey on the day of the negotiations, Captain Francis addressed Commissioner Lewis in the Indian language in which he stated that Commissioners Robbins,

---

[30] "Penobscot Indians." *Bangor Weekly Register* July 20, 1820 Volume V Issue 29 page 2.
[31] *The Eastern Argus* (Portland, Maine), vol. XVII, no. 891, Tuesday, July 11, 1820, p. 3, col. 1-2; *Hancock Gazette and Penobscot Patriot* (Belfast, Maine), vol. 1, no. 3, Thursday, July 20, 1820, p. 2, column 1-2.

[32] Penobscot Indians. *Bangor Weekly Register* July 20, 1820 Volume V Issue 29 page 2.

Davis and Hill told them they were to hold their four townships and the islands in the river for their "use improvement and benefit so long as the sun shines, waters flow, trees grow and the world lasts," and that if that promise was regarded by Maine they would be satisfied with the arrangement made for them. Mr. Lewis replied expressing the hope that they would not be disappointed because Maine would perform its promises to them as faithfully as Massachusetts.[33]

## Protection of the fisheries

After the 1820 treaty with Maine had been signed, Penobscot concerns with their fishery in the river continued as they had before the Treaty (as documented by the report of Professor Prins), so the Penobscot chiefs petitioned Maine's Executive Council for a law to be passed to prevent the destruction of fish in the Penobscot River in January, 1821.[34]

The Penobscot representatives explained to the Maine legislature that spawning fish had always been one of the greatest resources for their subsistence.  They specifically asked the legislature to outlaw the use of weirs on the Penobscot River so that they could once again rely on the spawning fish as a major source of food.  They specifically requested that the legislature pass a law that restricted fishing to no more than two days a week in the season of salmon, shad and alewives for at least five years in order to restore the fisheries. [35]

Although the state government failed to take action to prevent the growing depletion of fish stocks in the Penobscot River and its tributaries, they did legislate to protect the fish species intermittently along other tributaries in Maine.  For example, the legislature moved to protect alewives, shad and salmon several times between 1820 and 1826.  Instead of enacting statewide legislation to regulate fisheries, Maine typically left the care of the fish in the hands of the towns

---

[33] John Edwards Godfrey Papers Box 1201, F6, Box 1203, F22. Special Collections Fogler Library, University of Maine.
[34] Executive Council Papers. January 26, 1821, Maine State Archives.
[35] Petition of the  Penobscot John Neptune and five others, January 26, 1821, Maine Legislative Papers, GY 8-16, Maine State Archives.

that bordered the various waterways.  So, for example, in 1821 the legislature enacted an act to regulate the fisheries in the Damariscotta River. This Act authorized the towns of Newcastle and Nobleboro to establish a committee that would oversee the construction of a sluiceway in dams on the river to allow the fish to pass upriver.  The towns would then be allowed to take the fish and divide the take between them.  The Act also made it illegal for individuals to use seines and nets to take the fish between May and July and made it illegal to obstruct the fish by building dams or booms.[36]

A series of similar acts were passed for regulating alewives in Mount Desert, Woolwich and Dyer River in 1821, and in the Union River, and the St. Croix in 1823, and in Denny's River, Salmon Falls River, Vinalhaven and the St. Georges River in 1824.  In 1825 the Legislature passed an act for the preservation of fish in Penobscot Bay, ordering that the mills in Orland build a sufficient sluiceway to allow the salmon, shad and alewives to pass.[37]  However, no other laws were passed to protect the fish in the Penobscot River or its tributaries, as requested by the Penobscot Indians.

By 1822 the fisheries on the Penobscot River had become significantly depleted due to the State's lack of conservation measures to protect the game and fish stocks in the region. Even some of the local settlers were alarmed at the depletion of fish. For example, Joseph Butterfield of Old Town, who had lived in the area since 1803 wrote in support of the Penobscot's petition for help with the fisheries, explaining that the weirs in the bay were destroying the salmon, shad and alewives that had previously been abundant.  He also testified that the fish taken at Old

---

[36] An Act for the Regulation of the fishery in the Damariscotta River. Chapter L. *Special Laws of the State of Maine* June 1820 and January 1821.

[37] An act to regulate fishery of alewives in Mount Desert, Chapter LXXXI 3-19-1821; An act to regulate the taking of fish in Dyer River, Chapter 131, 1822; An act to regulate fisheries in St. Croix, Chapter 186, 1823; An act to regulate the herring fishery, Chapter CCXXXVII 2-12-1824; An act to prevent the destruction of fish called salmon and alewives on Denny's River, Chapter 240, 1824, etc. *Special Laws of the State of Maine* 1821-1825.

