```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MAINE

 3     _____

 4     PENOBSCOT NATION,
            Plaintiff,
 5
       and
 6
       UNITED STATES OF AMERICA, on its
 7     own behalf, and for the benefit
       Of the Penobscot Nation,
 8          Plaintiff-Intervenor,
                                          CIVIL ACTION
 9     v.
                              Docket No. 1:12-254-GZS
10
       STATE OF MAINE, JANET T. MILLS,
11     Attorney General of the State of Maine,
       CHANDLER WOODCOCK, Commissioner
12     for the Maine Department of Inland
       Fisheries and Wildlife, and
13     JOEL T. WILKINSON, Colonel for the
       Maine Warden Service,
14          Defendants,

15     and

16     CITY OF BREWER, et al.,
            Defendants-Intervenors.
17     _____

18

19

20                Transcript of Proceedings

21     Pursuant to notice, the above-entitled matter came on
       for Oral Argument held before THE HONORABLE GEORGE Z.
22     SINGAL, United States District Court Judge, in the
       United States District Court, Edward T. Gignoux
23     Courthouse, 156 Federal Street, Portland, Maine, on the
       14th day of October 2015 at 9:04 a.m. as follows:

24

25
```

```
 1

 2    Appearances:

 3

 4    For the Plaintiff:  Kaighn Smith, Jr., Esquire
                          James T. Kilbreth, Esquire
 5
      For the Plaintiff-
 6    Intervenor:         Steven Miskinis, Esquire

 7
      For the Defendants:  Gerald Reid, Esquire
 8                         Kimberly Patwardhan, Esquire

 9    For the Defendants-
      Intervenors:         Catherine R. Connors, Esquire
10                         Benjamin Jenkins, Esquire

11

12

13

14
                    Lori D. Dunbar, RMR, CRR
15                  Official Court Reporter

16              (Prepared from manual stenography and
                   computer aided transcription)
17

18

19

20

21

22

23

24

25
```

```
 1                     (Open court)
 2          THE COURT:  Counsel, let me just set myself up
 3    here.  Okay, we're here in Civil Docket 12-254,
 4    Penobscot Nation versus Schneider and others.  We're
 5    here for oral argument.  Just for the record, who's
 6    here for the Penobscot Indian Nation?
 7              MR. SMITH:  Kaighn Smith, Jr., Your Honor.
 8              MR. KILBRETH:  And James Kilbreth, Your Honor.
 9          THE COURT:  And for Intervenor United States?
10              MR. MISKINIS:  Steve Miskinis, Your Honor, and
11    I have with me Jennifer Turner and Bella Wolitz from
12    the Department of the Interior.
13              THE COURT:  And for the State?
14              MR. REID:  Gerald Reid, Your Honor, and
15    Kimberly Patwardhan.
16              THE COURT:  And for the town intervenors?
17              MS. CONNORS:  Catherine Connors and Benjamin
18    Jenkins.
19              THE COURT:  Very good.  All right.  I'm going
20    to hear oral argument.  I've reviewed voluminous
21    briefs, voluminous attachments.  My eye doctor is very
22    pleased that I have this case; it's been a lot of good
23    business for them.
24          We're going to start -- the order will be the
25    Penobscot Nation, then the United States, then the
```

```
 1    State, and then the town intervenors will bat cleanup

 2    here.  I'm not going to -- I don't expect we're going

 3    to have any rebuttal, because I don't know if we're

 4    going to have any time, but if we are going to have

 5    time I'll do it.  I'm going to try to limit everyone to

 6    no more than a half hour.  I tend to ask questions, and

 7    I apologize if I use up what you planned to address.

 8         Before I begin, I'm wondering if the parties are

 9    going to want to file anything after this argument.

10    I'll defer asking that question until at the end to see

11    if people think I need a little bit more education.

12         All right, let's start with the Penobscot Indian

13    Tribe.  Who's going to argue?

14              MR. SMITH:  I am, Your Honor, Kaighn Smith.

15              THE COURT:  Now, the acoustics in this room

16    are abominable.  So speak into the microphone and keep

17    your voice up.  If I don't hear you, it's not going to

18    impress me.

19              MR. SMITH:  Thank you, Your Honor.

20         I will at first address the affirmative motion for

21    summary judgment of the Penobscot Nation and the

22    directly confronting counterclaims that have been

23    submitted by the State defendants.

24              THE COURT:  Let me ask you first, though, is

25    it your view that this matter is decidable, to use a
```

1    poor word, solely on summary judgment?

2            MR. SMITH:  Yes, Your Honor.

3            THE COURT:  Okay.

4            MR. SMITH:  It is.

5            THE COURT:  Very good.

6            MR. SMITH:  And the reasons for that are that

7    really the essential undisputed facts spill from the

8    Congressional Record what Congress said about the

9    nature of this reservation.  And if you look closely at

10   the issue of whether this territory, the Penobscot

11   River watershed, was -- and the Main Stem in particular

12   was aboriginal domain, you will see that there is

13   really no dispute among the experts on that point, but

14   we can discuss that as we get into it.

15           THE COURT:  What do you see as the nature of

16   the Indian Claims Settlement Act and the MIA in this

17   case?  What were those proceedings; what are they

18   trying to do?

19           MR. SMITH:  Well, Your Honor, it's a -- really

20   it's a modern-day treaty.  The Supreme Court has used

21   the phrase treaty substitute, so Congress ended

22   treaty-making with tribes in 1871, and after that it

23   was all congressional enactments.

24           THE COURT:  So what do you think Congress and

25   the State was trying to do by passing those two acts?

1          MR. SMITH:  They were resolving <u>United States</u>

2     <u>versus Maine</u>, which was the historic land claims

3     brought by the Penobscot Nation and the Passamaquoddy

4     Tribe.

5          THE COURT:  And in that action the

6     Passamaquoddys and the Penobscots were asserting that

7     they retained rights under either aboriginal title or

8     otherwise for substantial portions of the state because

9     Maine had not acquired those titles through any other

10    device, correct?

11         MR. SMITH:  Correct, Your Honor, Maine and

12    Massachusetts, the 1796, 1818, and 1820 treaties were

13    not confirmed by the federal government.

14         THE COURT:  And Congress and the State of

15    Maine, you correct me if you disagree, were attempting

16    to have an overall settlement of the Indian claims and

17    the State of Maine defenses; am I correct?

18         MR. SMITH:  They were resolving the land

19    claims that were set forth in <u>United States versus</u>

20    <u>Maine</u>, that's correct, Your Honor.

21         THE COURT:  Which included the 1818 treaty

22    issues and the 1820 treaty issues.

23         MR. SMITH:  They were resolving -- those

24    sessions were confirmed -- Congress confirmed those

25    land sessions and those treaties, correct, Your Honor.

1          THE COURT:  And would you say that a new page

2     was turned over, each side recognized what rights and

3     responsibilities they had going forward?

4          MR. SMITH:  There was a new page, but there

5     was also a backwards page, if you will, Your Honor, and

6     I would say that the backwards page, for want of a

7     better term, was recognition that within the existing

8     reservation of the Penobscot Nation there -- as a

9     result of the landmark decisions in Bottomly versus

10    Passamaquoddy Tribe and State versus Dana, this

11    reservation was subject to federal Indian law doctrine.

12    And there was a carve-out.  This was a shockwave in the

13    middle of the land claims litigation, these cases that

14    came down.  In fact, you'll see that the record shows

15    that it really brought the State to the table.

16         And so one of the central features of the

17    settlement was that Maine had to recognize that they

18    were very -- it was very vulnerable to the reality that

19    this tribe in this place was governed by federal Indian

20    law precedent.  The agreement at the end of the day was

21    to give a substantial amount of jurisdiction to the

22    State.  That was a huge compromise on the part of the

23    Penobscot Nation and the United States.  What was

24    carved out from that resolution was the specific

25    sustenance rights and authorities that are at issue in

1    this case.

2           THE COURT:   And what do you think is at issue

3    in this case, what specific rights?

4           MR. SMITH:   The specific rights that are at

5    issue in this case, Your Honor, are those that are set

6    forth in Section --

7           THE COURT:   You just tell me.

8           MR. SMITH:   They are the right of the tribe to

9    govern its sustenance, hunting, fishing, and trapping

10   in the Penobscot Reservation, the right of tribal

11   members to take fish for their sustenance without

12   interference by the State, the right of the tribe to

13   exclusively govern these sustenance activities of its

14   members without interference by the State, and the

15   attendant exclusive authority set out in 6207 of the

16   tribe to govern nonmember hunting, trapping, and other

17   taking of wildlife within the same area.

18           THE COURT:   And that includes the Penobscot.

19           MR. SMITH:   Our contention, Your Honor, that

20   this is the Penobscot River bank to bank where this

21   reservation has been since time immemorial.

22           THE COURT:   So your view is that, even after

23   the Indian Land Claims Settlement Act, the Penobscot

24   Tribe owns from bank to bank in the Main Stem of the

25   Penobscot.

1          MR. SMITH:  No, Your Honor, I would say that

2     that's an overblown description of the legal status.

3          THE COURT:  What is your view of ownership

4     after the Indian Land Claims Settlement Act within the

5     Main Stem?

6          MR. SMITH:  Within the Main Stem, there is a

7     retained aboriginal use and occupation.

8          THE COURT:  Which came from?

9          MR. SMITH:  Came from the tribe's original

10    aboriginal domain, which was never ceded in the

11    treaties.  And under established Supreme Court and

12    First Circuit precedent, which we've cited,

13    Narragansett Indian Tribe versus Narragansett Electric

14    Corporation, and the Mattz case, which is cited in that

15    First Circuit case, an aboriginal domain is retained --

16    and those were the words that Congress used.  Congress

17    described these specific rights and authorities as

18    expressly retained sovereign authorities.  And the

19    First Circuit in the Johnson case in Footnote 11 said

20    that, when you assess the rights within this river, you

21    assess them in reference to what was retained out of

22    the treaties.  Congress spoke in no uncertain terms in

23    describing that these specific rights, and they're at

24    Section 7 of the Federal Act, they're described there,

25    are expressly retained sovereign activities, and it

1    promised the tribe that they were protected from

2    interference by the State.  At the hearings before

3    Congress, Your Honor, the Senate committee --

4             THE COURT:  I'm sorry, I -- I understand what

5    you've written.  I'm trying to cut through the case law

6    and cut through lawyer speak.

7             MR. SMITH:  Okay.

8             THE COURT:  So let's focus here.

9             MR. SMITH:  Fine, so these -- these specific

10   rights and authorities at issue were clear --

11            THE COURT:  What is it that you -- does the --

12   what do you believe, what is your assertion, that the

13   Penobscot Indian Tribe owns in the Penobscot stem?

14            MR. SMITH:  The Penobscot Tribe has retained

15   aboriginal use and occupation rights in the river,

16   never ceded, for the purposes of these rights and

17   authorities at issue in this case.

18            THE COURT:  And those rights are sustenance

19   fishing, hunting, and trapping.

20            MR. SMITH:  Yes, indeed, Your Honor.

21            THE COURT:  And those came because, in your

22   view, the Indian Lands Claims Settlement Act did not

23   impact those rights.

24            MR. SMITH:  Did not expressly extinguish them,

25   which is the term of art used by the Supreme Court.

1          THE COURT:  That's what your position is.

2          MR. SMITH:  Correct, Your Honor.

3          THE COURT:  And, therefore, the Penobscot

4    Indian Tribe continues to have the right to sustenance

5    hunt, fish, and trap in the Main Stem of the Penobscot.

