UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PENOBSCOT NATION et al.,                )
                                        )
                        Plaintiffs,     )
                                        )
v.                                      )    Docket no. 1:12-cv-254-GZS
                                        )
JANET T. MILLS, Attorney General for    )
the State of Maine, et al.,             )
                                        )
                                        )
                        Defendants.     )

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are three motions for summary judgment: (1) the State Defendants'

Motion for Summary Judgment, or in the Alternative, for Dismissal for Failure to Join

Indispensable Parties (ECF No. 117), (2) the United States' Motion for Summary Judgment (ECF

No. 120) and (3) the Motion for Summary Judgment by Plaintiff Penobscot Nation (ECF No.

121/128-1). As explained herein,[1] the Court GRANTS IN PART AND DENIES IN PART each

Motion.

I.      LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it

appears "that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

---

[1] The Court notes that it is has additionally received and reviewed the Brief in Support of Plaintiffs' Motions for Summary Judgment (ECF No. 131-1) submitted by five members of the Congressional Native American Caucus acting as Amici Curiae.

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation." (citations omitted)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants

summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

Even when filed simultaneously, "[c]ross-motions for summary judgment require the district court to consider each motion separately, drawing all inferences in favor of each non-moving party in turn. AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (internal quotations and citations omitted). In short, the above-described "standard is not affected by the presence of cross-motions for summary judgment." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) (citation omitted). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).

The Court notes that Local Rule 56 provides a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue of material fact." D. Me. Loc. R. 56(b). Local Rule 56 calls for "separate, short, and concise" statements that may be readily admitted, denied or qualified by the opposing side. D. Me. Loc. R. 56(b)&(c). Additionally, the rule requires each statement to be followed by a "record citation . . . to a specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). "The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." Id.; see also Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

3

In this Order, the Court has endeavored to construct the facts in accordance with the letter and spirit of Local Rule 56.  Doing so has required the Court to review 479 separately numbered paragraphs, many of which were compound, complex, and supported with citation to voluminous records.[2]  Additionally, many of the numbered paragraphs were immaterial and/or obviously disputed in the context of this litigation.[3]  In short, in multiple instances, each of the movants has failed to comply with the letter and spirit of Local Rule 56, making construction of the undisputed material facts unnecessarily difficult.  However, the parties have maintained—even after the briefing was complete—that this matter is amenable to resolution on the record submitted.  (See 10/14/15 Transcript (ECF No. 156) at 5.)  The Court concurs in that assessment.[4]

## II.    BACKGROUND[5]

On August 20, 2012, Plaintiff Penobscot Nation, which is a federally recognized American Indian tribe in Maine, filed this action seeking to resolve ongoing disputes between the tribe and the State of Maine regarding a section of the Penobscot River.  This Court allowed the United

---

[2] In one measure of the complications created by the parties' dueling statements of material facts:  There were a total of 713 responses (261 qualifications, 162 denials, and 290 instances of facts being admitted) to the 479 submitted statements of material facts.  See generally Pls. Opposing Statement of Material Facts (ECF No. 140) ("Pls. Response SMF"), State Defs. Opposing Statement of Material Facts (ECF No. 141) ("Defs. Response SMF") & State Defs. Reply Statement of Material Facts (ECF No. 148).

[3] In other instances, the parties have attempted to support assertions of fact with citations to inadmissible materials.  By way of example, the Court notes that factual assertions supported only by a citation to an unsworn expert report are hearsay and do not qualify as admissible evidence.  See, e.g., Pls. SMF (ECF No. 119) ¶ 48 (citing only to the Expert Report of Pauleena MacDougall (ECF No. 110-37)); State Defs. SMF (ECF No. 118) ¶ 187 (citing only to the Expert Report of Harold Prins).

[4] The Court's decision to move forward with resolving the cross motions for summary judgment is based in part on the Court's conclusion that it may disregard as immaterial many factual disputes appearing in the record.  Compare, e.g., Phillips Decl. (ECF No. 124) at PageID # 7504-05 & Hull Decl. (ECF No. 119-32) at PageID # 7335-36 with Paterson Decl. (ECF No. 141-1) at PageID # 8182.

[5] The citations used throughout this Order primarily reference the Joint Exhibits ("Jt. Ex."), which may be found on the docket at ECF Nos. 102-110, or the Public Document Exhibits ("P.D. Ex."), which were provided as a courtesy to the Court and may be found as indicated in the Declaration of Counsel (ECF No. 112) and the Public Documents Record Index (ECF No. 112-1).

States to intervene as a plaintiff on its own behalf and as a trustee for the Penobscot Nation.  (See generally United States' Complaint (ECF No. 58).)  The named State Defendants in this matter are: Janet T. Mills, the current Attorney General for the State of Maine; Chandler Woodcock, the Commissioner of the Maine Department of Inland Fisheries and Wildlife ("DIFW"); and Joel T. Wilkinson, Colonel of the Maine Warden Service.  Additionally, the United States' Complaint directly names the State of Maine as a State Defendant.[6]

The Penobscot Nation asserts that it was prompted to file this case in response to the August 8, 2012 Opinion issued by then-Maine Attorney General William J. Schneider regarding "the respective regulatory jurisdiction of the . . . Penobscot Nation and the State of Maine relating to hunting and fishing on the main stem of the Penobscot River."  (8/8/12 Ltr. from Atty. Gen. Schneider to Comm. Woodcock & Col. Wilkinson (ECF No. 8-2).)  In relevant part, this Opinion concluded:

> [T]he Penobscot Nation has authority to regulate hunting and fishing on those islands [in the main stem] included in its Reservation from Indian Island in Old Town, northward to the confluence of the East and West branches in Medway.  Like private landowners, the Penobscot Nation may also restrict access to their lands, here islands, as it sees fit.  However, the River itself is not part of the Penobscot Nation's Reservation, and therefore is not subject to its regulatory authority or proprietary control.  The Penobscot River is held in trust by the State for all Maine citizens, and State law, including statutes and regulations governing hunting, are fully applicable there.  30 M.R.S. § 6204.  Accordingly, members of the public engaged in hunting, fishing or other recreational activities on the waters of the Penobscot River are subject to Maine law as they would be elsewhere in the State, and are not subject to any additional restrictions from the Penobscot Nation.
>
> To avoid friction on the Penobscot River, it is important that state and tribal officials, as well as members of the Penobscot Nation and the general public, have a clear understanding of the regulatory jurisdictions of the Penobscot Nation and the State of Maine.  Both the State and the Penobscot Nation must encourage citizens to respond civilly to uniformed tribal and state game wardens performing their official duties.  All citizens must heed and comply with ordinances promulgated by the

---

[6] References to "State Defendants" in this Order refer jointly to Mills, Woodcock and Chandler, in their respective official capacities, and the State of Maine to the extent it is appropriately named as a defendant.

Penobscot Nation governing the islands it owns, as well as State laws and regulations covering the River.

Id.  The Penobscot Nation and the United States (together, "Plaintiffs") maintain that this 2012 Attorney General Opinion reflects a misinterpretation of the law governing the boundaries of their reservation and their rights to engage in sustenance fishing.[7]  Thus, Plaintiffs seek a declaratory judgment clarifying both those boundaries and tribal fishing rights within the Penobscot River.  In responding to Plaintiffs' multi-part requests for declaratory relief, State Defendants have asserted their own claim for declaratory relief regarding these same issues.  (See State Defs. Amended Answer (ECF No. 59) at 11-14 & State Defs. Mot. for Summ. J. (ECF No.  117) at 1, 30-31 n. 36.)

For purposes of this litigation, the parties agree that the "Main Stem" is a portion of the Penobscot River and stretches from Indian Island north to the confluence of the East and West Branches of the Penobscot River.  (Stipulations (ECF No. 111) ¶¶ 3 & 4.)  At present, the Main Stem is a non-tidal, navigable stretch of river that is approximately sixty miles long.  (Id. & Penobscot Chem. Fibre Co., 30 F.P.C. 1465, 1466 (Dec. 9, 1963).)  There are at least 146 islands located in the Main Stem.  (Jt. Ex. 568 (ECF No. 108-68) at PageID # 5522; J. Banks. Decl. (ECF No. 140-1) ¶ 4.)  These islands total between 4446 and 5000 acres.  (Jt. Ex. 593 (ECF No. 108-93) at PageID # 5631; Jt. Ex. 568 (ECF No. 108-68) at PageID # 5522.)  None of those islands contains a body of water in which fish live.  (Barry Dana Decl. (ECF No 124-2) ¶ 12.)   Within the Main Stem, there are stretches of river that contain no islands.  (See, e.g., Jt. Exs. 301, 304, 309 & 310.)  All told, the Main Stem islands, together with the bank-to-bank water surface of the Main Stem, cover approximately 13,760 acres.  (State Defs. Ex. 8 (ECF No. 118-8) at PageID # 7090.)

---

[7] To the extent the pleadings and docket may reflect additional areas of dispute, the parties' briefings on the pending dispositive motions and representations at oral argument have winnowed the issues to be decided, as explained in the Discussion section of this Order.  See infra III.

Before wading into the depths of the factual record the parties have placed before the Court, the Court first reviews the history of the key treaties and legislation that led to the present relationship between the State of Maine and the Penobscot Nation concerning the Main Stem.

### A.  Legislative Background of Penobscot Nation Land in Maine

In 1790, when Maine was still part of the Commonwealth of Massachusetts, Congress passed the Indian Nonintercourse Act ("ITIA"), 1 Stat. 137, which provided that "no sale of lands made by any Indians, or nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." 1 Stat. 138.[8]

### 1.      The 1796 and 1818 Treaties

Notwithstanding the language of ITIA, Massachusetts proceeded to negotiate two treaties with the Penobscot Nation that are relevant to the present case.  The first treaty was negotiated in 1796 (the "1796 Treaty").  The subject of the 1796 Treaty was a six mile wide strip of land on each side of the Penobscot River stretching for thirty miles of the Main Stem.  (Jt. Ex. 294 at PageID # 3858-59 (Transcription of 1796 Treaty).)  After the execution of the 1796 Treaty, Massachusetts directed that the subject land be surveyed and laid out into townships and quarter townships, as follows:

> Whereas this Commonwealth in August one thousand, seven hundred and ninety six, obtained of the Penobscot tribe of Indians their relinquishment of their claims to the lands six miles wide on each side of Penobscot River, extending from Nicholas Rock,

---

[8] The Nonintercourse Act, as amended, remains in effect today.  See 25 U.S.C. § 177; Oneida Indian Nation of N.Y. v. Oneida County, New York, 414 U.S. 661, 668 (1974) (ITIA "has remained the policy of the United States to this day").  However, it is not applicable to the Penobscot Nation as a result of express provisions of 25 U.S.C. § 1724(g), which establishes its own restraint on alienation of Penobscot Nation territory and provides specific exceptions.  See id. § 1724(g)(2)-(3).

so called, near the head of the tide in the said river, up the same river thirty miles, on a direct line, according to the general course thereof: and whereas … it is necessary to have a survey of said land, and information of the quality and situation there Resolved that Salem Town Esqr. be vested with full power to have all the said Lands surveyed and laid out into Townships as near the contents of six miles square as the land will admit, and also into quarters of Townships as soon as may be, according to his discretion, & a plan thereof returned to him with a true description of the quantity and situation of each Township, and quarter parts thereof, as also of the streams and waters therein and of the number of Settlers thereon, who may have settled prior to the first day of August one thousand, seven hundred and ninety six, with the number of acres each Settler has under improvement, and the particular time of his settlement.

(P.D. Ex.1 at 202-203.)   Park Holland, John Maynard, and John Chamberlain were engaged by Salem Town to survey the Penobscot tract and created a map reflecting their survey.  (Jt. Ex. (ECF No. 110-32) at Page ID # 6384.)   The tract surveyed by Holland, Maynard, and Chamberlain, comprised of 189,426 acres, became known as the Old Indian Purchase.[9]  (P.D. Ex. 21 at 209; Jt. Ex. 732 (Map 1).)  After accounting for land sold, in 1817, Massachusetts asserted it was "still the proprietor of 161,815 ½ acres of land in the Old Indian Purchase."[10]  (State Defs. Ex. 15 (ECF No. 118-15) at PageID # 7168.)

On June 29, 1818, Massachusetts entered into another treaty with the Penobscot Nation. In this "1818 Treaty," the Penobscot Nation ceded "all the lands [the Penobscot Nation possesses] on both sides of the Penobscot river, and the branches thereof, above the tract of thirty miles in length on both sides of said river, which said tribe [ceded in the 1796 Treaty]" but reserved four

---

[9] The nine surveyed townships became the Towns of Orono, Old Town, Argyle, Edinburg, Lagrange, Bradley, Milford, Greenbush, and Passadumkeag.  P.D. Ex. 21 at 208-10; Jt. Ex. 757 (ECF No. 110-57) at PageID # 6587   Following Park Holland's 1797 survey, Massachusetts empowered Salem Town to advertise and sell the newly surveyed townships and quarter townships because it "was important to promote an early settlement of that part of the Country as well as to obtain a reasonable price for the said lands." P.D. Ex. 21 at 209.  Between 1798 and 1810, Salem Town sold 27,610 ½ acres of land in the nine townships of the Old Indian Purchase.  State Defs. Ex. 14 (ECF No. 118-14) at PageID # 7163-64 (discharging Salem Town from further service); State Defs. Ex. 15 (ECF No. 118-15) at PageID # 7168.

[10] Notably, in 1815, Massachusetts conveyed one of the townships on the west side of the Main Stem, now located in Argyle, to the trustees of the Maine Literary and Theological Institution (later named Waterville College), using the following description: "A Township of land numbered three on the West side of Penobscot River / being one of the Townships purchased of the Penobscot tribe of Indians . . . bounded as follows (viz) easterly by Penobscot River . . . ." Jt. Ex. 672 (ECF No. 109-72) at PageID # 5973-5794.

townships as well as "all the islands in the Penobscot river above Oldtown and including said Oldtown island." (P.D. Exs. 7 & 8 (1818 Treaty & Transcription of 1818 Treaty) at 45-46.) The 1818 Treaty also explicitly granted to the citizens of the Commonwealth of Massachusetts a right to "pass and repass" in any river, stream or pond that "runs through any of the lands hereby reserved [for the Penobscot Nation] for the purpose of transporting timber and other articles." (P.D. Ex. 8 at 46.)

When Maine became a state in 1820,[11] the unsold public lands in Maine that were obtained under the treaties of 1796 and 1818 were divided between Maine and Massachusetts by Commissioners appointed for that purpose; this division included townships or unsold acreage located along the Penobscot River. (Jt. Ex. 667 (ECF No. 109-67) at PageID #s 5944-48, 5956; see also Jt. Ex. 732 (Map 2).) The December 28, 1822 report by the Commissioners assigns lands to each state. (Id. at PageID # 5943, 5945-46, 5947.)) From the Old Indian Purchase, the following unsold lands were assigned to Maine: Townships No. 1, 2, and 4, east of the Penobscot River, which townships later became Passadumkeag, Greenbush, and Bradley, respectively.[12] (Id. at PageID # 5947-5948; Jt. Ex. 757 (ECF No. 110-57) at PageID # 6587 (map dated 1829).)

Thereafter, a deed dated June 10, 1833 documents a sale of the Penobscot Nation's four reserved townships from the 1818 Treaty to the State of Maine (the "1833 Deed"):

> Know all men by these present that, we the Governor, Councillors and principal head men of the Penobscot Tribe of Indians in council assembled after mature deliberation and upon full consideration of a proposition made to us in behalf of said Tribe, by the State of Maine . . . do cede grant, bargain, sell and convey to said State, all the right, title and interest of said Tribe in and to their four townships of land lying north of the

---

[11] See 3 Stat. 544, ch. 19 (1820) (admitting Main to the United States of America as of March 1820).

[12] The following unsold lands along the Main Stem were assigned to Massachusetts: Townships No. 1, 2, 4, and 5 west of the Penobscot River and Township No. 3 east of the Penobscot River, which townships later became Edinburg, Old Town, Orono, and Milford, respectively; and unsold land in Township No. 3, which land became part of Argyle. Jt. Ex. 667 (ECF No. 109-67) at PageID # 5945-5949; Jt. Ex. 757 (ECF No. 110-58) PageID # 6857 (map dated 1829).

mouth of Piscataquis River . . . . To have and to hold to said State the above granted premises, with all the privileges and appurtenances thereto belonging forever.