Town falls by the Penobscots used to make up half of their annual subsistence but that now "they cannot take sufficient quantity for their families to eat even in the best part of the season, and many of the white people who used to take fish for their own use cannot get any by any means whatever." [38]

Even though the State did little to protect the fisheries, the Penobscot Tribe, in signing leases for the dam and mill owners to build on the islands near Old Town sought to protect the fish by reserving their fishing rights and by requiring that fish passages be left open on the east side of Shad Island where the spawning fish swam upstream in the spring. [39]

## Maine's Indian Agents and Penobscots Continuing Problems with Trespassers

In order to fulfill their treaty obligations, the State of Maine needed to appoint one or more persons to act as Indian agents.  To that end, in 1821 the Maine state legislature passed an act allowing the governor to appoint agents for the Penobscots and Passamaquoddies. Agents' duties included the procurement and delivery of treaty goods and the approval of all contracts and bargains regarding timber and hay growing on Indian land. Agents were not allowed to grant leases beyond one year or to sell more than five hundred dollars' worth of timber in a single year.  They were bonded and given the power to collect debts owed to the Indians.  They also had to keep good records and make an annual report to the governor and council. [40]

Three agents, Samuel Hussey, Moses Sleeper and Jackson Davis visited the Penobscots at Old Town and Passadumkeag in the summer of that same year to urge them to take up farming,

---

[38] Letter of Joseph Butterfield January, 1822. Miscellaneous Box Indians. Maine State Archives, Augusta.
[39] Penobscot County Registry of Deeds Book2 8, page 21: the deed conveys rights to Perly Haines to Pine Island except the right of taking fish on the east side of Pine Island; that right is reserved to the tribe. Penobscot County Registry of Deeds Book 28 page 117 November 23, 1831: The Penobscots leased the west side of Shad Island to Rich and N. Bartlett, James Purinton and Ira Wadleigh for 12 years with the stipulation that a fish passage must be reserved on the east side of Shad Island for Spring spawning runs of alewives and shad.
[40] *Resolves of the Maine Legislature*, Chapter 175. 766-68, March 5, 1821.

arguing that their hunting and fishing resources could no longer sustain them. The Penobscots replied politely that they would like to do so, but that all of their lands under cultivation were on their islands, and that on account of the ice out in the spring (which would tear down any fences built along the shores) they could not erect fences  and they had expected to reap four hundred and fifty bushels of corn in the last season, but that the white people turned out their cattle to graze on the banks of the river and when the river was low the cattle consumed all of the Indians' corn.  They reiterated to the agents that previously they had been able to support themselves by fishing and hunting, but the weirs and seines erected by the white people in the tide waters of the river had harmed their fish stocks.[41] Farming, it turned out, was not a good option for the Penobscots, since their lands were vulnerable to wandering cattle who consumed their crops.

Even with their lands mostly lost to the State, the Penobscots continued to face settler incursions even on their islands. When Penobscot Governor John Attean established a camp on the tribe's island at Mattawamkeag Point settlers "frightened his wife and children away."  They also destroyed his eel weir and stole all of his provisions.[42] Yet there was no enforcement of the law that should have protected him, his family and his property.  Similarly, in 1830, Lt. Governor John Neptune and Joseph Socbasin wrote a letter to the Governor reporting that their customary fishing excursions to the islands near Sedgwick were being disrupted by settlers who would not allow them to land their canoes on the islands.[43]  They requested an agent who lived near them and was not a sawmill owner, a logger or a trader.[44]  They also reminded the Council

---

[41] To the Governor and Council of Maine. 1822. Miscellaneous Box Indians. Maine State Archives, Augusta.
[42] "Penobscot Indian Reply to John G. Deane," Old Town, November 12, 1829, published in *The Eastern Argus* (Portland, Me), vol. VI, no. 539, December 1, 1829: 2.
[43] Although Sedgwick is well below Old Town, the petition shows that the Penobscots continued to exercise their rights to fish throughout the river.
[44] Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives.

that the islands in the river as far as Moosehead Lake belonged to them.[45]  They had become savvy about the designs of sawmill owners, loggers and traders to defraud them, though had little recourse and few allies to help them to resist the unrelenting march of the timber business. Finally, the petitioners wanted the exclusive right to fish on "Shad Island" below Old Town Island "where there are great conveniences for our Indians to take fish in the fishing-season."  If non-Indians fished within the limits of the small islands around Old Town Falls, the petitioners proposed a five dollar fine.[46]