6          MR. SMITH:  Bank to bank.  Attending --

7          THE COURT:  One bank to the other.

8          MR. SMITH:  Attending the islands in the

9    intervening the surrounding waters bank to bank,

10   because otherwise they'd be rendered meaningless.

11         THE COURT:  That's fine.  Is it your view that

12   the Indian tribe owns the bottom of the river?

13         MR. SMITH:  No.

14         THE COURT:  Is it your view that the Indian

15   tribe owns any portion of the land on either side of

16   the river?

17         MR. SMITH:  No, Your Honor, unless the tribe

18   has acquired it post settlement.

19         THE COURT:  Unless purchased, obviously.

20         MR. SMITH:  Ownership -- the ownership concept

21   is not in this case, Your Honor.

22         THE COURT:  Okay.  Is it your view that the

23   Penobscot Indian Reservation extends beyond the islands

24   in the Penobscot?

25         MR. SMITH:  Yes, for the purpose -- for the

1   purpose of sustenance hunting, trapping, and other

2   taking of wildlife, it extends into the river, which

3   was the aboriginal domain never ceded by the tribe, and

4   expressly confirmed by Congress.

5        THE COURT:  So your view is, just so I'm

6   clear, that the reservation extends throughout the Main

7   Stem of the Penobscot.

8        MR. SMITH:  For the purposes of the specific

9   rights and authorities at issue in this case.

10        THE COURT:  And as far as the land in the

11   Penobscot Main Stem or bordering the Penobscot Main

12   Stem, forgetting later purchases, is the reservation

13   the islands as described in the MIA or the Indian Land

14   Claims Settlement Act?

15        MR. SMITH:  Congress described the --

16        THE COURT:  Your position, I don't care what

17   Congress said.

18        MR. SMITH:  Let me make sure I understand the

19   question, Your Honor.  You're asking whether the

20   Penobscot Indian Reservation includes the islands?

21        THE COURT:  I understand you say it also

22   includes the right to hunt, fish, et cetera, let's put

23   that aside.

24        MR. SMITH:  Yes.

25        THE COURT:  Does it go beyond the islands?

1          MR. SMITH:   The reservation is the islands in

2     the Penobscot River as defined by Congress with the --

3     in the river were the operative words, right, the

4     Alaska Pacific Fisheries case makes very clear that if

5     you have islands that are surrounded by water that are

6     set aside for an Indian tribe to engage in sustenance

7     practices, they include the intervening and surrounding

8     waters, certainly for those purposes.

9          An argument can be made that this goes beyond

10    sustenance -- for the purposes of our second amended

11    complaint, which is a very narrowly tailored complaint,

12    there can be no doubt, given the legislative history

13    and what happened here, that Congress confirmed these

14    particular rights and authorities as expressly retained

15    sovereign authorities never ceded by the treaties or by

16    the statute.

17          THE COURT:   I understand.   Your position is

18    very clear in your brief.   What I'm trying to do -- I

19    don't want to hear your brief again because I've read

20    it, all right?   What I'm trying to do is get a clearer

21    delineation without all of the exposition I find in the

22    brief as to what you're claiming and what you're not

23    claiming.

24          MR. SMITH:   Absolutely.

25          THE COURT:   So I can narrow down where we're

1   going here.  Let me repeat what I've heard.  You tell

2   me if I've heard it incorrectly.

3        Your view is that pursuant to their aboriginal

4   rights that they didn't give away in their 1818, 1820

5   treaties and that were unaffected by the Indian Land

6   Claims Settlement Act, they retained their reservation

7   on the islands in the Main Stem of the Penobscot, as

8   described on paper in the documents we've got here.

9   And as part of that reservation they retained the right

10  for sustenance fishing, trapping, and hunting in the

11  Main Stem of the Penobscot bank to bank but not land

12  under the Penobscot other than what we've already

13  described and not any banks of the Penobscot unless

14  purchased later.  Am I incorrect?

15             MR. SMITH:  That's correct, Your Honor.

16             THE COURT:  Okay.

17             MR. SMITH:  The issue of riverbed ownership,

18  that whole conundrum is really something that would go

19  to an examination of the whole original aboriginal

20  claim.  So ownership is a concept I keep coming back to

21  on this, because the notion of ownership is very

22  different than the notion of an aboriginal use and

23  occupation never ceded.

24             THE COURT:  I understand.

25             MR. SMITH:  And the issue of whether the tribe

1    retains the riverbed as aboriginal title isn't

2    presented in this case.  There's no conflict that

3    emerges in this case that -- between, for instance, a

4    dam owner or the tribe with respect to how that

5    operates in reference to the aboriginal rights that the

6    tribe did not --

7            THE COURT:  So you're not claiming the

8    riverbed in terms of any dam owner.

9            MR. SMITH:  We're not doing that; that's not

10   before the Court.

11           THE COURT:  And you're not claiming any

12   riparian rights in this case.

13           MR. SMITH:  No, Your Honor, there is in the --

14   in the committee report of the State legislature, the

15   Attorney General Cohen examined the treaty rights as

16   riparian rights, so those are floating around, to

17   excuse the pun, in this case.

18           THE COURT:  Probably indefensible to the word

19   riparian floating around.

20           MR. SMITH:  There was a time, we might call it

21   the Tierney era, where the State took the positions

22   that the islands in the Penobscot in the Main Stem were

23   strictly ownership rights, like fee land, and with that

24   fee land under Maine riparian law you own out to the

25   thread of the river, right?  So that's one way that one

1   can examine this.  The State has retreated from that

2   position over the years, but it used to be that the

3   so-called rule of thumb was the tribe had as part of

4   its territory out to the thread.  So that riparian

5   ownership concept is floated around, but the Penobscot

6   Nation position is that that really is not what

7   Congress intended to do here.

8          THE COURT:  Now, I'm trying to figure out when

9   the MIA, it defines the reservation here, it uses the

10  word solely.  What is that intended to mean in the

11  legislative document?

12         MR. SMITH:  I think the United States has done

13  an excellent job, and you can ask Mr. Miskinis about

14  this, but I think the United States has examined it

15  properly, which is to say there needed to be a -- a

16  limiting principle in terms of which islands we were

17  talking about here in order to identify the geographic

18  space in which this reservation exists.  And it's very

19  much like the Alaska Pacific Fisheries case.  This was

20  a known area where the tribe had existed for hundreds,

21  hundreds of years, and the cutoff place was Indian

22  Island.  So it's solely Indian Islands and the islands

23  northward thereof, this was a delineating principle,

24  Your Honor, to make sure --

25         THE COURT:  You mean as opposed to any other

1    islands?

2         MR. SMITH:  Correct, exactly.  It was a

3    delineating principle in order to define that.  It does

4    not mean, as the State defendants and the intervenors

5    propose, that it meant nothing else.  In fact, the

6    statute's unworkable if that's the case because it

7    would render the sustenance fishing rights meaningless.

8         THE COURT:  Now, in this case we've had a

9    number of Attorney General opinions, some going one

10   way, some going the other.  Is there really any benefit

11   of my deciding which Attorney General was correct?

12        MR. SMITH:  I think that these -- over time

13   the Attorney General has changed.

14        THE COURT:  Why should I care which Attorney

15   General said what?  Does that --

16        MR. SMITH:  I'm sorry, Your Honor, I should

17   cut to the chase.  Your job is to discern what Congress

18   intended, right?  And what Congress intended was with

19   no uncertain terms to protect the sustenance uses of

20   this river and the cultural integrity of this tribe.

21   These were promises that Congress made to the tribe in

22   the identical Senate committee reports that were marked

23   as special issues.  And Congress, as the trustee for

24   the tribe in settling United States versus Maine, was

25   beset with some announced fears on the part of the

1    Penobscot Nation, and one of those fears was that the

2    sustenance rights and cultural integrity of the tribe

3    were going to be lost.  Congress knew and understood

4    and intended to protect the sustenance fishing rights

5    and authorities at issue as expressly retained.

6          THE COURT:  Just explain this to me.  I am

7    looking in the statute, the Maine Implementation

8    Statute, and I readily find a mention of sustenance

9    fishing within the bounds of the Indian reservation.  I

10   think you talked about that earlier, that they

11   recognized the right to sustenance fishing within the

12   reservation, and I understand how you define

13   reservation.  It's not an issue.  But I'm looking for

14   an equivalent mention of sustenance hunting and

15   trapping and fowling rights.  Could you point that out

16   to me, which section that is?

17         MR. SMITH:  Absolutely, Your Honor, that would

18   be Section 6207.

19         THE COURT:  Section 1?

20         MR. SMITH:  6207(1)(A) where --

21         THE COURT:  (1)(A) says that within their

22   respective Indian territories they can promulgate in an

23   act, ordinance regulating the hunting, trapping, and

24   other taking of wildlife, taking fish on any pond in

25   the shoreline.  Such ordinances may include special

1    provisions for sustenance.  That's what you're talking

2    about.

3           MR. SMITH:  Yes, absolutely, Your Honor.

4    That's an expression of exclusive authority on the part

5    of the Penobscot Nation.

6           THE COURT:  Where does it say exclusive?

7           MR. SMITH:  Subject to the regulations of

8    Subsection 6, which was the residual authority granted

9    to the Commissioner of the Inland Fish and Wildlife to

10   take action if sustenance practices on the part of the

11   tribe affected other resources, subject to that section

12   the -- excuse me, Your Honor.

13          THE COURT:  But let me --

14          MR. SMITH:  Shall have exclusive authority.

15          THE COURT:  Don't move on if I don't

16   understand what you've already said, because you're

17   going to lose me.  If in fact they have a right to

18   enact sustenance fishing, hunting, and trapping within

19   their territories, the right to enact ordinances, your

20   indication, just so I'm clear, is that that means that

21   they can enact that -- those ordinances not only in the

22   land purchased pursuant to the Act but also within

23   their reservation.

24          MR. SMITH:  Yes, Your Honor.  To be perfectly

25   clear, the definition of Penobscot Indian territory

1    encompasses two concepts, the Penobscot Indian

2    Reservation and the subsequently acquired lands that

3    were bought pursuant to the Land Act.

4              THE COURT:  I thought I just said that.

5              MR. SMITH:  Well, I -- I'm sorry, but I --

6              THE COURT:  Okay, go ahead.

7              MR. SMITH:  I was up too late last night.

8              THE COURT:  I apologize, I don't want you to

9    waste your time telling me what I've just repeated.

10             MR. SMITH:  And so in short this language says

11   with respect to -- if we isolate the reservation itself

12   this language says the Penobscot Nation shall have

13   exclusive authority within its reservation to

14   promulgate -- exclusive authority to promulgate

15   ordinance over hunting, trapping, other taking of

16   wildlife, and that includes sustenance uses as well.

17   So it's all inclusive.

18             THE COURT:  Go ahead.

19             MR. SMITH:  So that's the point there in

20   reference to the -- to those sustenance resources.

21        Your Honor, I don't know if it would be helpful to

22   you, but it's been helpful for us to actually see what

23   the reality is on the ground here in terms of what was

24   happening at the time of the settlement.  One of the

25   most compelling testimonies before Congress was that of

1    Lorraine Dana, who is a worried mother, single mother,

2    living on Indian Island, trying to feed her children.