And we do covenant with said State that we are authorized by the Laws and usage of said Tribe to convey as aforesaid and that we for ourselves and in behalf of said Tribe will forever warrant and defend the premises against the claims of all the members of said Tribe.

(PD Ex. 131 at 592.)  The sale price was $50,000.[13]  (Id.)

## 2. <u>United States v. Maine</u>:  The Land Claims Litigation

In the 1970s, the Penobscot Nation claimed that Maine and Massachusetts had failed to have the 1796 and 1818 Treaties and the 1833 Deed confirmed by Congress in accordance with ITIA.  The Penobscot Nation claimed that it consequently retained title to all of these lands.  <u>See, e.g.</u>, <u>Maine v. Johnson</u>, 498 F.3d 37, 41 (1st Cir. 2007) (citing <u>Bottomly v. Passamaquoddy Tribe</u>, 599 F.2d 1061, 1065 (1st Cir. 1979)); <u>see also</u> <u>Passamaquoddy Tribe v. Maine</u>, 75 F.3d 784, 787 (1st Cir. 1996) (explaining that the tribes then pursued claims to "nearly two-thirds of Maine's land mass").  The land claims of the Penobscot Nation were ultimately pressed by the United States in a 1972 case titled <u>United States v. Maine</u>, D. Me. Civil No. 1969-ND (P.D. Ex. 223 (Complaint)).[14]  Other Maine Indian tribes asserted similar claims involving similar land transactions that had occurred since 1790.[15]

---

[13] The parties do not dispute that some of this land was in the Main Stem area and incorporated as Mattawamkeag and Woodville.  Pls. Response to State SMF ¶ 203 (ECF No. 140 at PageID # 7832).  The land ceded by the Penobscot Nation in the 1818 Treaty and the 1833 Deed along the Main Stem became the towns of Howland, Mattamiscontis, Chester, Woodville, Enfield, Lincoln, Winn, and Mattawamkeag. Pls. Response to State SMF ¶ 204 (ECF No. 140 at PageID # 7832-33).

[14] In a litigation report dated January 1, 1977, the Department of the Interior summarized the history of the land holdings of the Penobscot Nation.  While noting that the Department of the Interior had experts who were prepared to testify that "at the time of the American Revolution and until 1796, the Penobscots continued to hold dominion over [6 to 8 million acres of land] which lay above the head of the tide of the Penobscot River," this report explained that as of the date of 1977 "the Penobscot Nation . . . holds only the islands in the Penobscot River between Oldtown [sic] and Mattawamkeag."  Jt. Ex. 8 (ECF No. 102-8) at PageID # 1237-1238.

[15] The United States also filed a similarly titled case on behalf of the Passamaquoddy Tribe.  <u>See</u> <u>United States v. Maine</u>, D. Me. Civil No. 1966-ND.

Settlement discussions in these cases began in March 1977 and were concluded with a stipulation of dismissal in August 1981. (See, e.g., P.D. Ex. 282 at 5941 (describing history of settlement discussions) & P.D. Ex. 233 at 3241-47 (stipulation of dismissal.) The tribes were represented at these negotiations in part by a committee of tribal representatives, including Rueben Phillips, Andrew Akins, James Sappier, and Timothy Love on behalf of the Penobscot Nation. (Phillips Decl. (ECF No. 124) ¶¶ 7-9.) The proposed settlement was presented to the members of the Penobscot Nation in early March 1980. (Phillips Decl. ¶¶ 12-17.) A tribal referendum vote on March 15, 1980 resulted in 320 votes in favor of the settlement and 128 opposed. (See P.D. Ex. 260 at 3940-42.)

As part of the Stipulation of Dismissal in United States v. Maine, on April 17, 1981, the Penobscot Nation Tribal Council authorized then-Governor Timothy Love to execute a Release and Relinquishment. (Jt. Ex. 612 (ECF No 109-12) at PageID # 5742.) In accordance with this authorization, on April 21, 1981, Governor Timothy Love authorized the United States to stipulate to the final dismissal with prejudice of the claims the United States had brought on behalf of the Penobscot Nation and also explicitly released and relinquished the Penobscot Nation's claims to the extent provided in the related acts passed by Congress and the Maine Legislature. (Jt. Ex. 612 (ECF No 109-12) at PageID # 5743.) This Release and Relinquishment was reviewed by the Department of Justice. (Jt. Ex. 612 (ECF No. 109-12) at PageID # 5736.)

### 3.  The Passage of the Settlement Acts[16]

Ultimately, the stipulation of dismissal in <u>United States v. Maine</u> (P.D. Ex. 233) was the culmination of the passage of two pieces of legislation:  the Maine Implementing Act, 30 M.R.S.A. §§ 6201-6214 ("MIA"), and the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735 ("MICSA").  Throughout this Order, the Court will refer to MICSA and MIA collectively as "the Settlement Acts."  While the Settlement Acts operate in tandem, each act has its own legislative history, and the parties have drawn extensively from those legislative histories in constructing the factual record now before the Court.

### a.  MIA:  30 M.R.S.A. §§ 6201-6214

Working on the premise that this particular legislative action needed to occur "as soon as possible," L.D. 2037, the negotiated proposal that was thereafter enacted as MIA, was presented to the Maine Legislature in mid-March 1980.  (Hull Decl. (ECF No. 119-32) ¶ 7.)  On March 28, 1980, the Maine Legislature's Joint Select Committee on Indian Land Claims held a public hearing on L.D. 2037.  (<u>See</u> P.D. Ex. 258 at 3738.)  In his opening remarks at the hearing, Attorney General Cohen described "the Settlement Proposal" and his reasons for recommending "this Settlement to the people of the State of Maine." (P.D. Ex. 258 at 3740.)  While acknowledging that "[i]t would be an overstatement to say that there would be no difference between Indians' Lands and non-Indians' Lands" under terms of L.D. 2037, he described the proposed legislation as "generally consistent with [his] belief that all people in the State should be subject to the same laws.  While

---

[16] The legislative history of the Settlement Acts has been provided to the Court as Public Document Exhibits 240 through 287.  Much of this factual section summarizes portions of that legislative history brought to the Court's attention via the submitted statements of material facts and responses thereto.  However, the Court notes that in considering the legislative history provided, it has looked beyond the portions cited in the parties' statements of material fact in an effort to properly apply the canons of statutory construction.

there are some exceptions which recognize historical Indian concerns, in all instances the State's essential interest is protected."  (Id. at 3744-45.)

Thomas Tureen, appearing at the hearing as counsel on behalf of the Penobscot Nation and the Passamaquoddy Tribe, explained that the negotiations that led to the current proposal occurred only because "feelings of mistrust began to break down and a spirit of reconciliation made itself felt."  (Id. at 3763.)  Tureen flagged the exercise of "tribal powers in certain areas of particular cultural importance such as hunting and fishing" as an issue that had been important for the State to understand.  (Id.)  Mr. Aikens, Chair of the Passamaquoddy-Penobscot Land Claims Committee, also spoke and indicated that part of the negotiation with the State had been "that neither side would make any changes or amendment to the package.  We have not and we expect the same in return from the Maine Senate or House."  (Id. at 3765-66.)

The Committee heard concerns about the hunting and fishing provisions of the proposed settlement.  By way of example, Joe Floyd, a Public Member of the Atlantic Seamen's Salmon Commission, expressed concern that "critical parts of the Penobscot River" would "fall within the confines of the Settlement," which he said "could spell danger to the salmon." (Id. at 3855-56.)  In response to expressed concerns about the sustenance fishing rights contemplated under L.D. 2037, Deputy Attorney General Patterson explained:

> Currently under Maine Law, the Indians can hunt and fish on their existing reservation for their own sustenance without regulation of the State.  That's a right which the State gave to the Maine Indians on their reservations a number of years ago and the contemplation of this draft was to keep in place that same kind of right and provide that the Indians could continue to sustenance hunt and fish and that that would provide a legitimate basis for distinction between Indian and non-Indian hunting and fishing.

(Id. at 3793-94.)  In response to later questions, Deputy Attorney General Patterson similarly explained:

> [T]he State currently lets Indians and the Legislature currently lets Indians engage and regulate their own hunting and fishing on their on reservations.  That's a current state

13

> law.  That's in Title 12, §7076.  That was a right which the State gave to the Indians
> on their reservations some years ago.  So in large measure, the policy embodied here
> was long ago recognized by the Legislature of the State.  That's why the right to
> sustenance hunt and fish on reservations which is found in Sub-§4 on Page 9, is not
> such a major departure from current policy.

(Id. at 3894.)

Following this hearing, additional memoranda were drafted and distributed suggesting clarifications that might be made to L.D. 2037.  The March 31, 1980 Preliminary Bill Analysis by John Hull, who was then working as a staff attorney for the Maine Legislature, noted, in relevant part, that the definition of the Penobscot Indian Reservation in L.D. 2037 "is unclear" with respect to whether "the boundaries extend to high or low water mark on tidal waters, or beyond that on marine waters."  (P.D. Ex. 262 at 3945.)

A memo from then-Attorney General Richard S. Cohen, dated April 1, 1980, was provided to the Joint Select Committee on Indian Land Claims.  It included a section, titled "Boundaries of the Reservation and Territory," that read in relevant part:

> The external boundaries of the Reservations are limited to those areas described in the
> bill including any riparian or littoral rights expressly reserved by the original treaties
> with Massachusetts or which are included by the operation of law.  . . .
>
> …. In any event the Tribes will not own the bed of any Great Pond or any waters of a
> Great Pond or river or stream, all of which are owned by the State in trust for all
> citizens.  Jurisdiction of the Tribes (i.e. ordinance powers, law enforcement) will be
> coextensive and coterminous with land ownership.

(P.D. Ex. 263 at 3965-66.)  The first portion of this section of the memo became part of the April 2, 1980 Report of the Joint Select Committee on Indian Land Claims Relating to L.D. 2037, "An Act to Provide for Implementation of the Settlement of Claims by Indians in the State of Maine and to create the Passamaquoddy Indian Territory and Penobscot Indian Territory," with minimal changes:

> The boundaries of the Reservations are limited to those areas described in the bill, *but* include any riparian or littoral rights expressly reserved by the original treaties with Massachusetts or by operation of *State* law.

(P.D. Ex. 264 at 3971 (changes noted by added emphasis).)  This was one of fourteen specific interpretations that the Joint Select Committee on Indian Land Claims announced as part of its understanding of MIA at the time of its passage.[17]  (See P.D. Ex. 272 at 4023 (Representative Post explaining that "as we vote on this particular piece of legislation, we accept the understanding that is reflected" in the 4/2/1980 Joint Committee Report).)

Upon introducing L.D. 2037 to the Maine Senate on April 2, 1980, Senator Samuel Collins acknowledged some technical amendments had been made at the committee level but stated that "[t]he amending process is not open to the Legislature in the manner of our usual legislation, because this is the settlement of a law suit [sic].  Just as with a negotiated labor contract we cannot make the changes." (P.D. Ex. 271 at 4016.)  He explained that, if enacted, the bill would be "a unique document" that would not "take effect unless Congress adopts it and finances it" and could not be readily amended once ratified by Congress.  (Id.)  He further stated, however, "It is the expectation of the committee . . . that at the time of enactment, we will have before you a further report of the committee in which we express some of our understandings of various words and provisions of this very complicated document, so that you may have them as a part of the legislative history of the act. No act of this complexity will be free from question marks. There will be

---

[17] The Penobscot Nation has attempted to supplement this MIA legislative history with documents that members of the Tribes' Negotiating Committee created between March 31, 1980 and April 2, 1980, all of which are focused on memorializing the Tribe's apparent objections to the April 2, 1980 Report of the Joint Select Committee on Indian Land Claims Relating to LD 2037 (P.D. Ex. 264).  See Phillips Decl. (ECF No. 124) at PageID # 7504-05 & attachments cited therein.  The Penobscot Nation's factual assertions on this point are clearly disputed.  See Pls. SMF (ECF No. 119) ¶¶ 71-73, 77, 87, 93-97 & State Defs. Responses (ECF No. 141) at PageID # 8071-72, 8076, 8083, 8088-92.  Thus, resolution of these factual issues would require a trial.  The Court notes, however, that even if the Court accepted these particular factual assertions under the guise of viewing the factual record in the light most favorable to the Penobscot Nation, it would not change the Court's construction of MIA.  Rather, such facts would only serve as additional evidence that some of MIA's provisions were ambiguous and susceptible to differing interpretations by the State and the tribes even at the time of MIA's passage.

interpretations necessary through the years just as there are interpretations necessary of all the statutes that we pass." (P.D. Ex. 271 at 4016.)  Senator Collins also noted that L.D. 2037 "[w]ill be extending some hunting, fishing and trapping rights to about 800 Indian people in 300,000 acres." (Id.)

Ultimately, on April 2, 1980, the Maine Senate voted to approve L.D. 2037.  (P.D. Ex. 271 at 4020.)  On April 3, 1980, the Maine House voted to approve it.  (P.D. Ex. 272 at 4025.) Thereafter, it was signed by Governor Brennan.  On April 3, 1980, the Maine House of Representatives passed an order (H.P. 2055) to place documents in the Legislative Files, as did the Maine Senate (the "Legislative Files Order").  (P.D. Ex. 274 at 4031.)  The Legislative Files Order directed that the following documents "be placed in the Legislative files": (1) "The report of the Joint Select Committee on Indian Land Claims," which included a memorandum to the Committee from Attorney General Richard S. Cohen, dated April 2, 1980 ("Report of Maine's Joint Committee"); and (2) "The transcript of the hearing of the Joint Select Committee on Indian Land Claims, including the statement of the Honorable James B. Longley and the memorandum to the committee from Maine Attorney General Richard S. Cohen, dated March 28, 1980." (Id.)[18]

In a declaration dated June 16, 2014, Michael Pearson, a member of the Maine Legislature and the Joint Select Committee in 1980, stated that he believes the sustenance fishing provisions of MIA were "intended to allow members of the Penobscot Nation to take fish for their sustenance from the Penobscot River in waters from Indian Island, near Old Town, at least as far up the River to Medway, where members of the Tribe had always taken fish for their subsistence" and were

---

[18] There is no indication in the Maine Legislative Record of consent or agreement on the part of the Tribes' Negotiating Committee to the Legislative Files Order or to the Report of Maine's Joint Committee. See P.D. Ex. 274 at 4031. There is also no record of consent or agreement on the part of the State's Negotiating Committee or the representatives of the United States.  See id. However, the United States Senate Committee took "note of the hearings before, and report of, the Maine Joint Select Committee on Land Claims and acknowledge[d] the report and hearing record as forming part of the understanding of the Tribe[s] and State regarding the meaning of the Maine Implementing Act." P.D. Ex. 282 at 5973.

"not intended to confine members of the Penobscot Nation to seek out fish for their sustenance on the surfaces of the islands or within restricted zones of the River next to the islands." (Pearson Decl. (ECF No. 119-37) at PageID # 7363.)  Likewise, Bennett Katz, then-Chair of the Maine Indian Tribal-State Commission, which was created by MIA, and previously a member of the Maine Senate at the time of MIA's passage, stated in a 1995 letter to the Federal Energy Regulatory Commission that he could not imagine that his colleagues intended MIA to be interpreted to mean that "[t]he sustenance fishing right granted to the Penobscot Nation is not on the Penobscot River" and that "[o]nly the islands and none of the waters in the Penobscot River constitute the Penobscot Reservation."  (Jt. Ex. 161 (ECF No. 104-61) at PageID # 2200.)  Katz went on to state that he was "certain the Penobscots never would have agreed to the Settlement had it been understood that their fishing right extended only to the tops of their islands" and that it would have "been assumed that the right [to sustenance fish] would be exercised in the waters of the Penobscot River" because any other interpretation would not "make sense."  (Id.)