## Logs and Leases

The 1818 treaty had provided that "citizens of said commonwealth" had a right to use the river for "the purpose of transporting their timber," and in the early nineteenth century, the timber business took over the river and even the Indians' islands.  It was no longer just fishing weirs that depleted the fish but also the massive number of logs that were floated downstream from the interior of Maine every spring. As the river became more crowded with operators trying to bring their logs to market, the State moved to regulate the river drives and logging operations by establishing the Penobscot Lumber Association and the Penobscot Boom Corporation (the association responsible for sorting logs) in 1825.[47] This first act allowed the corporation to purchase up to 400 acres of land to connect their booms at Costigan Island and to charge a toll of 35 cents per 1,000 ft. of logs to pay for it.  It also provided for persons suffering any damage from the logs in the booms to appeal to the Court of Common Pleas.

Ignoring the Penobscots' welfare and their rights to their islands, in 1832 the Maine legislature passed another act establishing the Penobscot Lumbering Association.  This act gave

---

[45] Moosehead Lake is the headwaters of the West Branch of the Penobscot River.
[46] Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives.
[47] An Act to establish the Penobscot Boom Corporation Chapter CCCLVI. Private Acts of the State of Maine, 2-26-1825 (Todd and Smith, printers to the state, 1825).

Rufus Dwinel and associates authority to erect and maintain a boom across Stillwater Branch and to build piers and side or branch booms between Hemlock and Orson Island, between Birch Stream and Pushaw Falls and between Pea Cove and the outlet of the thoroughfare between Orson and Marsh Islands.  [A boom is a manner of attaching logs in such a way that they cannot float downstream.] The Act stipulated that the Boom Corporation was required to provide space for safe passage of rafts and boats and they were allowed to charge a toll on the lumber to pay for their operation.[48] These acts ignored the Penobscot Nation's ownership of the islands. Timber concerns received the legislature's attention at the expense of the fish and the people who lived on the Penobscot River's islands.  The Penobscots did not sit idly by, but instead sent protests in an attempt to protect their interests and their property.[49]

The timber business was flooding the river with logs in the spring river drives.  These logs would pile up on the shores of the islands and cause the Penobscots great difficulty in launching their canoes and fishing from the shores.   The Penobscots complained to the Governor's Council that the Great Boom above Sunkhaze (located near Orson Island above Indian Island) deprived them of several islands, spoiling some by flooding and throwing wood upon them and as the owners of the boom were making a great deal of money the Penobscots thought they should be compensated for the damage and use of their islands. The Penobscots requested that they be paid 1 cent per log for the logs fastened to their islands by logging companies. [50]

---

[48] An Act to Incorporate the Penobscot Boom Corporation 1832 Chapter 236. SpC MS 725 SC folder includes Charter and By Laws 1885. Fogler Library, University of Maine.

[49] Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives. LGY Package # 56 Petition of Penobscot Indians re: leases of shorelines of Islands.

[50] Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives. LGY Package # 56 Petition of Penobscot Indians re: leases of shorelines of Islands.

In addition to their complaints about the logging companies, they also reported that individuals were cutting timber and hay from their islands, and sending their cattle and sheep to eat the crops they had planted on their islands. They requested that the owners of the cattle be prosecuted, "just as if we were white people. Indians now can raise nothing; bad men and their cattle do us so much evil."[51]  This petition was forwarded to the Executive Council who reported that it was the duty of the Indian Agent to see to these problems.



**The picture above illustrates what the river looked like in springtime at one of the booms. Clearly passage by canoe or boat from the island shores was entirely obstructed by the logs.[52]**

In addition to constructing dams and mills on the river that restricted fishing for the

---

[51]Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives. LGY Package # 56 Petition of Penobscot Indians re: leases of shorelines of Islands.
[52] Photos number 419, 701 and 703 from the Argyle Boom collection, Maine Folklife Center, University of Maine, Orono.

Penobscots, the Penobscot Lumbering Association and Boom Corporation constructed an elaborate system of booms that held the logs coming downriver. Each owner marked his log with a distinctive mark, and the logs were then sorted into various areas of the boom to be counted and then sent to be milled.  These were the booms or rafts of logs that as Neptune and Sockbasin wrote in their petition, "plagued the Penobscots very much."[53] They covered the shorelines, making travel by canoe and any kind of fishing activity extremely difficult at times.  The logs were floated down to the Orono-to-Bangor area of the river in the spring, the same time of year when fish had previously spawned in great numbers.