3    She misconceived what the Settlement Act said.  She

4    thought that it was going to give the State authority

5    to control tribal member sustenance fishing and

6    hunting.  And she said to Congress in her testimony,

7    she said, my son fishes my islands in order to put food

8    on the table for my family.  And the undisputed

9    evidence before the Court is that what she meant was a

10   Penobscot locution, she meant that my son is in the

11   waters surrounding my islands, engaged in his canoe,

12   taking eels and fish and other river-dwelling animals

13   to put them on the table for my family.  These aren't

14   sort of abstract things that are happening for this

15   tribe.  Tribal members have eaten out of this river for

16   a very long time, and they were doing so at the time

17   that Congress made its promises here.

18        The other testimony that's before you is of Chris

19   Francis, who was collecting food from the river at the

20   time of the Settlement Act to the tune of two to three

21   pounds three to four times per week with his family.

22   And the undisputed testimony of Butch Phillips and

23   others before the Court, Kirk Loring is another,

24   there's multiple undisputed testimony about the

25   importance of this river and the resources and the

1   sustenance for this tribe.  They need to get out on the

2   river.  That's what Congress was confirming.

3           THE COURT:  Is it your position here that the

4   Indians are -- have the right that they're asserting in

5   this case, that they have the right to exclude anyone

6   from the river?

7           MR. SMITH:  No, in the treaty, the 1818

8   treaty, there was an express easement for public

9   passage on the river.

10          THE COURT:  Is it your position that the

11  Penobscot Nation has the right to control water

12  sampling on the river?

13          MR. SMITH:  We have asked for permits.  We

14  have asked to have notice of who is on the river and

15  people have voluntarily complied with that.

16          THE COURT:  That's not my question, though.

17  You're trying to change it a little bit.  My question

18  is, is it part of your assertion in this case that the

19  Penobscot Nation has the right to regulate water

20  sampling on the river?

21          MR. SMITH:  We -- that issue respectfully,

22  Your Honor, is not currently in controversy so --

23          THE COURT:  Does that mean you're not

24  asserting that right in this case?

25          MR. SMITH:  We don't think that we need to

1    assert the right in the case because it's not --

2           THE COURT:  That isn't what I asked you.  Are

3    you asserting -- in your view are you asserting that

4    right in this case?

5           MR. SMITH:  We are not asserting that right in

6    this case.

7           THE COURT:  Is it your view that the Penobscot

8    Nation is asserting the right in this case to have

9    nontribal members appear for wildlife offenses before

10   tribal courts?

11          MR. SMITH:  No, Your Honor, we conceded that.

12   We've told the State time and again that those

13   summonses were issued by mistake.

14          THE COURT:  Is it your position in this case

15   and you're asserting that only Penobscot Nation wardens

16   may regulate sustenance fishing in the Penobscot by

17   tribal --

18          MR. SMITH:  That is our position, Your Honor,

19   yes, within the reservation.

20          THE COURT:  On the Main Stem.

21          MR. SMITH:  On the Main Stem, yes.

22          THE COURT:  Is it your position in this case

23   that the Penobscot Indian Nation has any right to

24   regulate nontribal member fishing on the Penobscot?

25          MR. SMITH:  Yes, that was the provision that

 1    we just discussed, Your Honor, pursuant to Section

 2    6207(1)(A), Congress confirmed exclusive authority of

 3    the tribe to promulgate regulations governing hunting,

 4    trapping, and other taking of wildlife.

 5         THE COURT:  And, therefore, you're asserting

 6    in this case that the State of Maine has no

 7    jurisdiction to regulate hunting, fishing, and trapping

 8    on the Main Stem of the Penobscot.

 9         MR. SMITH:  There -- on -- let me just stop on

10    the fishing part of that.  With respect to hunting,

11    trapping, and other taking of wildlife, Congress

12    confirmed the exclusive authority of the Penobscot

13    Nation with respect to those three things.  With

14    respect to fishing, if I may, Your Honor --

15         THE COURT:  Let me just stop you.  On those

16    areas, only Penobscot Indian wardens have jurisdiction.

17         MR. SMITH:  That's correct.

18         THE COURT:  Go ahead.

19         MR. SMITH:  Those wardens, however, are

20    completely trained pursuant to State law.

21         THE COURT:  Whether they're trained or not is

22    not what I was asking.  Go ahead.

23         MR. SMITH:  With respect to fishing, Your

24    Honor, that issue is not before the Court, so we're not

25    asserting any position on that in this case, in the

1    same way that we're not asserting positions on the

2    other matters that are not before the Court in terms of

3    a case of controversy.  There is, as you know, a very

4    interesting dispute about whether the Maine Indian

5    Tribal State Commission has the exclusive authority to

6    promulgate fishing regulations within the reservation.

7    That has not been resolved, it has not come to a head,

8    and folks have gotten along.  Nonmembers fish on the

9    Main Stem all the time.  There's just no case of

10   controversy that raises that issue.

11        Your Honor, this case is really governed by two

12   Supreme Court cases in a simple fashion.  The first is

13   Alaska Pacific Fisheries.  In that case Congress has

14   set aside a known body of islands for the Metlakahtla

15   Indian Tribe for the purpose of allowing them to have a

16   sustenance fishery.  Here Congress confirmed, even more

17   powerfully, the Penobscot's reservation treaty reserve

18   islands and attending waters, it's islands in the

19   river.  You can't have islands without water.  So the

20   only way to read that and give it meaning is to do what

21   the Supreme Court did in Alaska Pacific Fisheries, and

22   it's to say it obviously involves intervening

23   surrounding waters; otherwise, the reservation would be

24   meaningless.  And that's what Congress expressly said

25   that it was protecting.

1        The non-Indian case that's on point is the case

2    decided last term, the King versus Burwell case.  There

3    the question was whether an exchange established by a

4    state, which was the only exchange which would sort of

5    launch the ability of taxpayers to get their credits,

6    could include an exchange created by the federal

7    government.  It was fought hard on the plain language,

8    and the Court realized that language alone without

9    context doesn't often work.  And so the Court put it in

10   context and realized that the purpose of the statute

11   was to allow taxpayers to have credits both in federal

12   exchanges and state exchanges and read the statute

13   accordingly.

14        There's -- so those two cases, Your Honor, are

15   sufficient for you to find for the Penobscot Nation

16   here.

17           THE COURT:  Let me deal with one of the

18   intervenors here.  Is it your position here that the

19   towns have the right to discharge into the Penobscot as

20   indicated in the --

21           MR. SMITH:  They do and they are, Your Honor.

22           THE COURT:  They do and they are what?

23           MR. SMITH:  Excuse me?

24           THE COURT:  They do and they are what?

25           MR. SMITH:  They are discharging.

1          THE COURT:  We know that.  I'm asking your

2    position on their right to do so.

3          MR. SMITH:  They have the right to do so.

4          THE COURT:  No issue about that.

5          MR. SMITH:  No issue about that.

6          THE COURT:  So they can leave and go home.

7          MR. SMITH:  They can leave and go home, Your

8    Honor.

9          THE COURT:  Just so we're clear.

10         MR. SMITH:  Yes.

11         THE COURT:  What is the significance here of

12   the long-term State regulation of fishing, hunting, and

13   trapping on the Main Stem of the Penobscot?

14         MR. SMITH:  The long-term -- excuse me?

15         THE COURT:  What's the significance of the

16   fact that the State's been regulating those areas in

17   the Main Stem of the Penobscot for some period of time?

18         MR. SMITH:  It's of no moment whatsoever, Your

19   Honor, and that's made perfectly clear by Judge

20   Coffin's decision in Bottomly versus Passamaquoddy

21   Tribe.  We laid that out in our reply brief.  Tribes

22   can't lose these inherent sovereign authorities just

23   because another sovereign seeks to dominate in the same

24   area.

25         THE COURT:  I guess -- I guess my question

1    perhaps was inartful.  Does that tell me something

2    about the understanding of the parties with regard to

3    the language in the MIA?

4            MR. SMITH:  Absolutely not.

5            THE COURT:  And the reason is?

6            MR. SMITH:  The reason is because the

7    undisputed record shows that the tribe was feeding from

8    the river forever without a thought of complying with

9    any State regulations and presumed that it was part of

10   its homeland in order to do that and survive.  That's

11   been going on for centuries.  It's undisputed in the

12   record before the Court, so that has no bearing on the

13   parties' understanding whatsoever.

14           THE COURT:  And your position, just so I'm

15   covering my thought process here, and I apologize, I

16   didn't give you --

17           MR. SMITH:  Not at all, Your Honor, this is

18   fine.

19           THE COURT:  But I want to be clear.  And your

20   position with regard to whether or not there are

21   indispensable parties that should be in this litigation

22   that are not, as the State has asserted as an

23   alternate.

24           MR. SMITH:  There is an assertion in the air,

25   Your Honor, that there may be some parties that may

1    have some interest because they have some deed that

2    references some interest in the bed of the river.  But

3    that's just -- that just doesn't comply with Rule 19.

4    There has to be a party -- identifiable party with an

5    interest in the action, and there isn't one.

6              THE COURT:  And, in any event, what I've heard

7    you say, and correct me again if I'm wrong, is that

8    you're not claiming the bed of the river in any event.

9              MR. SMITH:  We're not.

10             THE COURT:  There you go.  Okay, anything else

11   before you sit down?

12             MR. SMITH:  Thank you, Your Honor.

13             THE COURT:  Thank you.  And I apologize for

14   pushing you, but time is very limited.

15             MR. SMITH:  Understood.

16             THE COURT:  I'd rather I get my questions

17   answered than you -- you get to --

18             MR. SMITH:  I would have droned on far too

19   long for you.

20             THE COURT:  Thank you very much.  All right,

21   the U.S.A.  Your name?

22             MR. MISKINIS:  Steven Miskinis, Your Honor.

23             THE COURT:  You go right ahead.

24             MR. MISKINIS:  Thank you, Your Honor.  The

25   United States' position is that the Penobscot Nation

1    owns the Main Stem bank to bank and we think --

2          THE COURT:  Is it identical to what I just

3    heard?

4          MR. MISKINIS:  No, we think that the Main

5    Stem -- their ownership rights would include the

6    submerged lands in the river as well.

7          THE COURT:  So you as trustee for the tribe

8    take a different position than the tribe.

9          MR. MISKINIS:  Yeah, we take --

10         THE COURT:  Is that a yes?

11         MR. MISKINIS:  That's a yes.

12         THE COURT:  Okay, go ahead.

13         MR. MISKINIS:  We take a different position in

14    that we think that their rights extend to the beds as

15    well.  Congress says it understood the reservation

16    definition in the Maine Implementing Act to give to the

17    Nation its surviving reservation lands.

18         THE COURT:  Let me just repeat what I've

19    heard, just so your position is clear in my mind.

20         MR. MISKINIS:  Okay.

21         THE COURT:  Your view is that the Penobscot

22    Indian Tribe owns bank to bank in the Main Stem of the

23    Penobscot.

24         MR. MISKINIS:  Subject to -- subject to those

25    portions of the reservation that have been transferred.

1          THE COURT:  All right.  Subject to the right

2     of navigation by the public.

3          MR. MISKINIS:  It's subject to the right of

4     navigation by the public, yes, of course.

5          THE COURT:  And that ownership includes the

6     bed.

7          MR. MISKINIS:  Yes.

8          THE COURT:  Does it include any portion of the

9     banks?

10          MR. MISKINIS:  No, the banks are -- the

11    Penobscot Nation does not own the banks.  Those were

12    ceded in the treaties.