### b.  MICSA:  25 U.S.C. §§ 1721-1735

With the State's enactment of MIA, attention shifted to Congress.  The Senate Select Committee on Indian Affairs held hearings on July 1 and 2, 1980 (P.D. Ex. 278), hearing testimony from tribal members and non-tribal Maine residents as well as state officials.[19]  A map that was presented to Congress during the sessions on ratifying MIA showed the Passamaquoddy and Penobscot Reservations as shaded in red. (Sproul Decl. (ECF No. 141-2) at PageID # 8185

---

[19] This testimony included the testimony of Penobscot Nation member Lorraine Nelson (aka Lorraine Dana) who expressed concern that under the language of the proposed Settlement Acts, her "family will endure hardship because of the control of taking deer and fish."  P.D. Ex. 278 at 4706-07.  She described how her son "fish[ed] her islands to help provide for [her] family" and was referring to the fact that he fished in the Main Stem.  L. Dana Decl. (ECF No. 1241-1) at PageID # 7508.

(referencing Jt. Ex. 732 (ECF No. 110-32) Map 30).)  On this map, "river and lakes adjacent to settlement lands" are shaded white.  (Jt. Ex. 732 (ECF No. 110-32) Map 30.)

At the Senate Committee hearing, the Committee requested that Maine's Governor and other state officials provide written responses to certain questions, including whether MIA and the proposed federal statute contain "jurisdictional language [that] bestow[s] preferential treatment upon the tribes."  In his August 12, 1980 "joint response" letter, Attorney General Cohen responded to that question as follows:

> Under [MIA], the Penobscot Nation and Passamaquoddy Tribe are given certain rights and authority within the 300,000 acres of "Indian Territory."  To the extent that these rights and authority exceed that given any Maine municipality, they do so only to a limited extent and in recognition of traditional Indian activities. . . .  The most significant aspect of this limited expansion of authority is in the area of hunting and trapping and, to a limited extent, fishing in Indian Territory.  Even in this area, the Indian Tribes must treat Indians and non-Indians alike, except for subsistence provisions, and Tribal authority can be overridden by the State if it begins to affect hunting, trapping or fishing outside the Indian Territory.  Generally the Act does not provide Indians with preferential treatment.  To the contrary, we believe the Implementing Act establishes a measure of equality between Indian and non-Indian citizens normally not existing in other States.  Indeed, the Act recovers back for the State almost all of the jurisdiction that had been lost as a result of recent Court decisions.
>
> Obviously no one can guarantee that there will be no litigation in the future over the meaning of certain provisions in the Maine Implementing Act or S.2829.  However, the provisions of S. 2829 and the Implementing Act have been carefully drafted and reviewed to eliminate insofar as possible any future legal disputes.  Particular care was taken to insure that S. 2829 is adequate to finally extinguish the land claims, and as to those provisions we are satisfied that they have been drafted as carefully as possible.  Nevertheless, litigation over this and other provisions is always possible and we cannot prevent the filing of future suits.  Any contract, agreement or legislation always contains unanticipated ambiguities that sometimes can only be resolved through the courts.  In our judgment, however, should questions arise in the future over the legal status of Indians and Indian lands in Maine, those questions can be answered in the context of the Maine Implementing Act and S. 2829 rather than using general principles of Indian law.

(P.D. Ex. 278 at 4436-4437.)

In the final House and Senate committee reports ("Committee Reports") on the federal act ratifying the terms of MIA, Congress confirmed in its "Summary of Major Provisions" that "the settlement . . . provides that the . . . Penobscot Nation will retain as reservations those lands and natural resources which were reserved to them in their treaties with Massachusetts and not subsequently transferred."  (P.D. Ex. 282 at 5946; P.D. Ex. 283 at 6008.) Congress also addressed as "Special Issues" concerns raised in testimony and written materials to the House and Senate Committees, all of which the committees said were "unfounded."  (P.D. Ex. 282 at 5942; P.D. Ex. 283 at 6004.)  In response to the concern "[t]hat the settlement amounts to a 'destruction of the sovereign rights and jurisdiction of the . . . Penobscot Nation," the Committee Reports stated, in identical language, that the settlement "protects the sovereignty of . . . the Penobscot Nation" and that "hunting and fishing provisions discussed in paragraph 7" of the "Special Issues" were "examples of expressly retained sovereign activities." (P.D. Ex. 282 at 5942-43; P.D. Ex. 283 at 6004-05.)  The Committee Reports then indicate in paragraph 7:  "Prior to the settlement, Maine law recognized . . . the Penobscot Nation's right to control Indian subsistence hunting and fishing within [its] reservation[], but the State of Maine claimed the right to alter or terminate these rights at any time." (P.D. Ex. 282 at 5944-45; P.D. Ex. 283 at 6006-07.)  In identical language, each report continued, "Under Title 30, Sec. 6207 as established by the Maine Implementing Act . . . the Penobscot Nation [has] the permanent right to control hunting and fishing . . . within [its] reservation. The power of the State of Maine to alter such rights without the consent of the [Tribe] is ended. . . . The State has only a residual right to prevent the [Tribe] from exercising [its] hunting and fishing rights in a manner which has a substantially adverse effect on stocks in or on adjacent lands or waters . . . not unlike that which other states have been found to have in connection with

federal Indian treaty hunting and fishing rights." (P.D. Ex. 282 at 5944-45; P.D. Ex. 283 at 6006-07.)

With the passage of MICSA, Congress approved and ratified all earlier transfers of land and natural resources by or on behalf of the Penobscot Nation.  See 25 U.S.C. § 1723.  This ratification by its express terms included not only "any voluntary or involuntary sale, grant, lease, allotment, partition, or other conveyance," but also "any act, event, or circumstance that resulted in a change in title to, possession of, dominion over, or control of land or natural resources."  17 U.S.C. § 1722(n).   Before the end of 1980, the Settlement Acts were in effect.

## B.  Post-Settlement Acts:  The State and the Penobscot Nation Chart a New Course[20]

"The slate is effectively wiped clean," stated Penobscot Nation counsel Thomas Tureen after Maine's passage of MIA.  (Jt. Ex. 580 (ECF No. 108-80) at PageID # 5563.)  Likewise, the Native American Rights Fund, whose lawyers represented the Penobscot Nation in the land claims case, celebrated the 1980 Acts by declaring: "The Maine settlement is far and away the greatest Indian victory of its kind in the history of the United States."  (Jt. Ex. 582 (ECF No. 108-82) at PageID # 5566.)

On January 9, 1981, the Department of the Interior (the "DOI") published a notice in the Federal Register announcing the "extinguishment of all land and related claims of the Maine Indians" and, in relevant part, stating that MICSA "extinguishes any claims of aboriginal title of

---

[20] The parties have provided the Court numerous factual assertions that related to pre-1980 events that the Court has determined offer no insight into resolving the present dispute.  Many of these statements are also disputed and supported by contested testimony of expert witnesses or actually reflect statements of law rather than fact.  See, e.g., State Defs. Opposing SMF (ECF No. 141) ¶¶  4, 5, 11, 12, 15, 23, 24 (first sentence), 26, 27, 28, 29, 31, 32, 34, 35, 42, 54, 55.  The Court has disregarded such statements and does not include them in its recitation of undisputed material facts.  The Court notes that, to the extent that it would have determined that the outcome of the present dispute required resolution of these disputed factual matters, this case could not have been resolved based on the present cross-motions.

the Maine Indians anywhere in the United States and bars all claims based on such title.  This section also extinguishes any land claims in the State of Maine arising under federal law by any Indian tribe . . . ."  (P.D. Ex. 288 at 6063 (46 Fed. Reg. 2390 (Dep't of Interior Jan. 9, 1981)).)

Since 1980, the Penobscot Nation has posted signs on certain islands in the Main Stem.  (State Defs. Ex. 8 (ECF No. 118-8) at PageID # 7083.)  Specifically, since at least 1983, the Penobscot Nation has posted signs on some (but not all) of the islands in the Main Stem that state:  "PENOBSCOT INDIAN RESERVATION.  NO TRESPASSING WITHOUT PERMISSION. VIOLATORS WILL BE PROSECUTED." (State Defs. Ex. 8 at PageID # 7083-84.)  Similar postings do not appear at the public boat launches or on the banks of the Main Stem, nor have such postings appeared in the past at these locations.  (Id. at PageID # 7084.)  Notably, non-tribal hunters and trappers generally access the Main Stem from these river banks, especially the public boat launches. (Id. at PageID # 7084-85 & Ring Aff. (ECF No 52-3).)

The Penobscot Nation has posted a three-panel informational kiosk at the Costigan Boat Launch in Milford, which was funded by the DOI.  (Id. at PageID # 7083; Jt. Ex. 705 (ECF No. 110-5) at PageID # 6156.)  With respect to permits, the panel states:  "To obtain fiddleheads or duck hunting permits for the islands, for information regarding other allowable uses of the reservation or to report water quality problems, contact the Penobscot Nation Department of Natural Resources at 12 Wabanaki Way, Indian Island, Old Town, Me. 04468 or call (207) 827-7776."  (Jt. Ex. 705 (ECF No. 110-5) at PageID # 6156.)

Likewise, the Penobscot Nation's woodland territory beyond the Main Stem contains postings.  (State Defs. Ex. 8 at PageID # 7084.)  Generally, these posting signs read:  **"NOTICE Penobscot Nation Indian Territory**  Hunting, trapping, and other taking of wildlife under exclusive authority of the Penobscot Nation. Special restrictions may apply.  Violators will be

prosecuted.  PERMIT MAY BE REQUIRED Contact: Wildlife & Parks Community Bldg. Indian Is., Me. 04465  1-207-827-777.”  (State Defs. Ex. 8. at PageID # 7084;  Georgia Decl. Ex. E (ECF No. 118-4) at PageID # 7037.)  These postings are not visible from the Main Stem, nor do the signs notify the public that the Penobscot Nation regulates activities on the Main Stem.  (State Defs. Ex. 8 at PageID # 7084.)

Since the passage of the Settlement Acts, the Penobscot Nation does not and has not required non-tribal members to purchase "access permits" in order to be on the waters of the Main Stem for navigating, fishing, or sampling.  (Banks Decl. (ECF No. 140-1) ¶ 5; Kirk Loring Decl. (ECF No. 140-21) ¶ 12 (regarding 1976-2001 when Loring was Chief Game Warden for tribe).)  However, the Penobscot Nation Warden Service has patrolled the Main Stem when it is not ice-bound, as it has done since it began operating its own warden service in 1976.  (Kirk Loring Aff. (ECF No. 119-12) ¶¶ 8 & 9; Gould Decl. (ECF No. 140-2) ¶ 5.)  The Penobscot Nation Warden Service historically has employed approximately four wardens who have patrolled in the Main Stem.  (Kirk Loring Aff. (ECF No. 119-12) ¶ 4.)  Under various Maine state laws, Penobscot Nation wardens are cross-deputized to enforce state laws within Penobscot Indian territory and have been granted the powers of a game warden outside said territory.[21]  See, e.g., 12 M.R.S.A. § 10401.

During the early years following the passage of the Settlement Acts, the game wardens for Penobscot Nation and Maine occasionally collaborated on patrols and enforcement actions in the Main Stem.  (See, e.g., Dunham Decl. (ECF No. 118-2) ¶2; Georgia Decl. (ECF NO. 118-4)  ¶¶ 5,

---

[21] This practice of cross deputizing tribal game wardens began in 1982 and was expanded in 1986.  P.L. 1981, ch. 644, § 4 (effective July 13, 1982), codified at 12 M.R.S.A. § 7055 (Supp. 1982-1983); P.L. 1985, ch. 633 (effective July 16, 1986), codified at 12 M.R.S.A. § 7055 (Supp. 1986). The statute was recodified in 2004 as 12 M.R.S.A. § 10401 (Supp. 2003). P.L. 2003, ch. 414, § A2 (effective April 30, 2004).

6-8; Georgia Decl. (ECF NO. 148-2) ¶¶ 4, 12; Wilkinson Aff. (ECF No. 118-6) at PageID # 7052;

see also Jt. Exs. 85-87 (ECF Nos. 103-35-103-37) at PageID # 1697-1700 (documenting game

warden collaboration on the summonsing of Kirk Francis).)  More recently, the Main Stem patrol

and enforcement actions by the wardens employed by the Penobscot Nation and the State have

become contentious.  (See, e.g., Wilkinson Aff. (ECF No. 118-6) at PageID # 7052-53.)  In a May

2005 memo from DIFW, Dunham expressed his concerns that non-tribal trappers were being

advised by tribal game wardens that their trapping activities violated tribal law and that the

Penobscot Nation "claimed" the River "bank-to-bank."  (See, e.g., Dunham Decl. (ECF No. 118-

2) at PageID # 3310.)  Dunham complained about the lack of clarity regarding the boundaries of

the reservation lands but asserted that "[t]he rule of thumb has always been the halfway point

between the island and the mainland" but "[t]he water belongs to the State."[22] (Id.)

The record contains dueling declarations regarding a November 12, 2011 interaction

between Penobscot Nation Game Warden Richard Adams and a four-person duck hunting party.

Jennifer Davis Dykstra was a member of the duck hunting party that was hunting from a boat on

the Main Stem.  As the party approached the Costigan boat landing, Penobscot Nation game

warden Richard Adams approached the party and asked to see their hunting permits.  The group

did not have any permits from the Penobscot Nation and Adams indicated that they would need a

Penobscot hunting permit to hunt in the Main Stem, even if that hunting was only done from a

boat located in the waters of the Main Stem.  (See Dykstra Aff. (ECF No. 52-2) ¶¶ 4-8; Gould

Decl. ¶¶ 11-14; Adams Decl. ¶¶ 4-14.) [23]

---

[22] The Court has been provided a memo by a tribal game warden memorializing a September 2010 conversation with another DIFW warden who similarly expressed the view that the "thread of the river" was the boundary line for enforcing duck hunting law on the Penobscot River.  Jt. Ex. 267 (ECF No. 105-67) at PageID # 3379.

[23] There is an apparent factual dispute regarding the exact words exchanged between the Penobscot Nation game warden and the Dykstra hunting party.  See Pls. Response to State SMF ¶ 78 (ECF No. 140) at Page ID # 7764.  The

## C. The History of Fish and Fishing in the Main Stem

In an affidavit dated January 8, 1822, Joseph Butterfield attested that he had lived in "Oldtown" since 1803, and:

> that the fish either Salmon[,] Shad or Alewives were abundantly plenty in the Penobscot River until about 1813. Since which time they have been rapidly decreasing every season so that by this time there is scarce any to be taken in the season of the year when they are most plenty which has led me to believe that they have been unreasonably destroyed and in endeavoring to find out the cause I am led to believe that it is owing to the vast number of destructive Machines used in the tide waters and other places that has produced this evil, particularly the Wears…. [It] is now a fact that at Oldtown falls where I reside used to be considered one of the greatest places for taking fish on the river where the Penobscot Indians procured at least half of their living annually. That now they cannot take a sufficient quantity for their families to eat even in the best part of the season and many of the white people used to take plent[y] for their own use cannot git any by any means whatever.

(Jt. Ex. 560 (ECF No. 108-60) at Page ID #s 5493-94.)[24]   As this affidavit establishes, there is a long history of fishing in the Main Stem, including commercial, recreational, and sustenance fishing.   The factual record in this case explicitly discusses fishing of two particular species, Atlantic salmon and eels.   The Court addresses each of these fisheries and then turns to a discussion of sustenance fishing by members of the Penobscot Nation.

---

Court cannot and need not resolve that factual dispute in connection with the pending motions.  Rather, the Court concludes that its resolution of this factual dispute would have no material impact on the issues addressed herein.

[24] The Court notes that the copy of the affidavit in the record is illegible but takes the contents to be true as admitted in the statements of material fact.  See Pls. Response to State SMF ¶ 120 (ECF No. 140) at Page ID # 7781.  The record does not provide any clear context for what prompted Butterfield to make this written record of his observations in Old Town.

24

### 1.  Atlantic Salmon

The commercial salmon catch in the Penobscot River decreased from the 1850s through 1947, the last year commercial fishing was permitted in the river, as follows:

> a. In the 1850s, the annual commercial salmon catch was approximately 25,000;
> b. In 1875, the annual commercial salmon catch was approximately 15,000;
> c. From 1873 to 1900, the annual commercial salmon catch was approximately 12,000;
> d. In 1910, the annual commercial salmon catch was approximately 2,500; and
> e. In 1947, the annual commercial salmon catch was 40, all by rod.

(Jt. Ex. 694 (ECF No. 109-94) at PageID # 6034.)   Even with commercial salmon fishing prohibited since 1947, for the decade between 1957 and 1967, no Atlantic salmon were reportedly caught in the Penobscot River.  (Id.)  By 1967, the quantity of shad, alewives, striped bass, and smelt in the Penobscot River was also severely reduced.  (Id.)