**The photo above illustrates how the boom logs were fastened to the shorelines and how the men worked to sort the logs.**

---

[53] Petition brought by delegates John Neptune and Joseph Sockbasin, January 25, 1831, Executive Council papers, box 36, f29 Maine State Archives. LGY Package # 56 Petition of Penobscot Indians re: leases of shorelines of Islands



**The photo above illustrates the extensive log works on White Squaw Island near Argyle boom and how the lumber companies attached their booms to the islands belonging to the Tribe against their protests.**

The timber business was the major impetus for land purchases in the lands around the Penobscot River in 1818.  In addition to the logs in the river during the river drives, the lumber companies also built water-powered lumber mills across the river in areas traditionally used by the Penobscot Nation for fishing.  On visiting Maine in the 1840s Henry David Thoreau remarked on the sawmills in the Orono and Old Town area in his book, *The Maine Woods*: "Within a dozen miles of Bangor we passed through the villages of Stillwater and Orono, built at the falls of the Penobscot, which furnish the principal power by which the Maine woods are converted into lumber. The mills are built directly over and across the river."[54]

As Thoreau observed, the period between 1832 and 1838 was a time of "feverish land speculation, a stampede of speculative investment in Maine timberlands."  Notwithstanding all this timber activity on the river, Henry David Thoreau observed the Penobscots well-engaged in

---

[54] Henry David Thoreau, *The Maine Woods*. Boston and New York: Ticknor and Fields, 1864:3-4.

their subsistence use of the river, setting out from the Mattanawcook Island, in a canoe

"examining the banks carefully for muskrats as they came along…"[55] The value of Maine

timberlands became very inflated.  Lands along the Penobscot were valued according to the

amount of the timber upon them.  The sawmill activity in Orono created an explosion in

population. Orono grew from 1500 to 6000 in the five years after 1832.[56]



**How the mills were constructed over the river at Old Town Falls where the Penobscots had
previously fished.[57]**

## Dams and fish

Lumbermen cut wood all winter in the interior and stacked it on ice-covered lakes and

streams.  Dams were built on nearly every drivable stream and on lakes above the Penobscot

River in order to hold back the logs until it was time to drive them down and to supply enough

---

[55] Henry David Thoreau, *The Maine Woods*, p. 78.
[56] Paul E. Rivard, *Maine Sawmills: A History*. Augusta, Maine State Museum, 1990: 42 and 44.

[57] Photo from Paul E. Rivard, *Maine Sawmills: A History*. Augusta, Maine State Museum, 1990: 42 and 44.

water after the ice went out to float the logs down.[58]  The construction of dams for the timber industry further harmed the native fisheries. For example, the Veazie Dam was created in 1834 at Eddington Bend and blocked large migrations of fish until it was recently breached in 2013.[59]

In addition to the problem of weirs downstream, the spring spawning runs of the several species fished by Penobscots were also disrupted by the river drives.  As Pawling has pointed out, the restoration of the Penobscot fishing privileges at Shad Island could not alleviate the harm to the Tribe's fishery because the anadromous fish could not ascend the river in the numbers they used to due to the extensive number of weirs and dams downriver.  Regaining access to the island did reaffirm the Penobscots' fishing rights in the river, but the availability of salmon, shad and alewives was limited.[60]

Before the dams were constructed in the 1830s salmon migrated upstream well into the headwaters of the Penobscot River.  Atlantic Salmon were found throughout the West Branch and probably even in Moosehead Lake. Alewives were also in abundance at the Penobscots' traditional fisheries at Old Town Falls. Foster and Akins estimated the annual catch could have been as high as one million alewives. Another essential fish in the Penobscot diet was the American shad—as many as two million fish may have spawned in the Penobscot before 1830. Shad continued to migrate into the Passadumkeag River, the West Branch and the East Branch. The rainbow smelt fishery was the second most important species, according to Foster and Akins, estimated at as much as 121,000 kg of smelts for the entire Penobscot River in the

---

[58] David C. Smith. *A History of Lumbering in Maine*. University of Maine Studies No. 93. Orono: University of Maine Press, 1971:64.
[59] The Veazie Dam has been removed as of August, 2013.
[60] Micah A. Pawling, "Petitions and the Reconfiguration of Homeland: Persistence and Tradition among Wabanaki Peoples in the Nineteenth Century." PhD dissertation in History, University of Maine, Orono, 2010:150.

1880s.[61]  The building of dams impeded the fish in their efforts to swim to the upper areas of the

Penobscot River.