13          THE COURT:  And your view whether every

14    landowner who has riparian rights within their deed

15    along the Penobscot is an indispensable party in this

16    case.

17          MR. MISKINIS:  Our view is that they are not.

18          THE COURT:  Now, if I owned a piece of land on

19    the Penobscot today, Main Stem, when I say Penobscot

20    that means the Main Stem, and my deed included riparian

21    rights --

22          MR. MISKINIS:  Which it probably wouldn't say

23    on the face of the deed.

24          THE COURT:  It probably wouldn't, correct.

25    Your view is that I should take away the riparian right

1    without hearing from that landowner.

2         MR. MISKINIS:  No, my view is not that.  My

3    view is that this Court -- under Rule 19 the question

4    is can this Court assign relief amongst the parties

5    that are before it.  The question here -- we're not

6    bringing a quiet title action.  I think there might be

7    property issues implicated in it, but this is a

8    jurisdictional dispute between the State of Maine and

9    the Penobscot Nation.

10        THE COURT:  Would my ruling on this case have

11   any impact on a later suit by a landowner saying my

12   riparian rights are still there?

13        MR. MISKINIS:  It would not.

14        THE COURT:  We'd litigate it all over again.

15        MR. MISKINIS:  If such a situation ever

16   occurred that they were in a conflict with them.  I

17   mean, what we're talking about here is the Nation's

18   wanting to exercise fishing rights in the river and

19   regulate hunting and trapping.  Property owners don't

20   get to regulate fishing or hunting and trapping; these

21   are governmental responsibilities.  So, I mean, the

22   Court has to take into account whether or not such a

23   conflict is speculative or realistic, you know, before

24   deciding to bring in these people.  And because it's

25   not clear on the face of the deeds whether or not

1    they're even claiming an interest in the river, and

2    this is a well-publicized case, we don't believe it's

3    appropriate to bring people in here and force them to

4    litigate riparian rights.

5         THE COURT:  What you're telling me is if in

6    fact a landowner comes in later and says, I do have

7    riparian rights, I'm going to relitigate this case,

8    and, who knows, another judge may hear it and come to a

9    completely different decision, correct?

10         MR. MISKINIS:  That's correct.

11         THE COURT:  All right.  What's your position

12    on the Penobscot Indian Nation's assertion with regard

13    to what rights they -- forgetting the bed -- what

14    rights they do have in the Main Stem?  In other words,

15    sustenance hunting, fishing, trapping, et cetera.

16         MR. MISKINIS:  If this Court were to rule in

17    favor of the Nation and say that the Main Stem is in

18    the reservation, very little would happen as far as the

19    general public.  The Nation would --

20         THE COURT:  That isn't what I asked you.  What

21    I asked you is do you concur, is your position the same

22    as theirs as to what rights they have in the Main Stem

23    bank to bank?

24         MR. MISKINIS:  They would have the right to

25    sustenance fishing and the right to regulate hunting

1    and trapping.

2          THE COURT:  Could they exclude the public from

3    hunting and fishing?

4          MR. MISKINIS:  They could not.

5          THE COURT:  Because?

6          MR. MISKINIS:  Because the State has a

7    navigational --

8          THE COURT:  They have a right to navigation;

9    that isn't what I asked you.  Could they exclude the

10   public from hunting and fishing?

11         MR. MISKINIS:  Oh, could they exclude --

12         THE COURT:  Non-Indian members, to be clear.

13         MR. MISKINIS:  They could -- they could do so

14   only if they passed a law that excluded Indian members

15   as well.  Any regulations have to be nondiscriminatory.

16         THE COURT:  What if they believe that their

17   sustenance fishing was burdened unduly by public

18   fishing, could they exclude the public to preserve

19   their right of sustenance fishing?

20         MR. MISKINIS:  They would not have the right

21   to exclude the public.  They might have a cause of

22   action against the State of Maine's regulations that

23   permit such fishing as arguing that --

24         THE COURT:  Does the State of Maine have in

25   your view the right to regulate fishing on the

1    Penobscot?

2         MR. MISKINIS:  Yes, the State of Maine

3    regulates nonsustenance --

4         THE COURT:  That isn't what I asked you.  I

5    know they do.  My question is, is it your position that

6    they have a right to regulate hunting and fishing on

7    the Main Stem of the Penobscot?

8         MR. MISKINIS:  My answer is yes, the State has

9    that right, until the point that the Maine Indian

10   Tribal State Commission issues its own regulations.

11        THE COURT:  Has the commission issued any

12   regulations?

13        MR. MISKINIS:  The commission has not.

14        THE COURT:  Does the commission have a right

15   to issue regulations on the Main Stem of the Penobscot

16   in your view?

17        MR. MISKINIS:  If this Court holds that

18   that -- the Main Stem falls in the reservation, the

19   commission would have authority to promulgate

20   regulations governing the public.

21        THE COURT:  Does the Indian Nation, does the

22   Penobscot Nation, have a right to issue hunting and

23   fishing regulations for the Main Stem of the Penobscot?

24        MR. MISKINIS:  It would have the right to

25   issue hunting regulations.

1          THE COURT:  Not fishing.

2          MR. MISKINIS:  But not fishing, only as far as

3    sustenance fishing goes.

4          THE COURT:  How about sustenance hunting?

5          MR. MISKINIS:  It would have the right to

6    regulate sustenance hunting as well.

7          THE COURT:  In your view does the -- your

8    view, I mean as a representative, obviously, does the

9    Penobscot Indian Nation have a right to sustenance

10   hunting and trapping and fowling on the Main Stem?

11         MR. MISKINIS:  Yes.

12         THE COURT:  Do they have the right to go

13   beyond that?

14         MR. MISKINIS:  Beyond the Main Stem?

15         THE COURT:  Beyond sustenance.

16         MR. MISKINIS:  They -- they don't have a right

17   as far as sustenance fishing, but if it falls in the

18   reservation then they would have the right to establish

19   ordinances for general hunting and trapping on the Main

20   Stem.

21         THE COURT:  And your view is that the Main

22   Stem is part of their reservation?

23         MR. MISKINIS:  Yes, Your Honor.

24         THE COURT:  Is it your view that riparian

25   rights have nothing do with this case?

1          MR. MISKINIS:  It -- well, our position is a

2     little bit -- I don't think they have anything to do

3     with regard to the reservation question, but if the

4     Court is going to rule against the Nation on that or,

5     you know, for whatever reason, we think at a minimum

6     the Nation has the same rights as any other riparian

7     owner would have in that situation.  No one contests

8     the Nation owns its islands and has always owned them.

9     So at a minimum the Nation would own to the thread of

10    the river on either side of its 146 islands up and down

11    the river.

12          THE COURT:  And, therefore?

13          MR. MISKINIS:  And, therefore, that area would

14    fall within the Nation's reservation and subject to all

15    of the rights and limitations that we've just been

16    going around about.

17          THE COURT:  Is it your view that the Penobscot

18    Nation has the right to exclude the public from the

19    river for any reason?

20          MR. MISKINIS:  No.

21          THE COURT:  Charge a fee for going on the

22    river?

23          MR. MISKINIS:  No.

24          THE COURT:  Bring nontribal members into

25    tribal courts for fish and wildlife violations?

1          MR. MISKINIS:  No.

2          THE COURT:  Bring nontribal members into

3    tribal courts for any violations of law, except

4    those -- no, any violations of law?

5          MR. MISKINIS:  No, but --

6          THE COURT:  Go ahead.

7          MR. MISKINIS:  I don't think that's the -- I

8    don't think they do.  But -- and that's all just

9    based -- basically our position is their rights would

10   be that which are spelled out in the Maine Implementing

11   Act.

12         THE COURT:  And no more.

13         MR. MISKINIS:  No more, no less.  There would

14   have to be a derivation of that or an application of

15   it.  But to -- I understand what the Court is trying to

16   do, but to render these types of --

17         THE COURT:  Well, I'm hearing a lot of

18   different arguments here, and some of them are

19   arguments that no one's resisting, so I want to be

20   clear on the record.

21         MR. MISKINIS:  Yeah, I -- well, our reading of

22   the Maine Implementing Act is that we don't see how

23   they could be able to hail a nonmember into tribal

24   court.

25         THE COURT:  Is it your view that under

1    aboriginal rights the Indians only had sustenance

2    fishing rights?

3           MR. MISKINIS:  Under the -- their aboriginal

4    rights gave them much more, the --

5           THE COURT:  Just so I'm clear.

6           MR. MISKINIS:  Those aboriginal rights are

7    subject --

8           THE COURT:  Included hunting, fishing,

9    trapping, for mercantile rights, correct?

10           MR. MISKINIS:  They had rights to do -- they

11    had the possession of that land, and in most Indian

12    country aboriginal rights mean you have the -- you --

13    state sovereignty is preempted by the tribe's right to

14    govern itself.

15           THE COURT:  I understand.  So just follow me

16    along because you understand this a lot better than I

17    do in terms of treaties, et cetera.  In 1818, when the

18    first of the treaties we've been discussing earlier

19    took place, is it your view that before that treaty was

20    signed the Indians had rights on the Penobscot that

21    went beyond sustenance fishing?

22           MR. MISKINIS:  Yes, Your Honor.

23           THE COURT:  They could fish to their heart's

24    extent; could they not?

25           MR. MISKINIS:  They could.

1          THE COURT:  Even if they sold the fish,

2    correct?

3          MR. MISKINIS:  Yes.

4          THE COURT:  Okay.  Your view is, correct me if

5    I'm wrong, that even after that treaty was signed they

6    continued to have those rights, correct?

7          MR. MISKINIS:  Subject to in that treaty

8    they -- they gave to the State -- they opened the river

9    up for purposes of public commerce and other uses.

10          THE COURT:  But they didn't give up their

11    fishing rights.

12          MR. MISKINIS:  No, in fact, they protested

13    when they felt their fisheries were infringed upon.

14          THE COURT:  So when was the first time that

15    the Penobscot Nation lost those unlimited rights to

16    fish?

17          MR. MISKINIS:  Well, according to federal

18    courts in the state of Maine they never did.  What

19    happened in the next --

20          THE COURT:  Do they have those today?

21          MR. MISKINIS:  They -- all their aboriginal

22    rights are now subject to the Maine Implementing Act.

23    So, no, their rights are now what are described in the

24    Maine Implementing Act.  They do not have rights

25    independent of that.

1          THE COURT:  Just so I'm clear, then, your view

2     is that after the 1818 treaty their rights were for --

3     for fishing, just to be very narrow and easy,

4     unlimited, correct?

5          MR. MISKINIS:  In -- in theory they were; in

6     practice they were unable to maintain control.

7          THE COURT:  But in terms of a right, it

8     doesn't mean what they exercised, it's what they had.

9          MR. MISKINIS:  That is correct.

10         THE COURT:  That right continued until --

11         MR. MISKINIS:  In 1980.

12         THE COURT:  Because they never gave up those

13    rights --

14         MR. MISKINIS:  That's correct.

15         THE COURT:  -- in 1818, correct?

16         MR. MISKINIS:  That's right, and in the

17    1970s --

18         THE COURT:  Then we had the Indian Land Claims

19    Settlement Act, correct?

20         MR. MISKINIS:  Yes.

21         THE COURT:  And you're telling me, just

22    correct me if I'm wrong, that that act restricted their

23    rights to fish.

24         MR. MISKINIS:  Yes.

25         THE COURT:  So that something happened to that

1    1818 reservation of fishing rights in the Maine Claims

2    Settlement Act, correct?  Maine -- in the MIA, as well

3    as the Settlement Act, something happened to those

4    rights.