A 1980 DIFW interdepartmental memo noted that Maine then allowed very limited non-commercial fishing of Atlantic salmon and expressed concern about the impact of "the proposed settlement" of the Indian claims, in that the settlement would involve acreage of watershed that could be subject to "[i]ncreased exploitation and capricious regulation" that would "negate" the gains made in increasing the "[u]seable Atlantic salmon habitat in Maine" and restoring anadromous fish stocks. (Jt. Ex. 601 (ECF No. 109-1) at PageID # 5681.)  Following the passage of the Settlement Acts, the Penobscot Nation acknowledged the need to limit harvest of Atlantic salmon as well as work towards long-term restoration of Atlantic salmon in the Penobscot River. Since 1980, the Penobscot Nation has issued sustenance permits for the taking of Atlantic salmon by gill net on two occasions.  (See Jt. Exs. 209 (ECF No. 105-9), 237 (ECF No. 105-37) & 239 (ECF Nos. 105-39).)

In 1983, the Penobscot Nation informed various state authorities that it had promulgated its own regulations for sustenance fishing of Atlantic salmon in the Penobscot River.  (See Jt. Ex.


63 (ECF No. 103-33) at PageID #s 1558-59; Jt. Ex. 64 (ECF No. 103-14) at PageID # 1560.)  In 1988, the Penobscot Nation proposed to harvest 10 to 12 Atlantic salmon for ceremonial use.  (Jt. Exs. 75 (ECF No. 103-25), 76 (ECF No. 103-26), 77(ECF No. 103-27) & 81 (ECF No. 103-31).)  In response to this proposal, the Atlantic Sea Run Salmon Commission sought clarification from the Maine Attorney General on the Penobscot Nation's "plan [to take] approximately 20 Atlantic salmon from the Penobscot River by the use of gill nets." (Jt. Ex. 78 (ECF No. 103-28) at PageID # 1638.)  In a letter dated February 16, 1988, then-Maine Attorney General James Tierney responded that the Penobscot Nation's proposed fishing "would not be prohibited" under the express terms of 30 M.R.S.A. § 6207(4), which allows "sustenance fishing" that occurs "within the boundaries of" the Penobscot Indian Reservation.  (Jt. Ex. 80 (ECF No. 103-30) at PageID # 1652.)  Currently, the Penobscot Nation addresses the sustenance taking of Atlantic salmon in its fish and wildlife laws.  (Banks Decl. ¶ 8; P.D. Ex. 222 at 3117-18 (section 303).)

## 2.  Eel Potting

Eels are "fish," as defined by MIA: a "cold blooded completely aquatic vertebrate animal having permanent fins, gills and an elongated streamlined body usually covered in scales and includes inland fish." 30 M.R.S.A. § 6207(9).[25]  Eel potting generally involves placing a device or "pot" at the bottom of a body of water, usually baited, to capture eels; the device is then marked with a line and a buoy.  (Jt. Ex. 130 (ECF No 104-30) at PageID # 2093.)  Both the State and the Penobscot Nation have issued commercial eel potting permits.  (See, e.g., Jt. Exs. 214 (ECF No. 105-14), 215 (ECF No. 105-15), 220 (ECF No. 105-20), 227 (ECF No. 105-27), 228 (ECF No.

---

[25] The Penobscot Nation has regulated the use of eel pots by non-members as a trapping activity. See P.D. Ex. 222 (section 402); Banks Decl. (ECF No. 140-1) ¶ 7.  The State disputes this categorization and asserts eel potting is a fishing activity for purposes of MIA.  See State Defs. Reply SMF (ECF No. 148) at PageID # 8764.  The significance of eel potting being categorized as trapping matters only if it is determined that an eel pot is being used on reservation land, in which case it would be regulated by the Penobscot Nation, if considered trapping, and by MITSC, if considered fishing.

105-28), 229 (ECF No. 102-29) & 312 (ECF No. 106-12).)   In 1994 and 1995, Maine
acknowledged that the Penobscot Nation had authority to control access to its lands for purposes
of placing eel pots by conditioning state permits with language to the effect:

> This permit does not give the permittee the right to place fishing gear on private
> property against the wishes of the property owner. The portions of the Penobscot
> River and submerged lands surrounding the islands in the river are part of the
> Penobscot Indian Reservation and eel pots should not be placed on these lands
> without permission from the Penobscot Nation.

(Jt. Ex. 102 (ECF No. 104-2) at PageID # 1887; see also Jt. Ex. 109 (ECF No. 104-9) at PageID #
1977; Jt. Ex. 110 (ECF No. 104-10) at PageID # 1979; Jt. Ex. 111 (ECF 104-11) at 1981.)
Likewise, the Penobscot Nation's commercial permits for eel potting have provided that State of
Maine eel potting regulations "not superseded" also apply.   (Jt. Ex. 214 (ECF No. 104-14) at
PageID # 2742; Jt. Ex. 220 (ECF No. 105-20) at PageID # 2807; Jt. Ex. 228 (ECF No. 105-28) at
PageID # 3090; Jt. Ex. 229 (ECF No. 105-29) at PageID # 3091.)   The Penobscot Nation
Department of Natural Resources finalized eel trapping permits and catch reports with conditions
for non-tribal members and tribal members in 1995.  (Jt. Ex. 145 (ECF No. 104-45) at PageID #
2167; Jt. Exs. 146 (ECF No. 104-46) at PageID # 2168; Jt. Ex. 221 (ECF No. 105-21) at PageID
# 2808.)  In this same time frame, the Penobscot Nation also raised concerns regarding the State's
issuance of eel permits and explained that a tribal member was seeking to begin a commercial
eeling venture; the Penobscot Nation sought from the State "a solution that lessens the possibility
of confrontation . . . on the river."  (Jt. Ex. 138 (ECF No. 104-38) at PageID # 2149.)  On June 5,
1995, a State permit for eel pots was issued to the same tribal member for the Penobscot River
from Oldtown to Howland and from West Enfield/Howland to the Mattaceunk Dam. (Jt. Ex. 486
(ECF No.107-93) at PageID # 5217.)  In response to the request of a tribal member in 1995, the

State allocated an exclusive fishing zone, Milford to West Enfield, for eeling by tribal members. (Jt. Ex. 142 (ECF No. 104-42) at PageID # 2157.)

In March 1996, DIFW sent previously permitted eel potters a memo outlining changes in eel potting regulations for the upcoming season. (Jt. Ex. 172 (ECF No. 104-72) at PageID # 2228.) The letter informed eel potters of the prohibition on taking eels less than six inches long, announced that the fee for a state-wide permit would be $100 and enclosed a copy of the new application. (Id. at PageID # 2242-43.) The new application continued to include the language that the permit does not give the holder permit permission to place gear within the Penobscot Nation reservation, defined to include "portions of the Penobscot River and submerged lands surrounding the islands in the river." (Id. at 2244.) Similar correspondence was sent to eel weir operators with applicable changes noted, as well as to all divisions within DIFW. (Jt. Ex. 173 (ECF No. 104-73) at PageID # 2229-48.) DIFW provided the Penobscot Nation with a list of all eel potters and weir owners in October 1996. (Jt. Ex. 184 (ECF No. 104-84) at PageID # 2303-05.)

### 3. Sustenance Fishing

In addition to commercial and recreational fishing, members of the Penobscot Nation have also caught many types of fish (including eel and Atlantic salmon) for sustenance. (B. Dana Decl. (ECF No. 124-2) ¶ 6; Phillips Decl. (ECF No. 124) ¶ 6; C. Francis Decl. (ECF No. 124-3) ¶ 5.) Despite the decrease in catch and concerns about pollution in the River, members of the Penobscot Nation have routinely engaged in sustenance fishing in the Main Stem, bank-to-bank. (See, e.g., L. Dana Decl. (ECF No. 124-1) ¶¶ 6-12 (recounting her memories of tribal members fishing the area of the Main Stem back to the 1940s); B. Dana Decl. (ECF No. 124-2) ¶¶ 5-6 & 8-9 (recounting his memories of fishing and other tribe members fishing the area of the Main Stem back to the 1960s); Phillips Decl. (ECF No. 124) ¶ 6 (explaining that the Penobscot River "was an important

source of food for my family" and that his family fished and trapped "bank to bank" while he was growing up in the 1940s-1960s); C. Francis Decl. (ECF No. 124-3) ¶ 5-11.)  Families living on Indian Island relied on the Penobscot River for food.  (K. Loring Decl. (ECF No. 119-12) ¶ 4.) Some tribal members engaged in such fishing without obtaining a permit from the State of Maine. (B. Dana Decl. ¶ 8; K. Loring Decl. (ECF No. 119-12) ¶ 6.)  State game wardens never interfered with any sustenance fishing activities pursuant to a "longstanding, informal policy" that "remains in effect." (Wilkinson Aff. (ECF No. 118-6) at PageID # 7054.)  In fact, State game wardens were rarely seen patrolling the Main Stem by tribal members fishing and trapping in the area.[26]  (See, e.g., Wilkinson Aff. (ECF No. 118-6) at PageID # 7054; L. Dana Decl. (ECF No. 124-1) ¶ 9; K. Loring Decl. (ECF No. 119-12) ¶5.)

### D.  The History of Regulation of the Main Stem

#### 1.  Regulation by the State

##### a.  Pre-Settlement Acts

The record reflects a long history of Penobscot Nation members and other residents looking to the State government to regulate the many activities occurring in the Penobscot River, including the Main Stem.  In 1790, 117 inhabitants on the Penobscot River petitioned the Massachusetts Governor and General Court, seeking legislation to protect the fish in the Penobscot River and its branches by placing limits on fishing nets and the number of days per week that fishing was permitted.  (Jt. Ex. 558 (ECF No. 108-58) at PageID # 5486-89.)  Later, in response to the January

---

[26] The Court notes that the State has submitted evidence that State game wardens patrol the Main Stem but "do not recall ever encountering a tribal member who claimed to be engaged in sustenance fishing." Georgia Decl. (ECF No. 118-4) ¶ 15.  Nonetheless, these same game wardens certainly acknowledge seeing tribal members using the river. See id. ¶¶ 8, 13, 33-40; see also Georgia Decl. (ECF No. 148-2) ¶ 9; Priest Decl. (ECF No. 148-1) at PageID # 8782-83.  Viewing the facts in the light most favorable to the Penobscot Nation, the Court can only conclude that the Maine game wardens involved have never had occasion to expressly inquire whether a tribal member was engaged in sustenance fishing, rather than commercial or recreational fishing.

1821 petition of the Chiefs of the Penobscot Indians, which had requested that the Maine Legislature restrict the weir and driftnet fisheries in the lower Penobscot River and Penobscot Bay, 176 inhabitants on the Penobscot Bay and River petitioned the Maine Legislature to complain about a variety of restrictions on their fishing, stating in part:

> Our "red brethren" have been instigated by some of their white brethren, far up the river, to make a talk about the destruction of salmon, by our expert fishermen on the big waters -- It will be found on investigation, that they have contributed their full share, to the destruction of the fish, not for their own use or consumption, but for fish merchants. When a salmon has run the gauntlet and arrived unharmed at the still waters, where the spawn is deposited, it becomes an object of solicitude; for by spearing them in these retired places, as has been the constant practice of the Indians, the destruction of a single fish is that of thousands. . . . The Indians are now reduced to a mere handful of strollers, having no regular residence and have really little or no interest in the result.

(Jt. Ex. 559 (ECF No. 108-59) at PageID # 5491-92.)

Starting in approximately 1825, the State of Maine passed legislation that authorized the construction and operation of log booms, piers, canals and dams in the Penobscot River, thereby regulating navigation on the Main Stem by non-tribal members.[27]  (See generally, e.g., P.D. Exs. 48, 50, 55, 59, 61, 71, 90-91 & 97.)

In a petition dated January 25, 1831, two Penobscot tribal leaders petitioned the Maine Governor and Council seeking fishing rights and redress for various grievances. The petition stated in pertinent part:

> 1.  There is an Island, called Shad Island, & some small ones near it, which belong to the Indians, lying just below Old town Island, where there are great conveniences for our Indians to take fish in the fishing season.  We wish to have the whole right, of taking fishing within six rods on the east side & four rids on the southerly & westerly sides of Shad Island, up as far as to the foot of Old town Island; & if anybody except Indians takes fish within the limits mentioned, he may be forced to pay five dollars.
>
>   . . . .

---

[27] When in use, booms held logs so that they covered the waters surrounding many of the islands in the Main Stem. Jt. Ex. 738 (ECF No. 110-38) at PageID #s 6450-51 & 6453.

5.   All the Island in the Penobscot River, from Old Town upwards belong to our
Tribe; . . . . Now we pray that all our Islands may be preserved and kept for the use
of us, especially as far up the West Branch as opposite Moosehead Lake.  Up the
Piscataquis to Borad Eddy; & up the East Branchy to the head of first ponds; . . . .

6.   Upon the border or margin of Oldtown Island & Orson Island, & among other
small islands of ours among them; the white people land and fasten a great many
rafts, which plagues us very much indeed. Now we pray our agent to be empowered
to take for every thousand feet of boards or other lumber landed & fastened to said
Islands two cents, for any log one cent, & if the rafts lay there two months there be
paid half as much more; & if they lay their four months, then be paid double; all be
paid at the beginning of the said periods; & if not so paid, the Indians shall be
blameless, if they set the rafts adrift.

7.   The Great Boom above Sunkhays deprives us of several Islands, spoils others by
soaking them & throwing the flood wood upon them; & as the owners make a great
deal of money; so we pray they give up the Islands to the Indians, as our rights, or
pay us twenty dollars every year.

(Jt. Ex. 548 (ECF No. 108-48) at PageID #s 5439, 5441-5442.)  In response, the Committee on

Indian Affairs reported, in relevant part:

[I]t is the duty of the Indian Agent to attend to the rights of said Indians,- to see that
there are no encroachments made by the whites upon the Indians Islands, their fishing
and other privileges, and generally to attend to all the reasonable complaints of [said]
Indians, and see that justice be done them.

(Jt. Ex. 549 (ECF No 108-49) at PageID # 5444.)  The report was approved by the Governor and

the Executive Council.  (Id.)

Between 1846 and 1883, the State of Maine passed multiple laws intended to generally

improve and regulate navigation on the Penobscot River.  (See generally P.D. Exs. 62, 68, 69, 75,

76, 78, 85 & 89.)  In 1862, the State of Maine passed a law allowing the "agent of the Penobscot

Tribe" to "lease the public farm on Orson Island" and also "lease the shores of the islands in the

Penobscot river belonging to said tribe . . . for the purpose of booming and hitching logs."  (P.D.

Ex. 66.)  In 1913, the State of Maine passed legislation that "authorized" the Penobscot Nation "to

establish and maintain a ferry across the Penobscot river" between Old Town and Indian Island.

(P.D. Exs. 95 & 99.)   In 1949, the State of Maine enacted a law to build a single lane bridge between Old Town and Indian Island.  This bridge project was paid for by the State.  (P.D. Ex. 101.)  From 1970 through 1980, state regulators and game wardens published Maine's Open Water Fishing Laws and sought to apply those laws on all areas of the Penobscot River, including the Main Stem.[28]  (P.D. Exs. 133-143.)

### b.   Post-Settlement Acts

The Settlement Acts contemplated that fishing regulations for bodies of water that ran through or bordered Indian territory would be promulgated by the Maine Indian Tribal State Commission ("MITSC").  See 30 M.R.S.A. §§ 6207(3) & 6212.  Until MITSC adopted regulations, MIA states that "all fishing laws and rules and regulations of the State shall remain applicable" in the waters within MITSC's contemplated jurisdiction.  30 M.R.S.A. §§ 6207(3).  In 1983, the Penobscot Nation asked MITSC to study the current management policies concerning Atlantic salmon, contending that the activities of the Maine Atlantic Sea-Run Salmon Commission were adversely affecting both the stocks "on the reservation" and the opportunity of the tribe to exercise its sustenance fishing rights in River. (Jt. Ex. 62 (ECF No. 103-12) at PageID # 1557.)