Eventually the Penobscots were successful in getting the lumbermen to pay them a small

amount of compensation for the use of their shorelines through lease agreements.  The Indian

agent conducted the lease negotiations on behalf of the Tribe.  For example, in August, 1831

Indian agent Samuel Hussey leased to Richard Bartlett and James Purinton both of Orono "all

the coves and eddies, and all other places on the shores of Orson and Jo Peas Islands" belonging

to the Penobscot Indians for the purpose of fixing booms and securing logs for ten years for the

sum of thirty dollars a year.[62]  This lease specifically allows for use of parts of the river, —

"coves and eddies" belonging to the Penobscot Nation.  That same fall Hussey granted a lease to

Bartlett, Purinton and Ira Wadleigh for "ledge Island or rock on Old Town Falls in shad channel

the site of the mill dam of the late Jackson Davis owned by Samuel Veazie" in order to build a

dam from Pine Island for twelve years for the sum of thirty dollars per year.   Bartlett's lease also

provides permission to use parts of the river-ledges and other landmarks within the channel of

the river, evidence that the Penobscots' rights extended into the river itself, not just the islands.

Also, the leases required a fish passageway for spawning fish. [63]

In 1834 another deed was recorded from the Indian Tribe to Bartlett, et al to release and

"sell forever" for the sum of one thousand dollars Pine Island and Shad Island, "reserving,

however, the right of taking fish on the eastern shore of Shad Island and the small islands east of

Shad Island in the season of taking shad and alewives in said river and the same is hereby

---

[61] N. W. Foster and C. G. Atkins, 1867. Report of Commission on Fisheries. In, *Twelfth annual report of the
Secretary of the Maine Board of Agriculture*. (Augusta: Stevens and Sayward Printers to the State).
[62] Penobscot County Registry of Deeds. Lease to James Purinton August 3, 1831, recorded November 15, 1831.
Volume 27 page 198.
[63] Penobscot County Registry of Deeds Volume 28: 119, 1831.

reserved to said Penobscot Tribe of Indians as their exclusive right and privilege."[64]

In 1837, the Standing Committee on Indian Affairs reviewed the damages along the shoreline of the Indians' islands from the logs in the booms constructed by Samuel Veazie on islands numbered nineteen to thirty-one.  Veazie's leases were for two rods (about 32 feet) width.  The committee ordered Veazie to pay a sum of twenty five dollars per year for twenty years for the damages to the shorelines. [65] The following year, Indian Agent Henry Richardson reported to the governor that he would be leasing the shores of islands belonging to the Penobscots, claiming that the islands in question were of no benefit to the Indians.[66] These leases brought little economic benefit to the Tribe and illustrate the lack of protection received by the Penobscots from the Indian agents assigned by the State.[67]

According to Indian agents' reports, at first the shore leases were a paltry sum. In 1847 the tribe received a mere $89 stumpage for timber.  There is no mention of shore rents in 1848 or 1849.  In 1850 they received $20 for shore rents and by 1860 the agent reported "some rents of small amount."  Meanwhile the Penobscots continued to try to find ways to subsist independently through hunting, fishing, and other employments.  By 1860, a few of the young men were employed as boat handlers on the river drives in the spring. The agent further reported

---

[64] Penobscot County Registry of Deeds volume 62: 455-458 recorded July 3, 1834.
[65] Letter to Council Chamber from Samuel Small. Executive Council Papers Box 68. Maine State Archives, Augusta.
[66] Letter from Henry Richardson to the Governor, 1838. Box 70 Executive Council Papers, Maine State Archives, Augusta.  More importantly, the state sought to remove the agency of the Penobscots' own governor and council in making decisions about their lands and resources.  By giving the agent power to lease and sell the Penobscot's lands and ignoring the wishes of the tribe the state essentially ignored the rights of the Penobscot people.  In at least one instance, in 1826 we find John Neptune and Peal Molly petitioning the House of Representatives for leave to lease their water privileges, but they were not allowed this agency.[66] No further mention of requesting permission of or of payment to Indians is made in the acts of the legislature until 1854, when a further act relating to the charter of the Penobscot Boom Corporation was added.  Chapter 299 adds in Section 10: "Said association shall also pay the shore rent of the Indian Islands…"
[67] An Act to Incorporate the Penobscot Boom Corporation 1832 Chapter 299:34. Approved April 5, 1854. SpC MS 725 SC folder includes Charter and By Laws 1885. Fogler Library, University of Maine. A boom is a series of logs chained end-to-end together and then fastened to a riverbank or to a pier and extended out into the current to stop and hold back loose floating logs.

that most of the men still went on their winter hunts, some one hundred men took part in agricultural pursuits, while most of the women made baskets, snowshoes and moccasins to sell in the towns.[68]  The legislature passed a resolve in 1867 to add the shore rentals to the state's Indian fund.[69] It wasn't until 1867 that any significant amount of money was paid to the Tribe for leases.  The agent collected about $5,000 and paid it into the State's treasury. From there the State withdrew funds to pay for their obligations to the Tribe for education, the chief's salaries, and a small per capita payment ($100) to each tribal member. By 1877 an economic downturn in the lumber industry reduced lease payments to the Tribe to a mere $1,000 per year.   The leases, together with the payment of shore rents, and the leasing of areas of the river (shores and eddies), supports the notion that the Penobscot Indian Nation still held rights to the Penobscot River after the 1818 treaty.