5              MR. MISKINIS:  To those specific rights.

6              THE COURT:  That's all I'm asking about,

7    correct?

8              MR. MISKINIS:  Yes.

9              THE COURT:  Okay.  So there was some

10   cognizance of the 1818 treaty at that time in working

11   out the language of the MIA and the Settlement Act; was

12   there not?

13             MR. MISKINIS:  Yes.

14             THE COURT:  All right.  So the -- the -- that

15   treaty wasn't ignored by the Congress or the Maine

16   legislature; was it?

17             MR. MISKINIS:  No.

18             THE COURT:  Okay.  So tell me why the right to

19   fish was impacted that they retained after 1818, but

20   no -- other things were not taken into account in the

21   Settlement Act.

22             MR. MISKINIS:  You mean why Congress

23   guaranteed the sustenance fishing right but not the

24   other rights?

25             THE COURT:  Well, for instance, this is what

1    I'm trying to focus on here.  I thought I heard from

2    the Penobscot Indian Nation that their rights that they

3    had in the 1818 treaty and beyond were not impacted at

4    all -- and I may have misheard but the record will be

5    printed and I'll understand it better -- were not

6    impacted at all by the MIA or the Indian Land Claims

7    Settlement Act.  That's what I heard previously.  I'm

8    hearing from you that they were, and at least as to

9    sustenance fishing because their unlimited rights were

10   reduced to sustenance fishing rights.  But I heard also

11   earlier that their claim of what constitute the

12   reservation was not impacted by the Maine Land Claims

13   Settlement Act, and your view I suspect is that it's

14   the same, correct?

15             MR. MISKINIS:  Right.  Congress intended to

16   confirm to the Nation its surviving reservation lands,

17   but at the same time as part of the Land Claims

18   Settlement the State negotiated a new jurisdictional

19   framework that allowed the State to acquire back much

20   of the rights that the tribe had just had validated in

21   the 1970s, and federal court decisions that held tribal

22   sovereignty was the same as in any other place in

23   Indian country.

24             THE COURT:  I understand.  Now, I've -- I read

25   that the State of Maine is upset about tribal wardens

```
 1    ticketing nontribal members to come to the tribal court

 2    for fish and wildlife infractions, that they're

 3    charging a fee for boaters to go on the Penobscot

 4    River, that type of thing.  Is it your view that the

 5    Indian tribes have that right -- the Penobscot Indian

 6    Tribe has that right on the Penobscot?

 7              MR. MISKINIS:  To charge money --

 8              THE COURT:  Entrance onto the Penobscot for a

 9    boater?

10              MR. MISKINIS:  No.

11              THE COURT:  To ticket them for fish and

12    wildlife violations into the tribal court?

13              MR. MISKINIS:  They have the authority to

14    enforce tribal ordinances going to hunting and

15    trapping.

16              THE COURT:  In the tribal court?

17              MR. MISKINIS:  But the -- the case would be

18    resolved in the state court.

19              THE COURT:  That isn't what I asked you.  Do

20    they have a right to bring someone into the Penobscot

21    Tribal Court for a fish and wildlife violation on the

22    Penobscot?

23              MR. MISKINIS:  And I think I said they have to

24    go to state court.

25              THE COURT:  So they don't have that right.
```

 1          MR. MISKINIS:  Correct.

 2          THE COURT:  Okay.  Do they have a right to

 3   require a fishing license payable from the tribe for

 4   fishing on the Penobscot?

 5          MR. MISKINIS:  I don't -- I don't think so.  I

 6   think the -- they don't regulate fishing so they would

 7   not have the right to --

 8          THE COURT:  What do you mean, they don't

 9   regulate fishing?

10          MR. MISKINIS:  The tribe has a sustenance

11   fishing right, but as to nonsustenance fishing, if it's

12   on the reservation, that would be governed by the

13   State's regulations unless and until the Maine Indian

14   Tribal State Council promulgates its own fishing

15   regulations.  Such regulations would be the vehicle by

16   which fishing licenses would be required.

17          THE COURT:  So in your view the tribe has the

18   right to promulgate fishing regulations but they

19   haven't.

20          MR. MISKINIS:  No, the Maine Indian Tribal

21   State Commission would have the right to promulgate

22   fishing regulations.

23          THE COURT:  But not the tribe.

24          MR. MISKINIS:  That's right.

25          THE COURT:  So the tribe may not regulate

1    fishing by nonmembers on the Penobscot.

2            MR. MISKINIS:  Correct.

3            THE COURT:  Do you see that as a difference

4    from the tribal view in this case?

5            MR. MISKINIS:  I don't think so.

6            THE COURT:  Go ahead.  Anything else?  Go

7    ahead.

8            MR. MISKINIS:  I just would, again, like to

9    emphasize that the -- there's no -- there's no real

10   issue with regard -- well, actually I'll just make one

11   last comment.  Because of this jurisdictional

12   framework, Congress was very concerned in the

13   settlement arrangement -- because the tribe was giving

14   so much of its sovereignty up, Congress was very

15   concerned about the fairness of it.  And that's why

16   they -- looking at the settlement and the legislative

17   history, this fishing right becomes so important and so

18   central and that's why it's so central today.  Because

19   Congress says, well, this -- in terms of concern that

20   the tribe's about to get enculturated, it's going to

21   lose its sovereignty, and feels fundamentally unfair,

22   Congress says, well, they still have this aspect of

23   their sovereignty, this survives it, and Congress

24   understood that this right could not be exercised on

25   the islands.

1          THE COURT:  Is it your view, just so I'm

2    clear, that the Penobscot Nation owns the water in the

3    Main Stem?

4          MR. MISKINIS:  I don't think the Nation owns

5    the water in the Main Stem.

6          THE COURT:  Go ahead.  Anything else?

7          MR. MISKINIS:  That's it.

8          THE COURT:  Thank you very much.  All right,

9    I'll hear from the State of Maine.

10         All right, you've heard two earlier speakers.

11   Tell me what you think is left to decide in this case

12   in terms of the interests of the State of Maine.

13         MR. REID:  What's left to decide, first of

14   all, if you look at Page 34 and 35 of the tribe's reply

15   brief you'll see more frank, perhaps, statement of what

16   they believe their authorities are within the scope of

17   the reservation if it's defined to include the Main

18   Stem.  And that includes in their view unfettered

19   rights to do anything that they believe is necessary to

20   protect so-called sustenance resources.

21         THE COURT:  I thought I asked that question.

22         MR. REID:  I'm sorry?

23         THE COURT:  I thought I asked one of them that

24   exact question, and they said they don't have -- one of

25   them said they don't have a right even to regulate

1    nontribal members on the Penobscot.

2          MR. REID:  Well, that's at variance from what

3    they've represented to the Court in the reply brief and

4    that's quite significant.

5          THE COURT:  I shouldn't believe them.

6          MR. REID:  Well, I think that Mr. Smith was

7    quite careful to try to avoid providing the Court with

8    specific responses to at least two questions regarding

9    water quality sampling and fishing regulation.

10         THE COURT:  So what is -- why don't you list

11   for me what you believe are live issues still remaining

12   in this case.

13         MR. REID:  The scope of the reservation is a

14   live issue, Your Honor, and at least because the tribe

15   and the U.S. are claiming that that brings with it the

16   authority to regulate nontribal activities, including

17   hunting and trapping in the reservation.  That's

18   clearly a live issue.  And what we're seeing here, Your

19   Honor, is a boot-strapping strategy.  It's being

20   presented to the Court in the context of sustenance

21   fishing.  They've been at this for four years; they've

22   spent hundreds of thousands of dollars of federal

23   taxpayer money.

24         THE COURT:  Let's focus on my question.  What

25   do you consider to be the live issues in this case?

1    What are they?

2           MR. REID:  The scope of the reservation.

3           THE COURT:  That's one.

4           MR. REID:  And that -- a ruling that resolves

5    that issue and confines the reservation to the islands

6    in the river consistent with 6203(8) would resolve

7    probably three-quarters of the issues that are

8    presented in this case.

9           THE COURT:  Obviously, and you're fully -- are

10   there any other issues -- let's assume that I limited

11   the reservation to the islands themselves.

12          MR. REID:  Right.

13          THE COURT:  How do I give sustenance fishing

14   to the Indians as the State has permitted --

15          MR. REID:  Sure.

16          THE COURT:  -- for years within the Main Stem

17   of the Penobscot?  What basis do I have for permitting

18   that?

19          MR. REID:  Well, as we've tried to explain in

20   the pleadings, Your Honor, under the statute the right

21   of sustenance fishing is tied to the islands, but

22   there's no real world issue.  There's no tribal member

23   who's ever come forward and said any state agent has

24   ever interfered with or attempted to interfere with

25   their engaging in sustenance fishing.

1              THE COURT:  I guess this is what I don't

2     understand.  You're trying to argue there's no real

3     case of controversy because you've permitted them, the

4     State has permitted them, to do this sustenance

5     fishing, et cetera, without inhibition.  So, therefore,

6     what are they complaining about?

7              MR. REID:  As to sustenance fishing.

8              THE COURT:  Right.

9              MR. REID:  Correct.

10             THE COURT:  But you agree, do you not, that

11    the United States could revoke that unilateral

12    privilege that you're granting, depending upon who the

13    governor is or who the Attorney General is?

14             MR. REID:  The State could revoke it?

15             THE COURT:  Yes.

16             MR. REID:  Presumably that's true but before

17    the Court --

18             THE COURT:  How is that a nonissue?

19             MR. REID:  Because the -- the record -- the

20    summary judgment record contains sworn testimony from

21    the colonel of the warden's service saying that it's

22    always been this way and they have no intent to change

23    the policy, and if it's ever changed they can come back

24    to court.  The State has no interest in taking on the

25    issue of sustenance fishing.

1          THE COURT:  Let me be clear.  If I claim a

2     right-of-way across your land and -- so I can walk to a

3     trailer, and you say, you don't have a right but I

4     can -- I'll let you walk because I'm a nice person,

5     you're telling me that I couldn't go to court even

6     while you were permitting me to walk anyway saying

7     there's a dispute as to ownership of this right-of-way

8     as to this easement that I claim?

9          MR. REID:  Where I am saying that's -- I

10    disavow any intention to ever exercise that privilege.

11         THE COURT:  But you can't forever disavow it

12    because you know, do you not, that that -- the governor

13    or the administration can change that at any time,

14    correct?

15         MR. REID:  And if that happens then we have a

16    case of controversy on the issue but we don't know.

17         THE COURT:  But it isn't permanent.  What

18    you're saying is the practice has been.

19         MR. REID:  Right, the reality is we're left

20    with a statute, and what the statute provides is a

21    right of sustenance fishing tied to the reservation.

22         THE COURT:  Okay.  You've heard them say that

23    they don't claim the right to tax anybody or charge a

24    fee to enter the river.  Do you accept that?

25         MR. REID:  I'm not sure I heard that clearly.

1     What I've heard is that they claim a right to regulate

2     fishing, for example, hunting and trapping of nontribal

3     members.  Implied within that right is the right to

4     prohibit those activities.  And I took the point of

5     some of the Court's questions to be, what does the

6     right to regulate entail?  If it doesn't entail the

7     right to prohibit or to charge a fee or to require a

8     license, what does it require?  What does it entail?

9     That's what regulation is all about.  So I don't think

10    that the plaintiffs satisfactorily responded to those

11    questions.