Since the enactment of the Settlement Acts, Maine, through DIFW, has continued to regulate boating on Maine's inland waters, including the Main Stem.  The State's boating regulations contained no special exceptions or language regarding the compliance of the Penobscot Nation or its members within the Main Stem.  (See generally State Defs. Ex. 21 (ECF No. 118-20) & P.D. Exs. 145-162.)  However, from the perspective of the Penobscot Nation, Maine's actual

---

[28] From 1820 through 1980, the Penobscot Nation did not regulate navigation by non-tribal citizens on the Main Stem. State Defs. Ex. 8 (ECF No. 118-8) at PageID # 7082.  Likewise, prior to the enactment of the 1980 Acts, the Penobscot Nation did not regulate kayaking, boating, canoeing or other forms of navigation by non-tribal members on the waters of the Main Stem.  Id.  Prior to the enactment of the 1980 Acts, the Penobscot Nation did not regulate sampling of the water, fish or wildlife by non-tribal members or the State of Maine on the waters, bed or banks of the Main Stem.  Id.

enforcement actions in the Main Stem were relatively minimal. (L. Dana Decl. (ECF No. 124-1) at PageID # 7507; T. Francis Decl. (ECF No. 124-4) at PageID # 7516.) From 1981 to the present, DIFW regulations have provided tribal members with a free license to fish, hunt and trap. (P.D. Exs. 144-66 at 859, 882, 928, 954, 980, 1012, 1049, 1102, 1140-41, 1190-91, 1262, 1331, 1377, 1422, 1461, 1506, 1549, 1594, 1641, 1686, 1700, 1759, 1820.) The Maine Warden Service's policy is to "not interfere with any Penobscot Nation member who is taking fish from the Main Stem for his or her individual sustenance." (Wilkerson Aff. (ECF No. 118-6) ¶ 14.)

The DIFW Warden Service has enforced Maine fishing and boating laws against non-tribal members on the Main Stem by issuing summonses to non-tribal members for fishing, boating, and safety violations. (State Defs. Exs. 2 & 4 (ECF Nos. 118-2 & 118-5) at PageID #s 7003 & 7014.) The DIFW Hunting Regulations Summaries from 1992 to 2013 stated the following: "The Penobscot Nation also has exclusive authority to regulate hunting and trapping in the Penobscot Reservation, consisting of all islands in the Penobscot River north of, and including, Indian Island, located near Old Town, Maine." (P.D. Exs. 188-207 at 2301, 2323, 2346, 2370, 2395, 2425, 2450, 2484, 2518, 2555, 2592, 2629, 2670, 2703, 2736, 2769, 2802, 2838, 2885-86.) The Maine open water and ice fishing regulations for April 1, 2012 to March 31, 2013 included the following language: "The Penobscot Indian Reservation includes certain islands and surrounding waters in the Penobscot River above Milford Dam." (P.D. Ex. 165 at 1803.) This language was subsequently withdrawn in the succeeding year's regulatory summary.[29] (P.D. Ex. 166 at 1861.)

Since 1985, Penobscot Nation has repeatedly applied for and received Maine-issued water quality certifications for the Penobscot Nation-owned wastewater treatment facility at Indian

---

[29] DIFW considers the language to have been a mistake and removed it the following year in the open water and ice fishing regulations effective from April 1, 2013, to December 31, 2013. See A. Erskine Aff. (ECF No. 118-3) at PageID # 7011; P.D. Exs. 166 at 1861.

Island that discharges into the Main Stem. (Jt. Exs. 523-25 & 527-28 (ECF Nos. 108-23-108-25 & 108-27-108-28).)

In 1991, the Maine Legislature enacted a law to allow the Penobscot Nation's Department of Natural Resources to engage in fish sampling using gill nets on "any waters within, flowing through or adjacent to the Penobscot Indian Nation territory . . . ." (P.D. Ex. 118 at 538 (P.L. 1991, ch. 357) (codified at 12 M.R.S.A. § 12763(2) (2005).). The State thereby gave tribal biologists the same access to gill nets that DIFW already had. This legislation had the support of the Penobscot Nation and unanimous support of MITSC. (P.D. Ex. 117 at 527-30.) In MITSC's statement in support of the legislation, the Commission explained in relevant part:

Under the Maine Indian Claims Settlement Act (30 M.R.S.A. § 6207), the Commission has exclusive authority to promulgate fishing regulations on certain bodies of water:

- Any pond (other than those wholly within Indian territory and less than 10 acres in surface area), 50% or more of which the linear shore of which is within Indian territory;
- Any section of a river or stream, both sides of which are within Indian territory; and
- Any section of a river or stream, one side of which is within Indian territory for a continuous length of ½ a mile or more.

To date, the Commission has not exercised this authority, because the Tribes and the State Department of Inland Fisheries and Wildlife both felt that state law and regulation have been sufficient. The Settlement Act provides that all state laws and regulations remain applicable until the Commission adopts its own regulations.
There is now a growing interest on the part of the Tribes to have the Commission promulgate regulations. Thus, in the coming months the Commission expects to work closely with both the Tribes and the Department of Inland Fisheries and Wildlife, as it exercises its authority for the first time.

(P.D. Ex. 117 at 527-28.)

In a letter dated November 15, 1996, from DIFW Commissioner Ray Owen to Representative Ray Biscula, Commissioner Owen listed out various actions that he suggested could lead to a better coordination and exchange of information between his Department and tribal officials. (Jt. Ex. 627 (ECF No. 109-27) at PageID # 5815-16.) Included in this list was the "annual

issuances of a scientific collection permit to the Penobscot Nation." (Id.)  The record includes a copy of one such permit issued to Penobscot Nation in 2003.  (Jt. Ex. 628 (ECF No. 109-28).) This permit designated the location where authorized activity may be conducted as "Penobscot Indian Territories" and "Streams/Rivers of the Penobscot drainage," authorized the collection of fish from the inland waters for scientific purposes, and expired on December 31, 2003.  (Id. at PageID # 5817.)  The record also includes a similar application for a permit from Penobscot Nation, dated June 3, 2007.  (Jt. Ex. 629 (ECF No. 109-29) at PageID # 5818.)  DIFW then issued a permit listing the same locations that were listed in the earlier 2003 permit.[30]  (Jt. Ex. 630 (ECF No. 109-30) at PageID # 5819.)

### 2.  Regulation by FERC

Between 1796 and 1980, several dams were constructed on submerged lands within and adjacent to the Main Stem.  Neither Penobscot Nation nor the United States acting on the Penobscot Nation's behalf granted a lease or any other interest in the submerged lands upon which any of the aforementioned dams were constructed.  See generally *Bangor Hydro-Electric Co. (West Enfield Dam)*, 43 F.P.C. 132, 132 (1970) (noting that the West Enfield Dam was constructed in 1894); *Bangor Hydro-Electric Co. (Milford Dam)*, 42 F.P.C. 1302, 1302 (1969) (noting that the Milford Dam was built in 1905 to 1906); *Great Northern Paper Co.(Mattaceunk Dam)*, 37 F.P.C. 75, 75 (1967) (noting the construction of the Mattaceunk Dam in the Main Stem was begun in 1937); *Penobscot Chemical Fibre Co. (Great Works Dam)*, 30 F.P.C. 1465, 1465 (1963) (noting that portions of the Great Works Dam, formerly in the Penobscot River at Old Town, were in

---

[30] The record also indicated that DIFW issued a Scientific Collectors Permit to the U.S. Fish & Wildlife Service on June 8, 2009, to collect bass from the Penobscot River in an area within the Main Stem.  See Jt. Ex. 702 (ECF No 110-2).

existence prior to 1861).  Because of the presence of hydroelectric dams on the Penobscot River, the Federal Energy Regulatory Commission ("FERC"), an independent federal agency, has had multiple occasions to conduct proceedings regarding licensed dams on the Penobscot River since the passage of the Settlement Acts.  The Joint Stipulated Record contains FERC submissions by various state, tribal, and federal entities and at least one FERC decision.  (See, e.g., Jt. Exs. 161, 179, 196-198, 200, 204, 207, 208, 210, 240, 471, 617, 618, 642-43, 655, 720 &728.)

As documented in FERC proceedings, the Penobscot Nation became more involved in hydroelectric relicensing based on its own interpretation of the rights it had secured under the Settlement Acts.  (See, e.g., Jt. Ex. 74 (ECF No. 103-24) at PageID # 1629; Jt. Ex. 68 (ECF No. 103-18) at PageID # 1572-88.)  In fact, by 1988, the definition of the Penobscot Indian Reservation in MIA was amended to account for some substitute lands the Penobscot Nation obtained as compensation for lands inundated by the West Enfield dam.  See P.L. 1987, ch. 712, § 1 (effective Aug. 4, 1988); see also Bangor Hydro-Electric Co. (West Enfield Dam), 27 F.E.R.C. 61467 (1984) (copy provided as Jt. Ex. 655 (ECF No. 109-55)).  The Penobscot Nation also received acknowledgment of its "critical interests in protecting the conservation of fishery resources on the Penobscot River" as part of a 1986 agreement with Bangor Hydro regarding the "West Enfield Associates" joint venture.  (Jt. Ex. 68 (ECF No. 103-18) at PageID # 1578.)

Penobscot Nation also played a key role in negotiating and managing Bangor Hydro's salmon fry stocking mitigation, which began as a result of FERC's 1984 relicensing of the West Enfield Hydropower Project and multiple amendments thereto.  (See generally Jt. Ex. 68 (ECF No. 103-18), Jt. Ex. 175 (ECF No. 104-76), Jt. Ex. 178 (ECF No. 104-78) & Jt. Ex. 248 (ECF No. 105-48).)  In 1989, the Penobscot Nation demanded in-basin stocking of Atlantic salmon fry in the Penobscot River, which was approved by FERC.  (See Jt. Ex. 248 (ECF No. 105-48) at PageID #

3296-3306.)  The Bangor Hydro Company again consulted with the Penobscot Nation, as well as State agencies and the U.S. Fish and Wildlife Service, when it sought to revise its plans for stocking Atlantic salmon fry in the Penobscot River in 1994-95.  (See P.D. Ex. 237 at 2370.)  Working alongside state and federal agencies, the record demonstrates that Penobscot Nation played an important role in managing the West Enfield Fisheries Fund through 2005 in an effort to restore anadromous fish to the Penobscot River.

With respect to the state and federal government, the FERC documents provided to the Court reflect evolving positions on the boundaries and fishing rights of the Penobscot Nation in the River.  For example, the DOI first publicly expressed its opinion that the Penobscot Indian Reservation included the bed or waters of the Main Stem in a 1995 letter to FERC.  (See Jt. Ex. 642 (ECF No. 109-42) at PageID # 5863-5864.)  By comparison, in 1993, when the DOI had occasion to analyze the status of islands located in the West Branch of the Penobscot River in connection with the relicensing of hydropower dams, the DOI explained that the Settlement Act had "extinguished all aboriginal claims to any lands or natural resources transferred from, by or on behalf of the Penobscot Nation.  25 U.S.C. § 1723. Included within this definition of transfer are any lands or natural resources over which the tribe lost dominion or control.  25 U.S.C. § 1722(n)."  (Jt. Ex. 721 (ECF No. 110-21) at PageID # 6309.)  Similarly, in 1994, the Penobscot Nation received a letter from the DOI regarding whether the Secretary of the Interior had authority to condition licenses FERC was issuing to two dams located in the west branch of the Penobscot River.  In that letter, dated March 3, 1994, the DOI indicated that the dams in the west branch of the Penobscot River were not located within the Penobscot Indian Reservation.  In reaching that conclusion, the letter explains,

Congress in 1980 intended to confirm to the Nation the reservation that it understood then existed.  In fashioning the 1980 legislation, the State of Maine and Congress recognized

37

> Penobscot ownership and control of islands in the main stem of the river, beginning at
> Indian Island and continuing north to the fork of the branches . . . .  The recognition
> provided the basis for Congress' confirmation of islands to the Nation as its reservation.
> 25 U.S.C. § 1722(i); 30 M.R.S.A. § 6203(8).  The background and history of this
> legislation, as well as its broad definition of transfer . . . , in my view, demonstrate that
> Congress considered islands located beyond the main stem to have been transferred, and
> the settlement legislation extinguished tribal claims to those transferred islands.

(Jt. Ex. 621 (ECF No. 109-21) at PageID # 5759.)

In 1995, the DOI again had an opportunity to address the boundaries of the Penobscot Indian Reservation in the context of its response to a pending FERC application by Great Northern Paper, Inc., which sought to license dams in the Lower Penobscot River.  In its December 13, 1995 letter, the DOI asserted that the Penobscot Nation retained fishing rights and other riparian rights in the Main Stem.  (Jt. Ex. 642 (ECF No. 109-42) at PageID # 5862-64.)  In this same proceeding, the State of Maine expressed the following position:

> [T]he State believes that members of the Penobscot Indian Nation have a right to take
> fish for individual sustenance pursuant to the provisions of the Maine Implementing
> Act from that portion of the Penobscot River which falls within the boundaries of the
> Penobscot Indian Reservation.  To the extent it has been argued that the Penobscots
> have no sustenance fishing rights in the Penobscot River, we disagree.

(Jt. Ex. 179 (ECF No. 104-79) at PageID # 2286.)

In a November 10, 1997 DOI letter to FERC responding to a State submission, the DOI acknowledged agreement between the State of Maine and the United States that the Penobscot Nation's sustenance fishing right was properly exercised in portions of the Penobscot River, although the DOI and Maine then disputed the scope of riparian rights afforded by Maine common law to riparian owners.  (Jt. Ex. 204 (ECF No. 105-4) at PageID # 2596-2608.)[31]

---

[31] In this same FERC proceeding, the Penobscot Nation also made a written submission asserting that the Great Northern project in fact "occup[ied] lands of the Penobscot Indian Nation."  See Jt. Ex. 110-20 (ECF No 110-20) at PageID # 6243.

Ultimately, in 1998, FERC concluded that the Penobscot Indian Reservation was not a "reservation of the United States," a status that would have triggered special consideration under the Federal Power Act.  Bangor Hydro-Electric Co. (Milford Dam), 83 F.E.R.C. 61037, 61078, 61082-090 (1998) (copy provided as Jt. Ex. 208 (ECF No. 105-8)).  Given this conclusion, FERC did not endeavor to resolve the issues regarding whether the Penobscot Indian Reservation encompassed some or all of the Main Stem waters.

### 3.  Regulation by the EPA

Beginning in the mid-1990s, the Penobscot Nation began lobbying the Environmental Protection Agency (the "EPA") for the establishment of water quality standards, particularly with respect to dioxin, that would protect the tribe's asserted right to sustenance fish in the Main Stem.  (See Jt. Ex. 170 (ECF No. 104-70) at PageID # 2224.)  This lobbying effort was in connection with the reissuance of a NPDES permit to Lincoln Pulp and Paper.  (See, e.g., Jt. Ex. 175 (ECF No. 104-75) at PageID # 2254-55.)   In the EPA's response to public comments, the EPA acknowledged that the Penobscot Nation was seeking "stringent dioxin limits" so that tribal members could "consume fish from the River without fear, consistent with the Nation's fishing rights." (Jt. Ex. 194 (ECF No. 104-94) at PageID # 2326.)  In the context of a subsequent appeal of the EPA's NPDES permit to Lincoln Pulp and Paper, by letter dated June 3, 1997, the State of Maine, through its Attorney General, wrote to the EPA, asserting that the EPA had no federal trust obligation to account for the interest of the Penobscot Nation in the Penobscot River, that the Tribe's sustenance fishing right under the Settlement Acts did "not guarantee a particular quality or quantity of fish," and that, pursuant to the 1796 and 1818 Treaties, the Penobscot Nation retained "no reservation of the River or any of its resources."  (Jt. Ex. 201 (ECF No. 105-1) at 2564-78.)  In the same proceeding, the DOI twice wrote the EPA to clarify its view that the Penobscot Nation

retained sustenance fishing rights that were properly exercised in portions of the Main Stem.  (See Jt. Ex. 203 (ECF No. 105-3) at PageID # 2591-94; Jt. Ex. 205 (ECF No. 105-5) at PageID # 2609-10.)

### E.  The Jurisdiction and Operation of the Penobscot Tribal Courts

Prior to 1979, the Penobscot Tribal Court did not exist. (Jt. Ex. 18 (ECF No. 102-18) at PageID # 1305.)  However, the Settlement Acts contemplated that certain violations of state law or tribal regulations would be handled by tribal courts.