Even as late as 1919, the State recognized the Penobscot Nation's river rights.  The State recognized the Penobscot Nation's retention of fishing rights in its own Statute in 1916 relating to the State's responsibilities to the Tribe.  The Statute states that "Surveys of the islands in Penobscot River from Old Town Falls to Mattawamkeag Point and field notes thereof, as made under chapter 158 of the public laws of 1835 and chapter 396 of the public laws of 1839, plans of which were returned to the land office and to the Indian agent, shall be deemded (sic) authentic in all matters to which they relate. The water privileges belonging to said islands, valuable for mills, booms, fisheries, tracts of wood and timberland, and other lots indicated on said plans as reserved for public use, except the public farm which is subject to allotment by chapter 22 of the private and special laws of 1878, are not subject to assignment or distribution to members of said

---

[68]Agents Report. *Documents of the Legislature.* Augusta: William T. Johnson, Thirty-first Legislature No. 45 in Senate, 1852:8-13.
[69] Resolve Chapter 103, *Resolves of the Legislature of the State of Maine.* Augusta 1867.

tribe, but shall remain for the benefit of the whole tribe." [70]

## Summary and Conclusions:

It is my expert opinion, as a historian with more than thirty years' experience working on Penobscot Indian history, language, and culture, that based on events occurring in the aftermath of the State treaties of 1796 and 1818 both the State of Massachusetts (and later Maine) and the Penobscot Nation understood that the Penobscot Nation reserved the Penobscot River as a tribal possession to be held and used as they traditionally had (as in fishing and gathering their necessary subsistence resources) in the signing of the 1818 treaty with the Commonwealth of Massachusetts and the signing of the 1820 treaty with the State of Maine. The strong cultural and historical ties the Penobscot have to the river, as demonstrated in the historical documents cited in my report, makes it unlikely that the Penobscots would negotiate to retain their islands in the river but cede the river itself with all its cultural significance and centrality. My opinion is based on the following:

### 1. The Penobscot Nation is primarily a river-based culture.

Fishing has consistently been an essential part of the Penobscot's subsistence. Members of the Penobscot Nation depended to a large extent on fishing in their lakes, river and bay for food supplies. The Penobscots subsisted primarily off the abundant sources of game living on the islands and along the river banks of the mainland, game such as moose, deer and beaver and as well as on the many species of fish especially salmon, shad, herring and eels that lived in the river. They traveled inland for hunting where they set up temporary camps, but their main villages were all on the islands or banks of the river. While their hunting territories were extensive, when they traveled inland to hunt they traveled along the rivers and streams to reach

---

[70] Section 4779 Maine Statutes and Codes Chapter 1353: Penobscot Tribe. *The Revised Statutes of the State of Maine*, passed September 29, 1916.

game and bring it back home in their canoes or toboggans.  In addition, they collected fiddleheads in the spring, berries, flag root and other medicines, and many other species of riverine plants as part of their diet.

The spearing of salmon in their annual run upstream in June, July or August was one of their great seasonal events.  They speared fish from land but also in the water from their canoes or from fishing stations along the river.  They also captured eels this way, even in winter making holes in the ice and spearing them in the mud.  Anthropologist Frank G. Speck, who visited the Penobscots in the early twentieth century and wrote the definitive ethnography of the tribe, documented these practices.  He also observed that archaeological, cultural and historical evidence demonstrates the ancestors of the people known today as the Penobscot Indian Nation settled on Islands and on the banks of the Penobscot River and its tributaries in order to take fish from the river and this has been a major part of their sustenance as a hunting and gathering tribe deep in the past.

The river was also a source of transportation.  Penobscot Indians traveled on the river primarily by canoe in summer and by snowshoe and toboggan in winter.  They built baskets to carry their belongings and catches of game and fish in the canoe or on their toboggans in winter.  As this was the primary mode of travel in a heavily forested environment, the Penobscots located their villages and temporary hunting sites on accessible waterways.  The Penobscot River and its tributaries were those waterways.  From the Penobscot River they could go to the sea or they could travel via canoe and carry to the larger inland lakes, or even to other rivers in order to meet with other tribes.  But their primary villages were located on the Islands and banks of the Penobscot River.