12          THE COURT:  Let's go back to my original

13    question.  Size of the reservation, extent of the

14    reservation, right to regulate nontribal members on

15    hunting and fishing in the Main Stem, correct?

16          MR. REID:  Right.

17          THE COURT:  What else?

18          MR. REID:  All the individual activities that

19    are raised in the State's counterclaims because the

20    tribe and the U.S. are anxious not to have the Court

21    address those in this case, but the summary judgment

22    record shows that there have been assertions of

23    authority with respect to each of those activities.

24    This issue of summonsing nontribal members to federal

25    court, it's clear they have no authority to do that, so

1    they don't want it addressed in the judgment.  But only

2    two years or a year before they filed this lawsuit they

3    were representing to the federal government in an

4    application for funds to file this lawsuit against the

5    State that exactly that type of activity was

6    anticipated in the following season.  They attached

7    those two summons of nontribal members to their

8    petition to the Department of Interior.

9         THE COURT:  Would you find it strange for

10   advocates for a party to give up rights in oral

11   argument which may well be incorporated in a final

12   judgment, they suspect, if in fact they're reserving

13   them for future litigation?

14        MR. REID:  I welcome any rights that are

15   actually being given up.  But what I heard this morning

16   are some very careful responses to the Court's

17   questions, and I'm not convinced that those things have

18   actually been given up in most cases.

19        THE COURT:  Do you believe that the Indian

20   tribes at a minimum have riparian rights just as other

21   riverfront -- riverfront landowners have?

22        MR. REID:  Riparian rights as distinguished

23   from ownership of submerged lands.

24        THE COURT:  I said riparian rights.

25        MR. REID:  Correct, but there seems to be some

1     confusion in the pleadings about what riparian

2     rights --

3               THE COURT:  Common law riparian rights.

4               MR. REID:  As distinct from the ownership of

5     submerged lands, correct.

6               THE COURT:  Is it your view that a person

7     having a riparian right on the bank of the river does

8     not have ownership rights of submerged land up to the

9     thread?

10              MR. REID:  Not necessarily, Your Honor.  The

11    two are separable.  And that's made clear in the Great

12    Cove Boat Club Law Court decision from 1996 and the

13    Farnham Treatise on Water Rights.

14              THE COURT:  Is it your view that the Indian

15    tribe has any riparian right adjacent to the

16    reservation islands?

17              MR. REID:  Riparian rights entailing

18    essentially access to the river water to make

19    commercial uses of it, yes.

20              THE COURT:  And that right extends to what

21    location?

22              MR. REID:  The reservation islands.

23              THE COURT:  From the reservation island to

24    where?

25              MR. REID:  The navigable portion of the

 1    stream.

 2            THE COURT:  What portion of that stream?

 3            MR. REID:  The navigable portion, wherever

 4    that may be --

 5            THE COURT:  Not to the thread.

 6            MR. REID:  Not to the thread.

 7            THE COURT:  Any portion of the stream that's

 8    navigable.

 9            MR. REID:  A right to access the navigable

10    portion of the stream.  That's what the riparian right

11    includes.

12            THE COURT:  No more.

13            MR. REID:  Correct.

14            THE COURT:  Now, Subsection 4 of 6207 says,

15    notwithstanding any rule or regulation, you know this

16    as well as I do, the tribe may take fish within the

17    boundaries of their respective Indian reservations for

18    their individual sustenance.

19            MR. REID:  Right.

20            THE COURT:  We agree, do we not, that on these

21    islands there are relatively few fish living.

22            MR. REID:  On the dry land, that's true.

23            THE COURT:  And clearly we have no eels or --

24    and I'm not going to give you the Latin word for either

25    of them because I probably can't pronounce it -- or

1    salmon on those islands.  So what does that sentence

2    means?

3         MR. REID:  It means -- first of all, it

4    applies equally to the Passamaquoddy Tribe and the

5    Penobscot Nation so --

6         THE COURT:  We're only dealing with the

7    Penobscot here.

8         MR. REID:  Correct.  But I think it's worth

9    noting that that's -- that provision is not specific to

10   the context of the Penobscot Reservation, so as applied

11   to the Penobscot Reservation and reconciled with

12   6203(8) which defines the reservation as solely the

13   islands in the river and means taking fish from the

14   islands.

15        THE COURT:  And that's all.

16        MR. REID:  That's all it means as a matter of

17   law.

18        THE COURT:  And in your view their legal

19   rights mean -- are as follows as far as sustenance

20   fishing is concerned.  They can stand on the island and

21   cast.  Period.

22        MR. REID:  They can fish from the islands in

23   whatever usual and customary ways --

24        THE COURT:  As long as they're standing one

25   foot on the island.

1      MR. REID:  And the record shows that

2  historically that's been very important to the tribe.

3      THE COURT:  Just so I'm clear, they can't fish

4  from a boat.

5      MR. REID:  As a matter of law, as a matter of

6  statute, it appears that they can't.  The State has

7  never sought to enforce that and has no intention of

8  doing so.

9      THE COURT:  Would you agree that until the

10  Indian Land Claims Settlement Act they at least

11  asserted that they had unlimited sustenance fishing

12  rights in the entire thread?

13      MR. REID:  I'm not sure that I can agree to

14  that.  I'm not sure --

15      THE COURT:  You don't know what they were

16  asserting.

17      MR. REID:  Correct.

18      THE COURT:  Why -- why does the State by grace

19  permit them to sustenance fish in the entire Penobscot

20  if in fact historically what was important to them was

21  to fish with one foot on the land?

22      MR. REID:  I think historically they fished in

23  both ways, but my point in saying that historically

24  fishing from the islands was important is to counter

25  their claim that this is somehow demeaning and not

1    significant.  Historically their own expert, Mr. Prins,

2    makes a big deal about how important fishing from the

3    islands was.  So it's not fair for them just to pretend

4    it's somehow demeaning to them to limit it to fishing

5    from the islands.

6        As a practical matter, Your Honor, to get to your

7    question, the State -- the sustenance fishing concept

8    has never been a big deal in the real world.  The

9    affidavit from the warden who patrolled the area for

10   30 years said he had never encountered a tribal member

11   who was engaged in sustenance fishing.  It's never been

12   a big deal.

13           THE COURT:  Is that really relevant in any

14   respect, if someone has a right whether or not they

15   exercise it?

16           MR. REID:  It's only relevant to the question

17   as to why the State hasn't sought to aggressively

18   enforce.  It's never been a big deal.

19           THE COURT:  You -- you -- when the statute

20   says they have a right to sustenance fish within the

21   boundary, within the boundary, I'm trying to work

22   within the grammar as I understand it.  Within a circle

23   means inside the circle.  It doesn't mean from the

24   circle outward.  Why does within the boundary in your

25   case mean within the fish -- the fish can be outside

1    the boundary but they have a right to catch it anyway?

2         MR. REID:  So the question under the statute

3    is where is the fishing occurring, where the person is

4    standing or the -- the line is cast.  But the -- the

5    issue is how is that provision you're quoting from

6    reconciled with the definition of reservation?  And

7    what the tribe is trying to do is to say, the answer to

8    the question of what are our reservation boundaries is

9    found in the subsection in the Implementing Act that

10   addresses sustenance fishing rights.  We say, no, it's

11   found in the -- the definitional provision, the -- the

12   provision where one would naturally expect to find the

13   answer, where the term Penobscot Indian Reservation is

14   defined with great particularity.  That's where you go

15   to define reservation, not the sustenance fishing

16   provision.

17        THE COURT:  Is there any way in your view that

18   I can reconcile a boundary of the reservation

19   consisting simply of the island, islands, and their

20   right to sustenance fish legally?

21        MR. REID:  Yes.

22        THE COURT:  By right?  In the stem of the

23   Penobscot, not as owners, but as the right to engage in

24   that activity only.

25        MR. REID:  Throughout the entire Main Stem?

1          THE COURT:  That's correct, just as you

2     yourself as -- indicated the State has by grace

3     permitted them to do so.

4          MR. REID:  Under the statute I don't believe

5     that's tenable.

6          THE COURT:  So in your view my decision is go

7     with their view that the reservation extends to the

8     Main Stem and, therefore, they have the right to fish

9     throughout the Penobscot, or your view that the -- only

10    the islands are the reservation and the sustenance

11    fishing rights are limited to one foot on the island.

12         MR. REID:  Correct, Your Honor.  And

13    sustenance fishing, if it ever becomes an issue, they

14    can come back at that time when they have a case of

15    controversy and we can argue about it then.  It's never

16    been an issue for 35 years; it's not today.  The sworn

17    testimony is there's no intention to make it an issue.

18         THE COURT:  Anything else?  Go ahead.  You

19    have a lot of time if you'd like it.

20         MR. REID:  Thank you.  I would observe, Your

21    Honor, there are other provisions in the statute that,

22    first of all, 6203(8) we believe is plain on its face,

23    the term islands in the river means islands in the

24    river.  The effect of the plaintiff's argument is to

25    say that islands in the river has a meaning that is

1    exactly equivalent to river.  So, in other words,

2    they're taking a scalpel and cutting the word islands

3    out.

4         THE COURT:  I don't think they're saying that.

5    I think they're saying that the islands in the river is

6    to designate which islands in the river and nothing

7    more, that -- not the islands below the Indian Island,

8    not the islands -- some other islands, but those

9    islands that are designated in that language.  What

10   they're saying is when it says solely those islands, I

11   think what they're saying is, if I understood them,

12   that it's a descriptive term designating which is

13   islands, not just the land of those islands.

14        MR. REID:  That's how the United States

15   addresses the term -- the word solely in the provision.

16   But there's nothing in 6203(8) that suggests in any way

17   that the river is intended to be swept into the

18   definitional provision and included within the concept

19   of islands.  But the plain definition of island is.

20        THE COURT:  Is there anything in the

21   legislative history here where anyone discussed whether

22   the river was included in the reservation?

23        MR. REID:  Well, there are two things in the

24   legislative history that are directly on point.  One is

25   the U.S. Department of the Interior represented to the

1   House of Representatives Committee of Jurisdiction that

2   the Penobscot Reservation was islands in the river

3   consisting of 4,000 acres.  It's undisputed in this

4   record that if the entire Main Stem were part of the

5   reservation it would be 14,000 acres.  That's not

6   sloppiness, that's not carelessness; it's not an

7   oversight, which is how they'd like to rationalize it.

8   It's direct evidence of what the understanding of the

9   reservation was in 1980.

10       There was also a map presented to the U.S. Senate.

11   That map had a key on it that indicated the Penobscot

12   Indian Reservation was shaded in red.  Only the islands

13   were shaded in red.  Again, that's not sloppiness; that

14   is clear evidence of what everybody understood the

15   reservation to consist of at that time.

16       THE COURT:  When you say everybody, apparently

17   not everybody.

18       MR. REID:  Well, everybody, Your Honor,

19   everybody.  And let me explain why.  Because right

20   after the Implementing Act became law in 1980, 6207(5)

21   included a requirement that both the Penobscot Nation

22   and the Passamaquoddy Tribe conspicuously post any

23   lands or waters that they claim to be subject to the

24   regulatory jurisdiction.  The Penobscot Nation complied

25   with that provision by posting conspicuously all of the

1    reservation islands.  And those postings, those signs,

2    are in the summary judgment record.  They make it

3    clear --

4         THE COURT:  What more should they have posted,

5    the water?