In a memo to State and local law enforcement, dated January 29, 1981, then-Maine Attorney General James Tierney offered guidance on law enforcement on tribal lands under the Settlement Acts.  In that memo, the Penobscot Indian Reservation was generally described as "Indian Island and all the islands in the Penobscot River north of Indian Island."  (Jt. Ex. 696 (ECF No 109-96) at PageID # 6045-46.)  The memo went on to explain that additional lands acquired, as contemplated by MICSA, would become part of Indian Territory.  The memo also explained that tribal courts would have certain exclusive jurisdiction but that such jurisdiction would depend on "(1) the nature of the subject matter, (2) the tribal membership of the parties, and (3) the place where the violation, crime or dispute occurred."  (Id. at PageID # 6047.)  In summary, the memo explained that the following would be "enforced only by Tribal police" and "prosecuted only in Tribal Courts":

    (1) Commission of Class E crimes on the Reservations by Tribal members against Tribal members or the property of Tribal members;

    (2) Commission of juvenile crimes which, if committed by an adult would constitute a Class E crime, on the Reservation by juvenile Tribal members against Tribal members or the property of Tribal members;

    (3) Commission of juvenile crimes in 15 M.R.S.A. § 2103(1)(B) thru (D) by juvenile Tribal members occurring on the Reservation of the Tribe; and

    (4) Violation of Tribal Ordinances by Tribal Members within Indian Territories

(Id. at PageID # 6050.)  By comparison, the memo explained that '[v]iolations of Tribal Ordinances by non-Tribal members within Indian Territories may be enforced <u>only</u> by Tribal police and prosecuted <u>only</u> by State Courts."  (Id.)  Likewise, "[a]ll other violations of any State laws or regulations occurring on the Reservations may be enforced by either State, county or Tribal law enforcement officers" but prosecution of these violations would be "only in State Courts."  (Id.) Similarly, correspondence from Andrew Mead, Chief Justice of the Penobscot Tribal Court, dated December 4, 1981, acknowledged that under the Settlement Acts, "the Tribal Court has complete jurisdiction over . . . all Class E offenses. . . . [E]verything above Class E automatically goes to the State Court having jurisdiction."[32]  (Jt. Ex. 613 (ECF No. 109-13) at PageID # 5744.)

The summary judgment record includes materials related to a number of individual cases that have had some connection to the Penobscot Nation Tribal Court or law enforcement by Penobscot Nation Game Wardens.  The Court briefly summarizes below each of the cases contained in the record as each serves as an example of the activities and enforcement actions involving the Penobscot Nation and the Main Stem.[33]

---

[32] In 1982, Tureen, acting as an attorney for the Penobscot Nation, did request that the Attorney General consider supporting legislation that would expand the jurisdiction of triable courts to Class D offenses.  Jt. Ex. 614 (ECF No. 109-14) at PageID # 5745.

[33] The record also includes a single child support case that was handled by the Penobscot Tribal Court.  In *Montgomery v. Montgomery (*Penobscot Nation Tribal Court Docket No. 2-27-08-Civ-014), the Penobscot Nation Tribal Court ruled on a child support claim by a Penobscot Nation tribal member against a non-tribal citizen who was not living on the Penobscot Indian Reservation and had never lived on the Penobscot Indian Reservation.  Willis Aff. Exs. A (ECF No. 126-1) & B (ECF No. 126-2).  In issuing its ruling, dated July 14, 2010, the Penobscot Nation Tribal Court acknowledged that it did "not have exclusive jurisdiction over [the child support] matter under the Land Claims Settlement Act" but found it had concurrent jurisdiction to enforce Maine's state laws regarding child support.  Willis Aff. Ex. B (ECF No 126-2) at Page ID # 7544-47.  The Court considers this case to have no relevance to the issues that this Court must resolve.

1. ***Penobscot Nation v. Kirk Fields*** **(Penobscot Nation Tribal Court Criminal Action Docket Nos. 90-36 and 90-37)**

In this 1990 case, the Penobscot Nation Tribal Court adjudicated a criminal case involving a tribal member, who was recorded employing a motor boat to chase down the deer and then shooting said deer in the Penobscot River with bow and arrow.  (Jt. Ex. 86 (ECF No. 103-36) at PageID # 1698; Jt. Ex. 88 (ECF No. 103-38) at PageID # 1701; Jt. Ex. 93 (ECF No. 103-43) at PageID #s 1708-09.)   The incident took place in the River between the mainland town of Greenbush and Jackson Island and was reported to state game wardens.  (Jt. Ex. 85 (ECF No. 103-35) at PageID # 1697; Loring Decl. (ECF No. 119-12) ¶ 12; see also Jt. Ex. 302, ECF No. 106-2 at PageID # 3939 (map of Penobscot River showing Jackson Island).)  The state game warden who initially took the report of Kirk's illegal deer hunting, contacted tribal game wardens.  (Jt. Ex. 85 (ECF No. 103-35) at PageID # 1697; Jt. Ex. 87 (ECF No. 103-37) at PageID # 1699.)   After an initial joint investigation, the state turned jurisdiction over to Penobscot Nation wardens for prosecution in the Tribal Court.  (Jt. Ex. 85 (ECF No. 103-35) at PageID # 1697; Jt. Ex. 87 (ECF No. 103-37/119-16) at Page ID # 1699; Loring Decl. (ECF No. 119-12) ¶ 12 & Exs. B-D.)

2. ***Penobscot Nation v. David Daigle*** **(Penobscot Nation Tribal Court Criminal Action Docket No. 95-143 & 144)**

On June 11, 1994, David Daigle was charged with two violations of Maine state law, namely, Operating a Watercraft While Under the Influence (12 M.R.S.A. § 7801-9) and Failure to Comply with Duty to Submit (12 M.R.S.A. § 7801-9A).  Charges were brought in Penobscot Tribal Court.  The parties stipulated that the offenses charged occurred "within the area from the shore to the thread of the Penobscot River in an area between two islands in the Penobscot River, both of

which are within the area defined as the 'Penobscot Indian Reservation'." (Jt. Ex. 159 at PageID # 2192.)

Daigle sought dismissal of the charges arguing that the Tribal Court lacked jurisdiction over an offense committed on the River. (Jt. Ex. 125 (ECF No. 104-25) at PageID #s 2038-41.) Penobscot Nation opposed the motion arguing that its jurisdiction was established by retained aboriginal title and its riparian rights as island owners. (Jt. Ex. 129 (ECF No. 104-29) at PageID # 2073-76.) In a decision dated October 16, 1994, Chief Judge Growe of the Penobscot Tribal Court concluded that the Tribal Court did have jurisdiction, citing both the tribal court's reading of the Settlement Acts and the riparian ownership rights generally accorded to the owner of land adjoining a fresh water river under Maine law. (Jt. Ex. 159 (ECF No. 104-59) at PageID # 2193-95.)

### 3. *Penobscot Nation v. Coffman et al.* (Penobscot Nation Tribal Court Civil Action Docket Nos. 7-31-03-CIV-04)

The Daigle decision was later cited in the case of Penobscot Nation v. Coffman. The Coffman case arose out of a July 2003 incident in which the Penobscot Nation learned that Ralph Coffman (a non-tribal member) and his daughter (a tribal member) had salvaged 60 sunken logs from the bed of the Main Stem. (Jt. Ex. 709 (ECF No. 110-9) at PageID # 6175-78.) As a result of the dispute over logs salvaged from the Main Stem, the Penobscot Nation Tribal Council ordered that Ralph Coffman be removed and barred from the Penobscot Indian Reservation effective August 1, 2003. (Jt. Ex. 242 (ECF No. 105-42) at PageID # 3222.) Upon Ralph Coffman's appeal of the removal order, the Penobscot Nation successfully argued to the Tribal Court that the Tribal Court had no jurisdiction or authority to review actions of the Penobscot Nation Chief and Tribal Council with respect to the removal and banishment of nonmembers from the reservation. (Jt. Ex.

43

242 (ECF No. 105-42) at PageID #3224-37; Jt. Ex. 710 (ECF No. 110-10) at PageID # 6192.)  In addition to removing Coffman, the Penobscot Nation filed a declaratory judgment action against Coffman, a non-tribal member, in Penobscot Tribal Court in order to gain possession of the logs. (Jt. Ex. 242 (ECF No. 105-42) at PageID # 3243-46.)  The Penobscot Nation asserted that it retained aboriginal ownership of the Main Stem, limited only by the right of the public to use the river for navigation, but denied that aboriginal ownership has the same meaning as fee title.  (Jt. Ex. 709 (ECF No. 110-9) at PageID # 6185-87.)  The Penobscot Nation also argued that the Penobscot Nation's Tribal Court has concurrent (if not exclusive) jurisdiction with the State courts over a variety of reservation disputes, such as contract, tort or property rights disputes between Indians and non-Indians.  (Id. at PageID # 6180-84.)  In a judgment dated March 2, 2005, the Penobscot Nation's Tribal Court concluded: "the Penobscot Tribal Court retains jurisdiction to decide property disputes arising on lands of the Penobscot reservation, even if the dispute involves a non-Indian party."[34]  (Jt. Ex. 246 (ECF No 105-46) at PageID # 3290.)  The Tribal Court then found that logs harvested from the Main Stem were the rightful possession of the Penobscot Nation and thereby determined that Coffman, a non-tribal member, had no right to own and possess the salvaged logs.[35]  (Jt. Ex. 246 (ECF No 105-46) at PageID # 3290-91.)

---

[34] The State of Maine was not a party to the Coffman litigation but was aware of the action given the parallel related litigation in the state court.  See Jt. Ex. 241 (ECF No. 105-41) at PageID # 3206 (Coffman's Maine District Court complaint against Penobscot Nation for forcible entry and detainer).

[35] In the only other example of salvage logging in the record currently before the Court, Wendell Scott apparently sought and received permits from both the federal and state government to salvage logs from the Penobscot River; the federal permission from the Army Corps of Engineers noted that Scott would need to seek permission from the Penobscot Nation for "operations on Penobscot Indian Nation lands."  (Jt. Ex. 171 (ECF No. 104-71) at PageID # 2226; Jt. Ex. 704 (ECF No. 110-4) at PageID # 6155.)

**4.** *Penobscot Nation v. Nathan Emerson & Tyler Honey* **(Penobscot Nation Tribal Court Criminal Summons)**

On September 5, 2009, a Penobscot Tribal Warden issued summonses to non-tribal members Nathan L. Emerson and Tyler J. Honey to appear in Penobscot Tribal Court for "[h]unting waterfowl [without] a [tribal] permit" on the Main Stem, specifically on the Penobscot River near Milford. (Jt. Ex. 701 (ECF No. 110-1) at Page ID # 6151.) The Director of the Penobscot Nation Department of Natural Resources, John Banks, was advised of these summonses via a memo from Penobscot Nation Game Warden Timothy Gould, in which Gould recounted that he had seen Emerson and Honey exit their boat and assume positions along the shore of an unnamed island in the Main Stem. (Jt. Ex. 699 (ECF No. 109-99) at PageID # 6145-46.) The record contains no additional information regarding the disposition of these summonses.

**5.** *State of Maine v. Miles Francis* **(Maine District Court Criminal Summons)**

In August 3, 1996, DIFW Wardens Georgia and Livezey were patrolling the Penobscot River in a boat in the area of Orson Island and Marsh Island. (Jt. Exs. 645 (ECF No. 109-45) at Page ID # 5877; Jt. Ex. 646 (ECF No. 109-46) at Page ID # 5878.) On this patrol, they issued a summons to Miles Francis, a tribal member, for the violation of Maine's headway speed laws. (Jt. Ex. 647 (ECF No. 109-47) at Page ID # 5879.) Penobscot Nation Counsel Mark Chavaree asserted that the appropriate forum to hear charges against Miles Francis was the Penobscot Nation Tribal Court and took the opportunity to note that "[t]he Penobscot Nation claims ownership of the entire bed of the [Main Stem]" and alternatively that the reservation "at the very least" extends "to the thread of the river surrounding our reservation islands." (Jt. Ex. 644 (ECF No. 109-44) at PageID # 5874.) In a further response to the summons issued to Miles Francis, Penobscot Nation Representative Paul Bisulca sent a letter to DIFW Commissioner Owen expressing the Nation's

45

concerns about DIFW enforcement actions against members of the tribe and informing him that tribal wardens were instructed to begin enforcing headway speed violations on the Penobscot River in order "to protect the integrity of [the Penobscot Nation] Reservation."  (Jt. Ex. 181 (ECF No. 104-81) at PageID # 2297-98.)

### F.  Post-Settlement Act Funding from the Federal Government

With the passage of the Settlement Acts, the Penobscot Nation became eligible to apply for funding through multiple programs run through the DOI's Bureau of Indian Affairs ("BIA"). By letter dated October 31, 1980, federal funds were requested for the development of a water resource conservation and utilization plan that would involve "a complete and in-depth inventory and analysis of the chemical, biological, and physical make-up for the [Penobscot] [R]iver." (Jt. Ex. 51 (ECF No. 103-1) at PageID # 1516.)  In this letter, then-Governor Timothy Love described the Penobscot Indian Reservation as "all the islands in the Penobscot River and its branches north of and including, Indian Island at Old Town" and sought funds to inventory of water resources on the river within "Estimated Water Miles 2600." (Id.)  For Fiscal Year 1984, BIA awarded the Penobscot Nation a contract in excess of $1.2 million to run "reservation programs," included among those programs were monies that would "continue efforts to provide and improve the Atlantic salmon fishery in the Penobscot River around Indian Island." (Jt. Ex. 65 (ECF No. 103-15) at PageID # 1566.)   The contract also specified that the Penobscot Nation would be "coordinating and cooperating" with DIFW and the Maine Atlantic Sea-Run Salmon Commission. (Id.)  Similar fisheries work was contemplated under the contracts for fiscal years 1986 and 1987. (See Jt. Ex. 69 (ECF No. 103-19) at PageID # 1591-94; Jt. Ex. 71 (ECF No. 103-21) at PageID # 1598-1602.)   The Penobscot Nation's contract for fiscal year 1989 allotted over $200,000 for

46

wildlife management and noted the continued development of a fisheries management program "for the Tribal reservation (Penobscot River) and newly acquired trust lands." (Jt. Ex. 83 (ECF No. 103-33) at PageID # 1662-63.)

In Fiscal Year 1993, the Penobscot Nation received funding for its water resources management program, which include monitoring of the Penobscot River.[36]  (Jt. Ex. 97 (ECF No. 103-47) at PageID # 1720-35.)  In relevant part, the scope of work for this project explained that "the Penobscot Nation has retained fishing rights through treaties" that applied to the Penobscot River.  (Id. at PageID # 1725.)  Similarly, the proposal submitted by the Penobscot Nation for EPA funding for water quality monitoring described the reservation as consisting of "all the islands of the Penobscot River (north of and including Indian Island) and appurtenant water rights, including fishing.  Tribal members use the Penobscot River and its islands for fishing, hunting, trapping, recreation, gathering, and spiritual and cultural activities.  As a riverine tribe with close spiritual and cultural ties to the river, [the Penobscot Nation] believes that clean water is of central importance."  (Jt. Ex. 108 (ECF No. 104-8) at PageID # 1975.)

In 1999, the Penobscot Nation applied for and received $19,700 to study and educate tribal members on the risk of consuming contaminated fish.  (See Jt. Ex. 211 (ECF NO 105-11) at PageID # 2715-23).  The summary for this funding explains in relevant part:  "[T]he members of the Penobscot Nation have continuously exercised their legally protected fishing rights.  Fish harvested from the Penobscot River and other waters provide necessary sustenance to tribal members."  (See id. at PageID # 2720.)  Between Fiscal Years 1999 and 2006, the Penobscot Nation ultimately received over $1 million in EPA funding for programs focused on water quality;

---

[36] This contract came after the Maine Legislature enacted a law to allow the Penobscot Nation to engage in certain types of fish sampling regarding "any waters within, flowing through or adjacent to the Penobscot Indian Nation territory…."  P.L. 1991, ch. 357 (effective June 18, 1991) (codified at 12 M.R.S.A. § 12763(2) (2005)), P.D. Ex. 118, 538.

much of the funded work centered on the Penobscot River.  (Jt. Ex. 222 (ECF No. 105-22) at PageID # 2845-57.)  In 2007 and 2010, the Penobscot Nation also sought and received funding for game warden patrols acknowledging that the tribe patrolled in the Penobscot River.  (See Jt. Exs. 256 (ECF No. 105-56) & 266 (ECF No. 105-66).)