The Penobscot River includes sacred sites.  The tribe has sacred burial sites and collected

red ochre paint for ceremonial uses on their islands and sites on the banks of the river. Most of the known burial sites connected to the Penobscots are located on Penobscot River islands or on the banks of the river.  At least three cemeteries dating as early as 4-5,000 years have been located by archaeologists on Indian Island, and others in Milford and Old Town on the banks of the river.

The Penobscots continue many of these cultural practices today: hunting, fishing, gathering fiddleheads and berries, making baskets and canoes and collecting sweet grass and other sacred materials for ceremonies. The Penobscot River is the center of their lives, as demonstrated by the numerous sacred sites along the river. Fishing in the river has continued to be an essential subsistence activity for the Penobscots throughout the historic period, although recently they have been forced to reduce their consumption of fish due to dioxin levels from the pulp and paper industry pollutants in the river.  The strong cultural and historical ties the Penobscot have to the River, as demonstrated in the historical documents cited in my report, makes it unlikely that the Penobscots would negotiate to retain islands in the river but cede the river itself with all its cultural significance and centrality. The Penobscots understood that they retained their rights to the river as well as the islands in the Treaties of 1796 and 1818.

In addition, the Penobscots sought to protect their river from outsiders. A good example can be found in Park Holland's account of his 1793 survey of lands above Old Town, when he was told by the Penobscots at Old Town and again by those residing at Mattawamkeag Island that the river belonged to the tribe and they did not want any whites to go upriver because they built dams and obstructed the fish from spawning upriver.[71]

---

[71] Park Holland, *Park Holland: Life and Diaries*, copied by Mary H. Curran, 1915, Bangor Public Library, Bangor, Maine, 39-42.

2. The State was granted the right of passage--not ownership--of all of the waterways in the Penobscot territories specifically for the transportation of timber and other goods.

Specifically, the treaty says "said Commonwealth shall have a right, at all times hereafter to make keep open, all necessary roads through any lands hereby reserved for the future use of said tribe and that <u>the Citizens of said Commonwealth shall have a right to pass and re-pass, any of the rivers, streams and ponds, which run through any of these lands hereby reserved, for the purpose of transporting their lumber and other articles through the same.</u>"[72]  This treaty language was crucial to the State since the Penobscot River provided a major transportation route for the lumber industry in Maine.

3. Throughout the historic period the Penobscot Tribe has regularly and vigorously sought redress in the maintenance and/or restoration of their fishing rights and fishing stations on the Penobscot River by petitioning the authorities in Massachusetts and Maine.

Tribal complaints reveal a record of frequent disruption of their subsistence fishing by the illegal sale of some of their islands by the State, the building of dams and mills blocking fish from spawning upriver, the pollution from lumber, textile and paper mills, and the building of weirs downstream from their habitation.  These actions to protect and defend their fishery did not end with the signing of the 1818 treaty.

- In 1820, just prior to the signing of the treaty with Maine the Penobscots petitioned the State once again for help in saving the fisheries.  Although Massachusetts had restored the Penobscots' fishing stations on the small island near Shad rips, the Penobscots still had great difficulty getting access to fish because of the weirs set up below.  Once again, the Penobscots petitioned for help, this time to the Maine legislature, explaining that

---

[72] Release of the Penobscot Tribe of Indians to Massachusetts. From Resolve February 20, No. 272, 1819 Box 193. Original legislative documents relating to 1796 and 1818 treaties Maine State Archives.

spawning fish had always been one of the greatest resources for their subsistence.  They specifically asked the legislature to outlaw the use of weirs on the Penobscot River so that they could once again rely on the spawning fish as a major source of food.

- The new State did not address their concerns about the fish in the river, so the Penobscot chiefs petitioned Maine's Executive Council for a law to be passed to prevent the destruction of fish in the Penobscot River in January, 1821.[73]

- In the 1830s, lumbermen drove logs down the river as contemplated in the 1818 treaty, but when the extent of the timber industry's use of the river began to interfere with Penobscot uses, the Tribe once again asserted its rights.  Timber men built a system of booms or containment areas by chaining logs together and fashioning them to the Indian's Islands.  The Penobscot chiefs Neptune and Sockbasin petitioned the State, complaining that the logs and booms "plagued the Penobscots very much." They covered the shorelines, making travel by canoe and any kind of fishing activity extremely difficult.  The logs were floated down to the Orono-to-Bangor area of the river in the spring, the same time of year when fish had previously spawned in great numbers.  In addition, pollution from the bark and sunken logs created an environment of oxygen that further destroyed the fisheries.