6         MR. REID:  The postings should have said that

7    we also claim the water.  But they don't.  They're very

8    specific.  You need a permit to hunt or trap on our

9    islands.  There's nothing in those postings that

10   states, suggests, or implies that they believe that

11   they had some jurisdiction over the river itself.

12   There are no other postings at the boat launches that

13   make that claim.  That's clear evidence of what they

14   understood at the time.

15        THE COURT:  Let me ask you this.  I've heard

16   from the Penobscot Nation here that Section 6207(1)

17   permits them to regulate hunting, trapping, and other

18   taking of wildlife on the Main Stem of the Penobscot

19   and permits sustenance hunting and trapping on the Main

20   Stem of the Penobscot.  Your position on that?

21        MR. REID:  That's incorrect, because that

22   applies to Indian territory.

23        THE COURT:  Indian territory includes

24   reservation.

25        MR. REID:  Exactly, and the Main Stem is not

1    part of the reservation.  So that -- that 6203(8)

2    controls the answer to that question.  The reservation

3    is defined as the islands and solely the islands.  The

4    river itself is not included in the reservation and

5    therefore not the territory.

6              THE COURT:  Thank you very much.

7              MR. REID:  Thank you, Your Honor.

8              THE COURT:  Intervenor.  You're a happy person

9    today.  You earned your fee.

10             MS. CONNORS:  Were that I could go home, Your

11   Honor.  But I think the United States just said it

12   wanted to move all the boundaries of the towns that are

13   contiguous to the river, so that --

14             THE COURT:  Tell me what you mean by that.

15             MS. CONNORS:  I believe --

16             THE COURT:  Your name first, for the record.

17             MS. CONNORS:  Catherine Connors.

18             THE COURT:  Go right ahead.

19             MS. CONNORS:  I believe they said that it's

20   the tribe that owns the bed.  And I believe that --

21             THE COURT:  That's not what the Penobscot

22   Nation says.

23             MS. CONNORS:  So, yes, I am focusing now --

24   one reason I'm still here is because apparently the

25   United States would like to move the boundaries of the

1    towns that are contiguous to the river.

2            THE COURT:  Why do you say it moves the

3    boundaries?

4            MS. CONNORS:  I believe that many of the towns

5    contiguous to the river would believe that the town

6    boundaries extend into the river.  And so --

7            THE COURT:  The town boundaries what?

8            MS. CONNORS:  Extend into the -- the riverbed.

9            THE COURT:  What does that mean when they

10   extend into the riverbed?

11           MS. CONNORS:  It means that the town --

12           THE COURT:  I know, but what does it mean

13   legally?  What does it -- what difference does it make

14   to the town?

15           MS. CONNORS:  You can enact ordinances that

16   relate to that, and that's why we're here.  Because

17   under Section 6206 of the Settlement Act, if the Main

18   Stem includes the river, they can enact ordinances.

19   And that means they can regulate what we do in the Main

20   Stem.  They have acknowledged -- I'm back to the

21   Indians now -- that we have a right to discharge.  This

22   is correct; under our existing permits we have a right

23   to discharge.  They would like to regulate the Main

24   Stem.  They have that power if it's in the reservation.

25   This case is all about the boundaries of the

1    reservation.  We have to define what those boundaries

2    are.  All their rights come from being within the

3    reservation or without.

4         THE COURT:  Let's tease that for a second.  I

5    heard from them that you have -- they're not contesting

6    your right to discharge into the Main Stem.

7         MS. CONNORS:  Well, no, that is not what I

8    heard.  I heard they said we have a right currently to

9    discharge.

10        THE COURT:  You have a right to discharge.

11   You don't have a permit from the Penobscot Nation.

12        MS. CONNORS:  We do not.

13        THE COURT:  So where would this right come

14   from if they claim this to be within the reservation?

15        MS. CONNORS:  6206, they would have the right

16   to enact ordinances, and they would also claim

17   treatment as a state so that they would have the rights

18   under the Clean Water Act.

19        THE COURT:  They indicate to me they don't

20   claim the water.  They don't claim the bed.  The

21   Penobscot Nation doesn't claim the water, doesn't claim

22   the bed.  What is left that troubles you?

23        MS. CONNORS:  Nothing would be left that would

24   trouble me if the plaintiffs would concede that they

25   have no basis to assert a right to regulate the State

1    intervenors' discharges.  Then we would only be left to

2    the boundaries.  So if they would concede they have no

3    basis to assert a right to regulate the State

4    intervenors' discharges, that nothing in the Settlement

5    Act or any aboriginal right gives them that right, then

6    that would take care of the discharge problem.

7            THE COURT:  Except if the bed is contested,

8    correct?

9            MS. CONNORS:  Yes, and then there's a boundary

10   problem.

11           THE COURT:  Tell me whether or not there are

12   indispensable parties if in fact that assertion is made

13   by the United States.

14           MS. CONNORS:  Well, if you're moving the

15   boundaries, you're moving the boundaries not only of

16   the town, you're also moving the boundaries of the

17   people who live by the river, the private property of

18   those people, so, yes.  Now, they say that we all come

19   back and litigate each and every one of those people

20   who are on the border, depending on when, if, they ever

21   wanted to contest any of the regulations.

22           THE COURT:  They're not bound by the results

23   in this case; are they?

24           MS. CONNORS:  That's what the United States is

25   saying.  And so if -- if any individual one of them

1    wanted to come against the massive resources of the

2    Indians who have been given many amounts of money to

3    put forward this case, they could do so.  It's my

4    understanding they could fight the United States and

5    they could fight the Indians.

6          We respectfully suggest that now is the time to

7    define the boundaries of the reservation.  It was

8    defined in 1980.  There have been skirmishes about

9    this, they avoided the issue in State versus Johnson,

10   and now we need to address it.  What are the boundaries

11   of the reservation?  All -- all the rights that they

12   have claimed, the sustenance rights, any other right --

13         THE COURT:  Let me be clear.  Your concern is

14   simply not having the Penobscot Nation be able to

15   regulate your discharges, correct?

16         MS. CONNORS:  And the boundaries of.

17         THE COURT:  As far as the Nation is concerned,

18   they don't claim the bed, but let's narrow it down.  If

19   I were to find that the -- that the U.S.A. is wrong,

20   that the Indian Nation is correct that they -- the

21   reservation includes the Main Stem but only as regards

22   sustenance fishing in the water and nothing more,

23   sustenance fishing, hunting, and trapping, but it does

24   not include, and they don't claim the right to include,

25   regulating discharges or preventing discharges, would

1   you be unhappy?

2          MS. CONNORS:  If they affirmatively gave up

3   any rights they would have with the -- with the Main

4   Stem falling within its boundaries to regulate our

5   discharges, we would be happy.

6          THE COURT:  Thank you.

7          MS. CONNORS:  But they would under -- if it's

8   in the reservation, they have the rights to enact

9   ordinances, they have the rights to engage in

10  sustenance fishing and to regulate all the fishing and

11  to -- and to pass regulations to protect that fishing.

12          THE COURT:  I understand.

13          MS. CONNORS:  So this is -- so the basis for

14  their claim, whatever they are claiming now, whether

15  it's a narrow right or a broad right, it's based on the

16  Main Stem falling within the reservation.  So that's

17  the issue before the Court today.

18      And in terms of identifying the -- the concerns

19  about that, we have filed a motion for judgment on the

20  pleadings, which means we think that this is decided by

21  the text.  The plaintiffs have said that the words

22  islands in the Penobscot River means identifying those

23  islands.  We agree, that's -- those are the islands

24  that are in the reservation.  It doesn't say the

25  islands and the water or the islands and the riverbed

1    or the islands and associated rights.  It just says the

2    islands.  It's -- this is very precise.

3         THE COURT:  Let's assume you're right.  Is it

4    your position that -- or do you have a position whether

5    the Penobscot Nation has a right to sustenance fishing

6    in the Main Stem on any other reason other than their

7    claim that it's part of the reservation?

8         MS. CONNORS:  They do not.  They can't -- they

9    can -- they can fish within the reservation and that

10   means on the islands.  They can throw a net; they can

11   throw a fishing line.  They can do what they were doing

12   since time immemorial if you look at their history.

13        THE COURT:  Just so I'm clear, your view is

14   that from time immemorial Indians did not use boats to

15   fish.

16        MS. CONNORS:  No, I'm saying that from time

17   immemorial, according to their experts -- their expert

18   has identified, for example, that one determinative

19   example he gives of the rights that the Indians were

20   concerned about and thought were reserved to them

21   related to Old Town Falls.  If you look at the language

22   that was used surrounding that dispute about the Old

23   Town Falls, it's all about the rights to fish from the

24   island.  If you look at all the expert testimony, it

25   talks about the rights relating to the shorelines and

1       the islands.  At no point do any of their experts cite

2       anything that references the water or the rights -- any

3       kind of understanding that they were retaining any

4       rights that related to the water itself.

5              Sometimes they say that's because the -- there was

6       a different aboriginal understanding of what ownership

7       meant.  That may be.  But then we go back to the text

8       of what the actual Settlement Act says, and the United

9       States, I believe, has indicated all the rights come

10      from this text.  So where in the text does it say the

11      river is a part of the reservation?

12             THE COURT:  Let me ask you this.  Is it your

13      view that perhaps the legislature was inartful and they

14      were thinking of the Passamaquoddy Tribe only, yet

15      added Penobscot Tribe when they said within the

16      boundaries of their respective Indian reservations?  In

17      other words, clearly that language -- the Passamaquoddy

18      Tribe has water fish within its reservation, the

19      Passamaquoddy Tribe does, because they're --

20             MS. CONNORS:  Right.

21             THE COURT:  But the Penobscot Tribe does not.

22             MS. CONNORS:  Well, I think that provision was

23      to apply to both of them, and so it has resonance as to

24      that -- so the intent would be to apply to both of

25      them, which meant the -- the Passamaquoddys clearly,

1    but also whatever fishing can be done from the island

2    would also be protected under this provision from the

3    Penobscots.  And we have to remember that we are not

4    talking about 1796.  We are talking about what was

5    important in 1980 and what were -- what was the

6    compromise being made in 1980, what did the tribes get

7    and what did they give away.

8         THE COURT:  I understand your position.  I

9    understand your argument what was important to the

10   tribe, but apparently it continues to be important to

11   the tribe to be able to sustenance fish in the Main

12   Stem because the State of Maine feels it's important

13   enough that they give by grace the members of the tribe

14   to do so.  So everybody until the present day continues

15   to believe it's important.

16        MS. CONNORS:  Well, I think we would not -- we

17   would not be here if the only -- if our only concern

18   was whether the tribes could fish in the river.  Our

19   concern is that comes with their interpretation of the

20   Act, which is the right to regulate, and that is what

21   this case is about.

22        THE COURT:  I understand, thank you very much.

23        All right, I'm going to give everyone five minutes

24   uninterrupted time for rebuttal.  Just indicate who you

25   are and who you represent.

1          MR. SMITH:   Kaighn Smith, Jr., for the

2     Penobscot Nation, Your Honor, thank you very much.

3          Just one point of clarification and one point in

4     rebuttal, and I'll start with the second first.

5          With respect to the relevant legislative history,

6     Your Honor, in terms of any reference to the river as

7     part of the reservation, you will see that there was a

8     very telling colloquy between John Patterson and Sam

9     Collins, who was the chair of the joint committee of

10    the State legislative, and a Mr. Floyd, who was

11    involved in the Atlantic Salmon Federation at the time

12    of the settlement.  We've outlined that colloquy quite

13    clearly in our briefs.