In connection with the pending litigation, the Penobscot Nation has applied to the DOI for $179,400 to pay for attorneys' fees and support in order to litigate the scope of the Penobscot Nation's reservation and jurisdiction.  The BIA has also provided litigation support costs to the Penobscot Nation in these amounts: $96,000 in a November 14, 2011 contract; and $50,000 in a June 25, 2013, contract modification.  (Jt. Ex. 636 (ECF No. 109-36) at PageID # 5825-52; Jt. Ex. 637 (ECF No. 109-37) at Page ID # 5832-55; State Defs. Ex. 7 (ECF No. 118-7) at Page ID # 7061.)  When initially seeking this funding in 2010, the Penobscot Nation's Chief Kirk Francis informed the DOI that the Penobscot Nation had no intention of relinquishing its authority to regulate hunting, trapping, and taking of wildlife in the Penobscot River.  (Jt. Ex. 636 (ECF No. 109-36) at PageID # 5826.)  Chief Francis attached to his letter requesting funding a copy of the summonses to Penobscot Tribal Court that had been issued to non-tribal members Emerson and Honey and informed the DOI that the Penobscot Nation expected that similar enforcement would be required when the hunting season begins in the fall.  (Id.)


III.     DISCUSSION

The questions presented by the cross-motions for summary judgment are questions of statutory construction.  Statutory construction necessarily begins "with the language of the statute itself."  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985)); see also State of R.I. v. Narragansett Indian

Tribe, 19 F.3d 685, 699 (1st Cir. 1994) ("In the game of statutory interpretation, statutory language is the ultimate trump card.").  "If the statute's language is plain, 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"  In re Rudler, 576 F.3d 37, 44 (1st Cir. 2009) (quoting Lamie v. United States, 540 U.S. 526, 534 (2004)) (additional citations omitted); see also Summit Inv. & Dev. Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995) ("'Literal' interpretations which lead to absurd results are to be avoided.").  When the plain language of the text is ambiguous, the Court may attempt to interpret the statute using various intrinsic and extrinsic aids.  In doing so, the Court first looks to intrinsic aids, such as titles and other language and punctuation within the statute itself.  See 2A Sutherland Statutory Construction § 47:1 (7th ed.) ("[I]ntrinsic aids generally are the first resource to which courts turn to construe an ambiguous statute.").  When the examination of the whole statute does not clarify the apparent ambiguity in question, the Court may then look to legislative history as an extrinsic aid.  See generally 2A Sutherland Statutory Construction § 48:1 (7th ed.).  Ultimately,

> [t]he chief objective of statutory interpretation is to give effect to the legislative will. To achieve this objective a court must take into account the tacit assumptions that underlie a legislative enactment, including not only general policies but also preexisting statutory provisions.  Put simply, courts must recognize that Congress does not legislate in a vacuum.

Passamaquoddy Tribe v. Maine, 75 F.3d 784, 788-89 (1st Cir. 1996) (internal citations omitted); see also 2A Sutherland Statutory Construction § 45:5 (7th ed.) ("[T]he essential idea that legislative will governs decisions on statutory construction has always been the test most often declared by courts.").

Beyond the general canons of statutory construction, the Court also necessarily acknowledges that special canons of construction are applicable to interpretation of statutes related to tribal matters:

First, Congress' authority to legislate over Indian affairs is plenary and only Congress can abrogate or limit an Indian tribe's sovereignty. See U.S. CONST., art. I, § 8, cl. 3; Morton v. Mancari, 417 U.S. 535, 551–53 (1974) (discussing the plenary power of Congress to deal with special problems of Indians); see also F. Cohen, *Handbook of Federal Indian Law* 231 (1982 ed.) ("Neither the passage of time nor apparent assimilation of the Indians can be interpreted as diminishing or abandoning a tribe's status as a self governing entity."). Second, special rules of statutory construction obligate us to construe "acts diminishing the sovereign rights of Indian tribes . . . strictly," Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir. 1994), "with ambiguous provisions interpreted to the [Indians'] benefit," County of Oneida v. Oneida Indian Nation of New York, 470 U.S. 226, 247, (1985). These special canons of construction are employed "in order to comport with the[ ] traditional notions of sovereignty and with the federal policy of encouraging tribal independence," White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143–44, (1980), and are "rooted in the unique trust relationship between the United States and the Indians," County of Oneida, 470 U.S. at 247.

Penobscot Nation v. Fellencer, 164 F.3d 706, 709 (1st Cir. 1999). However, these special rules of construction may be inapplicable when Congressional intent is clear. Passamaquoddy Tribe v. Maine, 75 F.3d 784, 793 (1st Cir. 1996) ("If ambiguity does not loom, the occasion for preferential interpretation never arises.").

With these canons in mind, the Court must undertake a construction of MICSA and MIA; two statutes that that Law Court has indicated "quite precisely laid out the relationship thenceforth to obtain between the Penobscot Nation and the State of Maine" while "set[ting] up a relationship between the tribes, the state, and the federal government different from the relationship of Indians in other states to the state and federal governments." Penobscot Nation v. Stilphen, 461 A.2d 478, 487 & 489 (Me. 1983), appeal dismissed 464 U.S. 923 (1983).

Recognizing that a number of issues have been raised by the filings and briefing in this case, the Court held oral argument in part to clarify what issues the Court must resolve. Before identifying the legal issues that require resolution, it is worthwhile to note some of the issues that are not before this Court. First, the Court is not resolving the right to regulate water sampling or the right to regulate discharges by towns or non-tribal entities that currently discharge into the

Penobscot River.  At oral argument, counsel for the Penobscot Nation acknowledged that the tribe is not claiming any such rights in this case.  (10/14/15 Transcript (ECF No. 156) at PageID #s 8956-57 & 8960-61.)  Likewise, the Penobscot Nation is not claiming a right to regulate fishing by nontribal members in the Main Stem.    (See id. at PageID #s 8958-59.)   The Court also concludes that it need not and should not resolve whether the Penobscot Nation has a right to summons nontribal members to appear before tribal courts for violations of state or tribal laws.[37] (See id. at PageID # 8972 ("[The United States'] reading of the Maine Implementing Act is that we don't see how [the Penobscot Nation] could be able to hail a nonmember into tribal court.") Additionally, the Court finds it need not separately address issues related to hunting and trapping. In the Court's view, MIA provides clear guidance on hunting and trapping once the boundaries of the Penobscot Indian Reservation are resolved.

Thus, the discussion that follows will not address any of the just-listed issues.  Putting those issues aside, the Court concludes that two issues must be resolved:  (1) the boundaries of the Penobscot Indian Reservation within the Main Stem and (2) the limits of the sustenance fishing rights of the Penobscot Nation in this same area.

**A.  The Differing Positions of the Parties Seeking Summary Judgment**

It is a helpful starting point to briefly lay out the differing views of the parties on these issues:

---

[37] The Court recognizes that State Defendants are seeking a resolution of this issue and have placed facts involving at least four prior cases in which non-tribal members were summonsed to appear before the Penobscot Nation Tribal Court.  However, in the Court's view, issues regarding the proper exercise of tribal jurisdiction in an individual case are inevitably fact-specific and should be raised in the context of the case in which jurisdiction is allegedly being improperly exercised.  Asking this Court to review the exercise of jurisdiction by another court long after final judgment has entered raises a myriad of issues, including res judicata and various abstention doctrines.  Therefore, the Court has determined that issues of tribal jurisdiction cannot and need not be adjudicated on the record presented.

### 1.  Penobscot Nation's Position

The Penobscot Nation asserts that it has retained aboriginal title to the waters and river bed of the Main Stem.  (Pl. Mot. (ECF No. 128-1) at 48.) As a result, it posits that the boundaries of the Penobscot Indian Reservation are actually the river banks found on either side of the Main Stem.  According to the tribe, these boundaries result in the Penobscot Nation having exclusive authority within its Main Stem reservation to regulate "hunting, trapping, and other taking of wildlife for the sustenance of the individual members of . . . the Penobscot Nation." (Pl. Reply (ECF No. 152) at 27 (internal quotation marks omitted).)

The Penobscot Nation also takes the position that any non-tribal use of the river portions of the Main Stem is allowed pursuant to the "right to pass and repass any of the rivers, streams and ponds, which run through the lands [of the Penobscot Nation] for the purpose of transporting . . . timber and other articles."  (P.D. Ex. 8 at 46.).  Thus, they do not claim that their rights in the waters of the Main Stem include the right to exclude non-tribal members from these waters.[38]

### 2.  United States' Position

The United States joins the Penobscot Nation is asserting that "the Main Stem falls within the bounds of the Nation's Reservation."  (U.S. Mot. (ECF No. 120) at 14.)  Alternatively, the United States asserts that the boundaries of the Penobscot Indian Reservation extend to the threads of the channels surrounding its islands.[39]  (U.S. Mot. (ECF No. 120) at 54-55; 10/14/15 Tr. (ECF

---

[38] Despite this concession, the Court notes that finding the Penobscot Indian Reservation stretches from the bank-to-bank of the Main Stem would require the Court to adjudicate the riparian rights of every landowner along the Main Stem.  Such an adjudication would require joinder of multiple riverfront landowners who are not currently involved in this litigation.  See infra n. 47.

[39] With respect to nontidal navigable rivers, since at least 1849, Maine has recognized a common law rule that "riparian proprietors own to the thread of fresh water rivers."  Brown v. Chadbourne, 31 Me. 9, 9 (1849); see also Pearson v. Rolfe, 76 Me. 380, 385-86 (1884) (explaining that in non-tidal, floatable streams, riparian rights include ownership of "the bed of the river to the middle of the stream" but do not include the right to block public passage);  Warren v. Thomaston, 75 Me. 329 (1883).

No. 156) at PageID# 8971.) According to the United States, these riparian rights around the islands of the Main Stem create virtual halos of water in which the tribe may exercise of sustenance fishing in accordance with 30 M.R.S.A. § 6207(4).  Because of the common law public servitudes on the riparian rights, the United States acknowledges that the Penobscot Nation does not have the ability to exclude non-tribal members from entering these areas to "fish, fowl, or navigate" or engage in any other public right that the Law Court might later determine falls within the public easement.[40] Under this riparian-rights approach, the United States posits that the area in which the Penobscot Nation may engage in sustenance fishing does not include the entire "bank-to-bank" of the Main Stem, but rather is limited to the halos around the islands.

### 3.  State Defendants' Position

Contrary to the arguments pressed by the United States, the State Defendants take the positon that island owners in a navigable river generally have no riparian rights:

> Under principles of Maine property law, the *riverside* owners of a nontidal, navigable river own the submerged lands to the centerline or "thread" of the river, unless the deed clearly states otherwise.

(State Defs. Mot. (ECF No. 117) at 38 & n. 43; see also State Defs. Response (ECF No. 142) at 45.)[41]   Given this position on the Maine common law, the State Defendants assert that the Penobscot Indian Reservation includes none of the waters surrounding the islands.  However, at

---

[40]       Public servitude on riparian property along tidal water, great ponds, or navigable streams may be summarized as the public right to fish, fowl, and navigate . . . .  The Maine Supreme Judicial Court, sitting as the Law Court, has interpreted "fish, fowl, and navigate" to encompass skating, digging worms, clamming, floating logs, landing boats, mooring, and sleigh travel, among other activities. These public servitudes, which evolved from commercial use, do not involve any depletion or damage to soil or chattels and do not include the right of the public to wash, swim, picnic, or sunbathe.

Donald R. Richards & Knud E. Hermansen, Maine Principles of Ownership Along Water Bodies, 47 Me. L. Rev. 35, 46-47 (1995) (footnotes omitted).

[41] In maintaining this position, the States' motion papers simply ignore Skowhegan Water-Power Co., 47 A. 515 (Me. 1900) (finding that island landowner in the Kennebec River acquired the rights of a riparian owner) and Warren v. Westbrook Manufacturing Co., 86 Me. 32 (1893) (holding that island owners had rights to the thread of the channel).

oral argument, the State did concede that Penobscot Nation did have a right to "access the navigable portion of the stream" from its islands.  (10/14/15 Tr. (ECF No. 156 at PageID # 8989.)

In its briefs and at oral argument, the State Defendants proffered two arguments to avoid an absurd reading of section 6207(4), under which the Penobscot Nation would have a right to "take" fish only in an area widely acknowledged to not have any fish.  First, , the State Defendants suggests that there is no case or controversy with respect to the sustenance fishing rights of the Penobscot Nation given the State's longstanding, informal policy of allowing sustenance fishing in the Main Stem.  (See State Defs. Response (ECF No. 142) at 6; 10 /14/15 Tr. (ECF No. 156) at PageID #s 8983-85 & 8994.)    Second, they assert that the sustenance fishing provision makes sense as applied to the reservations of other tribes with claims settled by MIA and MICSA.

With the three differing positions summarized, the Court turns to the statutory construction questions at hand.

### B.  The Boundaries of the Penobscot Indian Reservation

MICSA expressly defines "Penobscot Indian Reservation" as "those lands as defined in the Maine Implementing Act."  25 U.S.C. § 1722(i).  MIA, in its definitional section, expressly defines the "Penobscot Indian Reservation" as "the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818."  30 M.R.S.A. § 6203(8).

There is, in the Court's view, no ambiguity in these definitions.  Rather, the language plainly defines the Penobscot Indian Reservation as the islands in the Main Stem, which the Penobscot Nation had retained since the 1818 Treaty.  MICSA is explicitly silent on the issue of any waters being included within the boundaries of the Penobscot Indian Reservation because

§ 1722(i) speaks only of "lands."  By contrast, § 1722(b) specifically defines the phrase "land and natural resources" as "any real property or natural resources, or any interest in or right involving any real property or natural resources, including but without limitation minerals and mineral rights, timber and timber rights, water and water rights, and hunting and fishing rights." 25 U.S.C. § 1722(b).  Thus, § 1722(i)'s use of the word "lands," instead of the more broadly defined phrase "land and natural resources," appears to reflect a Congressional focus on defining only what land would make up the "Penobscot Indian Reservation."

With respect to MIA, looking only at the plain language of section 6203(8), the position taken by the Penobscot Nation would require this Court to read "the islands in the Penobscot River" as "the islands ***and*** the Penobscot River."  Such a reading is implausible on its face, as it changes the plain meaning of a simple word, "in," and thereby significantly alters the meaning of section 6203(8).[42]  Additionally, reading section 6203(8) to include the waters of the Main Stem requires the Court to disregard the statute's use of the term "solely."  See Vance v. Speakman, 409 A.2d 1307, 1310 (Me. 1979) ("As this Court has repeatedly declared, 'An elementary rule of statutory construction is that words must be given their common meaning unless the act discloses a legislative intent otherwise.'") (citing and quoting Hurricane Island Outward Bound v. Town of Vinalhaven, 372 A.2d 1043, 1046 (1977)).

Even if there were any arguable ambiguity in the plain definitional language of section 6203(8), the record provided to this Court includes ample evidence that the waters of the Main

---

[42] The 1988 amendment of 30 M.R.S.A. § 6203(8) further supports the reading that MIA's definitional section intended to deal with land only.  Pursuant to that amendment, land "that have been or may be acquired by the Penobscot Nation from Bangor Pacific Hydro Associates as compensation for flowage of reservation lands by the West Enfield dam" was added to the definition of "Penobscot Indian Reservation."  Law 1987, c. 747, § 1.  Implicit in this amendment is the suggestion that when islands in the Main Stem became submerged as a result of this dam, the Penobscot Nation had lost part of its reservation and should be allowed to replace it with additional land obtained "as compensation." If section 6203(8) was intended to include the waters of the Main Stem, flowage would not result in the loss of designated reservation space.

Stem have been treated and regulated like all other portions of the Penobscot River since Maine became a state in 1820.  Likewise, the undisputed record supports the view that at the time of the passage of the 1980 Settlement Acts, no one expressed the view that passage of the Settlement Acts would change the ownership of the waters of the Main Stem or that the Settlement Acts intended to recognize an aboriginal title in the Main Stem waters.[43]   (See, e.g., Jt. Ex. 732 (ECF No. 110-32) Map 30 (showing the islands of the Main Stem designates as "Indian Reservation" and the Main Stem waters as "river . . . adjacent to Settlement Lands").)