These petitions illustrate the constant concern the Penobscot Tribe has held with their fishing rights and with the maintenance of healthy fish stocks.  These actions all suggest the Penobscots have a long-standing tradition of stewardship over the Penobscot River and that they did not believe they had surrendered their rights to the river in signing the 1818 treaty.

---

[73] Executive Council Papers. January 26, 1821, Maine State Archives.

4. In contrast to the Penobscots constant concern for the protection of fish stocks in the river, the State did not consider itself steward of the Penobscot River resources as a result of the 1818 treaty.

The unrestricted cutting of timber throughout the nineteenth century, the building of dams, mills and factories along the shorelines in the nineteenth and twentieth centuries, the discharge of pollutants into the river under the oversight of the State resulted in great harm to an important natural resource—the Penobscot River fisheries.  These actions suggest that the State did not view itself as stewards of the Penobscot River. The State did not begin efforts to clean up the polluted waters of the Penobscot River until the second half of the twentieth century.[74]  For example:

- On the morning of May 26, 1826 the *Kennebec Journal* reported that seven thousand shad and nearly a hundred barrels of alewives were taken in one haul on the Penobscot River. The construction of a large dam at Eddington Bend in 1834 without any passage for fish created a disaster as multitudes of the fish gathered below the dam. As a result a great many shad and alewives died there until the air was thick with the stench of dead fish.  Without the ability to spawn, the numbers of fish were greatly reduced.[75]

- The Maine Department of Economic development reported in 1957 numerous pulp and paper mills, 22 leather plants and 25 textile plants in the lower Penobscot watershed. Residents began to voice concerns about pollution's effect on fisheries and drinking water supplies.

---

[74] Copeland, Claudia (2010). "Clean Water Act: A Summary of the Law." Report No. RL30030. Congressional Research Service, Washington, DC.
[75] http://www.penobscotriver.org/content/4004/the-river

5. Throughout the nineteenth and early twentieth centuries, the State recognized the Penobscot Nation's ownership interests in the river as demonstrated by the leases cited in this report.

For example, in August, 1831 Indian Agent Samuel Hussey leased to Richard Bartlett and James Purinton both of Orono "all the coves and eddies, and all other places on the shores of Orson and Jo Peas Islands" belonging to the Penobscot Indians for the purpose of fixing booms and securing logs for ten years for the sum of thirty dollars a year.[76]  This lease specifically allows for use of parts of the river, —"coves and eddies" belonging to the Penobscot Tribe.  That same fall Hussey granted a lease to Bartlett, Purinton and Ira Wadleigh for "ledge Island or rock on Old Town Falls in shad channel the site of the mill dam of the late Jackson Davis owned by Samuel Veazie" in order to build a dam from Pine Island for twelve years for the sum of thirty dollars per year.   Bartlett's lease also provides permission to use parts of the river-ledges and other landmarks within the channel of the river, suggesting strongly that the Penobscots held dominion over the river itself, not just the islands. [77]

In addition, the State recognized the Penobscot Tribe's retention of fishing rights in its own statutes as set forth in 1916 Statutes relating to the State's responsibilities to the Tribe.

The statute states that "Surveys of the islands in Penobscot River from Old Town Falls to Mattawamkeag Point and field notes thereof, as made under chapter 158 of the public laws of 1835 and chapter 396 of the public laws of 1839, plans of which were returned to the land office and to the Indian agent, shall be deemded (sic) authentic in all matters to which they relate. The water privileges belonging to said islands, valuable for mills, booms, fisheries, tracts of wood

---

[76] Penobscot County Registry of Deeds. Lease to James Purinton August 3, 1831, recorded November 15, 1831. Volume 27 page 198.
[77] Penobscot Registry of Deeds Volume 28: 119, 1831.

and timberland, and other lots indicated on said plans as reserved for public use, except the public farm which is subject to allotment by chapter 22 of the private and special laws of 1878, are not subject to assignment or distribution to members of said tribe, but shall remain for the benefit of the whole tribe." [78]

This provides evidence that the State, as well as the Tribe understood that the Penobscot had water privileges which they held in common with all members of the Tribe that included fishing as well as other resources.  The State viewed these privileges as reserved for public (tribal) use, so they could not be sold or distributed to any individual member of the Tribe.

**June 13, 2014**          */s/ Pauleena M. MacDougall*

**Pauleena M. MacDougall, PhD**

---

[78] Section 4779 Maine Statutes and Codes Chapter 1353: Penobscot Tribe, *The Revised Statutes of the State of Maine*, passed September 29, 1916.