14         I would direct the Court to ECF 144 at Page 8668

15    to 869 (sic) where Mr. Patterson in his colloquy made

16    clear in no uncertain terms that in terms of the

17    question asked, what would happen if the Penobscots put

18    a gill net right across the river, what rights would

19    the State have to protect the salmon?  And what they

20    were talking about in that context was a sustenance

21    ordinance.  Sustenance ordinances would be enacted by

22    the tribe only in the reservation, only for sustenance

23    fishing, and Mr. Patterson stood up and answered the

24    question with all of that in place and said, well, we

25    have this residual authority of the Inland Fisheries

1    and Wildlife who can come in and put a check on that

2    situation if the Penobscot sustenance ordinance,

3    obviously operated in the river, across the river, had

4    an adverse effect on stocks outside of those waters.

5    So that's plain legislative history.

6        The other is somewhat more nuanced but not much.

7    Congress said that the -- that the Settlement Act,

8    quote, provides that the Penobscot Nation will retain

9    as its reservation those lands and natural resources

10   which were reserved to it in its treaties and not

11   subsequently transferred by it.  A direct reference to

12   the treaties, a direct reference to what's retained,

13   the Penobscot Tribe ceded the uplands on the river, not

14   the river itself.  And for the purposes of this case

15   and the very narrowly drawn second amended complaint,

16   the rights and authorities at issues are retained in

17   that river.

18       Finally, Your Honor, the point of clarification

19   is, insofar as there's any reflection in this record

20   that I have conceded that the reservation is not in the

21   Main Stem itself, that should stand corrected.  That --

22   the ownership of the bed of the river is not before

23   this Court.  If it were, we would be arguing an

24   aboriginal use and occupation right that has never been

25   ceded.  The tribe never ceded those use and occupation

1    rights, it's aboriginal title, it's a different concept

2    than ownership.  That is for another day.  There's

3    absolutely no controversy before this Court about

4    riverbed ownership.  It is about the circumscribed

5    sustenance rights and related authorities that are

6    specifically outlined in our second amended complaint

7    and delineated in the footnotes -- the upfront

8    footnotes that specifically reference the rights and

9    authorities at issue.  Thank you, Your Honor.

10          THE COURT:  Now that you're done, right to

11    discharge, right to regulate discharge, is she still in

12    the case or not?

13          MR. SMITH:  No, she's not.

14          THE COURT:  You don't claim the right to

15    regulate discharge.

16          MR. SMITH:  We are not claiming the right to

17    regulate the nonmember discharges, no.

18          THE COURT:  You don't have that right or

19    you're just not using it.  You have it and you're not

20    using it.

21          MR. SMITH:  We -- we don't have that -- the

22    State has been given authority --

23          THE COURT:  You didn't say the magic word.

24    You almost said we don't have the right, but you choked

25    on the last word.  Let's try it again.

1    Does -- do you claim on behalf of the Penobscot

2   Nation that they have the right to regulate these

3   municipal discharges into the Penobscot?

4        MR. SMITH:  Let me be very clear because this

5   is important.  The permitting aspect of this has been

6   decided in the Johnson case.  Under the NPDS program

7   and the Clean Water Act the State has that authority,

8   not the tribe.

9        Under whether the tribe would have any authority

10  to set water quality standards in the Main Stem, that

11  issue has not been litigated.  There is an argument

12  that the tribe has concurrent authority with the State

13  to set water quality standards in the river, not before

14  the Court.

15       THE COURT:  Thank you very much.

16  U.S.A.?  And again if you just identify yourself

17  for the record.

18       MR. MISKINIS:  Steve Miskinis for the United

19  States.

20       THE COURT:  Go right ahead.

21       MR. MISKINIS:  If the Court wishes to go the

22  way of the tribe and not make this case -- and rule

23  without addressing the bed, the United States would be

24  perfectly fine with that.  We think the bed is

25  something that the tribe has rights to as well, and I

1    further point out that we think that, you know, as I

2    pointed out before, I don't think that the property

3    issues are really implicated here.  It's a

4    jurisdictional dispute.  But if the day were to come

5    where a dam owner or someone who's been using the river

6    were confronted with a -- a real case in controversy

7    emerged that somehow the Nation's use of the river is

8    infringing upon and they feel somehow aggrieved and

9    it's subject to resolution by a Court, such a party

10   would be able to avail themselves of the transfer

11   defenses.  And there's really no case law on this, but

12   the transfer defenses provide that if there's a change

13   in title to possession of dominion over or control of

14   land or natural resources, such areas will be deemed to

15   have been transferred out of the reservation.

16        So in such case, you know, we don't think our

17   position is inconsistent with protecting the

18   long-established uses of the rivers by non-Indians up

19   and down the Main Stem because we think they would have

20   a viable transfer defense.

21        And the State's invoking the transfer positions as

22   well.  We think that reading is, on the other hand,

23   much too broad.  The State's position is that you can

24   look -- there's a transfer by virtue of the fact that

25   the State has regulated the Main Stem.  And in our

1    briefs we pointed out that that can't be the case

2    because that would also, by that definition, transfer

3    to all the Nation's islands because the State has

4    stepped into the shoes of the -- as the Government --

5    of the governing sovereign and felt itself as -- felt

6    itself to be the fiduciary for the last 200 years to

7    the Nation and has regulated their islands and their

8    waters to the same degree.

9          So -- and the State on reply says, well, there's a

10   difference because when the State is regulating the

11   islands it's recognizing the Nation's reservation but

12   it's not doing so on the Main Stem.  But we identified

13   statutes in the record that make clear the State has

14   also -- has always recognized the Nation's rights in

15   the Main Stem as well.  And there are a series of

16   statutes from 1830s on, they were repeated frequently,

17   and in those statutes the State says we should survey

18   the Nation's islands, we should divide them up into

19   parcels that can be allotted to individuals, so that's

20   the micromanaging of the Nation's lands.  And they say,

21   well, we should reserve, set aside, all those portions

22   of their islands that are suitable for doing things in

23   the river.  And those should be leased out and the

24   money should be held in trust for the benefit of the

25   tribe, and they specified for fisheries, booms, and

1   dams.  And all three of those things are things that a

2   tribe would do in the river.  Fisheries are in the

3   river, not on the land, dams are in the river, not on

4   land, and so are booms.

5        So the State has acknowledged throughout its

6   history, even as it's regulated the Main Stem, that the

7   Nation is a party that has interest in the Main Stem

8   and rights to do things in the Main Stem, even if the

9   State improperly stepped into its shoes and said we're

10  going to regulate and tell you how you exercise those

11  rights, but they never said those are not your rights.

12       THE COURT:  Thank you.  State of Maine?  Again

13  your name.

14       MR. REID:  Gerald Reid.

15       THE COURT:  Go right ahead.

16       MR. REID:  The big picture of this litigation,

17  Your Honor, is that the tribe is trying to impose on

18  the State a result that it never could have achieved

19  legislatively in 1980, and that's true because the

20  Maine legislature never would have agreed to give

21  control over 60 miles of the Penobscot River to the

22  tribe when the tribe had never before exercised any

23  form of control over any activities taking place on

24  this river.  And this river segment was critical not

25  just to the regional economy but really to the

1    statewide economy for the mills, for the generation of

2    electricity, for sporting interests, for a myriad of

3    reasons, it was critical.

4         The legislature was especially striking about the

5    record of this case, is even if the legislature had

6    entertained the thought of doing that, it never would

7    have done that without there being substantial

8    legislative debate on the record.  And that's really

9    the -- it's the legislative equivalent of the dog that

10   didn't bark here.  There is no indication that anybody

11   believed what was happening in 1980 was that the result

12   of the bill was going to be that the entire Main Stem

13   was going to be included in the reservation.  Nobody

14   believed that.  Where were the dam owners, where were

15   the mill owners coming forward and saying, excuse me,

16   can I please have some assurance that my multimillion

17   dollar investment won't be harmed by the fact that

18   you're creating an Indian reservation surrounding my

19   property?  Nobody was thinking in those terms.  It's

20   very compelling.

21        A few points in rebuttal to what Mr. Smith and

22   Mr. Miskinis have just said.  The colloquy between

23   Mr. Patterson and Senator Collins, if that's who it

24   was, in the State hearing transcript, if you go back

25   and look at the transcript, I believe that's in

1    reference to Mopang Stream, which is a tributary of the

2    Penobscot, the idea of stringing a net across the

3    river, it's not necessarily stringing a net across the

4    Main Stem of the river.  And even if it were, the clear

5    context of exchange were the Senator was looking for

6    some reassurance that the statute provided the State

7    with overriding supervisory authority over sustenance

8    fishing so it wasn't focused on where does this right

9    take place, and the State has always conceded that they

10   have some right to engage in sustenance fishing in some

11   waters of the Main Stem.

12        The U.S. described on Page 56 of its original

13   motion that the tribe's interest in the Main Stem -- in

14   the submerged lands of the Main Stem was an ownership

15   interest.  So I understand there's been some back and

16   forth today as to whether they are retaining or

17   maintaining that position at oral argument.  That's

18   what they represented to the Court in the written

19   papers.

20        And, finally, I just observe that in response to

21   the Court's questions Mr. Smith is continually pausing

22   and, in the Court's words, choking on his words before

23   he can complete a response to these important questions

24   as to what rights the tribe is -- that they believe

25   they have and which -- what rights by contrast they are

1    pressing in this litigation.  And it's a really

2    important point, and that's why we believe that we are

3    entitled to and need specific declaratory relief on our

4    counterclaims, because what's happening here is the

5    tribe is coming before the Court saying, we're not

6    pressing that issue here, Your Honor, so it's not a

7    problem.  But what's easily foreseeable is as soon as

8    we get out of court it's going to be an issue again,

9    whether it's in the context of environmental

10   regulation, fishing, hunting, trapping, discharges,

11   whatever it is, you can hear them reserving their

12   right, it's going to be the next case, and that's why

13   we need specific declaratory relief.

14           THE COURT:  Thank you.  Town?

15           MS. CONNORS:  Just two quick points.  First, I

16   believe that the clarifications from the Penobscot

17   Nation's counsel make clear why I'm still here.  And

18   they have -- they've indicated that one of the cases

19   that will be coming down the pike if we don't resolve

20   these issues now is there will be an aboriginal title

21   claim to the waters, which they I believe indicated

22   they have never ceded their aboriginal title.

23       Section 1721 of the Federal Settlement Act was to

24   resolve all aboriginal claims to avoid having

25   aboriginal title suits.  That was why we enacted the

1    Settlement Act.  We need to go back to the text of the

2    Settlement Act and to resolve these issues right now,

3    permanently, so that we're not back here again.

4         THE COURT:  Thank you all.  You've been very

5    helpful.  I think you're all very wise people, done a

6    lot of work on a very complex, difficult case.  I don't

7    see any need for any more paper to be wasted in this

8    case in terms of repeating anything anyone said.  I

9    appreciate all of your comments, and I will begin

10   drafting our opinion.  Thank you, this Court is in

11   recess.

12             (Time noted:  10:38 a.m.)

13             **C E R T I F I C A T I O N**

14   I, Lori D. Dunbar, Registered Merit Reporter, Certified

15   Realtime Reporter, and Official Court Reporter for the

16   United States District Court, District of Maine,

17   certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19   Dated:  October 21, 2015

20             /s/ Lori D. Dunbar

21             Official Court Reporter

22

23

24

25