In short, the Court concludes that the plain language of the Settlement Acts is not ambiguous.  The Settlement Acts clearly define the Penobscot Indian Reservation to include the delineated islands of the Main Stem, but do not suggest that any of the waters of the Main Stem fall within the Penobscot Indian Reservation.  That clear statutory language provides no opportunity to suggest that any of the waters of the Main Stem are also included within the boundaries of the Penobscot Indian Reservation.  Further, even if the Court were to deem the language of MIA and MICSA ambiguous on this point, the Court finds that the available intrinsic evidence as well as the extrinsic evidence in the legislative history similarly supports a finding that the legislative intent of MIA and MICSA was to set the borders of the islands in the Main Stem as the boundaries of the Penobscot Indian Reservation in this portion of the Penobscot River.

---

[43] By contrast, Plaintiffs' arguably strongest undisputed extrinsic evidence that MIA should be read to include the waters of the Main Stem are statements made post-passage.  See, e.g., Jt. Ex. 80 (ECF No. 103-30) at PageID # 1652 (2/16/1998 Ltr. from Tierney indicating that the Penobscot Nation's proposed fishing in Main Stem "would not be prohibited" under the express terms of 30 M.R.S.A. § 6207(4), which allows "sustenance fishing" that occurs "within the boundaries of" the Penobscot Reservation); Jt. Ex. 161 (ECF No. 104-61) at PageID # 2200 (10/1/1995 Ltr. from Katz dismissing the argument that MIA can be read to mean that "[o]nly the islands and none of the waters in the Penobscot River constitute the Penobscot Reservation."); Pearson Decl. (ECF No. 119-37) at PageID # 7363.

### C.      Sustenance Fishing by the Penobscot Nation

Having determined that the Court must endorse the plain meaning of section 6203(8), the

Court next considers another section of MIA, "Regulation of fish and wildlife resources."   30

M.R.S.A. § 6207.  This section contains explicit sustenance fishing rights for the Penobscot Nation

and the Passamaquoddy Tribe:

> **Sustenance fishing within the Indian reservations.** Notwithstanding any rule or
> regulation promulgated by the commission or any other law of the State, the members
> of the Passamaquoddy Tribe and the Penobscot Nation may take fish, within the
> boundaries of their respective Indian reservations, for their individual sustenance
> subject to the limitations of subsection 6.

30 M.R.S.A. § 6207(4).[44]  The same section also defines "fish":

> As used in this section, the term "fish" means a cold blooded completely aquatic
> vertebrate animal having permanent fins, gills and an elongated streamlined body
> usually covered with scales and includes inland fish and anadromous and
> catadromous fish when in inland water.

30 M.R.S.A. § 6207(9).

Given section 6207's focus on the regulation of fishing and hunting, subsection nine's

carve out for sustenance fishing appears designed to position sustenance fishing outside the bounds

of regulation by the State or MITSC and thereby provide broad protection for tribal sustenance

fishing.  In fact, the undisputed record is replete with evidence that members of the Penobscot

Nation have continuously sustenance fished in the waters of the Main Stem both prior to the

Settlement Acts and after the enactment of the Settlement Acts.  See supra II.C.  However, unless

---

[44] The Court notes that the United States previously attempted to have section 6207(4) interpreted by the Law Court
in connection with a review of the Maine Board of Environmental Protection's decision to conditionally approve an
Bangor Hydro-Electric Company's plan for the Basin Mills Dam.  See Atl. Salmon Fed'n v. Bd. of Envtl. Prot., 662
A.2d 206, 211 (Me. 1995).  The Law Court then determined that arguments that the conditional license "violates the
Penobscot Indian Nation's reserved fishing rights established by 30 M.R.S.A. § 6207(4)" had not been properly
reserved for review on appeal.  Id.; see also Jt. Exs. 98 (ECF No. 103-48) (BEP public hearing transcript), Defs. Ex.
30 (ECF No. 141-11) (11/10/93 BEP decision on Basin Mills Hydro Project).

the waters of the Main Stem are inside the boundaries of the Penobscot Indian Reservation, the policy expressed in section 6207(4) actually contradicts this longstanding practice of a sustenance fishing in the Main Stem. To be clear, this difference between the written policy and the historical practice pre-dates the passage of MIA's section 6207(4). In fact, when passing MIA, the State simultaneously repealed 12 M.R.S.A. § 7076(9)(B), which had then afforded "special privileges" to Indians, including in relevant part: "the right of Indians to take fish and wildlife for their own sustenance on their own reservation lands." See Laws 1979, ch. 732, Sec. 6. By its terms, this prior statute allowed for sustenance fishing "on . . . reservation lands," but it was apparently understood and accepted that the Penobscot Nation sustenance fished in the waters of the Main Stem under this prior statute.

When 12 M.R.S.A. § 7076(9)(B) was replaced, in relevant part, with MIA's section 6507(4), nothing in the legislative history suggested that anyone thought they were substantively changing the sustenance fishing rights of the Penobscot Nation. (See, e.g., P.D. Ex. 276 at 4132 (Statement of Mr. Patterson: "Currently under Maine Law, the Indians can hunt and fish on their existing reservation for their own sustenance without regulation of the State. That's a right which the State gave to the Maine Indians on their reservations a number of years ago and the contemplation of this draft was to keep in place that same kind of right and provide that the Indians could continue to sustenance hunt and fish . . . ."). Rather, both the State and the Penobscot Nation understood that the Penobscot Nation's sustenance fishing rights would remain the same. But, it was understood that, by including those rights in the Settlement Acts, those rights could not be readily changed by some later State legislative action. Likewise, all sides were aware that but for the tribal sustenance fishing exception, MIA would mandate uniform fishing regulations for all,

58

with the regulations for all fishing grounds of significant size, including the entirety of the Penobscot River, promulgated by either the State or MITSC.[45]  See 30 M.R.S.A. § 6207.

Given the longstanding differences in the language of the sustenance fishing provisions and the accepted practices in the Main Stem, the Court readily finds the language of section 6207(4) to be ambiguous.  This ambiguity is reinforced by the three different positions asserted by the Penobscot Nation, the United States and the State Defendants, each of whom claim their position is supported by the language and history of the Settlement Acts.

The State Defendants suggest that this ambiguity can be resolved, and absurd results avoided, if the Court interprets section 6207(4) to mean that members of the Penobscot Nation may engage in sustenance fishing in the Main Stem so long as they cast their reel or net from one of the Nation's islands in the Main Stem.  To state the obvious, a fish swimming in the Main Stem would not actually be "within the boundaries of [the reservation]" when taken.  Thus, the State Defendants are not simply promoting a plain reading of section 6207(4).  Notably, under the State Defendants' proposed interpretation of section 6207(4) sustenance fishing in the Main Stem could not be done from a boat.  (See 10/14/15 Tr. (ECF No. 156) at PageID # 8991 ("MR. REID: As a matter of law, as a matter of statute it appears that they can't [fish from a boat]."))  At oral argument, the Court described this interpretation as only allowing only sustenance fishing in the Main Stem when a tribal member has "one foot on the island." [46]  (See id. at 56-57, 60.)

_____

[45] Tribal regulation of fishing was expressly limited to ponds that were less than ten acres in surface area and contained "wholly within Indian territory."  See 30 M.R.S.A. § 6207(1)(B).  Thus, even a great pond or portion of a river located within a reservation would be subject to MITSC regulation, not tribal regulation.  See id. at § 6207(3).  Additionally, Maine's Commissioner of DIFW retained the ability to step in if remedial measures were needed to secure any state fishery.  See 30 M.R.S.A. §§ 6207(1), (3) & (6).

[46] The Court is concerned that the logical extension of the State Defendants' proposed interpretation would result in a situation in which a hunter or trapper who keeps "one foot in the water" of the Main Stem somehow would not be hunting or trapping on the Penobscot Indian Reservation even though the bird or other animal being hunted is clearly located on land designated as a portion of the Reservation.

On the record presented to this Court, the State Defendants' proposed resolution of any absurd or ambiguous readings of section 6207(4) finds no support in the legislative record. There is no evidence that the Maine Legislature, Congress, or the Penobscot Nation intended for the Settlement Acts to change and further restrict the already long-accepted practice of Penobscot Nation members sustenance fishing in the Main Stem, such that tribal members would need to have at minimum one foot on an island and could no longer sustenance fish from boats in the Main Stem. Thus, this Court cannot endorse the State Defendant's proffered construction of section 6207(4) as a reflection of the legislative will. Additionally, the Court cannot accept the State Defendants' proffered interpretation as feasible under the special statutory canons that require the Court to read ambiguous provisions in a manner that narrowly diminishes the retained sovereignty over tribal sustenance fishing.

The Court also cannot allow the State to sidestep interpretation of section 6207(4). The State's assertion that it has no plans to discontinue its informal, longstanding policy of allowing sustenance fishing on the Main Stem does not obviate the need for this Court to clarify the scope of the sustenance fishing right guaranteed under MIA. The Settlement Acts were intended to secure certain rights for each tribe involved, and the Penobscot Nation has genuinely disputed the State's contention that sustenance fishing bank-to-bank is a mere favor that the State is free to continue or discontinue granting at its discretion.

Plaintiffs take an entirely different tack; they essentially assert that the rules of statutory construction require the Court to apply an identical meaning to "the boundaries of the [Penobscot Nation] Indian reservation[ ]" in section 6207(4) and the definitional provision of section 6203(8). Thus, to avoid an interpretation that would deprive the Penobscot Nation of any viable space for sustenance fishing, Plaintiffs urge the Court to place all or some of the waters of the Main Stem

within the boundaries of the reservation.  The Court certainly recognizes that the general rules of statutory construction dictate that defined terms should have the same definitions throughout an entire statute.  See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2004-05 (2012)  ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.") (internal quotations and citations omitted).  But, in the Court's assessment here, application of this canon would require the Court to disregard multiple other canons of statutory construction and the entirety of the available legislative history on the Settlement Acts.[47]

In deciding how to avoid the untenable and absurd results that flow from applying a singular definition of reservation in sections 6203(8) and 6207(4), the Court is reminded that MIA's "Definitions" section notes that the definitions laid out in section 6203 apply to the whole act "unless the context indicates otherwise."  30 M.R.S.A. § 6203.  On the issue of sustenance fishing, the context does indicate otherwise.  The current undisputed record shows a long history of Penobscot Nation members sustenance fishing the entirety of the Main Stem and an intention on the part of the Maine Legislature, Congress and the Penobscot Nation to maintain this status quo with the passage of the Settlement Acts.  In fact, this status quo was maintained in practice and it was only in the context of this litigation that the State took the position that sustenance fishing rights in the Main Stem were not guaranteed under MIA.

---

[47] To the extent that the Penobscot Nation seeks a declaration that the Penobscot Indian Reservation includes the Main Stem waters bank-to-bank, the Court notes that it agrees with State Defendants that such a declaration could only be made if any and all land owners along the Main Stem who might claim riparian rights were joined as parties.  See State Defs. Mot. (ECF No. 117) at PageID #s 6899-6902 & Fed. R. Civ. P. 19(a)(1).  This necessary joinder would involve hundreds of additional land owners and presumably title insurance companies.  See State Defs. Mot. (ECF No. 117) at PageID # 6900.  In addition to whatever case management challenges such a case would present, a case involving hundreds of parties—each with a unique title and the potential to impair each of those titles—is precisely what the Settlement Acts were designed to preclude.

In Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918), the Supreme Court confronted a situation somewhat similar to the one presented here. In that case, Congress had designated the "the body of lands known as the Annette Islands" as a reservation of the Metlakahtla Indians. See id. at 86 (quoting section 15 of the Act of March 3, 1891, c. 561, 26 Stat. 1101 (Comp. St. 1916, § 5096a)). Presented with a dispute as to whether the reservation included navigable waters around the islands, the Supreme Court took a pragmatic view: "The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation." Id. at 89. The Court also invoked the special canons of construction related to tribal matters and looked at the conduct of the tribe and the public since the creations of the Annette Islands reservation. In light of these considerations, the Supreme Court concluded that the reservation necessarily included the waters around the islands.

The Penobscot Nation cites the Alaska Pacific Fisheries case in support of its claim that section 6203(8) can be read to place the waters of the Main Stem within the Penobscot Indian Reservation. (See Penobscot Nation Mot. for S.J. (ECF No. 128-1) at 44-46.) In the Court's assessment, this argument is an overreach because the Court has found that 6203(8) is susceptible to a plain language interpretation. However, having found section 6207(4) to be ambiguous, Alaska Pacific Fisheries provides on-point precedent for interpretation of an ambiguous statutory provision related to a reservation. Considering all of the factors considered by the Supreme Court in Alaska Pacific Fisheries, this Court concludes that section 6207(4) must be read to allow the Penobscot Nation's longstanding, continuous practice of sustenance fishing in the waters adjacent to its island reservation. In the absence of any evidence suggesting that sustenance fishing has in

the past only occurred or been allowed in designated sections of the Main Stem, the Court finds that section 6207(4) allows the Penobscot Nation to sustenance fish in the entirety of the Main Stem subject only to the limitation of section 6207(6).[48]

Ultimately, the present dispute is not a disagreement about if or how members of the Penobscot Nation have sustenance fished in the Main Stem or whether they should be allowed to continue sustenance fishing in the Main Stem.  It amounts to a disagreement as to the import of the Penobscot Nation's sustenance fishing in the Main Stem both before and after the passage of the Settlement Acts.  The Penobscot Nation believes that sustenance fishing in the Main Stem reflects their retained aboriginal title as confirmed in the enactment of the Settlement Acts.  The United States believes that sustenance fishing in the Main Stem is somehow a unique riparian right of the Penobscot Nation under the terms of the Settlement Acts.  The State has evolved into a belief that this sustenance fishing is permissible by the good graces of the State under an informal policy that has given a broad reading to an otherwise very narrow statutory right.  The Court disagrees with all of these theories.

In the Court's final assessment, the plain language of section 6207(4) is ambiguous, if not nonsensical.  Because the Court must interpret this ambiguous provision to reflect the expressed legislative will and in accordance with the special tribal canons of statutory construction, the Court cannot adopt an interpretation of section 6207(4) that diminishes or extinguishes the Penobscot

---

[48] The Court certainly recognizes that the United States has argued that any ambiguity in section 6207(4) is best resolved by reading section 6203(8) to take the boundaries of the Penobscot Indian Reservation to the threads of the River around each island in its Reservation.  While this is a Solomonesque approach to resolving this dispute, it lacks support in the legislative history or the actual sustenance fishing practices as described in the record.  The Court also notes that the State maintains that this approach finds no support in Maine's common law.  But see supra n. 39.  Additionally, the Court recognizes that such a "halo" approach would create a myriad of enforcement issues that are not contemplated or addressed by the Settlement Acts.  The Court notes that nothing in this decision should be read as deciding whether the Penobscot Nation has common law riparian rights as an island owner in the Penobscot River.  Rather, the Court has determined that regardless of the resolution of that common law riparian rights question, the legislative intent contained in section 6207(4) was to provide the Penobscot Nation sustenance fishing rights in the entirety of Main Stem, not simply to the threads around their individual islands.

Nation's retained right to sustenance fish in the Main Stem.  Rather, the Court concludes that the Settlement Acts intended to secure the Penobscot Nation's retained right to sustenance fish in the Main Stem, as it had done historically and continuously.

## IV.  CONCLUSION

For the reasons just stated, each motion for summary judgment (ECF Nos. 117, 120, 121/128-1) is GRANTED IN PART AND DENIED IN PART.  The Court ORDERS that declaratory judgment enter as follows:

(1)  in favor of the State Defendants to the extent that the Court hereby declares that the Penobscot Indian Reservation as defined in MIA, 30 M.R.S.A. § 6203(8), and MICSA, 25 U.S.C. § 1722(i), includes the islands of the Main Stem, but not the waters of the Main Stem; and

(2)  in favor of the Penobscot Nation and the United States to the extent that the Court hereby declares that the sustenance fishing rights provided in section 30 M.R.S.A. § 6207(4) allows the Penobscot Nation to take fish for individual sustenance in the entirety of the Main Stem section of the Penobscot River.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 16th day of December, 2015.